# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| NORTH PENN TOWNS, LP, directly and as assignee of PHILMONT COUNTRY CLUB | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. _____ |
| | : | |
| v. | : | **Jury Trial Demanded** |
| | : | |
| CONCERT GOLF PARTNERS, LLC, PETER NANULA, CONCERT PHILMONT, LLC, CONCERT PHILMONT PROPERTIES, LLC, RIDGEWOOD REAL ESTATE PARTNERS, LLC, RIDGEWOOD PHILMONT, LLC, JONATHAN GREBOW, and MICHAEL PLOTNICK | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff, North Penn Towns, LP, directly and as assignee of Philmont Country Club, by and through its undersigned counsel, hereby brings this civil action against Defendants Concert Golf Partners, LLC, Peter Nanula, Concert Philmont, LLC, Concert Philmont Properties, LLC, Ridgewood Real Estate Partners, LLC, Ridgewood Philmont, LLC, Jonathan Grebow, and Michael Plotnick, and in support thereof, avers as follows:

### Jurisdiction and Venue

1.      This civil action arises out of, among others, federal antitrust laws, including the Sherman Act and Clayton Act, 15 U.S.C. § 1, *et seq*.  The Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964 in that certain of the claims arise under the laws of the United States. The Court has subject matter jurisdiction over other claims pursuant to 18 U.S.C. § 1367 under the Court's supplemental jurisdiction.

2.      Additionally, the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship between Plaintiff and the Defendants and the amount in controversy is in excess of $75,000.00.

3.      Venue is proper in this District under and pursuant to 18 U.S.C. § 1965, and pursuant to 28 U.S.C. § 1391, in that a substantial part of the events giving rise to the claims alleged in this Complaint occurred in this District.

## The Parties

4.      Plaintiff, North Penn Towns, LP ("NPT"), is a limited partnership organized and existing under the laws of the Commonwealth of Pennsylvania with its principal office located at 1030 Reed Avenue, Suite 100, Wyomissing, Pennsylvania 19610.

5.      Each of NPT's partners is a Pennsylvania citizen.

6.      Plaintiff is assignee of the claims set forth in this action by Philmont Country Club. A copy of the assignment agreement between Plaintiff and Philmont Country Club is attached hereto as Exhibit 1.

7.      Philmont Country Club ("Philmont NPC") is a non-profit corporation organized and existing under the laws of the Commonwealth of Pennsylvania and at all relevant times hereto maintained an office or place of business located at 301 Tomlinson Rd., Huntingdon Valley, Pennsylvania 19006.

8.      Defendant Concert Golf Partners, LLC ("CGP") is a limited liability company organized and existing under the laws of the state of California with an office or place of business located at 1 Coastal Oak, Newport Beach, California 92657.

9.      The sole member of CGP is Defendant Peter Nanula.

2

10.     Defendant Peter Nanula is an adult individual residing at 1 Coastal Oak, Newport Beach, California 92657.

11.     Defendant Concert Philmont, LLC ("Concert Philmont") is a limited liability company organized and existing under the laws of the state of Delaware with an office or place of business located at 1 Coastal Oak, Newport Beach, California 92657.

12.     Defendant Concert Philmont Properties, LLC ("Concert Philmont Properties") is a limited liability company organized and existing under the laws of the state of Delaware with an office or place of business located at 1 Coastal Oak, Newport Beach, California 92657.

13.     The sole member of both Concert Philmont and Concert Philmont Properties is FC Golf Partners II, LP, a Delaware limited partnership with an office or place of business located at 701 Fifth Avenue, Suite 7400, Seattle, Washington 98104.

14.     Upon information and belief, and after reasonable investigation, none of FC Golf Partners II, LP's partners are citizens of the Commonwealth of Pennsylvania.

15.     The general partner of FC Golf Partners II, LP is FC Golf GP II, LLC, a Delaware limited liability company with an office or place of business located at 701 Fifth Avenue, Suite 7400, Seattle, Washington 98104.

16.     Upon information and belief, and after reasonable investigation, none of FC Golf GP II, LLC's members are citizens of the Commonwealth of Pennsylvania.

17.     The managing members of FC Golf GP II, LLC are (1) Defendant Peter Nanula and (2) Freestone Investments, LLC, a Delaware limited liability company with an office or place of business located at 701 Fifth Avenue, Suite 7400, Seattle, Washington 98104.

18.     Upon information and belief, and after reasonable investigation, none of Freestone Investments, LLC's members are citizens of the Commonwealth of Pennsylvania.

19.     Defendant Ridgewood Real Estate Partners, LLC ("Ridgewood") is a limited liability company organized and existing under the laws of the state of New Jersey with an office or place of business located at 25A Hanover Road, Suite 310, Florham Park, NJ 07932.

20.     The members of Ridgewood are Defendant Jonathan Grebow, a citizen of the state of New Jersey, and Ronni Grebow, a citizen of the state of Florida.

21.     Defendant Ridgewood Philmont, LLC ("Ridgewood Philmont") is a limited liability company organized and existing under the laws of the state of New Jersey with an office or place of business located at 25A Hanover Road, Suite 310, Florham Park, NJ 07932.

22.     The sole member of Ridgewood Philmont is Ridgewood Golf, LLC a limited liability company organized and existing under the laws of the state of New Jersey with an office or place of business located at 25A Hanover Road, Suite 310, Florham Park, NJ 07932.

23.     Upon information and belief, and after reasonable investigation, Ridgewood Golf, LLC is not a citizen of the Commonwealth of Pennsylvania.

24.     Defendant Jonathan Grebow is an adult individual residing at 31 Morningside Drive, Livingston, New Jersey 07039.

25.     Grebow is, and was at all relevant times, the President and CEO of Ridgewood.

26.     Defendant Michael Plotnick is an adult individual residing at 2057 Elizabeth Ave., Scotch Plains, New Jersey 07076.

27.     Plotnick is, and was at all relevant times, the Vice President of Ridgewood.

**Factual Background**

28.     Philmont NPC owned and operated a members-only country club also bearing the name Philmont Country Club ("Philmont Club") located in Huntingdon Valley, Pennsylvania.

4

29.     Philmont Club was founded in 1906 and consisted of, among other amenities, two eighteen (18) hole golf courses (the "North Course" and "South Course"), tennis courts, a swimming pool, and a clubhouse.

30.     By the early 2000s, Philmont NPC found itself in poor financial and physical shape.

31.     To raise money for much-needed capital improvement projects to Philmont Club's facilities, Philmont NPC decided to sell nine of the eighteen holes comprising the South Course (the "Property") to a residential real estate developer.

32.     To that end, Philmont NPC entered into an agreement to sell the Property to homebuilder Toll Brothers on or about November 6, 2013.

33.     But, the agreement with Toll Brothers terminated on or about July 22, 2014.

**A.     The NPT Agreement of Sale**

34.     On or about May 15, 2015, Philmont NPC entered into an agreement of sale with homebuilder NVR, Inc. ("NVR") to sell NVR the Property.

35.     Although NVR builds homes, it does not engage in property development—that is, the process of taking raw land and readying it for home construction, including, but not limited to, grading the land and installing infrastructure such as sewer and electrical lines.

36.     Accordingly, as was permitted by the agreement of sale, NVR assigned the agreement of sale to NPT, a property developer, who would develop the Property into developed lots and sell the lots to NVR.

37.     On July 22, 2015, NPT and NVR entered into a Lot Purchase Agreement (the "LPA") under which NVR agreed to purchase developed lots created from the Property from NPT.

38.     The next day, July 23, 2015, NPT and Philmont NPC entered into an agreement of sale (the "AOS") whereby Philmont agreed to sell the Property to NPT.  A copy of the AOS is attached hereto as Exhibit 2.

39.     Specifically, under the AOS and LPA, NPT would purchase the Property from Philmont NPT, obtain development approvals from the Lower Moreland Township (the "Township"), develop the Property into individual development lots ("Units"), and sell the improved and developed Units to NVR who would then construct homes and sell them to consumers.

40.     The purchase price for the Property set forth in the AOS was based on a per Unit yield ($75,308.64 per Unit approved for development by the Township).  Ex. 2, § 2(a).

41.     Although the final Unit yield of the Property could vary somewhat based upon several factors, the AOS anticipated approvals for 162 Units and contemplated a minimum yield of 150 Units.  Ex. 2, § 2(a).

42.     Accordingly, the AOS set forth an anticipated purchase price of $12,200,000 based on a 162 Unit yield with a minimum purchase price of $11,296,296 (based on a minimum yield of 150 Units).  Ex. 2, § 2(a).

