**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **NORTH PENN TOWNS, LP, directly and as assignee of Philmont Country Club,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 19-4540-KSM** |
| **CONCERT GOLF PARTNERS, LLC, et al.,** | |
| Defendants. | |

## <u>MEMORANDUM</u>

**Marston, J.**                                                                                    **August 12, 2021**

As part of the fallout of a botched real estate transaction, Plaintiff North Penn Towns, L.P. ("NPT"), directly and as assignee of Philmont Country Club ("PCC"), has sued Defendants Concert Golf Partners, LLC ("CGP"), Concert Philmont, LLC, Concert Philmont Properties LLC, and Peter Nanula (collectively, "the Concert Defendants") and Ridgewood Real Estate Partners, LLC ("Ridgewood"), Ridgewood Philmont, LLC, Jonathan Grebow, and Michael Plotnick (collectively, the "Ridgewood Defendants") for fraud, breach of contract, conspiracy, and violations of federal antitrust law.  (Doc. No. 1.)

The Concert Defendants and Ridgewood Defendants filed a joint motion to dismiss, arguing that NPT cannot bring claims as an assignee of PCC; that NPT fails to state an antitrust claim because it, among other things, does not define a relevant market in which competition has been harmed; and that NPT did not satisfy the heightened pleading standard for fraud claims. (Doc. Nos. 13, 21.)  NPT opposed the motion.  (Doc. Nos. 17, 22, 33.)  The Court held oral argument on the motion on July 22, 2021.

For the reasons that follow, the Court grants in part and denies in part Defendants' motion.

## I.      Factual Background

### A.      *PCC Decides to Sell Part of Its Property to Raise Money for Improvement Projects*

PCC operated a member-owned country club ("Philmont Club") located in Huntington Valley, Pennsylvania.[1]  (Doc. No. 1 at ¶ 28.)  Founded in 1906, Philmont Club boasted many amenities, including two 18-hole golf courses (the "North Course" and the "South Course"), tennis courts, a swimming pool, and a clubhouse.  (*Id.* at ¶ 29.)  However, in the early 2000s, PCC "found itself in poor financial and physical shape."  (*Id.* at ¶ 30.)  Because it needed to raise money to improve Philmont Club's facilities, PCC decided to sell nine of the South Course's eighteen holes (the "Property") to a residential real estate developer.  (*Id.* at ¶ 31.)

At first, PCC agreed to sell the Property to Toll Brothers, a homebuilder.  (*Id.* at ¶ 32.)  However, that arrangement quickly fell apart, and the Toll Brothers agreement was terminated in July 2014.  (*Id.* at ¶ 33.)

### B.      *NPT Enters the Picture and Agrees to Develop the Property*

About a year later, in May 2015, PCC agreed to sell the Property to another homebuilder, NVR, Inc.  (*Id.* at ¶ 34.)  However, because NVR "does not engage in property development— that is, the process of taking raw land and readying it for home construction, including . . . grading the land and installing infrastructure such as sewer and electrical lines," NVR assigned the agreement of sale to NPT, a property developer.  (*Id.* at ¶¶ 35–36.)  The plan was for NPT to develop the Property into developed lots which NVR would then purchase from NPT.  (*See id.* at

---

[1] PCC is a non-profit corporation that owned and operated the country club also bearing the name Philmont Country Club.  (Doc. No. 1 at ¶¶ 7, 28.)

¶¶ 35–37.)  NPT and NVR entered into a Lot Purchase Agreement ("LPA") to this effect on July 22, 2015.  (*Id.* at ¶ 37.)  The following day, July 23, NPT and PCC entered into an agreement of sale ("AOS"), pursuant to which PCC agreed to sell the Property to NPT.  (*Id.* at ¶ 38; Doc. No. 1-1, Ex. 2.)

Taken together, under the AOS and LPA, NPT would first purchase the Property from PCC and then obtain development approvals from Lower Moreland township (the "Township"), develop the Property into individual development lots ("units"), and sell the units to NVR, who would ultimately construct the homes and sell them to consumers.  (Doc. No. 1 at ¶ 39.)

Under the AOS, the purchase price for the Property was based on a per unit yield; each unit approved for development by the Township cost $75,308.64.  (*Id.* at ¶ 40.)  Although the final yield was uncertain, the AOS anticipated that the Township would approve 162 units, resulting in an anticipated purchase price of $12.2 million.  (*Id.* at ¶ 41.)  The AOS contemplated that, at minimum, the yield would be 150 units (*id.*) and, accordingly, the minimum purchase price for the Property was $11,296,296 (*id.* at ¶ 42).

### C.     Zoning Issues Emerge, Causing NPT and PCC to Repeatedly Amend the Agreement of Sale

The AOS also provided NPT with a 90-day due diligence period, during which NPT could conduct commercially reasonable studies on the Property and terminate the AOS for any reason.  (*Id.* at ¶ 43.)  During this time frame, NPT and PCC learned of recent changes to the Township's zoning regulations.  (*Id.* at ¶ 44.)  The impact of those regulations was that the Property could only yield a maximum of 105 units—far below the minimum yield of 150 units and anticipated yield of 162 units.  (*Id.*)

Due diligence also revealed that the Property had high levels of mercury and arsenic due to decades of pesticide use, and these environmental conditions needed to be remedied before the

Property could be developed.  (*Id.* at ¶ 45.)

The zoning issues meant that NPT would essentially be purchasing the Property at the price of 150 units while only obtaining 105 units.  (*Id.* at ¶ 46.)  This arrangement "was not economically viable for NPT."  (*Id.*)  Furthermore, "selling the Property for a potential unit yield of only 105 units was not a viable option to solve [PCC's] financial issues."  (*Id.* at ¶ 47; *see also id.* at ¶ 46 ("[T]he revenue from 105 units was not sufficient to serve [PCC's] purposes in selling the Property.").)

After the zoning issues emerged, NPT and PCC agreed to extend the due diligence period so that they could seek zoning relief from the Township.  (*Id.* at ¶ 48.)  NPT and PCC wanted the Township's permission to develop 162 or more units.  (*Id.*)  Accordingly, NPT and PCC amended the AOS eight times, ultimately extending the due diligence period to September 26, 2016.  (*Id.* at ¶ 49; *see also* Doc. No. 1-1, Ex. 3.)

During the extended due diligence period, NPT engaged in extensive discussions with the Township about creating plans to develop the Property that the Township would find agreeable and which would warrant zoning relief to allow 162 or more units be developed.  (*Id.* at ¶ 50.)  However, the Township expressed concerns about the impact any development of the Property would have on the school system and roadway congestion.  (*Id.* at ¶ 51.)  NPT suggested making the development age-restricted (i.e., no residents under the age of 19 allowed) as well as making a $1 million contribution to roadway improvements to increase the unit yield.  (*Id.* at ¶ 52.)  NPT also suggested restricting 22 acres of PCC's property from further development, to meet the Township's open space requirements.  (*Id.* at ¶ 53.)

NPT's suggestion to implement age restrictions raised new concerns—namely, to make an age-restricted development marketable, it must include a clubhouse, which would cost

approximately $1.6 million to build.  (*Id.* at ¶¶ 54–55.)  Therefore, increasing the yield to 160

units or more would come at an additional cost of $2.6 million (the $1.6 million for the

clubhouse coupled with the $1 million roadway contribution), plus the environmental

remediation costs.  (*Id.* at ¶ 56.)

On September 7, 2016, NPT, NVR, and PCC met to determine the allocation of the

increased cost so that the parties could modify the AOS and LPA accordingly and move forward.

(*Id.* at ¶ 57.)  NPT and PCC reached an agreement in principle, pursuant to which PCC would

provide NPT with (a) a $375,000 purchase price credit, which would be decreased if the

clubhouse came in under budget, and (b) a potential price reduction of up to $151,543.20

depending on the number of units approved.  (*Id.* at ¶ 58.)  This agreement is encompassed in the

proposed Ninth Amendment to the AOS.  (*Id.* at ¶ 59; Doc. No. 1-2, Ex. 4.)

### D.    *CGP Expresses Interest in a Potential Transaction with PCC*

In the midst of these negotiations, on August 30, 2016, longtime PCC and Philmont Club

member David Fields had a 35-minute phone call with Defendant Nanula, the sole member of

CGP.[2]  (Doc. No. 1 at ¶¶ 9, 60.)  The pair spoke "about CGP potentially investing in the

Philmont Club to assist [PCC] with its pressing financial needs."  (*Id.* at ¶ 60.)  After the call,

Nanula emailed Fields, requesting information about Philmont Club, including "A summary of

your current real estate deal and the Toll [Brothers] deal."  (*Id.* at ¶ 61; Doc. No. 1-2, Ex. 5 at p.

14.)[3]

Fields called PCC's President, Glenn Meyer, and asked if Meyer would be interested in

---

[2] CGP is a golf course operator.  (Doc. No. 1 at ¶ 125; *see also* Doc. No. 1-3, Ex. 15 at p. 34 ("Having
invested in, operated, or made loans on 100+ properties, we pride ourselves on quickly and discreetly
closing golf transactions on an all-cash basis from our committed funds.").)

[3] The Court adopts the pagination used by the CM/ECF docketing system.

pursuing discussions with CGP.  (Doc. No. 1 at ¶ 62.)  Meyer indicated that he would.  (*Id.*)
Fields also forwarded Nanula's email to PCC's Treasurer, Sam Silverman.  (*Id.* at ¶ 63; Doc. No.
1-2, Ex. 5.)  On September 10, 2016, Silverman provided Nanula with the requested information
and explained that "it would be easier to provide a summary of the NPT real estate deal verbally
since [PCC] was 'in the process of receiving an amendment to the [AOS] that will better clarify
the details.'"  (Doc. No. 1 at ¶ 64; Doc. No. 1-2, Ex. 5 at p. 13.)

Nanula forwarded the information to CGP's Director of Acquisitions, Tom Moran, and
sent several follow up questions to Silverman, which Silverman responded to.  (Doc. No. 1 at ¶¶
65–66; Doc. No. 1-2, Ex. 5 at pp. 10–12.)  On September 19, 2016, Nanula requested additional
information, including "any and all details on the pending NVR deal for the South Course
acreage."  (Doc. No. 1-2, Ex. 5 at p. 9; Doc. No. 1 at ¶ 67.)  Nanula also stated that he would
"work on a preliminary proposal to share [that] week" about CGP's potential investment in
Philmont Club.  (*Id.*)

That same day, Meyer and Nanula had a phone call, during which Meyer updated Nanula
on the NVR/NPT deal and Nanula explained CGP's typical process for acquiring a country club.
(*Id.* at ¶¶ 68–69.)  Nanula also conveyed CGP's "preliminary terms" for purchasing Philmont
Club.  (*Id.* at ¶ 69.)  The preliminary terms included:  CGP would pay off PCC's debt, make a
few million dollars' worth of capital improvements to Philmont Club, and use the proceeds from
selling the Property for additional capital improvements.  (*Id.* at ¶ 70.)

The next day, September 20, Moran provided Nanula with a preliminary analysis of
Philmont Club's finances and Nanula replied,

Plenty for now.  This deal will be long and slow.

They are under contract with our pals at NVR homes to sell off 9 of their 36 holes
for $12.2m.  Not sure how they would sell the club to us, and let us have the real
estate upside.  Trying for that.  Enough work on the pro forma for now.

(*Id.* at ¶ 71; Doc. No. 1-2, Ex. 7 at p. 21)

### E.    *Ridgewood Is also Interested in a Potential Transaction with PCC*

In late 2014—shortly after the Toll Brothers deal fell apart—the Vice President of

Ridgewood, Defendant Plotnick, began emailing Meyer to inquire whether PCC was interested

in pursuing a potential transaction with Ridgewood.  (*See id.* at ¶¶ 72–73 (alleging Plotnick

emailed Meyer in December 2014, October 2015, and March 2016).)  Meyer did not respond to

Plotnick's inquiries.  (*Id.* at ¶ 73.)

However, in mid-September 2016, Plotnick attended an industry conference, where he

met John Brown, whose company, Brown Golf Management, had been hired by PCC to manage

Philmont Club.  (*Id.* at ¶ 74.)  After Plotnick told Brown that Ridgewood was interested in

becoming involved with Philmont Club (*id.* at ¶ 75; Doc. No. 1-3, Ex. 8), Brown introduced

Plotnick to Meyer.  Meyer and Plotnick then arranged for Plotnick and his colleague—

Ridgewood's CEO, Defendant Grebow—to visit Philmont Club on September 27, 2016.  (Doc.

No. 1 at ¶¶ 76–78; Doc. No. 1-3, Exs. 8 & 9.)

### F.    *NPT Terminates the AOS After PCC Refuses to Execute the Proposed Ninth Amendment*

As noted above, during the September 7, 2016 meeting that NPT, PCC, and NVR

attended to discuss the allocation of the new costs created by the age restriction, addition of a

clubhouse, and roadway improvements, NPT and PCC reached an agreement in principle to

move forward with the transaction.[4]  (Doc. No. 1 at ¶¶ 57–59.)  However, NPT and NVR did not

reach a resolution on how to modify the LPA to account for those additional costs.  (*Id.* at ¶ 79.)

While NPT and PCC worked towards memorializing the September 7, 2016 agreement in

---

[4] This agreement in principle was later memorialized in the proposed Ninth Amendment to the AOS.

writing and NPT and NVR worked to modify the LPA, NPT and PCC executed the Seventh and Eighth Amendments to the AOS, both of which extended the due diligence period. (*Id.* at ¶ 80.) Under the Eighth Amendment to the AOS, the due diligence period was extended to September 26, 2016. (*Id.*)

On September 22, just days before the due diligence period was set to expire, Meyer and Silverman, on behalf of PCC, "were prepared to re-enter into a new agreement with NPT." (*Id.* at ¶ 81.) This agreement would have "similar terms to the AOS as intended to be modified by the terms of the Ninth Amendment should the AOS need to be terminated as a result of an inability to modify the LPA to address the issues with Unit yield." (*Id.*)

However, the following day, Meyer spoke to Plotnick for the first time, which prompted Meyer to reevaluate and change course. (*Id.* at ¶ 82.) Instead of moving forward with NPT, Meyer told PCC's counsel: "After further thought, we have decided to let the [AOS] expire and evaluate our position rather than continue to negotiate with NVR." (*Id.*; Doc. No. 1-3, Ex. 11 at p. 24.)

In the meantime, NPT and NVR reached an agreement on how to amend the LPA. (Doc. No. 1 at ¶ 83.) Accordingly, NPT executed the Ninth Amendment to the AOS and sent it to PCC for countersignature. (*Id.*) But PCC refused to execute the Ninth Amendment. (*Id.* at ¶ 84.) PCC's refusal to execute the Ninth Amendment left NPT with "no reasonable option but to terminate the AOS to save NPT's deposit money." (*Id.* at ¶ 85.) NPT terminated the AOS on September 26, 2016. (*Id.* at ¶ 86.)

### G. PCC Separately Talks to NPT, Ridgewood, and CGP about Selling the Property and/or Philmont Club, and After Expressing Interest, Ridgewood Backs Out of a Potential Transaction

After NPT terminated the AOS, PCC pursued separate discussions with NPT, Ridgewood, and CGP about selling the Property and/or the entire Philmont Club. (*Id.* at ¶ 87.)

At the time, NPT was unaware that PCC was also engaging in discussions with Ridgewood and CGP.  (*Id.* at ¶ 88.)

On September 27, 2016—the day after the AOS terminated—NPT discussed the terms of the deposits it would render to PCC if PCC re-entered into the AOS.  (*Id.* at ¶ 89; Doc. No. 1-3, Ex. 12 at p. 27.)

That same day, Meyer met with Plotnick and Grebow at Philmont Club to discuss Ridgewood's interest in the Property.  (Doc. No. 1 at ¶ 90.)  Plotnick and Grebow then expressed their intent to provide PCC with a proposal for the transaction.  (*Id.* at ¶ 91; Doc. No. 1-3, Ex. 13 at p. 29.)  But Ridgewood later changed its mind and told PCC that it was no longer interested in purchasing the Property, reasoning that the ability to obtain approvals for 162 units was speculative and the risks associated with the development of the Property were too high.  (Doc. No. 1 at ¶ 92.)  "In other words, Ridgewood expressed doubt that it, or any other developer, would be able to obtain sufficient confidence in the feasibility of the profitable development of the Property such that purchasing the Property could be justified."  (*Id.* at ¶ 93.)

### H.      CGP's Proposal to Buy Philmont Club

Meanwhile, PCC's financial condition continued to deteriorate.  (*Id.* at ¶ 95.)