43.     The AOS provided NPT with a ninety (90) day "Due Diligence Period" during which NPT was permitted to conduct commercially reasonable studies on the Property and could terminate the AOS for any reason.  Ex. 2, § 13.

44.     Shortly after the execution of the AOS, it was discovered that recent changes in Township zoning regulations meant that the Property could only yield a maximum of 105 Units.

45.     Through the Due Diligence Period and due diligence in the Toll Brothers deal, it was also known that there were certain environmental conditions with the Property that would

need to be remedied before the Property could be developed, namely high levels of mercury and arsenic as a result of decades of pesticide use.

46.     Purchasing the Property at the price of 150 Units while only obtaining 105 Units, especially in light of the environmental contamination, was not economically viable for NPT and the revenue from 105 units was not sufficient to serve Philmont NPC's purposes in selling the Property.

47.     Put simply, selling the Property for a potential Unit yield of only 105 Units was not a viable option to solve Philmont NPC's financial issues.

48.     Accordingly, NPT and Philmont NPC agreed to extend the Due Diligence Period for NPT and Philmont NPC to seek zoning relief from the Township which would permit the development of 162 or more Units.

49.     To that end, NPT and Philmont NPC executed a series of eight amendments to the AOS that extended the Due Diligence Period to September 26, 2017.  A copy of the eight amendments is attached hereto as Exhibit 3.

50.     During the extended Due Diligence Period, NPT engaged in extensive communications and discussions with the Township about potential changes to the development plans for the Property which the Township would find agreeable and warrant zoning relief to allow 162 or more Units.

51.     The Township expressed concerns about the impact any development on the Property would have on the school system and roadway traffic congestion.

52.     NPT thus engaged in discussions with the Township about making the development age restricted (meaning no residents under the age of nineteen (19)) as opposed to market rate

(meaning the homes could be sold to any purchaser) as well as making a $1,000,000 contribution to roadway improvements to increase the Unit yield.

53.     Additionally, NPT had discussions with the Township about Philmont NPC deed restricting approximately twenty-two (22) acres of property from further development to meet the Township's open space requirements for development.

54.     But, the change of the development to age restricted brought about new concerns.

55.     Specifically, to make an age restricted development marketable, the development must include a clubhouse, which was anticipated to cost approximately $1,600,000.

56.     Thus, if the Unit yield could be increased to 160 or more, it would come at an additional cost of approximately $2,600,000, not including the environmental remediation costs.

57.     On September 7, 2016, NPT, NVR, and Philmont NPC held an in person meeting to determine the allocation of the $2,600,000 increased cost such that the parties could modify the AOS and LPA and move forward with seeking zoning relief to increase the Unit yield to make the development of the  Property a viable option.

58.     At that time, NPT and Philmont NPC reached an agreement in principle whereby Philmont NPC would provide NPT with a $375,000 purchase price credit (subject to decrease if the clubhouse came in under budget) and an additional potential price reduction up to $151,543.20 depending on the number of Units approved.

59.     Over the following days, NPT and Philmont NPC worked to reduce the agreement to a writing which culminated in a proposed Ninth Amendment to the AOS.  A copy of the Ninth Amendment is attached hereto as Exhibit 4.

**B.      CGP Enters the Picture**

60.      On August 30, 2016, longtime Philmont NPC and Philmont Club member David Fields had a thirty-five (35) minute phone call with Nanula about CGP's potentially investing in Philmont Club to assist Philmont NPC with its pressing financial needs.

61.      Nanula expressed interest in Philmont Club and, following the call, sent an email to Fields requesting various pieces of information about Philmont Club including "A summary of your current real estate deal and the Toll deal."  A copy of Nanula's August 30, 2016 email is attached hereto as Exhibit 5, at PCC-1050.

62.      Fields called Philmont NPC's President, Glenn Meyer, and asked if Meyer would be interested in pursuing discussions with CGP.  Meyer said yes.

63.      Fields then forwarded Nanula's email to Philmont NPC's Treasurer, Sam Silverman.  Ex. 5.

64.      On September 10, 2016, Silverman provided Nanula with the requested information and noted that it would be easier to provide a summary of the NPT real estate deal verbally since Philmont NPC was "in the process of receiving an amendment to the [AOS] that will better clarify the details."  Ex. 5, at PCC-1048-49.

65.      Nanula forwarded the information to CGP's Director of Acquisitions, Tom Moran, to prepare a pro forma analysis of Philmont Club.

66.      Nanula followed up with several additional questions on September 12, 2016 to which Silverman provided answers that same day.  Ex. 5, at PCC-1046-48.

67.      On September 19, 2016, Nanula asked for additional information including "any and all details on the pending NVR deal for the South Course acreage" and pledged to provide Philmont NPC with a proposal for CGP's investment in Philmont Club.  Ex. 5, at PCC-1045.

68.     That same day, Meyer and Nanula had a twenty-two (22) minute phone call so that Meyer could "update [Nanula] on the real estate deal."  Ex. 5, PCC-1044.

69.     During the call, Nanula explained to Meyer the typical process for CGP's acquisition of a country club and conveyed preliminary terms upon which CGP would be interested in purchasing Philmont Club.  Dep. Tr. Nanula, 215:22-217:17, attached hereto as Exhibit 6.

70.     The terms Nanula conveyed to Meyer were that CGP would pay off Philmont NPC's debt, make a few million dollars' worth of capital improvements to Philmont Club, and, upon the sale of the Property, use the sale proceeds for additional capital improvements.  *Id.*

71.     The following day, after Moran provided Nanula with a preliminary analysis of Philmont Club's finances, Nanula wrote to Moran:

> Plenty for now.  This deal will be long and slow.
> They are under contract with our pals at NVR homes to sell off 9 of
> their 36 holes for $12.2m.  Not sure how they would sell the club to
> us, and let us have the real estate upside.  Trying for that.  Enough
> work on the pro forma for now.

A copy of Nanula's September 20, 2016 email is attached hereto as Exhibit 7, at 2CGP012895.

## C.     Ridgewood Enters the Picture

72.     In late 2014, Plotnick began sending Meyer periodic introductory emails to see if Philmont NPC was interested in discussing a potential transaction with Ridgewood.

73.     Plotnick sent these emails on December 8, 2014, October 15, 2015, and March 16, 2016 but Meyer did not respond to any of Plotnick's inquiries.

74.     Plotnick attended an industry conference in Texas from September 14, 2016 to September 16, 2016 where he met John Brown, whose company, Brown Golf Management, had been hired by Philmont NPC to manage Philmont Club.

75.     Plotnick expressed interest to Brown about discussing any potential opportunity for Ridgewood to become involved with Philmont Club.  A copy of the email exchange between Plotnick and Brown is attached hereto as Exhibit 8.

76.     Brown spoke with Meyer about his discussions with Plotnick and Meyer agreed to speak to Plotnick.  Ex. 8.

77.     With the introduction made by Brown, Plotnick reached out to Meyer by email on September 23, 2016.  A copy of the email chain between Meyer and Plotnick is attached hereto as Exhibit 9.

78.     Meyer and Plotnick spoke on the phone that same day for nearly forty (40) minutes and thereafter arranged for Plotnick and Ridgewood's CEO, Jonathan Grebow, to visit Philmont Club with Meyer on September 27, 2016.  Ex. 9.

**D.     AOS Terminates**

79.     Although NPT and Philmont NPC reached an agreement on September 7, 2016 to move forward with the AOS as intended, issues remained between NPT and NVR regarding necessary modifications to the LPA to account for the change of the development to age restricted and the increased costs associated with the addition of a clubhouse and roadway improvements.

80.     While NPT and Philmont NPC worked towards memorializing the September 7, 2016 agreement and NPT and NVR worked to modify the LPA, NPT and Philmont NPC executed a Seventh Amendment to the AOS on September 9, 2016 to extend the Due Diligence Period to September 16, 2016 and an Eighth Amendment on September 16, 2016 extending the Due Diligence Period to September 26, 2016.

81.     As of September 22, 2016, Meyer and Silverman were prepared to re-enter into a new agreement with NPT under similar terms as the AOS as intended to be modified by the terms

11

of the Ninth Amendment should the AOS need to be terminated as a result of an inability to modify the LPA to address the issues with Unit yield.  A copy of the September 22, 2016 email chain between Meyer and Silverman is attached hereto as Exhibit 10.

82.     On September 24, 2016, the day after Meyer spoke to Plotnick, however, Meyer told Philmont NPC's counsel that "After further thought, we have decided to let the [AOS] expire and evaluate our position rather than continue to negotiate with NVR."  A copy of Meyer's September 24, 2016 email is attached hereto as Exhibit 11, at PCC-7793.