On November 1, 2016, Nanula provided PCC with a formal written proposal for CGP's purchase of Philmont Club in its entirety.  (*Id.* at ¶ 94; Doc. No. 1-3, Ex. 14.)  CGP proposed to (1) immediately pay off PCC's $1 million in debt, (2) make $4 million in capital improvements to Philmont Club, and (3) upon the sale of the Property, make an additional $5 million in capital improvements.[5]  (Doc. No. 1 at ¶ 96; Doc. No. 1-3, Ex. 14.)  CGP also promised that Philmont

---

[5] Notably, Philmont Club was appraised in 2003 at $10.6 million solely as a country club (i.e., this figure did not take into account the possibility of selling the Property for development purposes).  (*Id.* at ¶ 150.) Here, CGP promised PCC $10 million in debt payoff and capital improvements, meaning that "CGP's offer [in 2016] was not far removed from the appraised value of Philmont Club [in 2003]."  (*Id.* at ¶¶ 150,

Club would "remain an exclusive private club with at least 27 holes [of golf] after the South Course real estate transaction."  (Doc. No. 1-3, Ex. 14; Doc. No. 1 at ¶ 97.)  "Nanula purposely crafted the proposal" so that the amount of cash PCC would receive from CGP "roughly align[ed]" with the amount that PCC would have received under the AOS it had with NPT and NVR.  (Doc. No. 1 at ¶ 98.)

According to CGP, the advantage of selling Philmont Club to it instead of selling the Property to NPT was that CGP "would immediately purchase Philmont Club and worry about obtaining development approvals for the Property later," whereas a developer like NPT would only be "willing to pay full price for the Property upon obtaining development approvals which may never come."  (*Id.* at ¶ 99.)  CGP's website touts that the company "pride[s] [itself] on quickly and discreetly closing golf transactions on an all-cash basis."  (*Id.* at ¶ 100; Doc. No. 1-3, Ex. 15.)  In addition, one of CGP's main selling points was that it "only require[s] 30 days for due diligence and 5 days to close."  (Doc. No. 1-3, Ex. 15; Doc. No. 1 at ¶ 100.)

After Meyer reviewed CGP's proposal, he responded to Nanula, "I thought upon closing the real estate transaction we would have the full proceeds of the sale available towards capital improvements but I'm only seeing $5M listed."  (Doc. No. 1 at ¶ 101; Doc. No. 1-3, Ex. 16 at p. 36.)  In response, Nanula explained that PCC had two choices:  (1) they could either get the full proceeds of the sale of the Property, if a sale ever even occurred, "and bear all the risks and costs during the process" or (2) allow CGP to "rescue and fix the club now" "without taking any risk or bearing any cost at all."  (Doc. No. 1-3, Ex. 16 at p. 36.)  In other words, because the sale of the Property may never come to fruition, CGP crafted a proposal that "balanced out that risk by

_____

152.)  NPT alleges that this shows that "Philmont Club was worth many millions of dollars more than what it was sold . . . for."  (*Id.* at ¶ 151.)

allowing CGP to recover some of its initial investment if the Property were sold."  (Doc. No. 1 at
¶ 102; Doc. No. 1-3, Ex. 16 at p. 36 ("If we can pull this off, we could get back some of our
initial risk capital from future real estate proceeds – maybe zero, maybe never – and this prospect
allows us to be interested in PCC."); *see also* Doc. No. 1-3, Ex. 20 at p. 64 ("Sent Glenn a
proposal yesterday . . . He wanted to explore how we could give the club 100% of all our real
estate proceeds . . . I said no; about $5m is all we could afford to plow back.  We are taking the
risk in this scenario, not the club.").)  This explanation was consistent with Nanula's position
that:  "We have to assume no real estate transaction might ever be possible, due to the
environmental remediation vagaries and cost; the extensive infrastructure costs for the Philmont
Ave. intersection project; and the Town approval uncertainties."  (Doc. No. 1-3, Ex. 20 at p. 64;
Doc. No. 1 at ¶ 103.)

> **I.      *PCC Sells Philmont Club to CGP, and Ridgewood Re-Enters the Picture***

On November 17, PCC's Board of Directors voted to approve CGP's proposal.  (*See*
Doc. No. 1-3, Ex. 21 at p. 66.)  That same day, Meyer sent a letter to PCC's membership,
informing them of the terms of CGP's proposal to convert Philmont Club to a non-equity club,
including the "Guarantee of maintaining 27 holes of golf after the South Course is sold."  (Doc.
No. 1 at ¶¶ 104–05; Doc. No. 1-3, Ex. 17 at pp. 48–49.)

The next month, on December 12, 2016, a townhall-style meeting was held at Philmont
Club, and Nanula pitched PCC's membership on why they should accept CGP's offer and
answered members' questions about the deal.  (Doc. No. 1 at ¶ 106.)  PCC and CGP's counsel
proceeded to negotiate a proposed Purchase and Sale Agreement (the "PSA") and on January 19,
2017, PCC's Board of Directors voted to approve the PSA and scheduled a date for PCC's
membership to vote on it.  (*Id.* at ¶ 108.)

Because CGP insisted that the PSA be kept confidential, PCC members were only

permitted to view the 50-page PSA in person at Philmont Club and were prohibited from reproducing the PSA or taking any notes on it. (*Id.* at ¶¶ 109–10.) As a result, PCC members could not obtain any independent legal advice on the PSA before voting on whether to sell Philmont Club to CGP. (*Id.* at ¶ 109.)

Meanwhile, on January 23, 2017, CGP incorporated Concert Philmont and Concert Philmont Properties as single purchase entities to make the purchase of Philmont Club. (*Id.* at ¶ 112.) In other words, CGP would not be purchasing Philmont Club directly. (*Id.*) Initially, CGP contemplated Concert Philmont Properties taking title to the Property and Concert Philmont taking title to the remainder of Philmont Club. (*Id.* at ¶ 113.)

On February 1, 2017, PCC's membership voted to approve the PSA and sell Philmont Club to CGP. (*Id.* at ¶ 114.) The PSA was executed on February 6, and closing took place around March 1. (*Id.* at ¶¶ 115–16.) The PSA included an integration clause, which stated: "This Agreement and the exhibits attached hereto represent the entire understanding of the agreement between the Parties with respect to the subject matter hereof, and supersedes the Letter of Intent, all other negotiations, understandings and representations, if any, made between such Parties." (Doc. No. 13-9 at p. 47, § 17.1.) Nanula signed the PSA on behalf of Concert Philmont and Concert Philmont Properties. (*See id.* at p. 55.)

Because it was more complicated to separate title to the Property from title to the remainder of Philmont Club than CGP had originally contemplated, the entirety of Philmont Club was conveyed to Concert Philmont. (*Id.* at ¶ 117.) Therefore, Concert Philmont owned Philmont Club in its entirety but intended to convey the Property to Concert Philmont Properties in the future. (*Id.* at ¶ 118.)

The following month, on March 2, 2017, Concert Philmont Properties and Ridgewood

Philmont[6] entered into a Development Services Agreement (the "DSA"), which provided that Ridgewood Philmont would be responsible for obtaining development approvals for the Property as well as marketing and selling the Property to a developer. (*Id.* at ¶ 119.)

> **J.**      ***NPT Files Suit in State Court, and Discovery Reveals that Ridgewood and CGP Plotted Together to Acquire Philmont Club***

On March 3, 2017, NPT initiated a lawsuit against CGP and PCC in the Montgomery County Pennsylvania Court of Common Pleas (Case No. 2017-04395) (the "Original Action"), alleging that CGP tortiously interfered with its contract with PCC and that PCC breached its contract with NPT. (*Id.* at ¶ 121.) Discovery revealed that, unbeknownst to PCC, CGP had engaged in several covert actions leading up to the sale of Philmont Club, including communicating at length with Ridgewood. (*See, e.g.*, *id.* at ¶¶ 122–25, 128–31.) These revelations are discussed in turn below.

> **i.      CGP and Ridgewood's Initial Interactions in Fall 2016**

In September 2016, Nanula actually met Plotnick at the same industry conference where Plotnick met Brown. (*Id.* at ¶ 123.) During that conference, Plotnick and Nanula discussed the possibility of Ridgewood and CGP working together on future country club acquisitions that would involve excess land that could be developed for residential purposes. (*Id.* at ¶ 124.)

Shortly thereafter, Plotnick and Grebow toured Philmont Club on September 27, 2016, and they decided to try to partner with a golf course operator, such as CGP, so as to better position Ridgewood to be able to purchase Philmont Club. (*Id.* at ¶ 125.)

Nanula kept in touch with Plotnick throughout this time. For example, on October 10, 2016, after Nanula spoke to Meyer at PCC, Nanula immediately turned around and called

---

[6] Ridgewood Philmont is an entity created by Ridgewood for the purpose of entering into the DSA. (*Id.* at ¶ 120.)

Plotnick.  (*Id.* at ¶¶ 126–27.)

> ii.   **Ridgewood and CGP Begin Exchanging Terms of a Proposed Deal**

On October 21, 2016, Plotnick and Nanula began exchanging the terms of the deal that would eventually become the DSA (which was ultimately executed in March 2017).  (*Id.* at ¶ 128; Doc. No. 1-3, Ex. 18 at p. 51.)  Specifically, Plotnick proposed that in exchange for paying half of the costs of obtaining development approvals and finding a buyer for the Property, Ridgewood would receive half the sales of the Property above the costs of obtaining development proposals, plus $5 million.  (Doc. No. 1 at ¶ 129; Doc. No. 1-3, Ex. 18 at p. 51.)  Plotnick also suggested that $5 million from the sale of the Property be reinvested in Philmont Club as capital expenditures.  (*See* Doc. No. 1-3, Ex. 18 at p. 51; Doc. No. 1 at ¶ 130.)  Nanula eventually incorporated this suggestion into his November 1, 2016 proposal to PCC.  (Doc. No. 1 at ¶ 131; Doc. No. 1-3, Ex. 14.)

After receiving Ridgewood's proposal, Nanula forwarded the email to Nick Cicero, a partner at Freestone Capital Management.[7]  (Doc. No. 1 at ¶ 132; Doc. No. 1-3, Ex. 19 at pp. 55–56.)  Nanula explained that CGP was in the early stages of trying to purchase Philmont Club and had received an initial proposal from Ridgewood.  (Doc. No. 1-3, Ex. 19 at p. 56.)  Nanula noted that Ridgewood had "been talking to [the] Club about buying the 9 holes for [redacted] but they need a credible golf operator to sell the members on this" and that he "told them to back off completely so I can buy the whole Club and then deal them in as our real estate partner."  (*Id.*)  However, Nanula wondered, "why do we need Ridgewood at all?  They are not putting up any real capital at all here," and asked Cicero for his advice.  (*Id.*; Doc. No. 1 at ¶ 134.)

Cicero agreed that the return Ridgewood would receive under the proposal "seems

---

[7] Freestone Capital Management is the company responsible for managing the various entities that provided the financing for Concert Philmont's purchase of Philmont Club.  (Doc. No. 1 at ¶ 132.)

awfully high instead of just some set fee that is relatively nominal." (Doc. No. 1 at ¶ 135; Doc. No. 1-3, Ex. 19 at p. 54.) Acknowledging that Ridgewood had already expressed interest to PCC directly, Nanula responded, "Yes, but this firm is in advanced talks with club president about buying this 35 acre parcel from the club . . . So getting them to back off to a small fee will be difficult." (Doc. No. 1-3, Ex. 19 at p. 53; Doc. No. 1 at ¶ 137.) Ultimately, Nanula recognized that the proposed deal with Ridgewood was "[n]ot too shabby" and "juice[d] [CGP's] normal deal returns nicely." (Doc. No. 1-3, Ex. 19 at p. 56.)

### iii. After CGP Submits Its Proposal to PCC, CGP and Ridgewood Continue to Discuss Working Together and a Potential Deal

On November 2, Nanula emailed Plotnick to bring him up to date on PCC's reaction to CGP's proposal to purchase Philmont Club. (Doc. No. 1 at ¶ 140; Doc. No. 1-3, Ex. 20 at p. 64.) Nanula explained that Meyer wanted the club to receive 100% of the real estate proceeds but that he put his foot down and "said no; about $5m is all we could afford to plow back," given that CGP is "taking the risk in this scenario, not the club." (Doc. No. 1-3, Ex. 20 at p. 64.) Nanula predicted that Meyer "may come back to you, and ask for $7m instead of $5m." (*Id.*) As a result, Nanula made the following request: "For now, I hope you guys will stand back, profess some concerns about the real estate risks, and just wait to see if I can strike a better deal for all of us here." (*Id.*) A few hours later, Nanula sent a follow up email, stating that CGP "would only pursue the real estate angle with Ridgewood" and that he was "prepared to sign an agreement to that effect." (*Id.* at p. 63; Doc. No. 1-3, Ex. 21 at p. 68.)

Two days later, on November 4, Plotnick responded, "I completely understand what you are trying to do" and believed they had "the basis for a deal," with just a few minor tweaks. (Doc. No. 1-3, Ex. 21 at p. 68) Plotnick also suggested that Nanula get feedback from Meyer and PCC's Board before putting their agreement in writing. (*Id.*) Plotnick added, "In the

meantime, we will continue to stand on the sidelines and let you do your thing.  Keep me posted as to any progress made, and when you are closer to a deal with the club, we can paper our agreement."  (*Id.*)

Accordingly, Ridgewood told Meyer/PCC that it was not interested in the Property anymore because of risks with the development.  (*See* Doc. No. 1 at ¶¶ 92–93, 144.)  Ridgewood failed to disclose, however, that Ridgewood and CGP knew each other and had been working together behind the scenes, plotting for Ridgewood to "stand back."  (*Id.* at ¶ 144.)

Ridgewood and CGP continued to keep in touch as things moved ahead with CGP and PCC.  For example, on November 19, two days after PCC's Board of Directors voted to accept CGP's proposal, Nanula told Plotnick that the Board "want[s] to move fast and get this closed asap."  (Doc. No. 1-3, Ex. 21 at p. 66.)  Nanula estimated that "the member vote will be 90%+ in favor."  (*Id.*)  Speaking of PCC's Board, Nanula surmised, "They need us, they want us, and they have capitulated in every respect.  Now it is just a matter of executing."  (*Id.*)  At this point, given their success, Nanula decided it was time for Ridgewood and CGP to "paper our deal on the real estate opportunity."  (*Id.*)

### iv.    PCC Decides Not to Pursue a Deal with NPT, Twice

All the while, PCC remained completely unaware that Ridgewood and CGP were working together on the deal behind its back.  (*See generally* Doc. No. 1.)

Thus, in the fall of 2016, after Ridgewood and CGP both cast doubt on the feasibility of the Property development (Ridgewood when it told Meyer it was no longer interested and CGP when it explained why its proposal did not allow PCC to receive the full proceeds of any sale of the Property), PCC "decided to go with the sure thing—the sale of Philmont Club to CGP— rather than risk a sale to NPT failing to materialize months down the road" and refused to engage further with NPT or execute the Ninth Amendment to the AOS.  (*Id.* at ¶¶ 84, 145; *see also id.* at

¶¶ 147–48 ("The doubt cast by Ridgewood and CGP on the viability of the development of the Property at a time when [PCC] had pressing financial challenges caused [PCC] to sell Philmont Club to Concert Philmont at a rate significantly lower than [PCC] otherwise would have sold it. Had it known that the doubts and concerns expressed by Ridgewood and CGP were contrived to get Philmont Club for a cheap price rather than at a cost based in reality, [PCC] would not have sold Philmont Club to Concert Philmont.").)

In December 2016—after PCC's Board approved CGP's proposal but before it approved the PSA—NPT approached PCC again about renewing the AOS, but to no avail.  On December 20, 2016, NPT sent Meyer a revised proposal to buy the Property, which Meyer immediately forwarded to Silverman, stating, "Hot off the press.  Not interested."  (*Id.* at ¶ 146; Doc. No. 1-3, Ex. 22 at p. 72.)  In short, Meyer did not give the proposal "any consideration" and PCC turned down NPT yet again.  (Doc. No. 1 at ¶ 146.)

###### v.  CGP Tries to Ensure that the Risks Regarding Developing the Property are Eliminated

As noted above, Nanula told Meyer that CGP had to "assume no real estate transaction might ever be possible" and asked Ridgewood to "profess some concerns about the real estate risks."  (*Id.* at ¶ 153; Doc. No. 1-3, Exs. 16, 20.)  Nonetheless, CGP wanted to minimize the risk it took when buying Philmont Club.  (*See* Doc. No. 1 at ¶ 153.)  Thus, CGP tried to buy time so it could "confirm that the Property could be developed."  (*Id.*)

For example, even though CGP's website touted that the company "only require[s] 30 days for due diligence" (Doc. No. 1-3, Ex. 15), CGP pushed for a longer due diligence period on this transaction (*see* Doc. No. 1 at ¶¶ 154–55).  On December 13, 2016, Moran asked Nanula, "Are we still going for a 60 day DD period here to better understand the real estate play?  Which would push the close into late March?"  (Doc. No. 1-4, Ex. 24 at p. 76.)  Later that day, Moran

stated, "Understood on the 45 day DD so early March close."  (Doc. No. 1-4, Ex. 25 at p. 80.)

"CGP never informed [PCC] that it was delaying closing to ensure that it could obtain

development approvals for 160 or more Units on the Property and ensure that the Property could

be sold."  (Doc. No. 1 at ¶ 156.)