83.     Meanwhile, NPT and NVR came to terms on an amendment to the LPA and NPT executed the Ninth Amendment and sent it to Philmont NPC for counter signature.

84.     But, Philmont NPC refused to execute the Ninth Amendment.

85.     It was known and understood that absent Philmont NPC's execution of the Ninth Amendment, NPT would have no reasonable option but to terminate the AOS to save NPT's deposit money.

86.     NPT terminated the AOS on September 26, 2016.

**E.     Post AOS Occurrences**

87.     With the AOS terminated, Philmont NPC pursued separate discussions with NPT, Ridgewood, ***and*** CGP about a sale of the Property and/or the entirety of Philmont Club.

88.     NPT did not know at the time Philmont NPC was having separate discussions with either Ridgewood or CGP.

89.     On September 27, 2016, NPT discussed terms of the deposits NPT would make to Philmont NPC should the AOS be re-entered into.  A copy of Mike Tulio's September 27, 2016 email is attached hereto as Exhibit 12.

90.    Also on September 27, 2016, Meyer met with Plotnick and Grebow at Philmont Club about Ridgewood's interest in the Property.

91.    Plotnick and Grebow pledged to provide Philmont NPC with a proposal for a transaction. A copy of Plotnick's September 27, 2016 email is attached hereto as Exhibit 13.

92.    Eventually, however, Ridgewood told Philmont NPC that it was no longer interested in purchasing the Property as the ability to obtain approvals for 162 Units was speculative and the risks associated with the development of the Property were too high.

93.    In other words, Ridgewood expressed doubt that it, or any other developer, would be able to obtain sufficient confidence in the feasibility of the profitable development of the Property such that purchasing the Property could be justified.

**F.    Sale of Philmont Club to Concert Philmont**

94.    Keeping in line with his September 20, 2016 statement to Moran that "This deal will be long and slow," Nanula waited until November 1, 2016 to provide Philmont NPC with a formal written proposal for CGP's purchase of the entirety of Philmont Club. A copy of the November 1, 2016 proposal is attached hereto as Exhibit 14.

95.    Meanwhile, Philmont NPC's financial condition continued to deteriorate.

96.    The primary terms of the proposal were for CGP to (1) pay off Philmont NPC's approximately $1,000,000 in debt immediately, (2) make $4,000,000 in capital improvements to Philmont Club, and (3) upon the sale of the Property, make an additional $5,000,000 in capital improvements. Ex. 14.

97.    Additionally, CGP pledged that Philmont Club would "remain an exclusive private club with at least 27 holes [of golf] after the South Course real estate transaction." Ex. 14.

98.     Nanula purposely crafted CGP's proposal to roughly align the amount of the cash infusion from CGP with the amount that Philmont NPC would receive under the AOS.

99.     The advantage to selling Philmont Club to CGP rather than selling the Property to NPT, as touted by CGP, was that CGP would immediately purchase Philmont Club and worry about obtaining development approvals for the Property later whereas NPT, as with any developer, was only willing to pay full price for the Property upon obtaining development approvals which may never come.

100.    In fact, CGP's website notes "we pride ourselves on quickly and discreetly closing golf transactions on an all-cash basis" and lists as one of its main selling points that it "only require[s] 30 days for due diligence and 5 days to close." A printout of CGP's website is attached hereto as Exhibit 15.

101.    Meyer responded to Nanula's proposal by stating "I thought upon closing the real estate transaction we would have the full proceeds of the sale available towards capital improvements but I'm seeing only $5M listed." A copy of the email chain is attached hereto as Exhibit 16, at PCC-1331.

102.    Nanula responded by stating that the sale of the Property may never occur, and the terms of the proposal balanced out that risk by allowing CGP to recover some of its initial investment if the Property were sold. Ex. 16.

103.    Nanula's response was in line with his statement when transmitting the proposal that CGP must "assume no real estate transaction might ever be possible, due to the environmental remediation vagaries and cost; the extensive infrastructure costs for the Philmont Ave. intersection project; and the Town approval uncertainties." Ex. 16.

104.   On November 17, 2016, Meyer sent a letter to Philmont NPC's membership informing them of the terms of CGP's proposal, including the "Guarantee of maintaining 27 holes of golf after the South Course land is sold."  A copy of the November 17, 2016 letter is attached hereto as Exhibit 17.

105.   Nanula assisted Meyer in writing the November 17, 2016 letter and approved of its contents before it was sent to Philmont NPC's membership by Meyer.

106.   A townhall style meeting was held on December 12, 2016 at Philmont Club during which Nanula presented his pitch to Philmont NPC's membership for why they should accept CGP's offer and answered questions the members had about CGP and the deal.

107.   Nanula did not express any changes to the terms of CGP's November 1, 2016 offer.

108.   On January 19, 2017, Philmont NPC's Board of Directors voted to approve the proposed Purchase and Sale Agreement (the "PSA") that had been negotiated by Philmont NPC's and CGP's counsel in the prior weeks and a required vote of Philmont NPC's membership was scheduled.

109.   CGP insisted that the PSA be kept confidential.

110.   Accordingly, Philmont NPC members were only permitted to view the fifty (50) plus page PSA in person at Philmont Club beginning on or about January 19, 2017, and were prohibited from reproducing the PSA in any manner or taking any notes on the PSA.

111.   Philmont NPC members were thus unable to obtain any independent legal or other advice on the PSA before voting on whether to agree to sell Philmont Club to CGP.

112.   Rather than purchasing Philmont Club directly, CGP incorporated Concert Philmont and Concert Philmont Properties on January 23, 2017 as single purpose entities to make the purchase.

113.    CGP initially contemplated Concert Philmont Properties taking title to the Property and Concert Philmont taking title to the remainder of Philmont Club.

114.    On February 1, 2017, Philmont NPC's membership voted to approve the PSA and the sale of Philmont Club to CGP.

115.    The PSA was executed on February 6, 2017.

116.    Closing on the PSA took place on or about March 1, 2017.

117.    Because more was required for title to the Property to be separated from title to the remainder of Philmont Club than CGP initially thought, the entirety of Philmont Club was conveyed to Concert Philmont.

118.    Accordingly, Concert Philmont owns the entirety of Philmont Club but intends to convey the Property to Concert Philmont Properties in the future.

119.    On March 2, 2017, Ridgewood Philmont and Concert Philmont Properties entered into a Development Services Agreement (the "DSA") pursuant to which Ridgewood Philmont became responsible for obtaining development approvals for, marketing, and selling the Property to a developer.

120.    Ridgewood Philmont is a single purpose entity created by Ridgewood for the purpose of entering into the DSA.

**G.    Ridgewood and CGP Plot to Acquire Philmont Club Cheap**

121.    On March 3, 2017, NPT initiated a lawsuit against CGP and Philmont NPC in the Montgomery County Pennsylvania Court of Common Pleas at Case No. 2017-04395 (the "Original Action") alleging, among others, tortious interference with contract against CGP and breach of contract against Philmont NPC.

122.     Discovery in the Original Action yielded significant information about CGP's actions leading up to the sale of Philmont Club to Concert Philmont of which Philmont NPC was not aware.[1]

123.     Unknown to Philmont NPC until discovery in the Original Action, Nanula and Plotnick met at the same conference in Texas from September 14, 2016 to September 16, 2016 at which Plotnick met Brown.

124.     During that conference, Plotnick and Nanula discussed Ridgewood's and CGP's working together on future country club acquisitions that would involve excess land that could be developed for residential purposes.

125.     After touring Philmont on September 27, 2016, Plotnick and Grebow decided to try to partner with a gold course operator, such as CGP, so as to better position Ridgewood to be able to purchase Philmont Club.

126.     Nanula and Meyer had an eighteen (18) minute phone call on October 10, 2016.

127.     Immediately upon hanging up with Meyer, Nanula called and spoke to Plotnick for forty-two (42) minutes.

128.     By October 21, 2016, Ridgewood and Nanula were exchanging terms of the deal that would ultimately become the DSA.  A copy of Plotnick's October 21, 2016 email is attached hereto as Exhibit 18.

129.     Plotnick, with Grebow's knowledge, input, and approval, proposed that, in exchange for Ridgewood's paying half of the costs of obtaining development approvals, obtaining development approvals, and finding a buyer for the Property, Ridgewood would receive half of

---

[1] The documents and communications that follow, as well as Exhibit 7, began being produced by Ridgewood on October 18, 2018 pursuant to a subpoena served by NPT and by CGP on January 11, 2019 after voluminous discovery motions filed by NPT and court orders compelling production by CGP.

the sales price of the Property above the costs of obtaining development approvals plus $5,000,000. Ex. 18.