Then, on January 16, 2017, Nanula informed Ridgewood that the PSA was "moving

along quickly," with an expected timeline of:  PCC's Board of Directors' approval on January

18, PCC's members' approval on February 1, and a target closing date of February 28.  (Doc.

No. 1-4, Ex. 26 at p. 86.)  Mindful of Ridgewood's role in obtaining development approvals for

the Property, Nanula asked, "Does this give you guys enough time to get through environmental

and Town meetings, or should I buy some more time on our closing."  (*Id.*)

By January 20, 2017, Ridgewood had met with the Township's manager, who "[w]as

thrilled that there was going to be one owner who wanted to integrate homes into club" and

"[d]idn't flinch on the 160 units."  (Doc. No. 1-4, Ex. 27 at pp. 88–89.)  Grebow explained, "As

expected they want the $1mm contribution for traffic.  Standard 55 and over community —

mentioned something about no kids under 19 allowed."  (*Id.* at p. 89.)  Notably, the Township

"[w]ant[ed] to get the deal done."  (*Id.*; *see also* Doc. No. 1-4, Ex. 28 at p. 92 (Nanula's email to

CGP's Chief Operating Officer, Susan Dunnavant, stating "[T]he South Course real estate

development is looking good for now; met with the Town this week, and they want to get this

deal done with us.").)

A few days later, on January 24, 2017, Nanula told Ridgewood:  "Town not wasting any

time here.  Good body language."  (Doc. No. 1-4, Ex. 29 at p. 96.)  Grebow responded,

"Definitely great body language.  Last step in DD is the environmental cost analysis.  Our

attorney went through things with the consultant today and we should have that in about 2

weeks."  (*Id.* at p. 95.)

A couple of weeks later, on February 14, Nanula informed his colleagues that "Ridgewood came back optimistic about enviro remediation on the South Course, so we are a go on the real estate project.  They say it will take 12-18 months to get through Penn DEP [Pennsylvania Department of Environmental Protection], and we should have our entitlements for 165+ 'carriage homes' within 24 months.  Then we sell the nicely entitled 6[0] acre parcel to [a builder], and they start moving dirt and building homes about 2 years from now."  (Doc. No. 1 at ¶ 165; Doc. No. 1-4, Ex. 30 at pp. 99–100.)  Nanula then explained that the "big issue" was "dirt," since approximately 60,000 yards of the South Course dirt was "arsenic-infected" and may "need to be moved."  (Doc. No. 1-4, Ex. 30 at p. 100.)  Ridgewood "talk[ed] about putting it on the driving range and some berms to shield the new homes," but Nanula cautioned his team to carefully evaluate that plan.  (*Id.* ("Ridgewood just wants to maximize our proceeds from selling the entitled parcel [redacted]; they are our partner on the land deal, so it makes sense they are focused on that.  But they don't own any part of the Club and don't need to care about it.  We need to make sure we end up with a great North Course and some other workable club facilities. So **you** will be telling **them** where that 60k yards of dirt goes.").)  According to NPT, Nanula's email illustrates that by mid-February, "CGP had satisfied any concerns [it had] about the scope and cost of the environmental remediation."  (Doc. No. 1 at ¶ 164.)

At bottom, NPT asserts that the email exchanges discussing the Town's desire to move the deal along and the environmental remediation plans show that the risks with the development of the Property that CGP and Ridgewood had "professed" concerns about "had, in fact, been confirmed to be non-existent."  (*See id.* at ¶ 167.)  Moreover, CGP and Nanula never told PCC how they had resolved the environmental remediation and Township approval issues.  (*Id.*)

**K.      Contrary to its Proposal, CGP Never Intended to Keep 27 Holes of Golf at Philmont Club or to Spend $5 Million on Capital Improvements to the Club**

NPT alleges that, in addition to CGP keeping its relationship with Ridgewood a secret,[8] CGP made other misrepresentations to PCC.  (*See generally id.* at ¶¶ 170–182.)

First, even though CGP's November 1 proposal stated that "PCC will remain an exclusive private club with at least 27 holes after the South Course real estate transaction" (Doc. No. 1-3, Ex. 14 at p. 32), CGP emails illustrate that "CGP had no intention" to follow through on its promise (Doc. No. 1 at ¶ 170).

For example, on October 21, 2016—shortly before sending CGP's proposal to PCC— Nanula told Cicero that "[o]nly 18 or [sic] 27 holes truly needed for the membership."  (Doc. No. 1-3, Ex. 19 at p. 56).  Then, on December 8, 2016, Dunnavant asked Nanula whether CGP should "[g]o down to 18 hole [sic] immediately and maintain at levels that warrant the current higher level of dues" or "get North Course to sellable conditions and have South Course OK — Maybe do the public course?"  (Doc. No. 1-4, Ex. 31 at p. 102.)  The next day, December 9, CGP internally discussed turning the South Course into a "short course" of "3-6 holes" and "abandon[ing] the other 12-15 and kill[ing] off and re-grass[ing] these."  (Doc. No. 1-4, Ex. 32 at p. 105.)  And on December 9, after speaking to Meyer, Nanula emailed Dunnavant and Moran that Meyer was "OK with giving us carte blanche on the golf courses, so long as there is a great North Course."  (Doc. No. 1-5, Ex. 33 at p. 107.)  Nanula added, "[Meyer] doesn't understand what we will do with the $5-6k dues preview [sic] members who only get South Course access

---

[8] To that end, PCC remained completely unaware that Ridgewood and CGP had even been communicating since September 2016.  (*Id.* at ¶ 168.)  Ridgewood and CGP never informed PCC of this fact, "much less that they had been working together to acquire Philmont Club and develop the Property since October 2016 at the latest."  (*Id.*)  In fact, Meyer first learned that Ridgewood and CGP had "teamed up on the development of the Property" during his deposition on July 25, 2018.  (*Id.* at ¶ 169.)

now, but that is our problem.  There will be howling and lots of questions from the members, but we will stay flexible until we know what is best to do in terms of the South Course."  (*Id.*)

At the town hall meeting the following day, when Nanula pitched PCC's membership, he never mentioned CGP's intent to reduce the number of holes of golf below 27.  (Doc. No. 1 at ¶ 175.)  Nor did he inform them of this "at any other time before the closing on the PSA."  (*Id.*)  Nanula also did not appear to change his mind on downsizing the number of holes of golf as the transaction proceeded:  on March 1, 2017—the day Concert Philmont became owner of Philmont Club—Nanula told Dunnavant that they needed to consider "how the remaining 6-7 holes on the South Course will really work for our membership once remodeled" (Doc. No. 1-4, Ex. 34 at p. 109), "indicating that CGP planned to only maintain [24] to [25] holes of golf," not 27.  (Doc. No. 1 at ¶ 176.)

Second, NPT alleges that CGP also misrepresented to PCC "the amount that would be spent on capital improvements."  (*Id.* at ¶¶ 177–78.)  In an internal November 21, 2016 email, Nanula wrote, "The wild ideas the Board has about a 'master plan for the North Course are probably way overblown, and we have huge capital needs in the clubhouse, HVAC, etc.  You will see.  We will want to 'nod' to some master plan elements so the members are excited about their North Course being updated a bit, but we want to spend the smallest dollars possible to get the maximum member impact."  (Doc. No. 1-4, Ex. 35 at p. 114.)  Then, on January 2017, Nanula complimented CGP's counsel for the "nicely vague" language in the PSA about the capital improvement projects CGP would undertake.  (Doc. No. 1 at ¶ 181; Doc. No. 1-4, Ex. 36 at p. 118.)  Nanula also shared with counsel a list of the initial capital projects that CGP "actually . . . planned" to undertake, which were "[n]ot to be shared with" PCC.  (Doc. No. 1-4, Ex. 36 at pp. 117–18.)

In sum, according to NPT, "CGP never intended to expend the full $5,00,000 towards capital improvements that it promised to make upon the sale of the Property.  Rather, CGP intended to expend a significantly smaller amount and keep the remainder as profit."  (Doc. No. 1 at ¶ 180.)

**L.      The Limited Assignment Agreement Between PCC and NPT**

On September 18, 2019—approximately two-and-a-half years after NPT sued PCC and CGP in state court—NPT and PCC entered into a Limited Assignment of Claims Agreement. (*See* Doc. No. 1-1, Ex. 1 at pp. 2–4.)  Under the agreement, PCC (the Assignor) agreed to assign NPT (the Assignee)

> any and all claims, demands, and cause or causes of action of any kind whatsoever which Assignor has, may have, may have [sic], or may have had on or before March 1, 2017 against Concert Golf Partners LLC, Concert Philmont Properties, LLC, Concert Philmont, LLC, Peter Nanula, Ridgewood Real Estate Partners, Michael Plotnick, and Jonathan Grebow  . . .

(*Id.*)  In addition, the assignment agreement contained a categorical exclusion for all claims arising under the PSA:

> Assignee expressly acknowledges and agrees that Assignor is not assigning, and is specifically reserving to itself, any and all claims that it has against any/or all the Concert and Ridgewood Real Estate Partners, Michael Plotnick, and Jonathan Grebow under that certain Purchase and Sale Agreement dated February 6, 2017 by and among Philmont Country Club, Concert Philmont, LLC, and Concert Philmont Properties, LLC.

(*Id.*)

**M.      The Instant Case**

Shortly thereafter, on October 1, 2019, NPT initiated this lawsuit against Concert Defendants and Ridgewood Defendants.  (Doc. No. 1.)  The claims fall into four categories:  (1) antitrust, (2) fraud, (3) civil conspiracy, and (4) breach of contract.  With the exception of one of the antitrust counts (Count II), NPT asserts all of the claims against Defendants as PCC's

assignee.

**Antitrust**.  NPT claims that CGP, Nanula, Ridgewood, Grebow, and Plotnick violated the Sherman Antitrust Act, 15 U.S.C. § 1, by conspiring to "not compete against themselves in the purchase of Philmont Club, but rather, to work jointly to reduce the price" of the club and by providing PCC with "false information to cast doubt in [PCC's] mind about the viability of selling the Property to NPT or another developer and thereby positioning CGP as the only viable option for [PCC] to solve its financial issues." (Doc. No. 1 at ¶¶ 187–224 (Counts I & II).)  NPT asserts its antitrust claims directly and as assignee.  (*See id.*)

**Fraud**.  NPT brings five fraud-related claims against various Ridgewood and Concert Golf Defendants.  (*See id*. at pp. 32–43.)  First, NPT alleges that Ridgewood, Grebow, and Plotnick committed fraud, based on Plotnick and Grebow's misrepresentations to PCC (namely, telling PCC that Ridgewood was not interested in developing the Property when it was, in fact, interested and had an agreement with CGP about obtaining development approvals).  (*Id.* at ¶¶ 225–41 (Count III).)  Second, NPT claims that CGP and Nanula aided and abetted Ridgewood's fraud by "actively encourag[ing]" Ridgewood to profess concerns about developing the Property and stand back.  (*Id.* at ¶¶ 242–54 (Count IV).)  Next, NPT brings a separate claim for fraud against CGP and Nanula based on CGP's statements to PCC that the ability to develop the Property was speculative and risky, that CGP would retain 27 holes of golf at Philmont Club after the transaction, and that CGP would spend $5 million in capital improvements.  (*Id.* at ¶¶ 255–75 (Count V).)  Fourth, NPT claims that Ridgewood, Grewbow, and Plotnick aided and abetted CGP's fraud.  (*Id.* at ¶¶ 276–87 (Count VI).)  Last, NPT asserts a fraudulent concealment claim against CGP, Nanula, Ridgewood, Grebow, and Plotnick, again based on their failure to disclose the fact that they were working together to acquire Philmont Club.  (*Id.* at ¶¶ 288–99

(Count VII).)

**Civil Conspiracy**.  NPT alleges that all Defendants conspired with each other to engage in anti-competitive behavior in violation of the Sherman Act and Clayton Act, for Ridgewood and CGP to "fraudulently express concerns about the ability to obtain development approvals and the risks associated with" developing the Property, and "for CGP to acquire Philmont Club at a drastically reduced rate," among other things.  (*Id.* at ¶¶ 300–08 (Count VIII).)

**Breach of Contract**.  Finally, NPT claims that Ridgewood breached its September 29, 2016 confidentiality agreement with PCC when it disseminated some of PCC's confidential financial information to third parties.[9]  (*Id.* at ¶¶ 309–314 (Count IX).)

Subsequently, the Ridgewood Defendants and Concert Defendants filed a joint motion to dismiss, arguing that NPT cannot bring claims as an assignee of PCC; that NPT fails to state an antitrust claim because it, among other things, does not define a relevant market in which competition has been harmed; and that NPT did not satisfy the heightened pleading standard for fraud claims.  (Doc. Nos. 13, 21.)  NPT opposed the motion.  (Doc. Nos. 17, 22, 33.)  The Court held oral argument on the motion on July 22, 2021.

## II.    Legal Standard

In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

---

[9] Specifically, NPT alleges that, just days after signing the confidentiality agreement, Ridgewood transmitted PCC's financial information to ClubCorp and to Morningstar Golf & Hospitality, LLC.  (*Id.* at ¶¶ 183–86.)

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  "However an exception to the general rule is that a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Id.* (quotation marks and alterations omitted). Similarly, the Court "may consider an undisputably authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

## III.    Discussion

In moving to dismiss, Concert Defendants and Ridgewood Defendants argue that:

- Counts I, III, IV, VI, VII, and VIII must be dismissed because NPT cannot assert those claims as an assignee;

- The antitrust claims (Counts I and II) must be dismissed because NPT fails to allege a violation of Section 1 of the Sherman Act;

- The fraud and fraudulent concealment claims (Counts III, IV, V, VI, and VII) must be dismissed because NPT fails to demonstrate that any of the Defendants had a duty to speak or that NPT justifiably relied on the alleged false representations;

- The aiding and abetting fraud claims (Counts IV and VI) must be dismissed because NPT does not plead a viable fraud claim;

- The civil conspiracy claim (Count VIII) must be dismissed because it is based upon legally insufficient claims of antitrust violations and fraud and because NPT fails to plead malice;

- The breach of contract claim (Count IX) must be dismissed because NPT alleges no damages.

(Doc. No. 13-2.)  We address each contention in turn.

### A.    *Assignment*

Defendants argue that NPT's complaint must be dismissed because (1) the claims NPT asserts as assignee "arise under" the PSA and therefore are barred by the express language of the

Limited Assignment of Claims Agreement; (2) the PSA contained an anti-assignment clause; and (3) PCC did not expressly assign its antitrust claims to NPT, in contravention of Third Circuit law.  (*See* Doc. No. 13 at pp. 11–13 & Doc. No. 21 at pp. 2–4.)  For the reasons discussed below, the Court is unpersuaded by Defendants' arguments and denies Defendants' motion to dismiss on those grounds.

### i.    The Claims NPT Asserts as Assignee Do Not "Arise Under" the PSA

As noted above, in September 2019, NPT and PCC entered into a Limited Assignment of Claims Agreement.  (*See* Doc. No. 1-1, Ex. 1 at pp. 2–4.)  Pursuant to the agreement, PCC assigned NPT:

> any and all claims, demands, and cause or causes of action of any kind whatsoever which Assignor has, may have, may have [sic], or may have had on or before March 1, 2017 against Concert Golf Partners LLC, Concert Philmont Properties, LLC, Concert Philmont, LLC, Peter Nanula, Ridgewood Real Estate Partners, Michael Plotnick, and Jonathan Grebow  . . .

(*Id.*)  However, the agreement also contained a categorical exclusion for all claims arising under the PSA.  To that effect, "[NPT] expressly acknowledge[d] and agree[d] that [PCC] [wa]s not assigning, and [wa]s *specifically reserving to itself*, any and all claims that it has against any/or all the Concert and Ridgewood Real Estate Partners, Michael Plotnick, and Jonathan Grebow *under that certain Purchase and Sale Agreement* dated February 6, 2017 by and among Philmont Country Club, Concert Philmont, LLC, and Concert Philmont Properties, LLC."  (*Id.* (emphasis added).)

In their motion to dismiss, Defendants argue that the antitrust, fraud, and civil conspiracy claims that NPT asserts as assignee arise under the PSA and that those claims are reserved for PCC to bring itself.  (Doc. No. 13-2 at pp. 11–12 ("The Complaint expressly states that, because of the Defendants' unlawful conduct, Concert Golf was able to 'obtain Philmont Club at an unfair and unjust price.'  The Concert Defendants purchased Philmont Club pursuant to the PSA.

26

Hence, NPT's claims in this case (with the exception of Count IX against certain Ridgewood Defendants) as assignee arise under the PSA, which [PCC] expressly reserved for itself.").)

In response, NPT argues that the claims they bring as assignee do not arise under the PSA because the claims all relate to actions taken *before* the PSA was executed.  (Doc. No. 17 at pp. 16–18.)  In addition, NPT states that the antitrust claims arise out the Sherman and Clayton Acts, not the PSA, and that the fraud claims "arise in tort."  (*Id.* at p. 17.)