130.    Ridgewood suggested that $5,000,000 from the sale of the Property be reinvested in Philmont Club as capital expenditures.  Ex. 18.

131.    Nanula then incorporated that suggestion into his November 1, 2016 written proposal to Philmont NPC.  Ex. 14.

132.    Nanula forwarded Plotnick's October 21, 2016 email to Nick Cicero, a partner at Freestone Capital Management—the entity that is ultimately responsible for managing the various entities that provided the financing for Concert Philmont's purchase of Philmont Club.  A copy of Nanula's email chain with Cicero is attached hereto as Exhibit 19.

133.    Nanula explained to Cicero that Ridgewood was talking to Philmont NPC about purchasing the Property, but that Nanula "told them to back off completely so [Nanula] can buy the whole Club and then deal them in as our real estate partner."  Ex. 19, at 2CGP027014.

134.    Nanula, who orchestrated the terms of the DSA with Plotnick and Grebow, asked Cicero for his insight on "why do we need Ridgewood at all? They are not putting up any real capital at all here."  *Id.*

135.    In agreement, Cicero responded that the return to be given to Ridgewood "seems awfully high instead of just some set fee that is relatively nominal" and that "we know some age-restricted developers already that I'm sure can assist with that sort of entitlement work."  *Id.*, at 2CGP027012.

136.    Nanula responded: "Yes, but this firm is in advanced talks with [Meyer] about buying this 35 acre parcel from the club . . . So getting them to back off to a small fee will be difficult."  *Id.*, at 2CGP027011.

18

137.    Even with giving Ridgewood an "awfully high" rate of return, Nanula noted that the sale of the Property "[j]uices our normal deal returns nicely."  *Id.,* at 2CGP027014.

138.    Yet, Nanula told Meyer that CGP had to "assume that no real estate transaction might ever be possible," Ex. 16, at PCC-1332, and that "about $5m is all [CGP] could afford to plow back" into Philmont Club if the Property could ever be developed and sold.  A copy of Nanula's November 2, 2016 email to Plotnick is attached hereto as Exhibit 20, at 2CGP016515.

139.    Nanula also suggested to Philmont NPC that absent CGP's involvement, it would take four (4) to five (5) years to get development approvals, if at all, during which time Philmont NPC would "bear all the risks and costs during the process – while trying to sustain the club."  Ex. 16, at PCC-1331.

140.    On November 2, 2016, after speaking to Meyer about CGP's November 1, 2016 proposal to purchase Philmont Club, Nanula emailed Plotnick telling him about the offer and Meyer's protest about why only $5,000,000 from the sale of the Property would be reinvested into Philmont Club.  Ex. 20.

141.    Nanula told Plotnick that he believed Meyer "may come back to you, and ask for $7m instead of $5m.  For now, I hope you guys will stand back, profess some concerns about the real estate risks, and just wait to see if I can strike a better deal for all of us here."  Ex. 20, at 2CGP016515.

142.    Nanula followed up his email just a few hours later pledging to "only pursue the real estate angle with Ridgewood" and that "I am prepared to sign an agreement to that effect."  *Id.*, at 2CGP016154.

143.    Plotnick, with Grebow's knowledge and approval, responded on November 4, 2016 by stating that Ridgewood "will continue to stand on the sidelines and let you do your thing.  Keep

me posted as to any progress made, and when you are closer to a deal with the club, we can paper our agreement."  A copy of Plotnick's November 4, 2016 email is attached hereto as Exhibit 21, at 2CGP027066.

144.   Without disclosing to Philmont NPC that Ridgewood and CGP knew each other, much less that they were communicating about Philmont Club and had an agreement for Ridgewood to "stand back [and] profess some concerns about the real estate risks," Ridgewood told Meyer that Ridgewood was not interested in the Property because of risks with the development.

145.   With Ridgewood and CGP both having cast doubt as to the feasibility of the Property development, Philmont NPC ultimately decided to go with the sure thing—the sale of Philmont Club to CGP—rather than risk a sale to NPT failing to materialize months down the road.

146.   Unaware of Ridgewood's and CGP's secret discussions and agreement, Philmont NPC turned down NPT again in December 2016.  Specifically, NPT submitted a revised proposal to buy the Property to Meyer on December 20, 2016, which Meyer immediately forwarded to Silverman with the message, "Hot off the press.  Not interested." without giving the proposal any consideration.  A copy of Meyer's December 20, 2016 email is attached hereto as Exhibit 22.

147.   The doubt cast by Ridgewood and CGP on the viability of the development of the Property at a time when Philmont NPC had pressing financial challenges caused Philmont NPC to sell Philmont Club to Concert Philmont at a rate significantly lower than Philmont NPC otherwise would have sold it.

148.    Had it known that the doubts and concerns expressed by Ridgewood and CGP were contrived to get Philmont Club for a cheap price rather than at a cost based in reality, Philmont NPC would not have sold Philmont Club to Concert Philmont.

149.    As Nanula noted to Plotnick on November 19, 2016 after Philmont NPC's Board of Directors voted to accept CGP's proposal, "They need us, they want us, and they have capitulated in every respect."  Ex. 21, at 2CGP027064.

150.    While CGP promised $10,000,000 in debt payoff and capital improvements, Philmont Club was appraised in 2003 for $10,600,000 solely as a country club (i.e. not factoring selling the Property for development purposes).  A copy of the 2003 Appraisal is attached hereto as Exhibit 23.

151.    In other words, factoring in the ability to develop and sell the Property while retaining the remainder of Philmont Club as a country club, Philmont Club was worth many millions of dollars more than what it was sold to Concert Philmont for.

152.    But, accepting Ridgewood's and CGP's representations that "no real estate transaction might ever be possible," Ex. 16, and concerns about the risks of the development, CGP's offer was not far removed from the appraised value of Philmont Club.

**H.    CGP and Ridgewood Buy Time to Ensure Risks are Not a Factor**

153.    While Nanula told Meyer that CGP had to "assume no real estate transaction might ever be possible," Ex. 16, and plotted for Ridgewood to "profess some concerns about the real estate risks," Ex. 20, at 2CGP016515, CGP ensured it had just enough time to confirm that the Property could be developed, and thus there were no risks, before Concert Philmont's purchase of Philmont Club.

154.     Despite CGP's claim to "only require 30 days for due diligence," Ex. 15, on December 13, 2016, Moran asked Nanula "Are we still going for a 60 day DD period [due diligence period] here to better understand the real estate play? Which would push the close into late March?"  A copy of Moran's email is attached hereto as Exhibit 24, at 2CGP005349.

155.     In a subsequent email on the same date, Moran stated "Understood on the 45 day DD so early March close."  A copy of Moran's subsequent email is attached hereto as Exhibit 25, at 2CGP005352.

156.     CGP never informed Philmont NPC that it was delaying closing to ensure that it could obtain development approvals for 160 or more Units on the Property and ensure that the Property could be sold.

157.     On January 16, 2017, Nanula told Ridgewood that the expected timeline for the PSA was Philmont NPC's Board of Directors' approval on January 18, 2017, Philmont NPC members' approval on February 1, 2017, and closing on February 28, 2017.  A copy of Nanula's email is attached hereto as Exhibit 26, at 2CGP026415.

158.     Nanula asked Ridgewood, "Does this give you guys enough time to get through environmental and Town meetings, or should I buy some more time on our closing?"  *Id.*

159.     By January 20, 2017, Ridgewood had engaged in a meeting with the Township at which the Township manager was "thrilled" that CGP was planning to "integrate homes into [the] club" and "[d]idn't flinch on the 160 units."  A copy of Grebow's January 20, 2017 email is attached hereto as Exhibit 27, at 2.

160.     Grebow further noted that "As expected, they want the $1mm contribution for traffic.  Standard 55 and over community" and that the Township "Wants to get the deal done."  *Id.*

22

161.    Nanula reiterated to CGP's Chief Operating Officer, Susan Dunnavant, on January 21, 2017 that "the South Course real estate development is looking good for now; met with the Town this week, and they want to get this deal done with us."  A copy of Nanula's January 21, 2017 email is attached hereto as Exhibit 28.

162.    On January 24, 2017, Nanula noted to Grebow and Plotnick: "Town not wasting any time here.  Good body language."  A copy of Nanula's January 24, 2017 email is attached hereto as Exhibit 29, at 2CGP026420.

163.    Grebow responded by stating: "Definitely great body language.  Last step in DD [due diligence] is the environmental cost analysis.  Our attorney went through things with the consultant today and we should have that in about 2 weeks."  *Id.* at 2CGP026419.