> a.  *Fraud*

At this stage in the litigation, the Court is not persuaded by Defendants' contention that the fraud claims arise under the PSA.  Notably, Defendants fail to cite to any applicable case law to support their position.  (*See* Doc. No. 13-2 at pp. 11–12 & Doc. No. 21 at p. 3.)

Although Defendants did not raise the gist of the action doctrine in their briefing, the Court finds the doctrine instructive, insofar as it sheds light on the distinction between claims sounding in tort versus in contract.  Under Pennsylvania law, the gist of the action doctrine "prevents a plaintiff from recasting ordinary breach of contract claims into tort claims."  *Invs. Tr. LC v. TD Bank*, Civil Action No. 11-1551, 2011 WL 13141657, at *1 n.1 (E.D. Pa. May 26, 2011); *Weed v. Ally Fin. Inc.*, Civil Action No. 11-2808, 2011 WL 3803719, at *4 (E.D. Pa. Aug. 26, 2011).  Pennsylvania courts and courts in this District have repeatedly recognized that the purpose of the doctrine is "to maintain the distinction between the theories of contract and tort."  *Invs. Tr. LC*, 2011 WL 13141657, at *1 n.1; *Weed*, 2011 WL 3803719, at *4; *see also eToll, Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002).  Accordingly, the doctrine does not bar tort claims where the claims "arise independently of the underlying contract, with the contract being merely collateral."  *Invs. Tr. LC*, 2011 WL 13141657, at *1 n.1; *see also Weed*, 2011 WL 3803719, at *5.

As it relates to fraud, "fraud in the inducement claims are much more likely to present cases in which a social policy against the fraud, external to the contractual obligations of the parties, exists." *U.S. Claims, Inc. v. Saffren & Weinberg, LLP*, Civil Action No. 07-0543, 2007 WL 4225536, at *11 (E.D. Pa. Nov. 29, 2007); *see also CRS Auto Parts, Inc. v. Nat'l Grange Mut. Ins. Co.*, 645 F. Supp. 2d 354, 377–78 (E.D. Pa. 2009) ("Where . . . the fraud concerns an act collateral to and not interwoven with the terms of the parties' contract, such as fraudulent inducement to enter the contract, courts have been less willing to bar claims . . . [However,] [w]here the pre-contractual statements that are the basis for the fraudulent inducement claim concern specific duties that are later outlined in the contract, courts have repeatedly dismissed such claims as sounding in contract and, thus, barred by the gist of the action doctrine."); *Morales v. Superior Living Prods., LLC*, Civil Action No. 07-cv-04419, 2009 WL 3234434, at *8 (E.D. Pa. Sept. 30, 2009) ("Courts have held that fraudulent inducement claims are not barred by the gist-of-the-action doctrine where the alleged fraud is collateral to the contract.  However, fraudulent inducement claims are barred by the gist-of-the-action doctrine where the claims relate to the performance of the contract.").

Here, the allegations make clear that NPT is asserting a fraud in the inducement claim on PCC's behalf.  (*See generally* Doc. No. 1.)  Namely, NPT alleges that but for Ridgewood and CGP's misrepresentations as to the riskiness of developing the Property, PCC would not have sold Philmont Club to Concert Defendants and entered into the PSA.  (*See, e.g.*, Doc. No. 1 at ¶¶ 226–41 ("Michael Plotnick and Jonathan Grebow . . . told Meyer and [PCC] that . . . it was speculative that the Property could be developed and that there were significant risks involved in the development of the Property . . . Ridgewood knew its representations to be false and purposely made the misrepresentation to cause [PCC] to rely on it and agree to CGP's proposal

instead of pursing other options, including a sale of Property to NPT."); *id.* at ¶¶ 256–75 ("CGP represented to [PCC] that obtaining development approvals for the Property would be difficult and speculative . . . [PCC] was harmed as a result of its reliance upon CGP's representations by way of selling Philmont Club to Concert Philmont for below market value.").)

The Court finds that the alleged fraud is collateral to the PSA and that the fraud claims do not relate to the performance of the PSA. Nowhere in the complaint does NPT plead that Concert Defendants did not purchase Philmont Club for the price agreed upon or that Concert Defendants otherwise did not follow through on promises they made in the PSA. (*See generally* Doc. No. 1.) *Cf. Morales*, 2009 WL 3234434, at *8 ("Because the . . . fraudulent misrepresentation claims and the fraud claim essentially allege that defendants failed to honor their alleged promise to deliver bathtubs manufactured by Superior in accordance with the parties' agreement, I conclude that those claims are related to the performance of the contract[.]"). Taken together, the Court concludes that NPT's fraud claims sound in tort and do not arise under the PSA.

> b. <u>Antitrust</u>

Next, the Court holds that the antitrust claim NPT asserts as assignee is statutory in nature and arises out of federal antitrust law, not under the PSA. *See Walgreen Co. v. Johnson & Johnson*, 950 F.3d 195, 299 (3d Cir. 2020) ("The statutory federal antitrust claims asserted in Walgreen's complaint are extrinsic to, and not 'rights under,' the Distribution Agreement."); *see also id.* at 202 ("Walgreen is seeking to enforce a purely statutory right, not a substantive right originating from the Distribution Agreement").

> c. <u>Civil Conspiracy</u>

Last, the Court concludes that the civil conspiracy claim does not arise under the PSA

either.  The civil conspiracy claim is based entirely on the fraud and antitrust allegations—

specifically, NPT alleges that CGP, Nanula, Ridgewood, Grebow, and Plotnick conspired with

each other to (1) violate the federal antitrust laws and (2) commit fraud, including making

fraudulent misrepresentations as to the ability to obtain development approvals for the Property,

so that CGP could acquire Philmont Club at a drastically reduced rate.  (*See* Doc. No. 1 at ¶¶

300–08.)  Because the fraud and antitrust claims do not arise under the PSA—and the civil

conspiracy claim is grounded entirely on allegations that Defendants committed fraud and

violated federal antitrust laws—the civil conspiracy claim necessarily cannot arise under the

PSA.

### ii. The Limited Assignment Did Not Violate the PSA's Anti-Assignment Provision

Defendants argue that NPT is barred from bringing antitrust and state law claims as an

assignee because the PSA included an anti-assignment provision and, therefore, PCC could not

assign those claims to NPT.  (Doc. No. 13-2 at pp. 12–13.)  The anti-assignment clause states:

"[N]either the Seller nor the Buyer may assign this Agreement *nor any of the rights and/or

obligations under this Agreement* either directly, indirectly or by operation of law either prior to

or after the Closing Date without the approval of the other Party, which approval will not be

unreasonably withheld, delayed or conditioned."  (Doc. No. 13-3 at p. 48, § 17.4 (emphasis

added).)

As Defendants recognized during oral argument (Hr'g Tr. at 6:19–7:10), the Third Circuit

recently rejected the notion that an anti-assignment clause can preclude an assignee from

bringing a federal antitrust claim.  *See Walgreen Co.*, 950 F.3d at 196, 199, 203 (considering

"whether an assignment of federal antitrust claims is barred by a contract provision proscribing

the assignment of any 'rights and obligations' under that contract" and determining that the

answer was a resounding "no").  This is because the federal antitrust claims were "a product of federal statute and thus [we]re extrinsic to, and not rights 'under,' a commercial agreement."  *Id.* at 196.  So too here.

Defendants' argument that the anti-assignment clause prohibited PCC from assigning the common law fraud and civil conspiracy claims fails as well.  This is because the anti-assignment clause *only* proscribes the assignment of claims *arising under the PSA*.  But, for the reasons discussed above, the fraud and civil conspiracy claims do not arise under the PSA.  Therefore, the anti-assignment clause is inapplicable.

### iii.   PCC Expressly Assigned its Antitrust Claim to NPT

Third, Defendants argue that PCC did not expressly assign its antitrust claims to NPT, rendering the assignment of that claim unenforceable.  (Doc. No. 13-2 at p. 13.)  We disagree.

In *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, the Third Circuit held that an assignment of an antitrust claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, must be "express."  995 F.2d 425, 438–39 (3d Cir. 1993) ("[W]e hold that only an express assignment of an antitrust claim can be valid."); *id.* at 440 (holding that "any assignment of antitrust claims, as a matter of federal common law, must be an express assignment; general assignments, without specific reference to antitrust claims, cannot validly transfer the right to pursue those claims"). In that case, Gulfstream III Associates purchased an aircraft, which it resold to JB & A. Gulfstream then assigned its "rights, title and interest" in the aircraft and its purchase agreement with the manufacturer to JB & A.  *Id.* at 431, 437.  The Third Circuit held that the general assignment "of Gulfstream III's rights, title, and interest in" the aircraft and original purchase agreement did not suffice to assign its federal antitrust claims because it was not express.  *Id.* at 440 ("Gulfstream III Associates made no express assignment of its antitrust claims to JB & A[.]").

Six months after *Gulfstream*, the Third Circuit closely examined that decision and

applied the *Gulfstream* rule that assignments must be express, this time in the context of a

Racketeer Influenced and Corrupt Organizations ("RICO") claim.  *Lerman v. Joyce Int'l, Inc.*, 10

F.3d 106, 111–12 (3d Cir. 1993).  In *Lerman*, Litton had assigned "all of" LOPC's "causes of

action, . . . claims and demands of whatsoever nature," and the Third Circuit held that this

assignment was "'express' within the meaning of *Gulfstream*."  *Id.* at 112; *see also In re*

*Linerboard Antitrust Litig.*, 443 F. Supp. 2d 703, 712 (E.D. Pa. 2006) ("[T]he *Lerman* Court held

that an unambiguous and all-inclusive assignment of claims, even without specifying the types of

causes of action assigned, satisfies the express assignment requirement.").  In its analysis, the

Third Circuit distinguished from the assignment at issue in *Gulfstream*:

> The wording of the assignment in this case contrasts sharply with that in
> *Gulfstream*.  Here, Litton expressly assigned to Joye "all of" LOPC's "causes of
> action, . . . claims and demands of whatsoever nature."  In *Gulfstream*, on the
> other hand, the purchase agreement made no reference to legal causes of action or
> claims.  Rather, it referred only to Gulfstream III's "rights, title and interest" in
> the aircraft and the contract with the manufacturer.  As a result of the wording
> used in the assignment at issue here, we believe that the concern underlying the
> express assignment rule adopted in *Gulfstream* is satisfied.  The *Gulfstream* court
> appears to have been troubled by the difficulty of determining on a case-by-case
> basis whether an assignment such as the one in that case had been intended by the
> parties to transfer antitrust claims.  The wording of the assignment in this case,
> however, could not reasonably lead to such difficulty.  The assignment refers to
> Joye "all of" LOPC's "causes of action" and "claims of . . . whatsoever nature."
> This language is unambiguous and all-inclusive.  Consequently, we hold that this
> assignment is "express" within the meaning of *Gulfstream*.

10 F.3d at 112.

Here, the Court concludes that PCC expressly assigned its federal antitrust claims to NPT

in the Limited Assignment of Claims Agreement.  Under the terms of that agreement, PCC

assigned NPT "*any and all claims, demands, and cause or causes of action of any kind*

*whatsoever* which Assignor has, may have, may have [sic], or may have had on or before March

1, 2017 against Concert Golf Partners LLC, Concert Philmont Properties, LLC, Concert

Philmont, LLC, Peter Nanula, Ridgewood Real Estate Partners, Michael Plotnick, and Jonathan Grebow . . ."  (Doc. No. 1-1, Ex. 1 at pp. 2–4.)  This language is nearly identical to the assignment provision in *Lerman*, which the Third Circuit held to be "express" within the meaning of *Gulfstream*.  *Compare id.*, *with Lerman*, 10 F.3d at 112 ("The assignment refers to Joye 'all of' LOPC's 'causes of action' and 'claims of . . . whatsoever nature.'").  In addition, this language is distinguishable from the language that concerned the Third Circuit in *Gulfstream*.  As the *Lerman* court noted, the purchase agreement in *Gulfstream* "made no reference to legal causes of action or claims" and "referred only to Gulfstream III's 'rights, title and interest' in the aircraft and the contract with the manufacturer."  *See Lerman*, 10 F.3d at 112. In contrast, the language in the Limited Assignment of Claims Agreement unambiguously assigns *all* legal causes of action to NPT, with the exception of those that arise under the PSA, as discussed above.

Defendants' reliance on the Third Circuit's 2016 decision, *Wallach v. Eaton Corp.*, is unavailing.  (*See* Doc. No. 13-2 at p. 13; Doc. No. 21 at pp. 1–3.)  Citing to *Gulfstream*, the *Wallach* court noted that the Third Circuit has "long required that . . . assignments [of antitrust claims] be express."  837 F.3d 356, 366 (3d. Cir. 2016).  However, Defendants are mistaken when they say that the holding of *Wallach* dealt with what constituted an express assignment. (*See* Doc. No. 21 at pp. 2–3 ("The Third Circuit [in *Wallach*] rejected the concept that an effective assignment of an antitrust claim is accomplished by a general assignment of 'all claims' or all 'causes of action' without specific reference to antitrust claims."); Hr'g Tr. at 8:2–10:1, 19:22–24.)  As the *Wallach* court explicitly recognized, "*[a]t issue in this case . . . is not whether the assignment was express*.  Rather, we are asked to determine whether an assignment of a federal antitrust claim must also reflect consideration to be valid."  837 F.3d at 366 (emphasis

33

added); *see also id.* at 371 ("In sum, we conclude that consideration has little role in advancing the goals of *Illinois Brick* and requiring it could affirmatively undermine one of them by, in certain circumstances, discouraging private enforcement of the federal antitrust laws.  We therefore hold, consistent with the Second Restatement of Contracts, that consideration is not required under federal common law to give effect to an otherwise express assignment."); *id.* at 361 ("[W]e hold that an assignment of a federal antitrust claim need not be supported by bargained-for consideration in order to confer direct purchaser standing on an indirect purchaser; such assignment need only be express, and that requirement was met here.").

The fact that the Third Circuit in *Wallach* never considered whether the assignment was express is further underscored by the court's analysis and the case's procedural history.  First, unlike in *Gulfstream* and *Lerman*, in *Wallach*, the Third Circuit never mentioned the wording of the assignment.  *See generally id.*  Second, the district court had dismissed the action for lack of consideration and noted that the parties never disputed the fact that the antitrust claims were expressly assigned.  *See id.* at 363 ("Tauro . . . purchases trucks from R&R—a company that . . . expressly assigned Tauro its direct purchaser antitrust claims stemming from the alleged conspiracy between the OEMs and Eaten.  Before the District Court, Appellees challenged the propriety and effect of this assignment, urging that it lacked bargained-for consideration . . . The District Court agreed and dismissed Tauro from the suit."); *see also Wallach v. Eaton Corp.*, 125 F. Supp. 3d 487, 493 (D. Del. 2015), *rev'd*, 837 F.3d 356 (3d. Cir. 2016) ("Defendants do not dispute that 'an antitrust claim can be expressly assigned.'  Instead, defendants allege that the purported assignment is legally invalid for lack of consideration.").

Because PCC expressly assigned its federal antitrust claims to NPT, we deny Defendants' motion to dismiss on this ground.

### B.    Antitrust Claims

Next, the Court addresses Defendants' argument that the two antitrust claims—Count I, which NPT brings directly, and Count II, which NPT asserts as assignee—must be dismissed for failure to state a claim.  (Doc. No. 13-2 at pp. 13–20; Doc. No. 21 at pp. 4–8.)

Section 1 of the Sherman Act makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce[.]"  15 U.S.C. § 1.  To state a Section 1 claim, a plaintiff must allege (1) an agreement (2) to restrain trade unreasonably. *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 331 (3d Cir. 2018).  In turn, Section 4 of the Clayton Act provides a private right of action for plaintiffs seeking to allege an antitrust violation.  *See, e.g.*, *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 81 (3d Cir. 2011) ("Section 4 of the Clayton Act . . . provides a private right of action for 'any person who shall be injured . . . by reason of anything forbidden in the antitrust laws." (cleaned up)); *Gorrio v. Corr. Officer Francis*, Civil Action No. 2:19-1297, 2021 WL 3023736, at *17 (W.D. Pa. May 7, 2021) ("The Clayton Act provides a private right of action for violations of the Sherman Act."); *World Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 425 F. Supp. 2d 484, 518 (S.D.N.Y. 2006) ("[A] plaintiff alleging injury from an antitrust violation may seek damages only under § 4 of the Clayton Act, which authorizes private lawsuits . . .").

Defendants argue that Plaintiff's antitrust claims must be dismissed because (1) the complaint fails to establish an unreasonable restraint of trade, (2) the complaint fails to plausibly allege the existence of an agreement between Ridgewood and CGP, and (3) the complaint fails to allege an antitrust injury.  (*See* Doc. No. 13-2 at pp. 14–23.)  Because the Court finds that NPT fails to establish an unreasonable restraint of trade, we do not address the other two arguments.