164.    By February 14, 2017, CGP had satisfied any concerns about the scope and cost of the environmental remediation.

165.    To that end, on February 14, 2017, Nanula informed his colleagues that "Ridgewood came back optimistic about enviro[mental] remediation on the South Course, so we are a go on the real estate project.  They say it will take 12-18 months to get through Penn DEP, and we should have our entitlements for 165+ 'carriage homes' within 24 months.  Then we sell the nicely entitled 6[0]-acre parcel."  A copy of Nanula's February 14, 2017 email is attached hereto as Exhibit 30, at 2CGP014144.

166.    Nanula further noted that the contaminated soil could be transported to other areas of the Philmont Club that were not being developed to minimize the cost of the environmental remediation.  *Id.*

167.    CGP and Nanula never informed Philmont NPC that the risks with the development of the Property that they and Ridgewood professed before had, in fact, been confirmed to be non-existent.

168.    Nor did CGP or Ridgewood ever inform Philmont NPC that they had been communicating since September 2016, much less that they had been working together to acquire Philmont Club and to develop the Property since October 2016 at the latest.

169.    In fact, Meyer did not learn that Ridgewood and CGP had teamed up on the development of the Property until informed of the fact by NPT's counsel during his deposition on July 25, 2018.

I.    **CGP's Deception to Entice Philmont NPC to Agree to the PSA**

170.    Despite pledging that Philmont Club would "remain an exclusive private club with at least 27 holes [of golf] after the South Course real estate transaction," Ex. 14, CGP had no intention to maintain twenty-seven holes of golf.

171.    Rather, before even making the pledge, Nanula had shared his opinion with Cicero that "[o]nly 18 or 27 holes [are] truly needed." Ex. 19, at 2CGP027013.

172.    By December 8, 2016, Dunnavant asked Nanula whether CGP should "[g]o down to 18 hole[s] immediately" or "get North Course to sellable conditions and have South Course OK – Maybe do the public course?" A copy of Dunnavant's December 8, 2016 email is attached hereto as Exhibit 31.

173.    By December 9, 2016, CGP was discussing various options for the remainder of the South Course that would result in less than twenty-seven (27) holes of golf remaining at Philmont Club after the sale of the Property. A copy of the December 9, 2016 email chain is attached hereto as Exhibit 32.

24

174.     Nanula told Dunnavant and Moran that reducing the number of holes below twenty-seven (27) would result in "howling and lots of questions from the members, but we will stay flexible until we know what is best to do in terms of the South Course."  A copy of Nanula's December 11, 2016 email is attached hereto as Exhibit 33.

175.     Although Nanula mentioned reducing the total number of holes of golf below twenty-seven (27) with Meyer, he never mentioned those intentions to Philmont NPC's membership at the December 12, 2016 town hall meeting or at any other time before the closing on the PSA.  Put simply, Philmont NPC's membership was never aware that any deviation from CGP's promise to maintain twenty-seven holes of golf was contemplated, , much less planned, by CGP.

176.     More concretely, on March 1, 2017, the day Concert Philmont became the owner of Philmont Club, Nanula told Dunnavant that they needed to consider "how the remaining 6-7 holes on the South Course will really work," thereby indicating that CGP planned to only maintain twenty-four (24) to twenty-five (25) holes of golf, not the twenty-seven (27) promised to Philmont NPC.  A copy of Nanula's March 1, 2017 email is attached hereto as Exhibit 34, at 2CGP006162.

177.     Discovery in the Original Action also revealed that CGP never intended to abide by its promises with respect to the amount that would be spent on capital improvements.

178.     Regarding the capital improvement projects Philmont NPC expressed to CGP that they wanted performed as part of the transaction, CGP only ever intended to pay lip service to their intentions to complete the projects.

179.     In a November 21, 2016 email with CGP representatives, Nanula stated: "The wild ideas the Board has about a 'master plan' for the North Course are probably way overblown, and we have huge capital needs in the clubhouse, HVAC, etc.  You will see.  We will want to 'nod' to

some master plan elements so the members are excited about their North Course being updated a bit, but we want to spend the smallest dollars possible to get the maximum member impact." A copy of Nanula's November 21, 2016 email is attached hereto as Exhibit 35.

180. To that end, CGP never intended to expend the full $5,000,000 towards capital improvements that it promised to make upon the sale of the Property. Rather, CGP intended to expend a significantly smaller amount and keep the remainder as profit.

181. On January 16, 2017, Nanula praised CGP's counsel for the "nicely vague" language in the PSA regarding the capital improvement projects that CGP would undertake. A copy of Nanula's January 16, 2017 email is attached hereto as Exhibit 36, at 2CGP014817-18.

182. Nanula then informed CGP's counsel of the projects "we actually have planned" and stressed that the actual projects were not to be communicated to Philmont NPC or its counsel. *Id.*

**J.     Ridgewood Shares Philmont NPC's Confidential Information**

183. On September 29, 2016 to facilitate discussions, Philmont NPC and Ridgewood entered into a confidentiality agreement which required Ridgewood to keep confidential financial documents provided to it by Philmont NPC. A copy of the confidentiality agreement is attached hereto as Exhibit 37.

184. Nonetheless, Ridgewood transmitted Philmont NPC's confidential financial information to third parties, within just days of executing the confidentiality agreement.

185. Specifically, on October 5, 2016, Grebow instructed Plotnick to email Philmont NPC's confidential financial information to Tom Bennison at ClubCorp. A copy of Plotnick's October 5, 2016 email to Bennison is attached hereto as Exhibit 38.

186.    Then, on October 11, 2016, Plotnick transmitted the confidential information to Matthew Galvin at Morningstar Golf & Hospitality, LLC.  A copy of Plotnick's October 11, 2016 email to Galvin is attached hereto as Exhibit 39.

**COUNT I**
**Antitrust**
**North Penn Towns, LP, as assignee of Philmont Country Club v. Concert Golf Partners, LLC, Peter Nanula, Ridgewood Real Estate Partners, LLC, Jonathan Grebow, and Michael Plotnick**

187.    NPT hereby incorporates the foregoing averments as if the same were set forth at length herein.

188.    "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.

189.    CGP and Ridgewood restrained trade by agreeing, contracting, and conspiring to (1) not compete amongst themselves in the purchase of Philmont Club, but rather, to work jointly to reduce the purchase price of Philmont Club and (2) provide Philmont NPC with false information to cast doubt in Philmont NPC's mind about the viability of selling the Property to NPT or another developer and thereby positioning CGP as the only viable option for Philmont NPC to solve its financial issues.

190.    To further the ends of their agreement and conspiracy, Ridgewood, at CGP's urging and suggestion, declined to make an offer to purchase the Property or Philmont Club and purposely provided Philmont NPC with false information about the risks of attempting to develop the Property and the viability of selling the Property to a developer such as NPT.  Exs. 20 and 21.

191.    CGP also provided Philmont NPC with false information regarding the risks of developing the Property and speculation of being able to obtain development approvals. *See, e.g.,* Ex. 16.

192.    After expressing false concerns about the viability of developing the Property, Ridgewood and CGP agreed, contracted, and conspired to ensure they had a sufficient due diligence period to ensure that they could piggyback off of and finalize NPT's work with the Township to obtain approvals for a 160 or more Unit development.

193.    But, Ridgewood and CGP concealed from Philmont NPC that their professed concerns were fabricated and that Ridgewood and CGP had confirmed that the professed risks bore no relation to reality.

194.    Had Philmont NPC known that information, Philmont NPC would have considered other buyers for the Property, such as NPT, and/or would have demanded additional compensation from CGP for Philmont Club.

195.    Ridgewood and CGP concealed their communications, agreements, and conspiracy from Philmont NPC to restrain trade, to gain an unfair and unjust advantage on their competitors, and to acquire Philmont Club from Philmont NPC for significantly less than its fair market value.

196.    The result of Ridgewood's and CGP's agreements and conspiracy was to cast considerable doubt in Philmont NPC's mind that a sale of the Property to NPT or another developer would ever be able to materialize thereby restraining trade by making an otherwise attractive option to Philmont NPC unattractive and not worthy of consideration.

197.    Ridgewood's and CGP's agreements and conspiracy resulted in a reduction in competition for the Property and Philmont Club thereby allowing CGP to obtain Philmont Club at an unfair and unjust price.

198.   Ridgewood's and CGP's agreements and conspiracy caused Philmont NPC to believe that the value for Philmont Club was as a country club and not as a country club *and* a development parcel.

199.   "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor."  15 U.S.C. § 15(a).