### i.    Plaintiff Fails to Plead that Defendants Unreasonably Restrained Trade

The Supreme Court "has repeated time and again that § 1 outlaws only unreasonable

restraints." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). "An 'unreasonable' restraint is one that inhibits competition in the relevant market." *Lifewatch Servs. Inc.*, 902 F.3d at 335 (citation omitted).

There are two tests for determining whether a practice restrains trade in violation of Section 1 of the Sherman Act:  the rule of reason and the *per se* rule.  *See, e.g.*, *Leegin*, 551 U.S. at 885–86.  Typically, courts determine whether a restraint violates Section 1 of the Sherman Act by applying the rule of reason.  *See Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2151 (2021) ("*NCAA*") ("Determining whether a restraint is undue for purposes of the Sherman Act 'presumptively' calls for what we have described as a 'rule of reason analysis.'"); *see also id.* at 2155 ("Most restraints challenged under the Sherman Act—including most joint venture restrictions—are subject to the rule of reason, which (again) we have described as a fact-specific assessment of market power and market structure aimed at assessing the challenged restraint's actual effect on competition." (cleaned up)).

Under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition."  *Leegin*, 551 U.S. at 885–86 (cleaned up).  Courts consider "specific information about the relevant business," "the restraint's history, nature, and effect," and "[w]hether the businesses involved have market power."  *Id.* (cleaned up)); *see also NCAA*, 141 S. Ct. at 2151, 2155; *Eichorn v. AT & T Corp.*, 248 F.3d 131, 144–45 (3d Cir. 2001).  "In applying this test, we examine the competitive significance of the alleged restraint to determine whether it has an anti-competitive effect on the market and is an unreasonable restraint on trade." *Eichorn*, 248 F.3d at 145.  As the Supreme Court has explained, the rule of reason "distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints

36

stimulating competition that are in the consumer's best interest." *Leegin*, 551 U.S. at 886.

Some types of restraints, however, "are deemed unlawful *per se*." *Id.* (cleaned up).  The *per se* rule "treat[s] categories of restraints as necessarily illegal." *Id.*  As a result, if the *per se* rule applies, the court need not "study the reasonableness of an individual restraint in light of the real market forces at work." *Id.*  In other words, the court conducts a truncated analysis if the restraint is *per se* illegal.

Because of this, "the per se rules of illegality are the exception to antitrust analysis and are only employed in certain recognized categories." *Eichorn*, 248 F.3d at 144.  The Supreme Court has cautioned that "[r]esort to *per se* rules is confined to restraints that would always or almost always tend to restrict competition and decrease output," such as "horizontal agreements among competitors to fix prices or to divide markets." *Leegin*, 551 U.S. at 886.  At bottom, "a *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that the restraint would be invalidated in all or almost all instances under the rule of reason." *Id.* at 886–87.  To that end, the Supreme Court has "expressed reluctance to adopt per se rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *Id.* at 887 (cleaned up).  The Supreme Court has also instructed that "departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing." *Id.*

Here, NPT argues that the *per se* rule applies, and the Court need not conduct a rule of reason analysis.  (Doc. No. 17 at p. 20.)  In contrast, Defendants maintain that the rule of reason applies.  (Doc. No. 13-2 at pp. 20–23; Doc. No. 21 at p. 6.)  For the reasons discussed below, the Court finds that the rule of reason applies, and that Plaintiff fails to establish an unreasonable

restraint of trade under the rule of reason.

*a. Per Se Analysis*

NPT alleges that Defendants engaged in bid-rigging,[10] a *per se* violation. (Doc. No. 17 at pp. 20–28; Doc. No. 22 at pp. 3–4.) *See Smithline Beecham Corp. v. E. Applicators, Inc.*, No. CIV.A. 99-CV-6552, 2002 WL 1197763, at *2 (E.D. Pa. May 24, 2002) ("Bid-rigging . . . falls within the ambit of a *per se* violation."). NPT claims that CGP and Ridgewood were competitors since they were both interested in purchasing either Philmont Club or the Property and that they agreed not to compete when Nanula asked Ridgewood to "stand back, profess some concerns about the real estate risks, and just wait to see if I can strike a better deal for all of us here" and Ridgewood agreed to "continue to stand on the sidelines and let [CGP] do [its] thing" and, therefore, they engaged in bid-rigging. (*See* Doc. No. 17 at pp. 22–24.)

To support its contention, NPT cites to *United States v. Portsmouth Paving Co.*, a Fourth Circuit decision that is non-binding on the Court, for the proposition that "[a]ny agreement between competitors pursuant to which contract offers are to be submitted to *or withheld* from a third party constitutes bid rigging per se violative of 15 U.S.C. section 1." (*Id.* at p. 20 (citing

---

[10] During oral argument, Plaintiff's counsel—for the very first time—attempted to distinguish between the two antitrust claims, arguing that they were premised on different *per se* violations. Specifically, counsel contended that the antitrust claim NPT brought as PCC's assignee was based on bid-rigging, while the antitrust claim NPT brought directly was based on illegal boycotting. (*See, e.g.*, Hr'g Tr. at 43:2–20, 57:7–22.) Any mention of illegal boycotting is conspicuously absent from the voluminous briefing done on this motion. (*See* Doc. Nos. 17 & 22.) As a result, the Court finds that Plaintiff waived its illegal boycotting argument. *See Tomasko v. Iran H. Weinstock, P.C.*, 357 F. App'x 472, 479 (3d Cir. 2009) (finding that "the specific objections that Weinstock raised for the first time at oral argument in the District Court have been waived"); *In re Corio*, 371 F. App'x 352, 355 (3d Cir. 2010) (finding that the bankruptcy court did not abuse its discretion when it refused to consider an argument raised for the first time during oral argument); *Doherty v. Allstate Indem. Co.*, Civ. A. No. 15-05165, 2017 WL 1283942, at *23 (E.D. Pa. Apr. 6, 2017) ("[B]ecause this argument was asserted for the first time in Doherty's reply and at oral argument, it is waived."); *McCowan v. City of Philadelphia*, Civil Action No. 2:19-cv-03326-KSM, 2020 WL 6485097, at *3 n.5 (E.D. Pa. Nov. 4, 2020) ("During oral argument, Defendants for the first time referred to the subpoena as a 'deep sea fishing' expedition . . . The Court does not consider Defendants' relevancy argument, which was raised for the first time at oral argument[.]").

*Portsmouth*, 694 F.2d 312 (4th Cir. 1982)).)  However, NPT omits the footnote that immediately follows, which explains that "collusive bidding is an agreement between competitors *in a bidding contest* to submit identical bids or, by preselecting the lowest bidder, to abstain from all bona fide effort to obtain the contract." *Portsmouth*, 694 F.3d at 325 n.18 (cleaned up) (emphasis added).  Here, the complaint is devoid of any allegations that PCC had a bidding contest or auction for the sale of Philmont Club or the Property.[11]

The death knell for Plaintiff's argument that Defendants engaged in bid-rigging is its failure to cite to any analogous case law.  *Accord Eichorn*, 248 F.3d at 143 ("Acknowledging this judicial hesitance to extend the *per se* rule to new categories of antitrust claims, *we note there are no Supreme Court cases nor any federal cases that have applied the per se rule in similar factual circumstances*." (emphasis added)).  Indeed, as Defendants aptly point out (Doc. No. 21 at pp. 5–6), NPT fails to cite to a single case where a court held that the defendants engaged in bid-rigging either (a) in absence of a competitive bidding process or (b) in connection with a one-time private sale of real estate (*see* Doc. No. 17 at pp. 20–21).  As such, Plaintiff's cases are inapposite.  *See United States v. Sargent Elec. Co.*, 785 F.2d 1123, 1124–25 (3d Cir. 1986) (indictment charged electrical contractors with conspiring to rig bids for electrical construction work over the course of seven years); *United States v. Koppers, Inc.*, 652 F.2d 290, 291 (3d Cir. 1981) (involving "a conspiracy to rig bids and allocate territories in the sale of road tar to the State of Connecticut and its subdivisions," where the State "solicited bids on an annual basis for the sale and application of road tar")*Portsmouth*, 694 F.2d at 316, 325 n.18 (involving

---

[11] In its sur-reply, NPT argues that it is "illogical" to focus this narrowly on semantics.  (*See* Doc. No. 22 at pp. 3–4.)  But NPT fails to cite to any case law to support its argument that Defendants were engaged in a bidding contest given the facts at play here or that an "offer" versus a "bid" is a distinction without a difference.

construction and surface paving contracts in the Tidewater region where the "conspirators would

trade projects among themselves by agreeing to withhold bids or to submit artificially high

'complementary' bids on certain projects"); *Branta, LLC v. Newfield Prod. Co.*, 310 F. Supp. 3d

1166, 1177 (D. Colo. 2018) (auction for sale of oil and natural gas assets where the selling

parties "controlled the auction's rules for bidding and the identities and number of competitors

allowed to participate in the auction"); *United States v. Flom*, 558 F.2d 1179, 1182 (5th Cir.

1977) (officers of companies that sold reinforcing steel bars for use in construction projects "met

on a regular basis" to "allocate[] the business on upcoming construction contracts among their

respective companies" and agreed that the "losing bidders" would submit "a complimentary bid,

or no bid at all"); *United States v. Seville Indus. Mach. Corp.*, 696 F. Supp. 986 (D.N.J. 1988)

(involving bankruptcy auctions); *United States v. W.F. Brinkley & Son*, 783 F.2d 1157, 1158 (4th

Cir. 1986) ("concern[ing] the 1979 bidding process for a portion of the Pasquotank River Supply

Project," where "[t]he overall project was divided into several subprojects, each of which was to

be awarded through a competitive bidding process"); *Williams v. Estates LLC*, 1:19-CV-1076,

2020 WL 887997, at *9 (M.D.N.C. Feb. 24, 2020) (involving multiple foreclosure sales).

 Because NPT fails to allege that Defendants engaged in behavior that was *per se* illegal,

the Court now considers whether Defendants' conduct constituted an unreasonable restraint of

trade under the rule of reason.

   *b.*  <u>Rule of Reason Analysis</u>

 "In order to state a Sherman Act claim under § 1 . . . a plaintiff must identify the relevant

product and geographic markets and allege that the defendant exercises market power within

those markets." *Queen City Pizza, Inc v. Domino's Pizza, Inc.*, 124 F.3d 430, 435 (3d Cir.

1997); *see also Lifewatch Servs. Inc.*, 902 F.3d at 337 ("A plaintiff bears the burden of defining

both a relevant geographic and a relevant product market.").  Defendants argue that under the rule of reason, the antitrust claims must fail because (1) NPT fails to define a relevant product market; (2) NPT fails to define a relevant geographic market; and (3) NPT fails to allege market power or anticompetitive effects.  (Doc. No. 13-2 at pp. 20–23.)

NPT bears the burden of defining the relevant product market.  *See Queen City Pizza, Inc.*, 124 F.3d at 436; *Lifewatch Servs. Inc.*, 902 F.3d at 337.  To determine whether the relevant market was adequately defined, the Court must first consider "the extent to which [the] product is interchangeable with alternative products within the field."  *Mylan Pharma. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 436 (3d Cir. 2016).  "The term interchangeability implies that one product is roughly equivalent to another for the use to which it is put.  It also means that while there might be some degree of preference for one product over the other, either would work efficiently."  *Id.* (cleaned up).  In addition, courts must consider the "cross-elasticity of demand, which is defined as a relationship between two products, usually substitutes for each other, in which a price change for one product affects the price of the other."  *Lifewatch Servs. Inc.*, 902 F.3d at 337 (cleaned up); *see also Queen City Pizza, Inc.*, 124 F.3d at 437–38 ("[P]roducts in a relevant market are characterized by a cross-elasticity of demand, in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market" (cleaned up)).  Ultimately, "[t]he outer boundaries of the market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *Queen City Pizza, Inc.*, 123 F.3d at 436.

"The Third Circuit has instructed that although in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers,

there is no prohibition against dismissal of antitrust claims for failure to plead a relevant market."
*Fresh Made, Inc. v. Lifeway Foods*, No. Civ.A. 01-4254, 2002 WL 31246922, at *5 (E.D. Pa.
Aug. 9, 2002) (cleaned up); *see also Queen City Pizza, Inc.*, 124 F.3d at 436. Accordingly,
courts may find that a relevant market is legally insufficient and grant a motion to dismiss
"[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of
reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant
market that clearly does not encompass all interchangeable substitute products even when all
factual inferences are granted in plaintiff's favor." *Queen City Pizza, Inc.*, 124 F.3d at 436–37
(collecting cases); *see also Lifewatch Servs. Inc.*, 902 F.3d at 337 ("A complaint may be properly
dismissed if it defines the relevant market without reference to interchangeability or cross-
elasticity of demand or if it alleges a proposed relevant market that clearly does not encompass
all interchangeable substitute products even when all factual inferences are granted in plaintiff's
favor." (cleaned up)); *Bldg. Materials Corp. of Am. v. Rotter*, 535 F. Supp. 2d 518, 524 (E.D. Pa.
2008) ("If a complaint fails to allege facts regarding substitute products, to distinguish among
apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of
demand, . . . a court may grant a Rule 12(b)(6) motion." (cleaned up)).

    *Fresh Made, Inc v. Lifeway Foods, Inc.* is instructive. The plaintiff in that case
manufactured, distributed, and sold certain "specialty dairy products, such as kefir, a fermented
yogurt-style drink," and asserted that the relevant product market was "specialty Russian dairy
foods, including kefir." 2002 WL 31246922, at *5. The court held that the plaintiff failed to
plead a relevant product market because it did not reference the rule of reasonable
interchangeability and cross elasticity of demand in its amended complaint; accordingly, it
granted the defendant's motion to dismiss. *Id.* at *5–6 ("Fresh Made does not allege facts

establishing that the market for specialty Russian dairy products, such as kefir, is distinct from the market for yogurt, other drinkable yogurt products, or from other dairy products in general. The amended complaint contains no allegations relating to the price of and/or demand for kefir and other specialty Russian dairy products relative to products in the larger dairy market as a whole.  Fresh Made simply fails to allege whether there are reasonably interchangeable alternatives for its products."); *see also Bldg. Materials Corp. of Am.*, 535 F. Supp. 2d at 525 (granting motion to dismiss where the plaintiff defined the relevant product market as "asphalt shingle roof ridge vents" but failed to "explain why asphalt shingle roof ridge vents are distinct from the market for shingle roof ridge vents, roof ridge vents in general or any other roofing products," made "no reference to the price and/or demand for asphalt shingle roof ridge vents relate to the roofing products industry as a whole,"  and failed to "reference to the rule of reasonable interchangeability and the cross-elasticity of demand"); *Queen City Pizza, Inc.*, 124 F.3d at 432–33, 437–38 (holding that "ingredients, supplies, materials and distribution services used by and in the operation of Domino's pizza stores" did not constitute a relevant product market because "the dough, tomato sauce, and paper cups that meet Domino's Pizza, Inc. standards and are used by Domino's stores are interchangeable with dough, sauce and cups available from other suppliers and used by other pizza companies" and affirming the district court's dismissal of the complaint).

Here, the Court concludes that NPT failed to define a relevant product market. Noticeably absent from the complaint (or NPT's response brief or sur-reply) is any reference to the rule of reasonable interchangeability or the cross-elasticity of demand.  (*See generally* Doc. Nos. 1, 17 & 22.)  From the face of the complaint, it is unclear whether the relevant market is, for instance, country clubs, golf courses, or development properties, or how those are distinct

from one another.

During oral argument, NPT argued that the relevant market was "a market of one."  (Hr'g Tr. at 54:8–55:17.)  However, this Court is unpersuaded by NPT's contention that Philmont Club alone constitutes a relevant product market under the rule of reason.  To the contrary, courts routinely hold that a product market is insufficient if it is comprised of a single brand or a single entity.  *See*, *e.g.*, *Satnam Distribs. LLC v. Commonwealth-Altadis, Inc.*, 140 F. Supp. 3d 405, 419 (E.D. Pa. 2015) (noting that "[c]ourts routinely reject Sherman Act claims at the motion to dismiss stage where such claims involve single-brand or single-manufacturer products" and collecting cases); *Molinari v. Consol Energy Inc.*, No. 12cv1085, 2012 WL 5932979, at *6 (W.D. Pa. Nov. 27, 2012) (stating that "[c]ourts have frequently granted Motions to Dismiss in which the relevant market has been limited to a single entity" and collecting cases); *see also id.* at *5 ("Cases in which dismissal on the pleadings is appropriate frequently involve . . . failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes." (cleaned up)).

For example, in *Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, the plaintiffs proposed a relevant product market of "live Cubs games," and the court held that the proposed market could not "stand because it comprise[d] a single brand product."  87 F. Supp. 3d 874, 886–87 (N.D. Ill. 2015).  The court found that it was not plausible that there were "no interchangeable substitutes for live Cubs games," given that "the Cubs necessarily compete with other Major League Baseball teams, sporting events, and other live entertainment for revenue." *Id.* ("While the Court accepts that there are some die-hard Cubs fans that would never attend a White Sox game, that does not mean that Cubs games constitute their own market . . . [A]rguments of consumer preferences . . . fall short of rendering it plausible that there are no

interchangeable substitutes for live Cubs games."); *see also Satnam Distribs. LLC*, 140 F. Supp.