200.   Philmont NPC was harmed as a result of Ridgewood's and CGP's anticompetitive conduct.

201.   Had it not been for Ridgewood's and CGP's anticompetitive conduct, Philmont NPC would have sold the Property to a developer, such as NPT, and retained possession of the remainder of Philmont Club, or sold Philmont Club for more than the amount at which it was sold to Concert Philmont.

202.   Notably, CGP and/or Ridgewood were willing to pay $2,000,000 or more for Philmont Club had there been true and full competition for Philmont Club and the Property, but did not have to pay that extra consideration as a result of their anticompetitive conduct.  Ex. 20.

203.   Moreover, Concert Philmont obtained Philmont Club for approximately its value solely as a country club, and not for its significantly higher value when separated into a country club and a development parcel.

204.   Peter Nanula, Jonathan Grebow, and Michal Plotnick knowingly participated in the anticompetitive conduct of CGP and Ridgewood and are personally liable under the Sherman Act.

205.   Similarly, Peter Nanula, Jonathan Grebow, and Michael Plotnick are liable for the anticompetitive conduct of CGP and Ridgewood under the participation theory as they were the individuals who engaged in the anticompetitive conduct, agreements, and conspiracy on behalf of CGP and Ridgewood.

29

206.     Philmont NPC assigned this claim to NPT.  Ex. 1.

207.     A successful plaintiff in an antitrust claim "shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."  15 U.S.C. § 15(a).

WHEREFORE, Plaintiff, North Penn Towns, LP, as assignee of Philmont NPC, seeks judgement against Concert Golf Partners, LLC, Peter Nanula, Ridgewood Real Estate Partners, LLC, Jonathan Grebow, and Michael Plotnick, jointly and severally, in excess of $150,000 together with treble damages, reasonable attorney's fees, costs, and such other relief as the Court deems just and appropriate.

**COUNT II**
**Antitrust**
**North Penn Towns, LP v. Concert Golf Partners, LLC, Peter Nanula, Ridgewood Real Estate Partners, LLC, Jonathan Grebow, and Michael Plotnick**

208.     NPT hereby incorporates the foregoing averments as if the same were set forth at length herein.

209.     "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.

210.     CGP and Ridgewood restrained trade by agreeing, contracting, and conspiring to provide Philmont NPC with false information in order to cast doubt in Philmont NPC's mind about the viability of selling the Property to NPT and thereby causing Philmont NPC not to consider reentering into the AOS or otherwise making a deal with NPT.

211.     To further the ends of their agreement and conspiracy, Ridgewood, at CGP's urging and suggestion, declined to make an offer to purchase the Property or Philmont Club and purposely provided Philmont NPC with false information about the risks of attempting to develop the Property and the viability of selling the Property to a developer such as NPT.  Exs.  20 and 21.

212.   CGP also provided Philmont NPC with false information regarding the risks of developing the Property and speculation of being able to obtain development approvals. *See, e.g.,* Ex. 16.

213.   Ridgewood's and CGP's agreements and conspiracy caused Philmont NPC to believe that the value for Philmont Club was as a country club and not as a country club and a development parcel.

214.   After expressing false concerns about the viability of developing the Property, Ridgewood and CGP agreed, contracted, and conspired to ensure they had a sufficient due diligence period to ensure that they could piggyback off of and finalize NPT's work with the Township to obtain approvals for a 160 or more Unit development.

215.   But, Ridgewood and CGP concealed from Philmont NPC that their professed concerns were fabricated and that Ridgewood and CGP had confirmed that the professed risks bore no relation to reality because had Philmont NPC known that information, Philmont NPC would have considered selling the Property to NPT.

216.   Ridgewood and CGP concealed their communications, agreements, and conspiracy from Philmont NPC to restrain trade and to gain an unfair and unjust advantage on their competitors, namely, NPT.

217.   The result of Ridgewood's and CGP's agreements and conspiracy was to cast considerable doubt in Philmont NPC's mind that a sale of the Property to NPT would ever be able to materialize thereby restraining trade by making NPT's otherwise attractive offer to Philmont NPC unattractive and not worthy of consideration.

218.   As a result, Philmont NPC did not give consideration to NPT's offers to purchase the Property and instead only considered CGP's offer. *See, e.g.,* Ex. 22.

219.     "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor."  15 U.S.C. § 15(a).

220.     NPT was harmed as a result of Ridgewood's and CGP's anticompetitive conduct.

221.     But for Ridgewood's and CGP's anticompetitive conduct, Philmont NPC would have sold the Property to NPT, which had made a more financially attractive offer for the Property alone than CGP had for the entirety of Philmont Club.

222.     Peter Nanula, Jonathan Grebow, and Michal Plotnick knowingly participated in the anticompetitive conduct of CGP and Ridgewood and are personally liable under the Sherman Act.

223.     Similarly, Peter Nanula, Jonathan Grebow, and Michael Plotnick are liable for the anticompetitive conduct of CGP and Ridgewood under the participation theory as they were the individuals who engaged in the anticompetitive conduct, agreements, and conspiracy on behalf of CGP and Ridgewood.

224.     A successful plaintiff in an antitrust claim "shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."  15 U.S.C. § 15(a).

WHEREFORE, Plaintiff, North Penn Towns, LP, seeks judgement against Concert Golf Partners, LLC, Peter Nanula, Ridgewood Real Estate Partners, LLC, Jonathan Grebow, and Michael Plotnick, jointly and severally, in excess of $150,000 together with treble damages, reasonable attorney's fees, costs, and such other relief as the Court deems just and appropriate.

### COUNT III
### Fraud
### North Penn Towns, LP, as assignee of Philmont Country Club v.
### Ridgewood Real Estate Partners, LLC, Jonathan Grebow, and Michael Plotnick

225.     NPT hereby incorporates the foregoing averments as if the same were set forth at length herein.

226.     Michael Plotnick and Jonathan Grebow, acting on behalf of Ridgewood, told Meyer and Philmont NPC that Ridgewood was not interested in the Property because it was speculative that the Property could be developed and that there were significant risks involved in the development of the Property.

227.     In reality, Ridgewood was interested in the Property and knew that there would not be significant issues in obtaining development approvals and that the professed risks in developing the Property were negligible to nonexistent.

228.     Ridgewood even had an agreement to work with CGP to obtain development approvals for the Property.

229.     Ridgewood neglected to inform Philmont NPC that Ridgewood and CGP were in communication about Philmont Club and were working together to acquire Philmont Club at a below market rate.

230.     Ridgewood knowingly misrepresented the speculation and risks associated with the development of the Property to cast doubt in Philmont NPC's mind as to the viability of pursuing a sale with NPT or other developers.

231.     Ridgewood knowingly misrepresented the speculation and risks associated with the development of the Property to steer Philmont NPC towards the offer made by CGP, which was significantly below the true value of Philmont Club.

232.     Ridgewood neglected to inform Philmont NPC that it was actively engaged in discussions with the Township prior to the closing of the PSA and that it had confirmed that it would be able to obtain approvals for 160 or more Units on the Property and would be able to develop and sell the Property.

233.     Ridgewood's knowing misrepresentations were material to Philmont NPC's decision to agree to the PSA with CGP as it cast doubt in Philmont NPC's mind as to whether NPT or any other developer would ever obtain development approvals and close on the AOS and gave the appearance that CGP was the only viable option for Philmont NPC.

234.     Ridgewood knew its representation to be false and purposely made the misrepresentation to cause Philmont NPC to rely on it and agree to CGP's proposal instead of pursuing other options, including a sale of the Property to NPT.

235.     Ridgewood further made the knowingly false representations to convince Philmont NPC that the value of Philmont Club was as a country club and not as a country club and a development parcel, which, in reality, had a significantly higher value.

236.     Philmont NPC justifiably relied upon Ridgewood's representations about the speculation and risks associated with the development of the Property in concluding that pursuing a sale of the Property to NPT or another developer was not a viable option as Ridgewood is a professional real estate developer who purports to be knowledgeable in such matters.

237.     Philmont NPC was harmed by Ridgewood's misrepresentation by way of selling Philmont Club to CGP for a fraction of the true value of Philmont Club.

238.     Specifically, Philmont NPC was worth many millions of dollars more than the $10,000,000 in debt payoff and capital improvements CGP agreed to provide.

239.     Philmont NPC could have sold the Property itself for $12,200,000 or more to NPT and still retained ownership of the remainder of Philmont Club.

240.     Jonathan Grebow and Michael Plotnick are liable for Ridgewood's fraud under the participation theory in that they acted on behalf of Ridgewood and were the individuals who made the fraudulent statements to Philmont NPC.