3d at 419 (concluding that the plaintiff "failed to carry its burden of alleging a plausible product

market," where the proposed market was "the market for distribution of a single manufacturer's

brands"); *Molinari*, 2012 WL 5932979, at *6 ("Plaintiff's Amended Complaint is void of any

factual allegation that Consol is so unique as an employer . . . to constitute its own market.");

*Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063–64 (9th Cir. 2001) (holding that the plaintiff

"failed to identify an appropriately defined product market" where the proposed market was

"UCLA women's soccer program" and reasoning that "[the plaintiff's] limitation of the relevant

product market to a single athletic program is especially unavailing insofar as the very existence

of any given intercollegiate athletic program is predicated upon the existence of a field of

competition composed of other, similar programs").

      The same logic applies with equal force here.  When NPT identified "Philmont Club" as

the relevant product market during oral argument, it failed to explain how Philmont Club is

unique and why it is not interchangeable with any other country club.  A close review of NPT's

complaint also illustrates the lack of any allegation that Philmont Club is so unique as to

constitute its own market.

      NPT's reliance on *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451

(1992) fails to move the needle.  (*See* Hr'g Tr. at 54:22–25 ("We have an *Eastman Kodak* case

which talks about [sic] a relevant market can be limited to one single brand.").)  In *Queen City*

*Pizza, Inc. v. Domino's Pizza, Inc.*, the Third Circuit outlined the limited circumstances in which

*Kodak* applies.  124 F.3d at 439; *see also Satnam Distribs. LLC*, 140 F. Supp. 3d at 419

(explaining that courts permit claims that involve single-brand or single-manufacturer product

markets "[o]nly in rare, fact-specific circumstances" such as "where customers were locked into

purchasing a manufacturer's tying products, often aftermarket parts and services" as in *Kodak*).
*Kodak* "held that the market for repair parts and services for Kodak photo-copiers was a relevant
market because repair parts and services for Kodak machines are not interchangeable with the
service and parts used to fix other copiers." *Queen City Pizza, Inc.*, 124 F.3d at 439 (citation
omitted).

In *Queen City Pizza*, the plaintiffs, Domino's franchisees, argued that Domino's violated
the Sherman Act by requiring its franchisees to purchase its ingredients, supplies, and materials
either directly from it or from an approved list of suppliers. *Id.* at 433. The plaintiffs proposed a
relevant product market of "ingredients, supplies, materials and distribution services used by and
in the operation of Domino's pizza stores" and argued that *Kodak* "support[ed] its proposed
relevant market because it indicates that in some circumstances, a single brand of a product or
service may constitute a relevant market." *Id.* at 439. The Third Circuit explained that the
plaintiffs' interpretation of *Kodak* was too far-reaching and that, under *Kodak*, a single brand
product may constitute a relevant market only "where the commodity is unique, and therefore
not interchangeable with other products." *Id.* The Third Circuit found *Kodak* inapplicable to the
case before it because "contractual restraints aside, the sauce, dough, and other products and
ingredients approved for use by Domino's franchisees are interchangeable with other items
available on the market." *Id.*

As in *Queen City Pizza*, this Court finds that *Kodak* is distinguishable because NPT has
given no indication Philmont Club is "unique" and "therefore not interchangeable with other
products" or entities. As noted above, NPT has given us no reason to conclude that Philmont
Club is not interchangeable with other country clubs.

Because NPT fails to adequately plead a relevant product market, the Court does not

address the other factors in the rule of reason test—namely, whether NPT defined a relevant geographic market or alleged market power or anticompetitive effects.  *See, e.g.*, *Bldg. Materials Corp. of Am.*, 535 F. Supp. 2d at 525 ("There is no need to examine the other factors in the rule of reason test because Rotter's counterclaim fails to state a relevant product market for antitrust purposes.").

Given NPT's failure to establish an unreasonable restraint of trade under either the *per se* rule or the rule of reason, the Court finds that NPT fails to state a claim under Section 1 of the Sherman Act and dismisses Counts I and II.

Having decided that the federal claims are subject to dismissal, we now turn to the state law claims—fraud, fraudulent concealment, aiding and abetting fraud, civil conspiracy, and breach of contract.[12]

### C.     Fraud and Fraudulent Concealment Claims

As assignee, NPT asserts fraud claims against Ridgewood, Grebow, and Plotnick (Count III) and CGP and Peter Nanula (Count V), which it bases on both alleged affirmative misrepresentations and omissions.  NPT also brings a fraudulent concealment claim against CGP, Nanula, Ridgewood, Grebow, and Plotnick (Count VII) as PCC's assignee.

Under Pennsylvania law, to state a *prima facie* case of fraud, a plaintiff must plead that the defendant made (1) a false representation, (2) with knowledge of its falsity or recklessness as to whether it is true or false, (3) which was intended to make the plaintiff act, (5) that the plaintiff justifiably relied on the misrepresentation, and (6) that the plaintiff suffered damages as

---

[12] In their reply brief and during oral argument, Defendants argued that the Court should dismiss the state law claims for lack of supplemental jurisdiction.  (*See* Doc. No. 21 at pp. 11–12; Hr'g Tr. at 15:4–7.) Defendants are wrong.  NPT has pled facts showing that the Court can properly exercise *diversity* jurisdiction over this case.  (*See, e.g.*, Doc. No. 1 at ¶¶ 2, 4–27; *accord* Hr'g Tr. at 82:19–83:1.)

a proximate result of its reliance. *Bucci v. Wachovia Bank, N.A.*, 591 F. Supp. 2d 773, 782 (E.D. Pa. 2008). A fraud claim based on an omission has the same elements as fraud, "except that an omission is actionable as fraud only where there is an independent duty to disclose the omitted information." *Id.* at 783 (cleaned up). Fraudulent concealment has similar elements as fraud in the omission and likewise requires a plaintiff to show that the party that fraudulently concealed the information had a duty to speak. *See Marcum v. Columbia Gas Transmission, LLC*, 423 F. Supp. 3d 115, 121 (E.D. Pa. 2019) ("Plaintiffs must show: (1) [Defendant caused] an omission; (2) the omission was material to the transaction at hand; (3) the omission was made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) the omission was made with the intent of misleading another into relying on it; (5) the plaintiff justifiably relied on the omission; and (6) the resulting injury was proximately caused by the reliance. In addition to those six elements, Plaintiffs must show a special relationship that would give rise to a duty to speak between them and the party that fraudulently concealed the information." (cleaned up)).

Defendants contend that the fraud and fraudulent concealment claims must be dismissed because (1) NPT fails to allege fraud with particularity; (2) the PSA was fully integrated and thus NPT cannot assert fraud claims against the Concert Defendants; (3) Defendants did not have a duty to speak; (4) some of the alleged misrepresentations are based on future promises and therefore are unactionable; and (5) NPT has failed to plead justifiable reliance. (Doc. No. 13-2 at pp. 24–32.) The Court addresses each argument below.

### i.    NPT Alleges Fraud with Particularity

Under Federal Rule of Civil Procedure 9(b), a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *see also Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) ("Pursuant to Rule 9(b), a plaintiff

alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which [it is] charged.").  The Third Circuit has explained that to comply with Rule 9(b), a plaintiff "must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation."  *Id.*

Plaintiff has undoubtedly satisfied this standard here.  With respect to false representations, NPT alleges that:

- In the fall of 2016, "Ridgewood told [PCC] that it was no longer interested in purchasing the Property as the ability to obtain approvals for 162 Units was speculative and the risks associated with the development of the Property were too high" (Doc. No. 1 at ¶ 92);

- On November 1, 2016, CGP and Nanula promised to make $5 million in capital improvements once the Property was sold (*id.* at ¶ 96);

- On November 1 and November 17, CGP and Nanula represented that they would retain at least 27 holes of golf at Philmont Club after the South Course was sold (*id.* at ¶¶ 97, 104);

- On November 2, CGP and Nanula represented to PCC that the sale of the Property may never occur and the terms of the proposal balanced out that risk (*Id.* at ¶ 102).

And as to the alleged omissions, NPT pled that:

- Beginning in October 2016, Ridgewood, CGP, Nanula, Plotnick, and Grebow worked closely together to acquire Philmont Club and develop the Property, yet never told PCC that they were teaming up (*see, e.g.*, *id.* at ¶¶ 167–68); and

- By January 20, 2017, Ridgewood had met with the Township, the Township manager "didn't flinch at 160 units," and over the next month Ridgewood and CGP discussed the Township's positive "body language"—all while failing to tell PCC about this progress towards getting development approvals (*see, e.g.*, *id.* at ¶¶ 159, 162–63, 167).

In sum, the complaint provides the who, what, where, and when of the alleged fraud and clearly puts Defendants on notice of the cause of action against them, which is all that Rule 9(b) requires.  *See, e.g.*, *Kunkle v. Cmty. Health Sys. Pro. Servs. Corp.*, CIV. NO. 09-0208, 2009 WL

10737883, at *1 (E.D. Pa. Apr. 22, 2009) ("Although Plaintiff does not include quotes or exact

dates, he does provide names, a general time-frame, and the substance of the allegedly fraudulent

statements.  This is sufficient to provide [the defendant] the notice it needs to begin to prepare its

defense."); *cf. Int'l Strategic Cancer Alliance, LLC v. Stichting Katholieke Universiteit*, Civil

Action No. 17-2024, 2017 WL 4681789, at *6 (E.D. Pa. Oct. 18, 2017) ("[T]he Complaint does

not provide details regarding any specific representation made by Defendant, in terms of content,

location, time, or speaker.").

### ii. The PSA Does Not Bar NPT from Asserting Fraud Claims Against CGP and Nanula

Defendants' next argument is more complex, but similarly flawed.  NPT brings its fraud

claims as PCC's assignee, and Defendants contend that because the PSA was fully integrated, the

parol evidence rule[13] bars NPT from relying on representations the Concert Defendants made to

PCC prior to executing the agreement.  (Doc. No. 13-2 at pp. 27–28.)  Because prior

misrepresentations form the entire basis for Plaintiff's fraud claims (i.e., but for Concert

Defendants' representations that obtaining development approval would be risky and a sale of

the Property may never transpire, PCC would not have entered into the PSA), the parol evidence

rule would, in effect, proscribe Plaintiff from asserting any of its fraud claims (except for those

against Ridgewood Defendants, who were not party to the PSA).

In response, NPT asserts that only Concert Philmont and Concert Philmont Properties are

---

[13] Under Pennsylvania law, "[t]he parol evidence rule forbids admitting evidence of prior representations to fully integrated written agreements, even for claims of fraudulent inducement." *Berardine v. Weiner*, 198 F. Supp. 3d 439, 444 (E.D. Pa. 2016).  "Fraud in the inducement does not involve terms omitted from an agreement, but rather allegations of oral representations on which the other party relied in entering into the agreement but which are contrary to the express terms of the agreement." *Id.*  Here, the complaint alleges that the CGP and Nanula committed fraud in the inducement by, *inter alia*, falsely representing that obtaining development approvals would be risky and that it would maintain 27 holes of golf— statements PCC then relied on in agreeing to enter into the PSA.  (*See generally* Doc. No. 1.)

bound by the PSA and accordingly the PSA is of no moment since the fraud claims are asserted against *CGP* and *Nanula—not Concert Philmont or Concert Philmont Properties*.  (Doc. No. 17 at pp. 33–24.)  Defendants counter that because Nanula signed the PSA in his capacity as an agent of Concert Philmont and Concert Philmont Properties, "[i]t would conflict with agency principles" if NPT were allowed to bring the fraud claims against him and CGP (the agents) and not the principals.  (Hr'g Tr. at 17:4–20; *see also* Doc. No. 21 at pp. 3–4 ("While they are not signatories to the PSA, both Nanula and Concert Golf were acting on behalf of Concert Philmont Defendants, the special purpose entities formed to acquire the Philmont Club, in negotiating the PSA.  Agents of disclosed principals acting within the course and scope of their agency have no independent liability to those with whom they negotiate on behalf of their principal." (citations omitted)).)

Defendants are mistaken.  In *Interwave Technologies, Inc. v. Rockwell Automatic, Inc.*, the court rejected a similar argument.  No. Civ.A. 05-398, 2005 WL 3605272, at *14–19 (E.D. Pa. Dec. 30, 2005).  That case involved a commercial dispute, where Interwave and its assignee sued defendants Rockwell Automatic, Inc. and Richard Ryan for breach of contract and fraudulent inducement.  *Id.* at *1.  Rockwell had purchased nearly all of Interwave's assets pursuant to an Asset Purchase Agreement (the "APA"), and Ryan had acted as Rockwell's agent during the transaction but was not a party to the agreement himself.  *See id.* at *2 (explaining that Ryan "was Rockwell's chief negotiator and conduit of information between Rockwell and Interwave regarding the transaction between the parties that is the focal point of the litigation"); *id.* at *19 (noting that Ryan was not a party to the APA).  The plaintiffs alleged that Ryan and Rockwell fraudulently induced Interwave to enter into the APA, and the defendants moved to dismiss, arguing that the parol evidence rule and integration clause barred that claim.  The

APA's integration clause stated:

> This Agreement and the Confidentiality Agreement collectively constitute the
> entire agreement between the parties with respect to the subject matter hereof and
> thereof and this Agreement and the Confidentiality Agreement supersede all prior
> negotiations, agreements and understandings of any nature, whether oral or
> written, relating thereto.

*Id.* at *15.

Because the APA was fully integrated and Rockwell was a party to the APA, the court
dismissed the fraudulent inducement claim against it.  *Id.* at *19 ("Fully integrated contracts
preclude fraudulent inducement claims.  It is no different here.  Therefore, Interwave's and
Kall's claim of fraudulent inducement against Rockwell as a party to the APA will be
dismissed.").  However, the court allowed the fraudulent inducement claim against Ryan to
proceed *because he was not a party to the APA*.  *Id.*  In its analysis, the court distinguished from
two other cases that found that the integration clauses also applied to agents, observing that in
those cases "the integration clauses, unlike here, specifically referred to the representations of the
agents as barred."  *Id.* (cleaned up); *see also Sunquest Info. Sys., Inc. v. Dean Witter Reynolds,
Inc.*, 40 F. Supp. 2d 644, 656 & n.7 (W.D. Pa. 1999) (holding that the integration clause barred
the plaintiff's fraud in the inducement claims against Compucare but did not bar those claims
against Compucare's agent, who was not a party to the agreement).

We are persuaded by the rationale in *Interwave*.  Here, the integration clause in the PSA
provides:

> This Agreement and the exhibits attached hereto represent the entire
> understanding of the agreement between the Parties with respect to the subject
> matter hereof, and supersedes the Letter of Intent, all other negotiations,
> understandings and representations, if any, made between such Parties.

(Doc. No. 13-9 at p. 47, § 17.1.)  This integration clause is nearly identical to the one in
*Interwave*.  Accordingly, if Plaintiff had asserted fraud in the inducement claims against Concert

Philmont and Concert Philmont properties—who were parties to the PSA—then those claims would be dismissed. However, Plaintiff did not; rather, Plaintiff sued CGP and Nanula, who Defendants admit were not parties to the PSA. (*See* Doc. No. 21 at pp. 3–4; *see also* Doc. No. 13-9 at p. 56 (indicating that Nanula signed the PSA as agent of Concert Philmont and Concert Philmont Properties, not in his own capacity).) Because CGP and Nanula were not parties to the PSA, the integration clause does not apply to them and NPT's fraud claims against them survive the motion to dismiss.

### iii.   Defendants Did Not Have a Duty to Speak

NPT claims that CGP, Nanula, Ridgewood, Grebow, and Plotnick fraudulently failed "to inform [PCC] that they were working together towards purchasing Philmont Club and developing the Property" and "to inform [PCC] that Defendants were in active discussions with the Township about developing the Property and had confirmed that they would be able to finalize [the] development plans to not only develop the Property but to achieve a Unit yield in excess of 162." (Doc. No. 17 at p. 31.) Defendants argue that the fraud in the omission and fraudulent concealment claims must be dismissed because the Defendants had no duty to speak. (*See* Doc. No. 13-2 at pp. 28–30.)

As noted above, fraud in the omission and fraudulent concealment claims can only lie where there is a duty to disclose the omitted information. *See Bucci*, 591 F. Supp. 2d at 783 (cleaned up); *Marcum*, 423 F. Supp. 3d at 121; *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 612 (3d Cir. 1995). Under Pennsylvania law, the duty to speak "exists only in limited circumstances," such as (1) "when there is a fiduciary, or confidential, relationship between the parties"; (2) where one party is the only source of information to the other party or the problems are not discoverable by other reasonable means; (3) "when disclosure is necessary to prevent an ambiguous or partial statement from being misleading"; (4) "where subsequently

acquired knowledge makes a previous representation false"; or (5) "where the undisclosed fact is basic to the transaction." *Bucci*, 591 F. Supp. 2d at 783; *Duquesne Light Co.*, 66 F.3d at 611; *see also Marcum*, 423 F. Supp. 3d at 122 (explaining that the "duty to speak often arises in the home purchase setting where one party has unique knowledge"; for example "a seller who knows of a termite infestation has a duty to tell an unwitting buyer about it," and "when one party has a special vulnerability," such as neighbors who convinced an elderly and infirm 86-year-old neighbor to sell her house).