241.     Philmont NPC assigned this claim to NPT.  Ex. 1.

Wherefore, Plaintiff, North Penn Towns, LP, as assignee of Philmont NPC, respectfully requests judgment against Ridgewood Real Estate Partners, LLC, Jonathan Grebow, and Michael Plotnick, jointly and severally, in excess of $150,000 together with punitive damages, costs, and such other relief as the Court deems just and appropriate.

**COUNT IV**
**Aiding and Abetting Fraud**
**North Penn Towns, LP, as assignee of Philmont Country Club v.**
**Concert Golf Partners, LLC and Peter Nanula**

242.     NPT hereby incorporates the foregoing averments as if the same were set forth at length herein.

243.     Ridgewood made fraudulent statements to Philmont NPC regarding the speculation and risks associated with the development of the Property.

244.     Ridgewood neglected to inform Philmont NPC that Ridgewood and CGP were in communication about Philmont and were working together to acquire Philmont Club at a below market rate.

245.     Ridgewood neglected to inform Philmont NPC that it was actively engaged in discussions with the Township prior to the closing of the PSA and that it had confirmed that it would be able to obtain approvals for 160 or more Units on the Property and would be able to develop and sell the Property.

246.     CGP and Nanula not only were aware of Ridgewood's fraudulent statements and omissions to Philmont NPC but actively encouraged and asked Ridgewood to make the statements and omissions.  Exs. 20 and 21.

247.     CGP and Nanula encouraged Ridgewood to make the fraudulent statements so they could make their own offer to purchase Philmont Club look more appealing than it was.

248.    Philmont NPC was harmed by CGP and Nanula's aiding and abetting Ridgewood's misrepresentation by way of selling Philmont Club to CGP for a fraction of the true value of Philmont Club.

249.    Specifically, Philmont NPC was worth many millions of dollars more than the $10,000,000 in debt payoff and capital improvements CGP agreed to provide.

250.    Philmont NPC could have sold the Property itself for $12,200,000 or more to NPT and still retained ownership of the remainder of Philmont Club.

251.    Even CGP would have been willing to purchase Philmont Club for significantly more than it did, but encouraged and supported Ridgewood to make fraudulent statements in order to acquire Philmont Club at a reduced rate.

252.    Because of Ridgewood's fraudulent statements, Philmont Club was effectively sold for its value as a country club and not its value as a country club *and* a development parcel.

253.    Peter Nanula is liable for CGP's aiding and abetting Ridgewood's fraud under the participation theory in that he acted on behalf of CGP and was the individual who encouraged and asked Ridgewood to make the fraudulent statements to Philmont NPC.

254.    Philmont NPC assigned this claim to NPT.  Ex. 1.

Wherefore, Plaintiff, North Penn Towns, LP, as assignee of Philmont NPC, respectfully requests judgment against Concert Golf Partners, LLC and Peter Nanula, jointly and severally, in excess of $150,000 together with punitive damages, costs, and such other relief as the Court deems just and appropriate.

**COUNT V**
**Fraud**
**North Penn Towns, LP, as assignee of Philmont Country Club v.**
**Concert Golf Partners, LLC and Peter Nanula**

255.    NPT hereby incorporates the foregoing averments as if the same were set forth at length herein.

256.    CGP represented to Philmont NPC that obtaining development approvals for the Property would be difficult and was speculative.  *See, e.g.,* Ex. 16.

257.    But, CGP knew that not to be the case.

258.    CGP represented to Philmont NPC that Philmont Club would retain "at least 27 holes after the South Course real estate transaction."  Ex. 14.

259.    CGP never intended to abide by its representation that it would maintain twenty-seven holes of golf.  *See, e.g.,* Exs. 31-34.

260.    Nonetheless, CGP concealed from Philmont NPC's members its intention to reduce the number of holes of golf below twenty-seven at the December 12, 2016 townhall meeting and otherwise failed to inform Philmont NPC's membership that it did not intend to maintain twenty-seven holes.

261.    CGP represented to Philmont NPC that it would engage in certain capital improvement projects at Philmont Club.

262.    CGP did not intend to engage in those projects as represented, but instead had a separate list of capital improvement projects it actually intended to engage in.  Ex. 36, at 2CGP014817-18.

263.    CGP represented to Philmont Club that it would make $5,000,000 in capital improvement projects upon the sale of the Property, but in reality, had no intention of expending the full $5,000,000.

264.    CGP's representations that (1) obtaining development approvals would be difficult and speculative, (2) CGP would maintain at least twenty-seven holes of golf, (3) CGP would make specified capital improvements, and (4) CGP would invest $5,000,000 in capital improvements upon the sale of the Property, were material to Philmont NPC's decision to sell Philmont Club to Concert Philmont.

265.    CGP's representations tarnished the attractiveness of NPT's offer to purchase the Property and make a sale of Philmont Club to CGP more attractive.

266.    CGP knowingly made the false representations with the intention to have Philmont NPC rely on the representations and agree to sell Philmont Club to CGP rather than sell the Property to NPT or another developer.

267.    CGP neglected to inform Philmont NPC that Ridgewood and CGP were in communication about Philmont and were working together to acquire Philmont Club at a below market rate.

268.    CGP neglected to inform Philmont NPC that it was actively engaged in discussions with the Township prior to the closing of the PSA and that it had confirmed that it would be able to obtain approvals for 160 or more Units on the Property and would be able to develop and sell the Property.

269.    CGP's omissions were material to Philmont NPC's decision to sell Philmont Club to Concert Philmont as the omitted information would have notified Philmont NPC that the Property could be developed and sold for more than CGP was offering for the entirety of Philmont Club.

270.    The omissions also would have notified Philmont NPC as to the falsity of Ridgewood's and CGP statements about the risks associated with the development and that

Ridgewood's decision to not make an offer for the Property was motivated out of anticompetitive behavior, not legitimate business concerns.

271.    Philmont NPC justifiably relied upon CGP's representations and omissions.

272.    Philmont NPC was harmed as a result of its reliance upon CGP's representations by way of selling Philmont Club to Concert Philmont for below market value.

273.    Because of CGP's fraudulent statements and concealment, Philmont Club was effectively sold for its value as a country club and not its value as a country club and a development parcel.

274.    Peter Nanula is liable for CGP's fraud under the participation theory in that he acted on behalf of CGP and was the individual who made the fraudulent statements to Philmont NPC.

275.    Philmont NPC assigned this claim to NPT.  Ex. 1.

Wherefore, Plaintiff, North Penn Towns, LP, as assignee of Philmont Country Club, respectfully requests judgment against Concert Golf Partners, LLC and Peter Nanula, jointly and severally, in excess of $150,000 together with punitive damages, costs, and such other relief as the Court deems just and appropriate.

## COUNT VI
### Aiding and Abetting Fraud
### North Penn Towns, LP, as assignee of Philmont Country Club v.
### Ridgewood Real Estate Partners, LLC, Jonathan Grebow, and Michael Plotnick

276.    NPT hereby incorporates the foregoing averments as if the same were set forth at length herein.

277.    CGP made fraudulent statements to Philmont NPC regarding (1) the speculation and risks associated with the development of the Property, (2) the number of holes of golf CGP would retain at Philmont Club, (3) and the nature and amount of the capital improvements CGP would make to Philmont Club, as set forth above.

278.    CGP also fraudulently neglected to inform Philmont NPC that (1) Ridgewood and CGP were in communication about Philmont and were working together to acquire Philmont Club at a below market rate, and (2) that it was actively engaged in discussions with the Township prior to the closing of the PSA and that it had confirmed that it would be able to obtain approvals for 160 or more Units on the Property and would be able to develop and sell the Property.

279.    Ridgewood, Grebow, and Plotnick not only were aware of CGP's fraudulent statements and omissions to Philmont NPC but actively encouraged CGP to make such statements and omissions.

280.    Ridgewood, Grebow, and Plotnick encouraged CGP to make the fraudulent statements in order for CGP's offer to purchase Philmont Club to be more attractive and thereby allowing Ridgewood to obtain a grossly inflated fee for obtaining development approvals for the Property from CGP.

281.    Philmont NPC was harmed by Ridgewood's, Grebow's, and Plotnick's aiding and abetting CGP's misrepresentations by way of selling Philmont Club to CGP for a fraction of the true value of Philmont Club.

282.    Specifically, Philmont NPC was worth many millions of dollars more than the $10,000,000 in debt payoff and capital improvements CGP agreed to provide.

283.    Philmont NPC could have sold the Property itself for $12,200,000 or more to NPT and still retained ownership of the remainder of Philmont Club.