Here, NPT argues that Defendants had a duty to speak because the omissions were "basic to the transaction" (i.e., PCC would not have entered into the PSA had it known that the development approvals were forthcoming and/or that Ridgewood and CGP were working together) and that subsequently acquired knowledge rendered previous representations Defendants made to PCC false (i.e., after discussing development approvals with the Township, Defendants had confirmed they would be able to develop the Property).  (*See* Doc. No. 17 at pp. 31–33.)  We disagree.

Where, as here, "both the plaintiff and defendant were sophisticated business entities, entrusted with equal knowledge of the facts," the duty to speak does not arise.  *Bucci*, 591 F. Supp. 2d at 783 (quoting *Duquesne Light Co.*, 66 F.3d at 612); *see also Duquesne Light Co.*, 66 F.3d at 612 ("[T]here is virtually no Pennsylvania case in which a defendant has been held to have a duty to speak when both the plaintiff and defendant were sophisticated business entities, entrusted with equal knowledge of facts."); *Paramount Fin. Commc'ns, Inc. v. Broadridge Inv. Commc'n Sols., Inc.*, Civil Action No. 15-405, 2015 WL 4093932, at *5 (E.D. Pa. July 7, 2015) ("The parties have not cited any Pennsylvania cases imposing a duty to speak on sophisticated business entities, absent a special or fiduciary relationship, and the Court has found none.");

*accord Marcum*, 423 F. Supp. 3d at 122 (explaining that a special relationship giving rise to the duty to speak "generally does not arise in a typical, arms-length business transaction unless one party surrenders substantial control over some portion of its affairs to the other," which is "often described as requiring 'overmastering influence' on one side or 'weakness, dependence, or trust, justifiably reposed' on the other side." (cleaned up)).

The face of the complaint shows that PCC and Defendants were both sophisticated parties,[14] engaging in an arms-length transaction. *See Marcum*, 423 F. Supp. 3d at 122 (dismissing fraudulent concealment claim where "Plaintiffs appear to be in a standard, arms-length business relationship" and the plaintiffs failed to identify a basis for a fiduciary duty existing between the parties); *see also Paramount Fin. Commc'ns, Inc.*, 2015 WL 4093932, at *5 (concluding that the defendant had no duty to speak and granting motion to dismiss where the parties "ha[d] not entered into a fiduciary or special relationship" and where the claims arose "out of arms-length transactions between sophisticated parties:  namely, the agreement between Plan Management, Miller, and Broadridge to enter into the Marketing Agreement and between Miller and BOSI to enter into the Stock Purchasing Agreement"); *accord Morton's Rest. Grp., Inc. v. Charest*, No. CIV. A. 97-7013, 1998 WL 767444, at *5 (E.D. Pa. Nov. 4, 1998) (granting motion for summary judgment and finding no "duty to speak and, therefore, no fraud" where "Morton and Corsica were both represented by counsel and engaged in arm's length negotiations").[15]

---

[14] The fact that PCC had amended its AOS with NPT eight times (and proposed a ninth amendment) underscores the fact that it is a sophisticated business entity.

[15] In *Morton's Restaurant Group, Inc. v. Charest*, the court stated that even if a confidential or fiduciary relationship did not exist, "there may still be a heightened responsibility based on the dealings of the parties."  1998 WL 767444, at *5 ("Thus, one may justifiably rely on silence where there is no confidential relationship only if a specific relationship of trust has been developed with regard to a certain matter.").  As in *Morton's*, NPT fails to allege that "a specific relationship of trust developed" between

Plaintiff fails to plead that the rezoning information was not reasonably discoverable to PCC or that Defendants had sole, or unequal, access to the Township. *See Duquesne Light Co.*, 66 F.3d at 612 (distinguishing from cases where the omitted information was "not discoverable by other reasonable means" and the defendant was "the only reasonable source of the information," and explaining that "[n]one of these cases is applicable to the situation present here, where the two parties are sophisticated business entities, with equal and ample access to legal representation.  Superior information and better business acumen are legitimate advantages, which lead to no liability").[16]

In addition, Plaintiff's allegation that Defendants "had confirmed that they would be able to finalize [the] development plans to not only develop the Property but to achieve a Unit yield in excess of 162 units"—one of the alleged omissions—is conclusory.  None of the exhibits Plaintiff relies on in its complaint indicates that was the case.  (*See* Doc. No. 1 at ¶¶ 159–63 (citing Exs. 27–29).)  To the contrary, the emails show that, at most, CGP and Ridgewood believed that the Township was *enthusiastic* about the potential deal—not that Defendants had received *confirmation* that they would receive the zoning approvals.  (*See* Doc. No. 1-4, Ex. 27 at p. 89 (noting that the meeting with the Township's manager "went well" and that the manager "[d]idn't flinch on the 160 units"); Doc. No. 1-5, Ex. 28 at p. 92 (noting that the Township "want[s] to get this deal done with us"); Doc. No. 1-6, Ex. 29 at pp. 95–96 (surmising that the

---

PCC and Defendants to give rise to a duty to speak.

[16] The sole case NPT relies on applies New York law and is inapposite.  *See Zaccaro v. Shah*, 746 F. Supp. 2d 508, 520, 522 (S.D.N.Y. 2010) ("*Under New York law*, Shah, possessed a superior knowledge not readily available to Zaccaro as to the REIT's interest in purchasing AHA, had a duty to disclose that knowledge to Zaccaro to correct his mistaken belief that the REIT was not interested in purchasing AHA, particularly in view of Shah's prior statement that the REIT was not interest [sic] in purchasing the Hotel." (emphasis added)).

Township was "not wasting any time here" and had "[g]ood body language").)  Furthermore, documents from the Township indicate that the zoning approvals did not come to fruition until 2018—*a year after* PCC entered into the PSA with Concert Philmont and Concert Philmont Properties.  (*See* Doc. No. 13-5 at pp. 1–9 (granting Concert Philmont's conditional use application on March 13, 2018 and amending the Township's zoning ordinance); *see also id.* at pp. 14–18 (letter dated September 13, 2018, in which the Township advised Grebow that the Township had approved the "Preliminary Land Development Plan . . . for an Active Adult Housing Development Consisting of 176 Units").)  Accordingly, the evidence belies Plaintiff's assertion that Defendants subsequently acquired information from the Township on the zoning approvals that gave rise to a duty to speak.

Because Defendants did not have a duty to speak, the Court grants Defendants' motion to dismiss NPT's fraud in the omission and fraudulent concealment claims.

### iv.   NPT Can Establish Fraud in Connection with Future Promises

Turning back to affirmative misrepresentations, NPT alleges that CGP and Nanula committed fraud when they told PCC that they would retain 27 holes of golf and would spend $5 million in capital improvements.  (*See* Doc. No. 1 at ¶¶ 258–59, 261–63 (Count V).)  Defendants argue that Count V must be dismissed to the extent it is based on these representations, because they are promises to do something in the future and therefore are insufficient to establish a fraud claim.  (Doc. No. 13-2 at pp. 30–31.)

Although Defendants correctly recite the general principle that "the breach of a promise to do something in the future is not actionable in fraud," *see Shoemaker v. Commonwealth Bank*, 700 A.2d 1003, 1006 (Pa. Super. Ct. 1997), Defendants misstate the law when they argue that a future promise can *never* support a fraud claim (*see* Hr'g Tr. at 22:1–22).  To the contrary, under Pennsylvania law, "an expressed intention to take a future action that does not actually comport

with one's true state of mind at that time is a misrepresentation of existing fact and may serve as the basis for a fraud claim." *Giordano v. Claudio*, 714 F. Supp. 2d 508, 518 (E.D. Pa. 2010) (cleaned up); *see also Mellon Bank Corp. v. First Union Real Estate Equity & Mortg. Invs.*, 951 F.2d 1399, 1410 (3d Cir. 1991).

Courts deny motions to dismiss where the plaintiff alleges that, from the outset, the defendant never intended to keep its promise to do something in the future. *See, e.g.*, *Giordano*, 714 F. Supp. 2d at 519 (denying motion to dismiss the fraud counterclaim where the defendant alleged that the plaintiff promised to give the defendant authorship credit in an article and "did so knowing that he intended to omit [the defendant's] name as an author when he submitted the Article for publication"); *SSC Manager, LLC v. Venezia FC 1907 LP*, Civil Action No. 17-1042, 2017 WL 3225851, at *5–6 (E.D. Pa. July 27, 2017) (denying motion to dismiss the fraud claim where the plaintiff pleaded sufficient facts to show that defendants' statements "may have been contrary to the speakers' present intention" and thus "fraudulent when made"); *cf. Rapid Circuits, Inc. v. Sun Nat'l Bank*, Civil Action NO. 10-6401, 2011 WL 1666919, at *10 (E.D. Pa. May 3, 2011) ("[T]he Court cannot identify any allegation that the Bank had no present intention to attempt to restructure the loans when that statement was made . . . Absent an allegation that Mr. Brehm falsely represented his (or the Bank's) present intention regarding any attempt to restructure the SBA loans when he allegedly made the statement, the claim for fraudulent misrepresentation based upon this statement must be dismissed.").  Thus, the Court must determine whether NPT has adequately pleaded facts showing that, at the time CGP and Nanula promised to keep 27 holes of golf and to make $5 million in capital improvements, they "had no intention of following through" on those promises.  *SSC Manager, LLC*, 2017 WL 3225851, at *5 ("[T]he crux of th[e] analysis is whether [the claimant] has adequately pleaded facts showing

that, at the time these statements were made, the speaker had no intention on following through on them.").

Viewing all facts in the light most favorable to NPT and drawing all inferences in its favor, this Court concludes that NPT has met its burden.  First, NPT has alleged that CGP had no intention to maintain 27 holes of golf at the time it made that promise.  (*See* Doc. No. 1 at ¶ 171 ("[B]efore even making the pledge [to keep 27 holes of golf], Nanula had shared his opinion with Cicerco that "only 18 or [sic] 27 holes are truly needed"); ¶¶ 258–59 ("CGP represented to [PCC] that Philmont Club would retain 'at least 27 holes after South Course real estate transaction.'  CGP never intended to abide by its representation it would maintain twenty-seven holes of golf.").)  Likewise, the complaint pleads that at the time CGP promised to spend $5 million in capital improvement projects, it never intended to follow through with that promise. (*See id.* at ¶ 263 ("CGP represented to Philmont Club that it would make $5,000,000 in capital improvement projects upon the sale of the Property, but in reality, had no intention of expending the full $5,000,000.").)[17]

Because NPT alleges that CGP and Nanula never intended to follow through on their promise to keep 27 holes of golf or spend $5 million in capital improvements, it has adequately pled a misrepresentation of present fact and, therefore, we deny Defendants' motion to dismiss on that basis.

---

[17] (*See also* Doc. No. 1-4, Ex. 35 at p. 114 ("The wild ideas the Board has about a 'master plan for the North Course are probably way overblown, and we have huge capital needs in the clubhouse, HVAC, etc. You will see.  We will want to 'nod' to some master plan elements so the members are excited about their North Course being updated a bit, but we want to spend the smallest dollars possible to get the maximum member impact."); Doc. No. 1-4, Ex. 36 at p. 118 (complimenting CGP's counsel for the "nicely vague" language in the PSA about the capital improvement projects CGP would undertake).)

### v.    NPT Has Not Established Justifiable Reliance

As noted above, a plaintiff must show that it justifiably relied on the false representation to state a fraud claim.  Defendants argue that NPT's fraud claims must fail because it has not shown justifiable reliance.[18]  (*See* Doc. No. 13-2 at pp. 31–32.)

The Court must determine whether NPT justifiably relied on the following:

- Ridgewood's representation "that it was no longer interested in purchasing the Property as the ability to obtain approvals for 162 Units was speculative and the risks associated with the development of the Property were too high" (Doc. No. 1 at ¶ 92);

- CGP and Nanula's promise to make $5 million in capital improvements once the Property was sold (*id.* at ¶ 96);

- CGP and Nanula's promise to retain at least 27 holes of golf at Philmont Club after the South Course was sold (*id.* at ¶¶ 97, 104);

- CGP and Nanula's representation that the sale of the Property may never occur and the terms of the proposal balanced out that risk (*id.* at ¶ 102).

The Court considers the first and fourth statements together, since the crux of each is the same—namely, that Defendants told PCC that the ability to develop the Property and to obtain approvals from the Township was speculative and risky.  (*See also* Doc. No. 52-2 at p. 4 (explaining that the basis for the fraud claims "is that Defendants falsely told [PCC] that obtaining development approvals would be difficult to obtain [sic] and purposely withheld from [PCC] that Defendants 'had confirmed that [they] would be able to obtain approvals for 160 or more Units on the Property and would be able to develop and sell the Property'").)

"[I]n deciding whether the plaintiff justifiably relied on the information, a court may consider the degree of sophistication of the parties and the history of the negotiation process

---

[18] Notably, in its response brief, NPT fails to cite to a single case to support its contention that PCC justifiably relied on Defendants' misrepresentations.  (*See* Doc. No. 17 at pp. 34–35.)

between them." *Boardakan Rest. LLC v. Gordon Grp. Holdings, LLC*, Civil Action No. 11-5676, 2016 WL 6213035, at *13 (E.D. Pa. Oct. 14, 2016); *see also Wittekamp v. Gulf & W., Inc.*, 991 F.2d 1137, 1144–45 (3d Cir. 1993) ("We note further that as the President of Mac-Hemp and the former CEO of another company, and as a person having long business experience, [the plaintiff] was clearly a sophisticated party. . . . In light of his sophistication, as well as the absence of any special fiduciary or longstanding business relationship with [the defendant], giving him a basis for relying on representations made by [the defendant]; the questions that reading the past collective bargaining agreements and group health insurance documents should have raised in his mind; and the considerable amount of money involved, [the plaintiff] was wholly unjustified in" relying on the defendant's nondisclosures).

Although courts may consider "the nature of the relationship between the parties" when analyzing the justifiable reliance element of a fraud claim, the Pennsylvania Supreme Court has "hesitate[d] to find reliance justified where the party claiming reliance had an adequate opportunity to verify the allegedly fraudulent statements." *Porreco v. Porreco*, 811 A.2d 566, 571 (Pa. 2002) (holding that the plaintiff's reliance on her husband's valuation of a ring and assets in the prenuptial agreement was not justifiable because "she had possession of the ring and was not impeded from . . . obtain[ing] an appraisal of the ring" and she "had sufficient opportunity to inform herself fully of the nature and extent of her own assets, rather than rely on [her husband's] statements"); *see also Moore v. Steinman Hardware Co.*, 179 A. 565, 566 (Pa. 1935) ("It has many times been pointed out that a buyer or seller is not entitled to rely on such statements where he has an equal opportunity to ascertain the facts affecting the value of the thing to be sold."); *id.* ("Nor is there merit in the contention that the plaintiffs did not have equal opportunity to discover the facts relating to the value of the shares. As owners of a majority of

61

the shares they controlled the corporation, upon whose assets the value of the shares depended. Obviously the corporate books and records were available to them for the purpose of determining that value.  In any case, their status as shareholders clearly entitled them to an examination of the books in order to determine the value of their shares in connection with the proposed sale."); *Martinez v. Russo*, No. 1943, 2000 WL 33711034, at *3 (Pa. Commw. Ct. Aug. 8, 2000) ("A party's right to rely on a false assertion of value is diminished further where the one supposed to rely on such statement has an equal opportunity to ascertain the facts on which such opinion might be based." (cleaned up)).