284.    Even CGP would have been willing to purchase Philmont Club for significantly more than it did, but worked with Ridgewood to make fraudulent statements in order to acquire Philmont Club at a reduced rate.

285.    Because of CGP's fraudulent statements, Philmont Club was effectively sold for its value as a country club and not its value as a country club and a development parcel.

286.    Jonathan Grebow and Michael Plotnick are liable for Ridgewood's aiding and abetting CGP's fraud under the participation theory in that they acted on behalf of Ridgewood and were the individuals who encouraged CGP to make the fraudulent statements to Philmont NPC.

287.    Philmont NPC assigned this claim to NPT.  Ex. 1.

Wherefore, Plaintiff, North Penn Towns, LP, as assignee of Philmont Country Club, respectfully requests judgment against Ridgewood Real Estate Partners, LLC, Jonathan Grebow, and Michael Plotnick, jointly and severally, in excess of $150,000 together with punitive damages, costs, and such other relief as the Court deems just and appropriate.

## COUNT VII
## Fraudulent Concealment
### North Penn Towns, LP, as assignee of Philmont Country Club v.
### Concert Golf Partners, LLC, Peter Nanula, Ridgewood Real Estate
### Partners, LLC, Jonathan Grebow, and Michael Plotnick

288.    NPT hereby incorporates the foregoing averments as if the same were set forth at length herein.

289.    Ridgewood and CGP expressed concerns about the speculation and risks associated with obtaining development approvals and developing the Property.

290.    Ridgewood and CGP neglected to inform Philmont NPC that Ridgewood and CGP were in communication with Philmont and were working together to acquire Philmont Club at a below market rate.

291.    Ridgewood and CGP neglected to inform Philmont NPC that it was actively engaged in discussions with the Township prior to the closing of the PSA and that they had

confirmed that they would be able to obtain approvals for 160 or more Units on the Property and would be able to develop and sell the Property.

292.    Ridgewood's and CGP's omissions were material to Philmont NPC's decision to sell Philmont Club to Concert Philmont as the omitted information would have notified Philmont NPC that the Property could be developed and sold for more than CGP was offering for the entirety of Philmont Club.

293.    The omissions also would have notified Philmont NPC as to the falsity of Ridgewood's and CGP statements about the risks associated with the development and that Ridgewood's decision to not make an offer for the Property was motivated out of anticompetitive behavior, not legitimate business concerns.

294.    Ridgewood and CGP knowingly omitted the material information with the intention of Philmont NPC relying on the omissions in an effort to ensure Philmont NPC relied on their prior false statements and to diminish the attractiveness of other potential bidder's offers, primarily NPT's.

295.    Philmont NPC justifiably relied on the omissions of material fact and prior representations of Ridgewood and CGP for, among other reasons, Ridgewood represented itself as a professional real estate developer knowledgeable in development matters.

296.    Philmont NPC was harmed as a result of its reliance upon CGP's representations by way of selling Philmont Club to Concert Philmont for below market value.

297.    Because of Ridgewood's and CGP's fraudulent omissions, Philmont Club was effectively sold for its value as a country club and not its value as a country club *and* a development parcel.

298.     Peter Nanula, Jonathan Grebow, and Michael Plotnick are liable for the fraudulent concealment of CGP and Ridgewood, respectively, under the participation theory as they were the individuals who actively concealed the pertinent information from Philmont NPC.

299.     Philmont NPC assigned this claim to NPT.  Ex. 1.

Wherefore, Plaintiff, North Penn Towns, LP, as assignee of Philmont Country Club, respectfully requests judgment against Concert Golf Partners, LLC, Peter Nanula, Ridgewood Real Estate Partners, LLC, Jonathan Grebow, and Michael Plotnick, jointly and severally, in excess of $150,000 together with punitive damages, reasonable attorney's fees, costs, and such other relief as the Court deems just and appropriate.

**COUNT VIII**
**Civil Conspiracy**
**North Penn Towns, LP, as assignee of Philmont Country Club v.**
**Concert Golf Partners, LLC, Peter Nanula, Concert Philmont, LLC, Concert Philmont**
**Properties, LLC, Ridgewood Real Estate Partners, LLC, Ridgewood Philmont, LLC,**
**Jonathan Grebow, and Michael Plotnick**

300.     NPT hereby incorporates the foregoing averments as if the same were set forth at length herein.

301.     As set forth above, CGP, Nanula, Ridgewood, Grebow, and Plotnick conspired with each other (1) to engage in anticompetitive behavior in violation of the Sherman Act and Clayton Act, (2) for Ridgewood to refrain from making an offer to purchase Philmont Club or the Property so as to not compete with CGP in purchasing Philmont Club, (3) for Ridgewood to instead fraudulently express concerns about the ability to obtain development approvals for the Property and the risks associated with the Property, (4) for CGP to fraudulently express concerns about the ability to obtain development approvals for the Property and the risks associated with the Property, (5) for CGP to fraudulently misrepresent the number of holes it would retain and improvements that would be made to Philmont Club, (6) for Ridgewood and CGP to fraudulently omit material

information from Philmont NPC's consideration, and (7) for CGP to acquire Philmont Club at a drastically reduced rate.

302.    As set forth above, CGP, Nanula, Ridgewood, and Plotnick acted in furtherance of their conspiracies.

303.    In furtherance of the conspiracies, CGP incorporated Concert Philmont and Concert Philmont Properties as single purpose entities to take title to Philmont Club and engage in the development of the Property.

304.    In furtherance of the conspiracies, Ridgewood incorporated Ridgewood Philmont as a single purpose entity for the purpose of entering into the DSA and obtaining development approvals for the Property.

305.    Philmont NPC was harmed as a result of the Defendants' conspiracy by way of selling Philmont Club to Concert Philmont for below market value.

306.    Because of the Defendants' conspiracy, Philmont Club was effectively sold for its value as a country club and not its value as a country club *and* a development parcel.

307.    Peter Nanula, Jonathan Grebow, and Michael Plotnick are liable for the conspiracies of CGP and Ridgewood, respectively, under the participation theory as they were the individuals who actively created and engaged in the conspiracies.

308.    Philmont NPC assigned this claim to NPT.  Ex. 1.

Wherefore, Plaintiff, North Penn Towns, LP, as assignee of Philmont Country Club, respectfully requests judgment against Concert Golf Partners, LLC, Peter Nanula, Concert Philmont, LLC, Concert Philmont Properties, LLC, Ridgewood Real Estate Partners, LLC, Ridgewood Philmont, LLC, Jonathan Grebow, and Michael Plotnick, jointly and severally, in

excess of $150,000 together with punitive damages, costs, and such other relief as the Court deems just and appropriate.

## COUNT IX
### Breach of Contract
### North Penn Towns, LP, as assignee of Philmont Country Club v.
### Ridgewood Real Estate Partners, LLC

309.    NPT hereby incorporates the foregoing averments as if the same were set forth at length herein.

310.    On September 29, 2016, Philmont NPC and Ridgewood entered into a confidentiality agreement pursuant to which Ridgewood had a duty to keep confidential certain financial information provided to it by Philmont NPC.  Ex. 37.

311.    Ridgewood breached the confidentiality agreement by disseminating Philmont NPC's confidential information to ClubCorp on October 5, 2016 and to Morningstar Golf & Hospitality, LLC on October 11, 2016.  Exs. 38 and 39.

312.    Philmont NPC was harmed by Ridgewood's intentional and inexcusable breach of the confidentiality agreement by way of having its confidential financial information disclosed to third parties.

313.    Pursuant to the confidentiality agreement, Philmont NPC is entitled to attorneys' fees from Ridgewood as a result of the breach.  Ex. 37, ¶ 5.

314.    Philmont NPC assigned its claim against Ridgewood for the breach of the confidentiality agreement to NPT.  Ex. 1.

Wherefore, Plaintiff, North Penn Towns, LP, as assignee of Philmont Country Club, respectfully requests judgment against Ridgewood Real Estate Partners, LLC in excess of $150,000 together with reasonable attorney's fees, costs, and such other relief as the Court deems just and appropriate.

## JURY DEMANDED

Plaintiff hereby demands trial by jury of twelve (12) on all issues so triable.

Respectfully submitted,

KANG HAGGERTY & FETBROYT LLC

By:  /s/ *Edward T. Kang*
Edward T. Kang
David R. Scott
123 S. Broad Street, Suite 1670
Philadelphia, PA 19109
Tel: 215-525-5850
Fax: 215-525-5860
ekang@KHFlaw.com
dscott@KHFlaw.com

Dated: October 1, 2019                *Attorneys for Plaintiff*