Here, PCC was a sophisticated business entity engaging in a transaction that involved over 200 acres of property and a considerable amount of money.  PCC knew that Philmont Club had been appraised in 2003 for $10.6 million "solely as a country club (i.e., not factoring selling the Property for development purposes)."  (Doc. No. 1 at ¶ 150; *see also* Doc. No. 1-4, Ex. 23.) PCC easily could have asked the Township if it intended on giving development approvals or amending its zoning regulations.[19]  Nothing in the pleadings indicates that CGP or Ridgewood had sole access to the Township or an upper hand in obtaining information from the Township. Given the previous appraisal and the amount of money at stake—and the fact that PCC had sole possession of the property—PCC also could have asked another developer or golf course operator (outside of Ridgewood and CGP) for its opinion on the riskiness (or lack thereof) of

---

[19] In that vein, the complaint indicates that PCC knew by September 2016, that the Township was inclined to grant approval if certain conditions were met when NVR, NPT, and PCC were negotiating an amendment to the LPA and the proposed ninth amendment to the AOS.  According to Plaintiff, NPT had extensive discussions with the Township to determine what development plans the Township would find favorable, including making a $1 million donation to the Township for roadway improvements and making the development age-restricted—the very same conditions that provided the basis for the eventual deal between CGP and PCC, the deal that CGP and Ridgewood indicated that the Township was enthusiastic about.

developing the Property.  Moreover, Plaintiff never claims that PCC engaged in prior real estate transactions with Defendants or had regular business dealings with Defendants, such that it would have a basis for trusting their representations.[20]  *Cf. Scaife v. Rockwell-Standard Corp.*, 285 A.2d 451, 455–56 (Pa. 1971) (finding that the jury could have concluded that the defendant "knowingly abused [the plaintiff's] confidence which would further justify [the plaintiff's] reliance," given that there was "evidence of continuous, business transactions between the corporations" and "close, personal relationships existed between the executives of both companies"); *Silverman v. Bell Sav. & Loan Ass'n*, 533 A.2d 110, (Pa. Super. Ct. 1987) (concluding that the trial court correctly determined that the plaintiff's reliance was justified, given "the fact that [the plaintiffs] had engaged in numerous prior real estate transactions with Bell and, therefore, had a basis for trusting the representations made by Bell's employees").

Moreover, statements as to the riskiness of developing and/or selling the Property are "statements of value," and therefore are "a part of 'trade talk' and bargaining which customarily accompany negotiations for the sale of property."  *Moore*, 179 A. at 566 (affirming the trial court's conclusion that there was no fraud where the plaintiff alleged that the defendant's president proposed purchasing her deceased husband's shares in the company at a rate of $300 per share and "fraudulently represented" during "negotiations" that the shares were "not worth more than he was offering"); *see also Binns*, 6 A.2d at 897, 899 (fraud claim not actionable

---

[20] Plaintiff alleges that it justifiably relied on Ridgewood's representations because "Ridgewood is a professional real estate developer who purports to be knowledgeable in such matters."  (Doc. No. 1 at ¶ 236; *see also id.* at ¶ 295 (claiming that PCC justifiably relied on Ridgewood representations because "Ridgewood represented itself as a professional real estate developer knowledgeable in development matters").  However, Plaintiff fails to cite to any case law indicating that a defendant's expertise or professional knowledge is, without more, sufficient to establish justifiable reliance, particularly when both sides to the negotiations are sophisticated business entities.  Therefore, even when taking all allegations in the light most favorable to Plaintiff, we cannot find that PCC justifiably relied on Defendants' representations.

where the plaintiff alleged that the defendant-company's treasurer said that the stock "was not worth any more than $10 a share"); *Martinez*, 2000 WL 33711034, at *3 ("Here, the entire basis for EMVEST's fraudulent misrepresentation claim is the false nature of the Defendants' statements about the Formed Steel share value prior to the execution of the Arbitration Award. However, even if Defendants' statements were inaccurate, EMVEST cannot rely on such 'trade talk' to support a claim for fraudulent misrepresentation."). Because NPT cannot rely on "trade talk" to support its fraud claim, the Court grants Defendants' motion to dismiss to the extent it is based on representations relating to the riskiness of the sale of the Property and/or obtaining development approvals.

NPT also has not shown that it justifiably relied on CGP and Nanula's assertion that they would keep 27 holes of golf. An email attached to Plaintiff's complaint suggests that Glenn Meyer, PCC's President, knew *before* the PSA was executed that Concert Defendants may reduce the number of holes to below 27. (*See* Doc. No. 1-4 at p. 107 ("Good news from Glenn Meyer. He is OK with giving us carte blanche on the golf courses, so long as there is a great North Course . . . He doesn't understand what we will do with the $5-6k dues preview members who only get South Course access now, but that is our problem. There will be howling and lots of questions from the members, but we will stay flexible until we know what is best to do in terms of the South Course.").)

However, the Court denies Defendants' motion to dismiss the fraud claim to extent the claim is based on CGP's statement that it would spend $5 million in capital improvements. Defendants have not addressed this in their briefing and the Court finds that, at the motion to dismiss stage, NPT has sufficiently alleged that PCC justifiably relied on CGP and Nanula's assertion that it would spend $5 million in capital improvements.

### D.      *Aiding and Abetting Fraud Claims*

#### i.      **Count IV**

In Count IV, NPT first alleges that CGP and Nanula aided and abetted Ridgewood's commission of fraud by "actively encourag[ing] Ridgewood" to make false representations to PCC "regarding the speculation and risks associated with the Property."  (Doc. No. 1 at pp. 35–36.)  In addition, NPT claims that CGP and Nanula "encouraged" Ridgewood to make fraudulent omissions, such as "neglect[ing] to inform [PCC] that Ridgewood and CGP were in communication about Philmont and were working together to acquire Philmont Club at a below market rate" and that "neglect[ing] to inform [PCC] that it was actively engaged in discussions with the Township prior to the closing of the PSA and that it had confirmed that it would be able to obtain approvals for 160 or more Units on the Property and would be able to develop and sell the Property."  (*Id.* at ¶¶ 245–47.)

It is obvious that if there is no underlying fraud claim against Ridgewood, CGP cannot be said to have aided and abetted Ridgewood's fraud.  *See The Roskamp Inst., Inc. v. Alzheimer's Inst. of Am., Inc.*, Civil Action No. 15-3641, 2015 WL 6438093, at *10 (E.D. Pa. Oct. 23, 2015) ("Plaintiffs in this case fail to allege an actionable underlying fraud that the Foundation could have aided and abetted . . . Absent a viable claim of fraud, the Foundation could not have aided and abetted any tort.").

Accordingly, because the Court has (a) dismissed NPT's fraud claims to the extent they are based on statements about the riskiness of developing the Property given Plaintiff's failure to show justifiable reliance and (b) has dismissed the fraud in the omission claims because Defendants had no duty to speak, Count IV must also be dismissed.

#### ii.      **Count VI**

In Count VI, NPT alleges that Ridgewood, Grebow, and Plotnick aided and abetted CGP

and Nanula's commission of fraud.  (*See id.* at pp. 39–41.)  NPT claims that CGP made

fraudulent representations to PCC "regarding (1) the speculation and risks associated with the

Property, (2) the number of holes of golf CGP would retain at Philmont Club, (3) and the nature

and amount of the capital improvements CGP would make to Philmont Club.  (*Id.* at ¶ 277.)

NPT also alleges that CGP and Nanula committed fraud in the omission regarding their

partnership with Ridgewood and their ongoing discussions with the Township.  (*Id.* at ¶ 278.)

Plaintiff then pleads, in a conclusory fashion, that the Ridgewood Defendants "actively

encouraged CGP to make such statements and omissions."  (*Id.* at ¶ 279; *see also id.* at ¶ 280.)

Again, this Court has dismissed NPT's fraud in the omission claims because Defendants

had no duty to speak and has dismissed NPT's fraud claims to the extent they were based on

statements about the riskiness of developing the Property and how many holes of golf

Defendants would retain after the sale given Plaintiff's failure to show justifiable reliance.

Accordingly, the only underlying fraud claim remaining—and thus the only fraud Ridgewood

could have possibly aided and abetted—is based on CGP's representation that it would make $5

million in capital improvements.

But, missing from the complaint (or, for that matter, Plaintiff's response or sur-reply

briefs) are any allegations that Ridgewood acted in concert with CGP or substantially assisted

CGP in making misrepresentations as to how much money it would spend on *capital*

*improvements* or what kind of projects it would undertake.  (*See id.* at pp. 39–41; *see also id.* at

¶¶ 177–82.)[21]  *See The Roskamp Inst., Inc.*, 2015 WL 6438093, at *10 (explaining that under the

Restatement, "a defendant is subject to liability for the tortious action of another if he (a) does a

---

[21] Nor do the exhibits on which NPT relies to show that CGP misrepresented the nature of the capital
improvement projects it would undertake support NPT's argument.  (*See* Doc. No. 1-4, Ex. 35 at pp. 114
(internal CGP email that did not include Grebow or Plotnick); Doc. No. 1-4, Ex. 36, at pp. 116–18 (email
between CGP employees and CGP's counsel).)

tortious act in concert with the other or pursuant to a common design with him, (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person"); *see also Marion v. Bryn Mawr Trust Co.*, No. 2470 EDA 2018, 2021 WL 565481, at *3 (Pa. Super. Ct. Feb. 16, 2021) (same).  The allegations are either conclusory or focus on Ridgewood and CGP's communications about what they should tell PCC about the Property's development potential.  This is fatal to NPT's aiding and abetting claim. Therefore, the Court also dismisses Count VI for failure to state a claim.

### E.    Civil Conspiracy

Next, Defendants argue that Plaintiff's state law civil conspiracy claim must be dismissed because NPT has failed to state an underlying claim that Defendants could have conspired to commit (i.e., antitrust violations or fraud) *and* NPT failed to allege malice, an essential element of civil conspiracy.  (Doc. No. 13-2 at p. 35.)

To state a cause of action for civil conspiracy, a plaintiff must show:  "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage."  *Morilus v. Countrywide Home Loans, Inc.*, 651 F. Supp. 2d 292, 312 (E.D. Pa. 2008) (quotation marks and citations omitted); *see also Zafarana v. Pfizer, Inc.*, 724 F. Supp. 2d 545, 559 (E.D. Pa. 2010).  A viable civil conspiracy claim also requires "malice or intent to injure."  *Morilus*, 651 F. Supp. 2d at 313.  "Bald assertions that certain actions were malicious are insufficient; it must be alleged that the '*sole* purpose of the conspiracy was to injure the Plaintiffs.'"  *Id.* (citation omitted)); *see also Sarpolis v. Tereshko*, 625 F. App'x 594, 601 (3d Cir. 2016) ("Proof of malice is an essential part of a cause of action

for conspiracy, and malice requires that the conspirators act with the sole purpose of injuring the plaintiff." (cleaned up)); *Barker v. Hostetter*, Civil Action No. 13-5081, 2014 WL 1464319, at *31 (E.D. Pa. Apr. 15, 2014) ("[A] successful claim for civil conspiracy also requires that 'the *sole* purpose of the conspiracy is to injure the plaintiff,' not just that the plaintiff was injured." (citation omitted)); *Three Rivers Hydroponics, LLC v. Florists' Mut. Ins. Co.*, 2:15-cv-00809, 2018 WL 791405, at *6 (E.D. Pa. Feb. 8, 2018) ("Malicious intent requires that a defendant acted 'solely to injure' a plaintiff; injury that is incidental to another purpose, even if it appears 'selfish or unreasonable,' is not malicious." (citation omitted)).  "A showing that the acts alleged were done to advance the defendant's business interests, such as to increase company profits, precludes a civil conspiracy claim, since this means injuring the plaintiff was not the *sole* purpose of the conspiracy."  *Three Rivers Hydroponics, LLC*, 2018 WL 791405, at *6.

Courts routinely dismiss civil conspiracy claims where the plaintiff failed to allege that the defendants acted maliciously or acted with the sole intent to injure him or her.  *See, e.g.*, *Zafarana*, 724 F. Supp. 2d at 559 ("Nowhere in Plaintiffs' Amended Complaint are Defendants alleged to have acted with an intent to harm Plaintiffs, much less that it was Defendants' sole intent to harm Plaintiffs.  With these allegations, we cannot find that Plaintiffs have pled a cause of action for conspiracy under Pennsylvania law." (citation omitted)); *Barker*, 2014 WL 1464319, at *31 ("At no point in the Amended Complaint do Plaintiffs expressly state the sole purpose of the conspiracy was to injure them.  Accordingly, the Court will grant the Motion to Dismiss Plaintiffs' civil conspiracy claim."); *Three Rivers Hydroponics, LLC*, 2018 WL 791405, at *6–7 (dismissing the plaintiff's civil conspiracy claim where the amended complaint alleged that the defendants conspired "to place company profits over its insured" and that the defendants acted "solely to increase company commissions and profits," and therefore "injuring the plaintiff

was not the sole purpose of the conspiracy"); *accord Morilus*, 651 F. Supp. 2d at 313 (granting motion for summary judgment on the defendant's counterclaim because the facts showed that the "plaintiffs were guided by personal interests separate and apart from any alleged desire to cause harm to Countrywide").

Here, NPT claims that PCC was injured by Defendants' conduct. (*See, e.g.*, Doc. No. 1 at ¶¶ 272–73; *id.* at ¶¶ 305–06 ("[PCC] was harmed as a result of the Defendants' conspiracy by way of selling Philmont Club to Concert Philmont for below market value.  Because of the Defendants' conspiracy, Philmont Club was effectively sold for its value as a country club and not its value as a country club *and* a development parcel.").)  But injury alone is insufficient to support a civil conspiracy claim; critically, NPT fails to allege that Defendants acted with the intent to injure PCC, let alone with the sole intent to injure PCC.  Moreover, allegations in the complaint and emails NPT attaches to its complaint lead the Court to the very opposite conclusion—specifically, they show that Defendants were motivated by their own business concerns, not just the desire to injure PCC.  (*See* Doc. No. 1 at ¶ 137 ("Even with giving Ridgewood an 'awfully high' rate of return, Nanula noted that the sale of the Property '*[j]uices our normal deal returns quite nicely*.'" (emphasis added)); Doc. No. 1-3, Ex. 19 at pp. 54, 56; Doc. No. 1 at ¶ 140 (alleging that Nanula told Plotnik to "wait to see *if I can strike a better deal for all of us* here" (emphasis added)); Doc. No. 1-3, Ex. 20 at p. 64.)  Given NPT's failure to adequately plead malice, the Court must dismiss the civil conspiracy claim.[22]

---

[22] Because the Court finds that NPT failed to plead malice, the Court does not address Defendants' alternative argument—that NPT also failed to allege an underlying tort claim to support the civil conspiracy claim.  However, the Court notes that the only remaining claim that could plausibly support the civil conspiracy claim is the fraud claim against CGP, to the extent it is based on the alleged misrepresentation that CGP would make $5 million in capital improvements.

F.      **Breach of Contract**

As assignee, NPT asserts a breach of contract claim against Ridgewood, claiming that Ridgewood breached its confidentiality agreement with PCC when Ridgewood disseminated PCC's confidential financial information to third parties, ClubCorp and Morningstar Golf & Hospitality, LLC.  (Doc. No. 1 at ¶¶ 310–11; Doc. No. 1-4, Exs. 37, 38, 39 at pp. 127–34.)

"To state a claim for breach of contract under Pennsylvania law, a plaintiff is required to plead:  (1) the existence of a contract, including its essential terms, (2) a breach of duty imposed by the contract, and (3) resultant damages."  *Clapps v. State Farm Ins. Cos.*, 447 F. Supp. 3d 293, 297 (E.D. Pa. 2020) (cleaned up).  Defendants argue that the breach of contract claim must be dismissed because NPT failed to plead that PCC suffered damages that were causally related to Ridgewood's breach.  (Doc. No. 13 at pp. 35–36.)

We disagree.  Here, NPT has pled that "[PCC] was harmed by Ridgewood's . . . breach of confidentiality agreement by way of having its financial information disclosed to third parties" and that "[PCC] is entitled to attorneys' fees from Ridgewood as a result of the breach."  (Doc. No. 1 at ¶¶ 312–13.)  The Court finds this sufficient at the motion to dismiss stage.  *See Walsh v. Amerisource Bergen Corp.*, Civil Action No. 11-7584, 2014 WL 2738215, at *4 (E.D. Pa. June 17, 2014) (holding that the defendants sufficiently alleged that they suffered damages as a result of the plaintiff's breach of a confidentiality agreement because at minimum, they would be entitled to "nominal damages" if they prevailed on the counterclaim, since the contract provided that they would "be entitled to attorneys' fees and costs incurred in protecting their confidential information"); *AscellaHealth, LLC v. CRx Health Servs.*, *LLC*, Civil Action No. 14-5949, 2015 WL 1573395, at *5 (E.D. Pa. Apr. 9, 2015) ("CRx has alleged that Ascella . . . failed to maintain its confidential and proprietary information . . . [a]nd CRx alleges it suffered damages as a result

of Ascella's alleged breach.  While the allegations are thin, they contain sufficient factual content to draw a reasonable inference that a claim is plausible and, thus, the Court finds that they pass muster at this stage of the proceedings.").

## IV.    Conclusion

For the foregoing reasons, this Court dismisses the federal antitrust claims (Counts I and II) and the fraud in the omission and fraudulent concealment claims.  The Court dismisses the fraud claim asserted against the Ridgewood, Plotnick, and Grebow (Count III).  The Court also dismisses the fraud claim asserted against CGP and Nanula (Count V) to the extent it is based on representations about the riskiness of developing the Property or retaining 27 holes of golf, but the Court denies the motion to dismiss to the extent that claim is based on CGP's statement that it would spend $5 million in capital improvements.  Next, the Court dismisses the aiding and abetting fraud claims (Counts IV & VI) and the civil conspiracy claim (Count VIII).  Finally, the Court denies Defendants' motion to dismiss the breach of contract claim against Ridgewood (Count X).

An appropriate Order follows.