# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

————————————————————————

|  |  |  |
|---|---|---|
| NORTH PENN TOWNS, LP, directly and as assignee of PHILMONT COUNTRY CLUB | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO.  19-4540-KSM |
| | : | |
| v. | : | **Jury Trial Demanded** |
| | : | |
| CONCERT GOLF PARTNERS, LLC, PETER NANULA, RIDGEWOOD REAL ESTATE PARTNERS, LLC, JONATHAN GREBOW, and MICHAEL PLOTNICK | : | |
| | : | |
| Defendants. | : | |

————————————————————————

## AMENDED COMPLAINT

Plaintiff, North Penn Towns, LP, directly and as assignee of Philmont Country Club, by and through its undersigned counsel, hereby brings this civil action against Defendants Concert Golf Partners, LLC, Peter Nanula, Ridgewood Real Estate Partners, LLC, Jonathan Grebow, and Michael Plotnick, and in support thereof, avers as follows:

### Jurisdiction and Venue

1.     This civil action arises out of, among others, federal antitrust laws, including the Sherman Act and Clayton Act, 15 U.S.C. § 1, *et seq*.  The Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964 in that certain of the claims arise under the laws of the United States. The Court has subject matter jurisdiction over other claims pursuant to 18 U.S.C. § 1367 under the Court's supplemental jurisdiction.

2.     Additionally, the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship between Plaintiff and the Defendants and the amount in controversy is in excess of $75,000.00.

3.      Venue is proper in this District under and pursuant to <u>18 U.S.C. § 1965</u>, and pursuant to <u>28 U.S.C. § 1391</u>, in that a substantial part of the events giving rise to the claims alleged in this Complaint occurred in this District.

## The Parties

4.      Plaintiff, North Penn Towns, LP ("NPT"), is a limited partnership organized and existing under the laws of the Commonwealth of Pennsylvania with its principal office located at 1030 Reed Avenue, Suite 100, Wyomissing, Pennsylvania 19610.

5.      Each of NPT's partners is a Pennsylvania citizen.

6.      Plaintiff is assignee of the claims set forth in this action by Philmont Country Club. A copy of the assignment agreement between Plaintiff and Philmont Country Club is attached hereto as Exhibit 1.

7.      Philmont Country Club ("Philmont NPC") is a non-profit corporation organized and existing under the laws of the Commonwealth of Pennsylvania and at all relevant times hereto maintained an office or place of business located at 301 Tomlinson Rd., Huntingdon Valley, Pennsylvania 19006.

8.      Defendant Concert Golf Partners, LLC ("CGP") is a limited liability company organized and existing under the laws of the state of California with an office or place of business located at 1 Coastal Oak, Newport Beach, California 92657.

9.      The sole member of CGP is Defendant Peter Nanula.

10.     Defendant Peter Nanula is an adult individual residing at 1 Coastal Oak, Newport Beach, California 92657.

11.     Defendant Ridgewood Real Estate Partners, LLC ("Ridgewood") is a limited liability company organized and existing under the laws of the state of New Jersey with an office or place of business located at 25A Hanover Road, Suite 310, Florham Park, NJ 07932.

12.     The members of Ridgewood are Defendant Jonathan Grebow, a citizen of the state of New Jersey, and Ronni Grebow, a citizen of the state of Florida.

13.     Defendant Jonathan Grebow is an adult individual residing at 31 Morningside Drive, Livingston, New Jersey 07039.

14.     Grebow is, and was at all relevant times, the President and CEO of Ridgewood.

15.     Defendant Michael Plotnick is an adult individual residing at 2057 Elizabeth Ave., Scotch Plains, New Jersey 07076.

16.     Plotnick is, and was at all relevant times, the Vice President of Ridgewood.

## **Factual Background**

17.     Philmont NPC owned and operated a members-only country club also bearing the name Philmont Country Club ("Philmont Club") located in Huntingdon Valley, Pennsylvania.

18.     Philmont Club was founded in 1906 and consisted of, among other amenities, two eighteen (18) hole golf courses (the "North Course" and "South Course"), tennis courts, a swimming pool, and a clubhouse.

19.     By the early 2000s, Philmont NPC found itself in poor financial and physical shape.

20.     To raise money for much-needed capital improvement projects to Philmont Club's facilities, Philmont NPC decided to sell nine of the eighteen holes comprising the South Course (the "Property") to a residential real estate developer.

21.     To that end, Philmont NPC entered into an agreement to sell the Property to homebuilder Toll Brothers on or about November 6, 2013.

3

22.     But, the agreement with Toll Brothers terminated on or about July 22, 2014.

**A.     The NPT Agreement of Sale**

23.     On or about May 15, 2015, Philmont NPC entered into an agreement of sale with homebuilder NVR, Inc. ("NVR") to sell NVR the Property.

24.     Although NVR builds homes, it does not engage in property development—that is, the process of taking raw land and readying it for home construction, including, but not limited to, grading the land and installing infrastructure such as sewer and electrical lines.

25.     Accordingly, as was permitted by the agreement of sale, NVR assigned the agreement of sale to NPT, a property developer, who would develop the Property into developed lots and sell the lots to NVR.

26.     On July 22, 2015, NPT and NVR entered into a Lot Purchase Agreement (the "LPA") under which NVR agreed to purchase developed lots created from the Property from NPT.

27.     The next day, July 23, 2015, NPT and Philmont NPC entered into an agreement of sale (the "AOS") whereby Philmont agreed to sell the Property to NPT.  A copy of the AOS is attached hereto as Exhibit 2.

28.     Specifically, under the AOS and LPA, NPT would purchase the Property from Philmont NPT, obtain development approvals from the Lower Moreland Township (the "Township"), develop the Property into individual development lots ("Units"), and sell the improved and developed Units to NVR who would then construct homes and sell them to consumers.

29.     The purchase price for the Property set forth in the AOS was based on a per Unit yield ($75,308.64 per Unit approved for development by the Township). Ex. 2, § 2(a).

30.     Although the final Unit yield of the Property could vary somewhat based upon several factors, the AOS anticipated approvals for 162 Units and contemplated a minimum yield of 150 Units.  Ex. 2, § 2(a).

31.     Accordingly, the AOS set forth an anticipated purchase price of $12,200,000 based on a 162 Unit yield with a minimum purchase price of $11,296,296 (based on a minimum yield of 150 Units).  Ex. 2, § 2(a).

32.     The AOS provided NPT with a ninety (90) day "Due Diligence Period" during which NPT was permitted to conduct commercially reasonable studies on the Property and could terminate the AOS for any reason.  Ex. 2, § 13.

33.     Shortly after the execution of the AOS, it was discovered that recent changes in Township zoning regulations meant that the Property could only yield a maximum of 105 Units.

34.     Through the Due Diligence Period and due diligence in the Toll Brothers deal, it was also known that there were certain environmental conditions with the Property that would need to be remedied before the Property could be developed, namely high levels of mercury and arsenic as a result of decades of pesticide use.

35.     Purchasing the Property at the price of 150 Units while only obtaining 105 Units, especially in light of the environmental contamination, was not economically viable for NPT and the revenue from 105 units was not sufficient to serve Philmont NPC's purposes in selling the Property.

36.     Put simply, selling the Property for a potential Unit yield of only 105 Units was not a viable option to solve Philmont NPC's financial issues.

37.     Accordingly, NPT and Philmont NPC agreed to extend the Due Diligence Period for NPT and Philmont NPC to seek zoning relief from the Township which would permit the development of 162 or more Units.

38.     To that end, NPT and Philmont NPC executed a series of eight amendments to the AOS that extended the Due Diligence Period to September 26, 2017.  A copy of the eight amendments is attached hereto as Exhibit 3.  The amendments were limited in scope and served only to extend NPT's Due Diligence Period so that it could determine whether the necessary approvals for the planned development could be obtained.

39.     During the extended Due Diligence Period, NPT engaged in extensive communications and discussions with the Township about potential changes to the development plans for the Property which the Township would find agreeable and warrant zoning relief to allow 162 or more Units.

40.     The Township expressed concerns about the impact any development on the Property would have on the school system and roadway traffic congestion.

41.     NPT thus engaged in discussions with the Township about making the development age restricted (meaning no residents under the age of nineteen (19)) as opposed to market rate (meaning the homes could be sold to any purchaser) as well as making a $1,000,000 contribution to roadway improvements to increase the Unit yield.

42.     Additionally, NPT had discussions with the Township about Philmont NPC deed restricting approximately twenty-two (22) acres of property from further development to meet the Township's open space requirements for development.

43.     But, the change of the development to age restricted brought about new concerns.

6

44.     Specifically, to make an age restricted development marketable, the development must include a clubhouse, which was anticipated to cost approximately $1,600,000.

45.     Thus, if the Unit yield could be increased to 160 or more, it would come at an additional cost of approximately $2,600,000, not including the environmental remediation costs.

46.     On September 7, 2016, NPT, NVR, and Philmont NPC held an in person meeting to determine the allocation of the $2,600,000 increased cost such that the parties could modify the AOS and LPA and move forward with seeking zoning relief to increase the Unit yield to make the development of the Property a viable option.

47.     At that time, NPT and Philmont NPC reached an agreement in principle whereby Philmont NPC would provide NPT with a $375,000 purchase price credit (subject to decrease if the clubhouse came in under budget) and an additional potential price reduction up to $151,543.20 depending on the number of Units approved.

48.     Over the following days, NPT and Philmont NPC worked to reduce the agreement to a writing which culminated in a proposed Ninth Amendment to the AOS.  A copy of the Ninth Amendment is attached hereto as Exhibit 4.

**B.     CGP Enters the Picture**

49.     On August 30, 2016, longtime Philmont NPC and Philmont Club member David Fields had a thirty-five (35) minute phone call with Nanula about CGP's potentially investing in Philmont Club to assist Philmont NPC with its pressing financial needs.

50.     Nanula expressed interest in Philmont Club and, following the call, sent an email to Fields requesting various pieces of information about Philmont Club including "A summary of your current real estate deal and the Toll deal."  A copy of Nanula's August 30, 2016 email is attached hereto as Exhibit 5, at PCC-1050.

51.     Fields called Philmont NPC's President, Glenn Meyer, and asked if Meyer would be interested in pursuing discussions with CGP.  Meyer said yes.

52.     Fields then forwarded Nanula's email to Philmont NPC's Treasurer, Sam Silverman.  Ex. 5.

53.     Meyer, Silverman and the other leadership of Philmont NPC serve in a volunteer capacity for the non-profit organization, working without compensation on a part-time basis while working other day jobs.

54.     On September 10, 2016, Silverman provided Nanula with the requested information and noted that it would be easier to provide a summary of the NPT real estate deal verbally since Philmont NPC was "in the process of receiving an amendment to the [AOS] that will better clarify the details."  Ex. 5, at PCC-1048-49.

55.     Nanula forwarded the information to CGP's Director of Acquisitions, Tom Moran, to prepare a pro forma analysis of Philmont Club.

56.     Nanula followed up with several additional questions on September 12, 2016 to which Silverman provided answers that same day.  Ex. 5, at PCC-1046-48.

57.     On September 19, 2016, Nanula asked for additional information including "any and all details on the pending NVR deal for the South Course acreage" and pledged to provide Philmont NPC with a proposal for CGP's investment in Philmont Club.  Ex. 5, at PCC-1045.

58.     That same day, Meyer and Nanula had a twenty-two (22) minute phone call so that Meyer could "update [Nanula] on the real estate deal."  Ex. 5, PCC-1044.

59.     During the call, Nanula explained to Meyer the typical process for CGP's acquisition of a country club and conveyed preliminary terms upon which CGP would be interested in purchasing Philmont Club.  Dep. Tr. Nanula, 215:22-217:17, attached hereto as Exhibit 6.

60.     The terms Nanula conveyed to Meyer were that CGP would pay off Philmont NPC's debt, make a few million dollars' worth of capital improvements to Philmont Club, and, upon the sale of the Property, use the sale proceeds for additional capital improvements.  *Id.*

61.     The following day, after Moran provided Nanula with a preliminary analysis of Philmont Club's finances, Nanula wrote to Moran:

> Plenty for now.  This deal will be long and slow.
> They are under contract with our pals at NVR homes to sell off 9 of
> their 36 holes for $12.2m.  Not sure how they would sell the club to
> us, and let us have the real estate upside.  Trying for that.  Enough
> work on the pro forma for now.

A copy of Nanula's September 20, 2016 email is attached hereto as Exhibit 7, at 2CGP012895.

## C.     Ridgewood Enters the Picture

62.     In late 2014, Plotnick began sending Meyer periodic introductory emails to see if Philmont NPC was interested in discussing a potential transaction with Ridgewood.

63.     Plotnick sent these emails on December 8, 2014, October 15, 2015, and March 16, 2016 but Meyer did not respond to any of Plotnick's inquiries.

64.     Plotnick attended an industry conference in Texas from September 14, 2016 to September 16, 2016 where he met John Brown, whose company, Brown Golf Management, had been hired by Philmont NPC to manage Philmont Club.

65.     Plotnick expressed interest to Brown about discussing any potential opportunity for Ridgewood to become involved with Philmont Club.  A copy of the email exchange between Plotnick and Brown is attached hereto as Exhibit 8.

66.     Brown spoke with Meyer about his discussions with Plotnick and Meyer agreed to speak to Plotnick.  Ex. 8.

67.     With the introduction made by Brown, Plotnick reached out to Meyer by email on September 23, 2016.  A copy of the email chain between Meyer and Plotnick is attached hereto as Exhibit 9.

68.     Meyer and Plotnick spoke on the phone that same day for nearly forty (40) minutes and thereafter arranged for Plotnick and Ridgewood's CEO, Jonathan Grebow, to visit Philmont Club with Meyer on September 27, 2016.  Ex. 9.

**D.     AOS Terminates**

69.     Although NPT and Philmont NPC reached an agreement on September 7, 2016 to move forward with the AOS as intended, issues remained between NPT and NVR regarding necessary modifications to the LPA to account for the change of the development to age restricted and the increased costs associated with the addition of a clubhouse and roadway improvements.

70.     While NPT and Philmont NPC worked towards memorializing the September 7, 2016 agreement and NPT and NVR worked to modify the LPA, NPT and Philmont NPC executed a Seventh Amendment to the AOS on September 9, 2016 to extend the Due Diligence Period to September 16, 2016 and an Eighth Amendment on September 16, 2016 extending the Due Diligence Period to September 26, 2016.

71.     As of September 22, 2016, Meyer and Silverman were prepared to re-enter into a new agreement with NPT under similar terms as the AOS as intended to be modified by the terms of the Ninth Amendment should the AOS need to be terminated as a result of an inability to modify the LPA to address the issues with Unit yield.  A copy of the September 22, 2016 email chain between Meyer and Silverman is attached hereto as Exhibit 10.

72.     On September 24, 2016, the day after Meyer spoke to Plotnick, however, Meyer told Philmont NPC's counsel that "After further thought, we have decided to let the [AOS] expire

and evaluate our position rather than continue to negotiate with NVR." A copy of Meyer's September 24, 2016 email is attached hereto as Exhibit 11, at PCC-7793.

73.   Meanwhile, NPT and NVR came to terms on an amendment to the LPA and NPT executed the Ninth Amendment and sent it to Philmont NPC for counter signature.

74.   But, Philmont NPC refused to execute the Ninth Amendment.

75.   It was known and understood that absent Philmont NPC's execution of the Ninth Amendment, NPT would have no reasonable option but to terminate the AOS to save NPT's deposit money.

76.   NPT terminated the AOS on September 26, 2016.

**E.   Post AOS Occurrences**

77.   With the AOS terminated, Philmont NPC pursued separate discussions with NPT, Ridgewood, ***and*** CGP about a sale of the Property and/or the entirety of Philmont Club.

78.   On September 27, 2016, NPT discussed terms of the deposits NPT would make to Philmont NPC should the AOS be re-entered into. A copy of Mike Tulio's September 27, 2016 email is attached hereto as Exhibit 12.

79.   Also on September 27, 2016, Meyer met with Plotnick and Grebow at Philmont Club about Ridgewood's interest in the Property.

80.   Plotnick and Grebow pledged to provide Philmont NPC with a proposal for a transaction. A copy of Plotnick's September 27, 2016 email is attached hereto as Exhibit 13.

81.   Eventually, however, Ridgewood told Philmont NPC that it was no longer interested in purchasing the Property.

82.     Ridgewood expressed doubt that it, or any other developer, would be able to obtain sufficient confidence in the feasibility of the profitable development of the Property such that purchasing the Property could be justified.

**F.     Sale of Philmont Club to Concert Philmont, LLC**

83.     Keeping in line with his September 20, 2016 statement to Moran that "This deal will be long and slow," Nanula waited until November 1, 2016 to provide Philmont NPC with a formal written proposal for CGP's purchase of the entirety of Philmont Club.  A copy of the November 1, 2016 proposal is attached hereto as Exhibit 14.

84.     Meanwhile, Philmont NPC's financial condition continued to deteriorate.

85.     The primary terms of the proposal were for CGP to (1) pay off Philmont NPC's approximately $1,000,000 in debt immediately, (2) make $4,000,000 in capital improvements to Philmont Club, and (3) upon the sale of the Property, make an additional $5,000,000 in capital improvements. Ex. 14.

86.     Additionally, CGP pledged that Philmont Club would "remain an exclusive private club with at least 27 holes [of golf] after the South Course real estate transaction." Ex. 14.

87.     Nanula purposely crafted CGP's proposal to roughly align the amount of the cash infusion from CGP with the amount that Philmont NPC would receive under the AOS.

88.     The advantage to selling Philmont Club to CGP rather than selling the Property to NPT, as touted by CGP, was that CGP would immediately purchase Philmont Club and worry about obtaining development approvals for the Property later whereas NPT, as with any developer, was only willing to pay full price for the Property upon obtaining development approvals which may never come.

89.     In fact, CGP's website notes "we pride ourselves on quickly and discreetly closing golf transactions on an all-cash basis" and lists as one of its main selling points that it "only require[s] 30 days for due diligence and 5 days to close."  A printout of CGP's website is attached hereto as Exhibit 15.

90.     Meyer responded to Nanula's proposal by stating "I thought upon closing the real estate transaction we would have the full proceeds of the sale available towards capital improvements but I'm seeing only $5M listed."  A copy of the email chain is attached hereto as Exhibit 16, at PCC-1331.

91.     Nanula responded by stating that the sale of the Property may never occur, and the terms of the proposal balanced out that risk by allowing CGP to recover some of its initial investment if the Property were sold.  Ex. 16.

92.     Nanula's response was in line with his statement when transmitting the proposal that CGP must "assume no real estate transaction might ever be possible, due to the environmental remediation vagaries and cost; the extensive infrastructure costs for the Philmont Ave. intersection project; and the Town approval uncertainties."  Ex. 16.

93.     On November 17, 2016, Meyer sent a letter to Philmont NPC's membership informing them of the terms of CGP's proposal, including the "Guarantee of maintaining 27 holes of golf after the South Course land is sold."  A copy of the November 17, 2016 letter is attached hereto as Exhibit 17.

94.     Nanula assisted Meyer in writing the November 17, 2016 letter and approved of its contents before it was sent to Philmont NPC's membership by Meyer.

95.     A townhall style meeting was held on December 12, 2016 at Philmont Club during which Nanula presented his pitch to Philmont NPC's membership for why they should accept CGP's offer and answered questions the members had about CGP and the deal.

96.     Nanula did not express any changes to the terms of CGP's November 1, 2016 offer.

97.     On January 19, 2017, Philmont NPC's Board of Directors voted to approve the proposed Purchase and Sale Agreement (the "PSA") that had been negotiated by Philmont NPC's and CGP's counsel in the prior weeks and a required vote of Philmont NPC's membership was scheduled.

98.     CGP insisted that the PSA be kept confidential.

99.     Accordingly, Philmont NPC members were only permitted to view the fifty (50) plus page PSA in person at Philmont Club beginning on or about January 19, 2017, and were prohibited from reproducing the PSA in any manner or taking any notes on the PSA.

100.    Philmont NPC members were thus unable to obtain any independent legal or other advice on the PSA before voting on whether to agree to sell Philmont Club to CGP.

101.    Rather than purchasing Philmont Club directly, CGP incorporated Concert Philmont, LLC and Concert Philmont Properties, LLC on January 23, 2017 as single purpose entities to make the purchase.

102.    CGP initially contemplated Concert Philmont Properties taking title to the Property and Concert Philmont taking title to the remainder of Philmont Club.

103.    On February 1, 2017, Philmont NPC's membership voted to approve the PSA and the sale of Philmont Club to CGP.

104.    The PSA was executed on February 6, 2017.

105.    Closing on the PSA took place on or about March 1, 2017.

14

106.     Because more was required for title to the Property to be separated from title to the remainder of Philmont Club than CGP initially thought, the entirety of Philmont Club was conveyed to Concert Philmont.

107.     Accordingly, Concert Philmont owns the entirety of Philmont Club but intends to convey the Property to Concert Philmont Properties in the future.

108.     On March 2, 2017, Ridgewood Philmont, LLC and Concert Philmont Properties entered into a Development Services Agreement (the "DSA") pursuant to which Ridgewood Philmont became responsible for obtaining development approvals for, marketing, and selling the Property to a developer.

109.     Ridgewood Philmont is a single purpose entity created by Ridgewood for the purpose of entering into the DSA.

**G.     Ridgewood and CGP Plot to Acquire Philmont Club Cheap**

110.     On March 3, 2017, NPT initiated a lawsuit against CGP and Philmont NPC in the Montgomery County Pennsylvania Court of Common Pleas at Case No. 2017-04395 (the "Original Action") alleging, among others, tortious interference with contract against CGP and breach of contract against Philmont NPC.

111.     Discovery in the Original Action yielded significant information about CGP's actions leading up to the sale of Philmont Club to Concert Philmont of which Philmont NPC was not aware.[1]

---

[1] The documents and communications that follow, as well as Exhibit 7, began being produced by Ridgewood on October 18, 2018 pursuant to a subpoena served by NPT and by CGP on January 11, 2019 after voluminous discovery motions filed by NPT and court orders compelling production by CGP.

112.    Unknown to Philmont NPC until discovery in the Original Action, Nanula and Plotnick met at the same conference in Texas from September 14, 2016 to September 16, 2016 at which Plotnick met Brown.

113.    During that conference, Plotnick and Nanula discussed Ridgewood's and CGP's working together on future country club acquisitions that would involve excess land that could be developed for residential purposes.

114.    Nanula and Meyer had an eighteen (18) minute phone call on October 10, 2016.

115.    Immediately upon hanging up with Meyer, Nanula called and spoke to Plotnick for forty-two (42) minutes.

116.    By October 21, 2016, Ridgewood and Nanula were exchanging terms of the deal that would ultimately become the DSA.  A copy of Plotnick's October 21, 2016 email is attached hereto as Exhibit 18.

117.    Plotnick, with Grebow's knowledge, input, and approval, proposed that, in exchange for Ridgewood's paying half of the costs of obtaining development approvals (approximately $500,000), obtaining development approvals, and finding a buyer for the Property, Ridgewood would receive half of the sales price of the Property above the costs of obtaining development approvals plus $5,000,000.  Ex. 18.

118.    Ridgewood suggested that $5,000,000 from the sale of the Property be reinvested in Philmont Club as capital expenditures.  Ex. 18.

119.    Nanula then incorporated that suggestion into his November 1, 2016 written proposal to Philmont NPC.  Ex. 14.

120.    Nanula forwarded Plotnick's October 21, 2016 email to Nick Cicero, a partner at Freestone Capital Management—the entity that is ultimately responsible for managing the various

16

entities that provided the financing for Concert Philmont's purchase of Philmont Club.  A copy of Nanula's email chain with Cicero is attached hereto as Exhibit 19.

121.    Nanula explained to Cicero that Ridgewood was talking to Philmont NPC about purchasing the Property, but that Nanula "told them to back off completely so [Nanula] can buy the whole Club and then deal them in as our real estate partner."  Ex. 19, at 2CGP027014.

122.    Nanula, who orchestrated the terms of the DSA with Plotnick and Grebow, asked Cicero rhetorically, "why do we need Ridgewood at all? They are not putting up any real capital at all here." *Id.*

123.    In agreement, Cicero responded that the return to be given to Ridgewood "seems awfully high instead of just some set fee that is relatively nominal" and that "we know some age-restricted developers already that I'm sure can assist with that sort of entitlement work." *Id.*, at 2CGP027012.

124.    Nanula answered his rhetorical question by responding as follows: "Yes, but this firm is in advanced talks with [Meyer] about buying this 35 acre parcel from the club . . . So getting them to back off to a small fee will be difficult." *Id.*, at 2CGP027011.

125.    Even with giving Ridgewood an "awfully high" rate of return, Nanula noted that the sale of the Property "[j]uices our normal deal returns nicely." *Id.,* at 2CGP027014.

126.    In a November 2, 2016 email, Nanula and Plotnick discussed their expectations that Ridgewood would make a "7-14x" return on its approximately $500,000 investment.[2]  In other words, CGP would pay Ridgewood $3.5 – $7 million for something that it could hire someone else to do for a "set fee that is relatively nominal" in exchange for Ridgewood not bidding on Philmont

---

[2] In the Original Action, CGP improperly mass marked its document production as "confidential," including the referenced email.  Many of the confidentiality markings were stricken.  Plaintiff believes the confidentiality marking on the referenced email was stricken, but at this time has not been able to confirm that, so, in an abundance of caution, is not attaching the email to this Amended Complaint.

Club and instead casting false doubt in Philmont NPC's mind about the value of Philmont Club. Nanula confirmed in his deposition that he anticipated paying Ridgewood $3.5 - $7 million.

127.    Yet, Nanula told Meyer that CGP had to "assume that no real estate transaction might ever be possible," Ex. 16, at PCC-1332, and that "about $5m is all [CGP] could afford to plow back" into Philmont Club if the Property could ever be developed and sold.  A copy of Nanula's November 2, 2016 email to Plotnick is attached hereto as Exhibit 20, at 2CGP016515.

128.    Nanula also suggested to Philmont NPC that absent CGP's involvement, it would take four (4) to five (5) years to get development approvals, if at all, during which time Philmont NPC would "bear all the risks and costs during the process – while trying to sustain the club."  Ex. 16, at PCC-1331.

129.    On November 2, 2016, after speaking to Meyer about CGP's November 1, 2016 proposal to purchase Philmont Club, Nanula emailed Plotnick telling him about the offer and Meyer's protest about why only $5,000,000 from the sale of the Property would be reinvested into Philmont Club.  Ex. 20.

130.    Nanula told Plotnick that he believed Meyer would seek a better deal from Ridgewood and that "For now, I hope you guys will stand back, profess some concerns about the real estate risks, and just wait to see if I can strike a better deal for all of us here."  Ex. 20, at 2CGP016515.

131.    Nanula followed up his email just a few hours later pledging to "only pursue the real estate angle with Ridgewood" and that "I am prepared to sign an agreement to that effect." *Id.*, at 2CGP016154.

132.    Plotnick, with Grebow's knowledge and approval, responded on November 4, 2016 by stating that Ridgewood "will continue to stand on the sidelines and let you do your thing.  Keep

18

me posted as to any progress made, and when you are closer to a deal with the club, we can paper our agreement." A copy of Plotnick's November 4, 2016 email is attached hereto as Exhibit 21, at 2CGP027066.

133.    Without disclosing to Philmont NPC that Ridgewood and CGP knew each other, much less that they were communicating about Philmont Club and had an agreement for Ridgewood to "stand back [and] profess some concerns about the real estate risks," Ridgewood told Meyer that Ridgewood was not interested in a deal for Philmont Club or the Property.

134.    With Ridgewood and CGP both having cast doubt as to the feasibility of the Property development, Philmont NPC ultimately decided to go with the sure thing—the sale of Philmont Club to CGP—rather than risk a sale to NPT failing to materialize months down the road.

135.    Unaware of Ridgewood's and CGP's secret discussions and agreement, Philmont NPC turned down NPT again in December 2016. Specifically, NPT submitted a revised proposal to buy the Property to Meyer on December 20, 2016, which Meyer immediately forwarded to Silverman with the message, "Hot off the press. Not interested." without giving the proposal any consideration. A copy of Meyer's December 20, 2016 email is attached hereto as Exhibit 22.

136.    The doubt cast by Ridgewood and CGP on the viability of the development of the Property at a time when Philmont NPC had pressing financial challenges caused Philmont NPC to sell Philmont Club to Concert Philmont at a rate significantly lower than Philmont NPC otherwise would have sold it.

137.    Had it known that the doubts and concerns expressed by Ridgewood and CGP were contrived to get Philmont Club for a cheap price rather than at a cost based in reality, Philmont NPC would not have sold Philmont Club to Concert Philmont.

19

138.     As Nanula noted to Plotnick on November 19, 2016 after Philmont NPC's Board of Directors voted to accept CGP's proposal, "They need us, they want us, and they have capitulated in every respect."  Ex. 21, at 2CGP027064.

139.     While CGP promised $10,000,000 in debt payoff and capital improvements, Philmont Club was appraised in 2003 for $10,600,000 solely as a country club (i.e. not factoring selling the Property for development purposes).  A copy of the 2003 Appraisal is attached hereto as Exhibit 23.

140.     In other words, factoring in the ability to develop and sell the Property while retaining the remainder of Philmont Club as a country club, Philmont Club was worth many millions of dollars more than what it was sold to Concert Philmont for.

141.     But, accepting Ridgewood's and CGP's representations that "no real estate transaction might ever be possible," Ex. 16, and concerns about the risks of the development, CGP's offer was not far removed from the appraised value of Philmont Club.

**H.     CGP and Ridgewood Buy Time to Ensure Risks are Not a Factor**

142.     While Nanula told Meyer that CGP had to "assume no real estate transaction might ever be possible," Ex. 16, and plotted for Ridgewood to "profess some concerns about the real estate risks," Ex. 20, at 2CGP016515, CGP ensured it had just enough time to confirm that the Property could be developed, and thus there were no risks, before Concert Philmont's purchase of Philmont Club.

143.     Despite CGP's claim to "only require 30 days for due diligence," Ex. 15, on December 13, 2016, Moran asked Nanula "Are we still going for a 60 day DD period [due diligence period] here to better understand the real estate play? Which would push the close into late March?"  A copy of Moran's email is attached hereto as Exhibit 24, at 2CGP005349.

20

144.    In a subsequent email on the same date, Moran stated "Understood on the 45 day DD so early March close."  A copy of Moran's subsequent email is attached hereto as Exhibit 25, at 2CGP005352.

145.    CGP never informed Philmont NPC that it was delaying closing to ensure that it could obtain development approvals for 160 or more Units on the Property and ensure that the Property could be sold.

146.    On January 16, 2017, Nanula told Ridgewood that the expected timeline for the PSA was Philmont NPC's Board of Directors' approval on January 18, 2017, Philmont NPC members' approval on February 1, 2017, and closing on February 28, 2017.  A copy of Nanula's email is attached hereto as Exhibit 26, at 2CGP026415.

147.    Nanula asked Ridgewood, "Does this give you guys enough time to get through environmental and Town meetings, or should I buy some more time on our closing?"  *Id.*

148.    By January 20, 2017, Ridgewood had engaged in a meeting with the Township at which the Township manager was "thrilled" that CGP was planning to "integrate homes into [the] club" and "[d]idn't flinch on the 160 units."  A copy of Grebow's January 20, 2017 email is attached hereto as Exhibit 27, at 2.

149.    Grebow further noted that "As expected, they want the $1mm contribution for traffic.  Standard 55 and over community" and that the Township "Wants to get the deal done." *Id.*

150.    Nanula reiterated to CGP's Chief Operating Officer, Susan Dunnavant, on January 21, 2017 that "the South Course real estate development is looking good for now; met with the Town this week, and they want to get this deal done with us."  A copy of Nanula's January 21, 2017 email is attached hereto as Exhibit 28.

151.    On January 24, 2017, Nanula noted to Grebow and Plotnick: "Town not wasting any time here.  Good body language."  A copy of Nanula's January 24, 2017 email is attached hereto as Exhibit 29, at 2CGP026420.

152.    Grebow responded by stating: "Definitely great body language.  Last step in DD [due diligence] is the environmental cost analysis.  Our attorney went through things with the consultant today and we should have that in about 2 weeks."  *Id.* at 2CGP026419.

153.    By February 14, 2017, CGP had satisfied any concerns about the scope and cost of the environmental remediation.

154.    To that end, on February 14, 2017, Nanula informed his colleagues that "Ridgewood came back optimistic about enviro[mental] remediation on the South Course, so we are a go on the real estate project.  They say it will take 12-18 months to get through Penn DEP, and we should have our entitlements for 165+ 'carriage homes' within 24 months.  Then we sell the nicely entitled 6[0]-acre parcel."  A copy of Nanula's February 14, 2017 email is attached hereto as Exhibit 30, at 2CGP014144.

155.    Nanula further noted that the contaminated soil could be transported to other areas of the Philmont Club that were not being developed to minimize the cost of the environmental remediation.  *Id.*

156.    CGP and Nanula never informed Philmont NPC that the risks with the development of the Property that they and Ridgewood professed before had, in fact, been confirmed to be non-existent.

157.    Nor did CGP or Ridgewood ever inform Philmont NPC that they had been communicating since September 2016, much less that they had been working together to acquire Philmont Club and to develop the Property since October 2016 at the latest.

22

158.    In fact, Meyer did not learn that Ridgewood and CGP had teamed up on the development of the Property until informed of the fact by NPT's counsel during his deposition on July 25, 2018.

I.    **CGP's Deception to Entice Philmont NPC to Agree to the PSA**

159.    Despite pledging that Philmont Club would "remain an exclusive private club with at least 27 holes [of golf] after the South Course real estate transaction," Ex. 14, CGP had no intention to maintain twenty-seven holes of golf.

160.    Rather, before even making the pledge, Nanula had shared his opinion with Cicero that "[o]nly 18 or 27 holes [are] truly needed." Ex. 19, at 2CGP027013.

161.    By December 8, 2016, Dunnavant asked Nanula whether CGP should "[g]o down to 18 hole[s] immediately" or "get North Course to sellable conditions and have South Course OK – Maybe do the public course?" A copy of Dunnavant's December 8, 2016 email is attached hereto as Exhibit 31.

162.    By December 9, 2016, CGP was discussing various options for the remainder of the South Course that would result in less than twenty-seven (27) holes of golf remaining at Philmont Club after the sale of the Property. A copy of the December 9, 2016 email chain is attached hereto as Exhibit 32.

163.    Nanula told Dunnavant and Moran that reducing the number of holes below twenty-seven (27) would result in "howling and lots of questions from the members, but we will stay flexible until we know what is best to do in terms of the South Course." A copy of Nanula's December 11, 2016 email is attached hereto as Exhibit 33.

164.    Although Nanula mentioned reducing the total number of holes of golf below twenty-seven (27) with Meyer, he never mentioned those intentions to Philmont NPC's

membership at the December 12, 2016 town hall meeting or at any other time before the closing

on the PSA.  Put simply, Philmont NPC's membership was never aware that any deviation from

CGP's promise to maintain twenty-seven holes of golf was contemplated, , much less planned, by

CGP.

165.    More concretely, on March 1, 2017, the day Concert Philmont became the owner

of Philmont Club, Nanula told Dunnavant that they needed to consider "how the remaining 6-7

holes on the South Course will really work," thereby indicating that CGP planned to only maintain

twenty-four (24) to twenty-five (25) holes of golf, not the twenty-seven (27) promised to Philmont

NPC.  A copy of Nanula's March 1, 2017 email is attached hereto as Exhibit 34, at 2CGP006162.

166.    Discovery in the Original Action also revealed that CGP never intended to abide

by its promises with respect to the amount that would be spent on capital improvements.

167.    Regarding the capital improvement projects Philmont NPC expressed to CGP that

they wanted performed as part of the transaction, CGP only ever intended to pay lip service to their

intentions to complete the projects.

168.    In a November 21, 2016 email with CGP representatives, Nanula stated: "The wild

ideas the Board has about a 'master plan' for the North Course are probably way overblown, and

we have huge capital needs in the clubhouse, HVAC, etc.  You will see.  We will want to 'nod' to

some master plan elements so the members are excited about their North Course being updated a

bit, but we want to spend the smallest dollars possible to get the maximum member impact."  A

copy of Nanula's November 21, 2016 email is attached hereto as Exhibit 35.

169.    To that end, CGP never intended to expend the full $4,000,000 in capital

improvements upon purchasing Philmont Club or the $5,000,000 towards capital improvements

that it promised to make upon the sale of the Property.  Rather, CGP intended to expend a significantly smaller amount and keep the remainder as profit.

170.    On January 16, 2017, Nanula praised CGP's counsel for the "nicely vague" language in the PSA regarding the capital improvement projects that CGP would undertake. A copy of Nanula's January 16, 2017 email is attached hereto as Exhibit 36, at 2CGP014817-18.

171.    Nanula then informed CGP's counsel of the projects "we actually have planned" and stressed that the actual projects were not to be communicated to Philmont NPC or its counsel. *Id.*

**J.    Ridgewood Shares Philmont NPC's Confidential Information**

172.    On September 29, 2016 to facilitate discussions, Philmont NPC and Ridgewood entered into a confidentiality agreement which required Ridgewood to keep confidential financial documents provided to it by Philmont NPC.  A copy of the confidentiality agreement is attached hereto as Exhibit 37.

173.    Nonetheless, Ridgewood transmitted Philmont NPC's confidential financial information to third parties, within just days of executing the confidentiality agreement.

174.    Specifically, on October 5, 2016, Grebow instructed Plotnick to email Philmont NPC's confidential financial information to Tom Bennison at ClubCorp.  A copy of Plotnick's October 5, 2016 email to Bennison is attached hereto as Exhibit 38.

175.    Then, on October 11, 2016, Plotnick transmitted the confidential information to Matthew Galvin at Morningstar Golf & Hospitality, LLC.  A copy of Plotnick's October 11, 2016 email to Galvin is attached hereto as Exhibit 39.

## COUNT I[3]
## Fraud
### North Penn Towns, LP, as assignee of Philmont Country Club v.
### Concert Golf Partners, LLC and Peter Nanula

176.    NPT hereby incorporates the foregoing averments as if the same were set forth at length herein.

177.    CGP represented to Philmont NPC that it would engage in certain capital improvement projects at Philmont Club.

178.    CGP did not intend to engage in those projects as represented, but instead had a separate list of capital improvement projects it actually intended to engage in.  Ex. 36, at 2CGP014817-18.

179.    CGP represented to Philmont NPC that it would make $4,000,000 in capital improvements upon sale of Philmont NPC to CGP and another $5,000,000 in capital improvements upon the sale of the Property, but in reality, had no intention of expending the full amount of either the $4,000,000 or $5,000,000.

180.    CGP's representations that it would make specified capital improvements and invest $4,000,000 upon sale of Philmont Club and $5,000,000 in capital improvements upon the sale of the Property were material to Philmont NPC's decision to sell Philmont Club to Concert Philmont.

181.    CGP knowingly made the false representations with the intention to have Philmont NPC rely on the representations and agree to sell Philmont Club to Concert Philmont.

182.    Philmont NPC justifiably relied upon CGP's representations.

---

[3] Without waive of any rights, Plaintiff has removed from this Amended Complaint those claims that were dismissed by the Court on Defendants' Motion to Dismiss.

183.    Philmont NPC was harmed as a result of its reliance upon CGP's representations by way of selling Philmont Club to Concert Philmont for far below market value and under the false belief that certain improvements would be made.

184.    Peter Nanula is liable for CGP's fraud under the participation theory in that he acted on behalf of CGP and was the individual who made the fraudulent statements to Philmont NPC.

185.    Philmont NPC assigned this claim to NPT.  Ex. 1.

Wherefore, Plaintiff, North Penn Towns, LP, as assignee of Philmont Country Club, respectfully requests judgment against Concert Golf Partners, LLC and Peter Nanula, jointly and severally, in excess of $150,000 together with punitive damages, costs, and such other relief as the Court deems just and appropriate.

## COUNT II
### Fraudulent Concealment (Restatement § 550)
### North Penn Towns, LP, as assignee of Philmont Country Club v.
### Concert Golf Partners, LLC, Peter Nanula, Ridgewood Real Estate
### Partners, LLC, Jonathan Grebow, and Michael Plotnick

186.    NPT hereby incorporates the foregoing averments as if the same were set forth at length herein.

187.    Ridgewood and CGP concealed from Philmont NPC that Ridgewood and CGP were working together in secret so CGP could acquire Philmont Club at a below market rate.

188.    Ridgewood and CGP purposely misled Philmont NPC so that Philmont NPC would not discover that they were working together to acquire Philmont Club, maintaining the false appearance that they were competitors to undermine the purchase price and take advantage of Philmont NPC's precarious financial position.

189.    Per CGP's and Nanula's instructions and encouragement, Ridgewood told Philmont in early November 2016 that it was not interested acquiring Philmont Club.

27

190.     During that communication, Ridgewood concealed from Philmont NPC that it had reached an agreement with CGP and was finalizing terms of which it would become a developer for Philmont Club and receive a "fee" of $3.5 - $7 million or more once CGP gets Philmont Club at a reduced price in exchange for Ridgewood's not making an offer to buy Philmont Club.  Ex. 21 at 2CGP027066.

191.      Ridgewood further concealed that its dealings with Philmont NPC were scripted by CGP and Nanula for the purpose of reducing the sale price of Philmont Club and distorting perceptions of Philmont Club's market value.

192.     Similarly, when CGP communicated with Philmont NPC on or about November 2, 2016 regarding CGP's proposal dated November 1, 2016, CGP concealed its secret negotiations with Ridgewood from Philmont NPC.  Ex. 20, at 2CGP016515.

193.     Specifically, while purportedly explaining to Philmont NPC why the amount of the proposal was significantly lower than the amount CGP promised Philmont NPC in late September 2016 (i.e., the purported real estate development risk), CGP concealed from Philmont NPC the true reason that the amount of the November 1, 2016 proposal was substantially lower than the amount proposed before: that CGP had reached an agreement with Ridgewood in secret and was finalizing terms under which Ridgewood, per CGP's and Nanula's instructions, would not offer to buy Philmont Club and in exchange CGP would share the anticipated excess profit from acquisition and development of Philmont Club with Ridgewood.

194.     Ridgewood's and CGP's concealments were material to Philmont NPC's decision to sell Philmont Club to Concert Philmont as the concealed information would have notified Philmont NPC that the proposed purchase from CGP did not reflect the true market value as it was a product of collusion between purported competitors CGP and Ridgewood.

28

195.     Philmont NPC justifiably relied on the concealments of material fact as it had no reason to suspect Ridgewood and CGP were colluding.

196.     Philmont NPC's reliance was justifiable in that Ridgewood and CGP both approached Philmont NPC separately at different points regarding their interest in acquiring Philmont Club.

197.     Given that CPG is a California company and Ridgewood a New Jersey company with no known connection between the two, Philmont NPC had no reason to suspect any foul play between them.

198.     Additionally, this ruse by CGP and Ridgewood was calculated to take maximum advantage of Philmont NPC's distressed financial condition.   CGP and Ridgewood knew that Philmont NPC's need for immediate cash would make it particularly susceptible to their ruse.

199.     Also, CGP and Ridgewood took advantage of Philmont NPC's lack of leadership – that they knew the management of Philmont NPC was made up of a few volunteers who had other day jobs.

200.     Philmont NPC was harmed as a result of its reliance upon CGP's and Ridgewood's concealment by way of selling Philmont Club to Concert Philmont for far below market value.

201.     Because of Ridgewood's and CGP's fraudulent concealments, Philmont Club was effectively sold for a fraction of its true value.

202.     Peter Nanula, Jonathan Grebow, and Michael Plotnick are liable for the fraudulent concealment of CGP and Ridgewood, respectively, under the participation theory as they were the individuals who actively concealed the pertinent information from Philmont NPC.

203.     Philmont NPC assigned this claim to NPT.  Ex. 1.

Wherefore, Plaintiff, North Penn Towns, LP, as assignee of Philmont Country Club, respectfully requests judgment against Concert Golf Partners, LLC, Peter Nanula, Ridgewood Real Estate Partners, LLC, Jonathan Grebow, and Michael Plotnick, jointly and severally, in excess of $150,000 together with punitive damages, costs, and such other relief as the Court deems just and appropriate.

**COUNT III**
**Fraudulent Nondisclosure (Restatement § 551)**
**North Penn Towns, LP, as assignee of Philmont Country Club v.**
**Concert Golf Partners, LLC, Peter Nanula, Ridgewood Real Estate**
**Partners, LLC, Jonathan Grebow, and Michael Plotnick**

204.    NPT hereby incorporates the foregoing averments as if the same were set forth at length herein.

205.    Ridgewood and CGP failed to disclose to Philmont NPC that Ridgewood and CGP were working together in secret so CGP could acquire Philmont Club at a below market rate.

206.    Ridgewood and CGP purposely misled Philmont NPC so that Philmont NPC would not discover that they were working together to acquire Philmont Club, maintaining the false appearance that they were competitors to undermine the purchase price and take advantage of Philmont NPC's precarious financial position.

207.    Per CGP's and Nanula's instructions and encouragement, Ridgewood told Philmont in early November 2016 that it was not interested in acquiring Philmont Club.

208.    During that communication, Ridgewood failed to disclose to Philmont NPC that it had reached an agreement with CGP and was finalizing terms under which it would become a developer for Philmont Club for a fee of $3.5 - $7 million or more in exchange for Ridgewood's not making an offer to buy Philmont Club.  Ex. 21 at 2CGP027066.

209.     Ridgewood further failed to disclose that all its dealings with Philmont NPC were scripted by CGP and Nanula for the purpose of minimizing the sale price of Philmont Club and distorting perceptions of Philmont Club's market value.

210.     Similarly, when CGP communicated with Philmont NPC on or about November 2, 2016 regarding CGP's proposal dated November 1, 2016, CGP failed to reveal to Philmont NPC its secret negotiation with Ridgewood.  Ex. 20, at 2CGP016515.

211.     Specifically, while purportedly explaining to Philmont NPC why the amount of the proposal was significantly lower than the amount CGP promised Philmont NPC before, CGP concealed from Philmont NPC the true reason that the amount of the proposal was substantially lower than the amount proposed before: that CGP had reached a deal with Ridgewood in secret and was finalizing terms under which Ridgewood would not offer to buy Philmont Club and in exchange CGP would split the millions of dollars in anticipated excess profit as a result of the lack of competition with Ridgewood.

212.     Ridgewood's and CGP's nondisclosures were material to Philmont NPC's decision to sell Philmont Club to Concert Philmont as the omitted information would have notified Philmont NPC that the proposed purchase from CGP did not reflect the true market value as it was a product of collusion between purported competitors CGP and Ridgewood.

213.     Philmont NPC justifiably relied on the nondisclosure of a material fact as it had no reason to suspect Ridgewood and CGP were colluding.

214.     Philmont NPC's reliance was justifiable in that both Ridgewood and CGP approached Philmont NPC separately at different points regarding their interest in acquiring Philmont Club.

215.     Given that CPG is a California company and Ridgewood a New Jersey company with no known connection between the two, Philmont NPC had no reason to suspect any foul play between the two.

216.     Additionally, this ruse by CPG and Ridgewood was calculated to take maximum advantage of Philmont's NPC's distressed financial condition.

217.     Also, CGP and Ridgewood took advantage of Philmont NPC's lack of leadership – that they knew the management of Philmont NPC was made up of a few volunteers who had other day jobs.

218.     Philmont NPC was harmed as a result of its reliance upon CGP's omission and Ridgewood's omission by way of selling Philmont Club to Concert Philmont for far below market value.

219.     Because of Ridgewood's and CGP's fraudulent nondisclosures, Philmont Club was effectively sold for a fraction of its true value.

220.     Peter Nanula, Jonathan Grebow, and Michael Plotnick are liable for the fraudulent concealment of CGP and Ridgewood, respectively, under the participation theory as they were the individuals who actively concealed the pertinent information from Philmont NPC.

221.     Philmont NPC assigned this claim to NPT.  Ex. 1.

Wherefore, Plaintiff, North Penn Towns, LP, as assignee of Philmont Country Club, respectfully requests judgment against Concert Golf Partners, LLC, Peter Nanula, Ridgewood Real Estate Partners, LLC, Jonathan Grebow, and Michael Plotnick, jointly and severally, in excess of $150,000 together with punitive damages, costs, and such other relief as the Court deems just and appropriate.

**COUNT IV**
**Aiding and Abetting Fraud**
**North Penn Towns, LP, as assignee of Philmont Country Club v.**
**Concert Golf Partners, LLC and Peter Nanula**

222.   NPT hereby incorporates the foregoing averments as if the same were set forth at length herein.

223.   Ridgewood made fraudulent statements to Philmont NPC about not being interested in Philmont Club.

224.   CGP and Nanula not only knew that Ridgewood would make those fraudulent statements, but requested and encouraged Ridgewood to make the false statements.

225.   Ridgewood fraudulently omitted to inform Philmont NPC and fraudulently concealed from Philmont NPC that Ridgewood and CGP were cutting a deal to undermine the price of Philmont Club and to split the excess profits (i.e., reduction in price) between themselves rather than paying it to Philmont NPC.

226.   CGP and Nanula encouraged and assisted Ridgewood in omitting that information and in concealing it from Philmont NPC.

227.   CGP and Nanula requested, encouraged, and assisted Ridgewood in making fraudulent statements, omissions, and concealments in order to acquire Philmont Club for far below market value.

228.   Philmont NPC was harmed by CGP's and Nanula's aiding and abetting Ridgewood's fraudulent statements, omissions, and concealments by way of selling Philmont Club to Concert Philmont for a fraction of the true value of Philmont Club.

229.   Even CGP would have been willing to purchase Philmont Club for significantly more than it did, but worked with Ridgewood to make fraudulent statements, omissions, and concealments in order to acquire Philmont Club at a reduced rate.

230.    Because of Ridgewood's fraudulent statements, omissions, and concealments, Philmont Club was effectively sold for a fraction of its true value.

231.    Peter Nanula is liable for CGP's aiding and abetting Ridgewood's fraud under the participation theory in that he acted on behalf of CGP and was the individual who encouraged Ridgewood to make the fraudulent statements to Philmont NPC.

232.    Philmont NPC assigned this claim to NPT.  Ex. 1.

Wherefore, Plaintiff, North Penn Towns, LP, as assignee of Philmont Country Club, respectfully requests judgment against Concert Golf Partners, LLC and Peter Nanula, jointly and severally, in excess of $150,000 together with punitive damages, costs, and such other relief as the Court deems just and appropriate.

## COUNT V
### Aiding and Abetting Fraud
### North Penn Towns, LP, as assignee of Philmont Country Club v.
### Ridgewood Real Estate Partners, LLC,
### Jonathan Grebow, and Michael Plotnick

233.    NPT hereby incorporates the foregoing averments as if the same were set forth at length herein.

234.    CGP fraudulently omitted to inform Philmont NPC and fraudulently concealed from Philmont NPC that it was cutting a deal with Ridgewood to undermine the price of Philmont Club and to split the excess profits (i.e., reduction in price) between themselves rather than paying it to Philmont NPC.

235.    Ridgewood, Grebow, and Plotnick encouraged and assisted CGP in omitting that information and in concealing it from Philmont NPC.

236.   Ridgewood, Grebow, and Plotnick knew that CGP was making false representations to Philmont NPC about the improvements that would be made and the amount of money that would be reinvested in Philmont Club.

237.   Ridgewood, Grebow, and Plotnick encouraged and assisted CGP in making those false representations to Philmont NPC so as to enable Concert Philmont to acquire Philmont Club at far below market value and to increase profits which would be split with Ridgewood.

238.   Ridgewood, Grebow, and Plotnick requested, encouraged, and assisted CGP in making fraudulent statements, omissions, and concealments in order for CGP to acquire Philmont Club at far below market value and to pay Ridgewood approximately $3.5 - $7 million simply to obtain development approvals.

239.   Philmont NPC was harmed by Ridgewood's, Grebow's, and Plotnick's aiding and abetting CGP's fraudulent statements, omissions, and concealments by way of selling Philmont Club to Concert Philmont for a fraction of the true value of Philmont Club.

240.   Even CGP would have been willing to purchase Philmont Club for significantly more than it did, but worked with Ridgewood to make fraudulent statements, omissions, and concealments in order to acquire Philmont Club at a reduced rate.

241.   Because of CGP's fraudulent statements, omissions, and concealments, Philmont Club was effectively sold for a fraction of its true value.

242.   Jonathan Grebow and Michael Plotnick are liable for Ridgewood's aiding and abetting CGP's fraud under the participation theory in that they acted on behalf of Ridgewood and were the individuals who encouraged CGP to make the fraudulent statements to Philmont NPC.

243.   Philmont NPC assigned this claim to NPT.  Ex. 1.

Wherefore, Plaintiff, North Penn Towns, LP, as assignee of Philmont Country Club, respectfully requests judgment against Ridgewood Real Estate Partners, LLC, Jonathan Grebow, and Michael Plotnick, jointly and severally, in excess of $150,000 together with punitive damages, costs, and such other relief as the Court deems just and appropriate.

**COUNT VI**
**Breach of Contract**
**North Penn Towns, LP, as assignee of Philmont Country Club v.**
**Ridgewood Real Estate Partners, LLC**

244.    NPT hereby incorporates the foregoing averments as if the same were set forth at length herein.

245.    On September 29, 2016, Philmont NPC and Ridgewood entered into a confidentiality agreement pursuant to which Ridgewood had a duty to keep confidential certain financial information provided to it by Philmont NPC.  Ex. 37.

246.    Ridgewood breached the confidentiality agreement by disseminating Philmont NPC's confidential information to ClubCorp on October 5, 2016 and to Morningstar Golf & Hospitality, LLC on October 11, 2016.  Exs. 38 and 39.

247.    Philmont NPC was harmed by Ridgewood's intentional and inexcusable breach of the confidentiality agreement by way of having its confidential financial information disclosed to third parties.

248.    Pursuant to the confidentiality agreement, Philmont NPC is entitled to attorneys' fees from Ridgewood as a result of the breach.  Ex. 37, ¶ 5.

249.    Philmont NPC assigned its claim against Ridgewood for the breach of the confidentiality agreement to NPT.  Ex. 1.

Wherefore, Plaintiff, North Penn Towns, LP, as assignee of Philmont Country Club, respectfully requests judgment against Ridgewood Real Estate Partners, LLC in excess of

$150,000 together with reasonable attorney's fees, costs, and such other relief as the Court deems just and appropriate.

## **JURY DEMANDED**

Plaintiff hereby demands trial by jury of twelve (12) on all issues so triable.

Respectfully submitted,

KANG HAGGERTY & FETBROYT LLC

By:  /s/ *David R. Scott*
Edward T. Kang
David R. Scott
Kandis L. Kovalsky
123 S. Broad Street, Suite 1670
Philadelphia, PA 19109
ekang@kanghaggerty.com
dscott@kanghaggerty.com
kkovalsky@kanghaggerty.com
P: (215) 525-5850
F: (215) 525-5860
*Attorneys for Plaintiff*

# EXHIBIT 1

**Limited Assignment of Claims**

This Limited Assignment of Claims (this "Assignment") is made and effective this 18th day of September 2019, by and between Philmont Country Club (the "Assignor"), a Pennsylvania non-profit corporation with an office or place of business located at 301 Tomlinson Road, Huntingdon Valley, Pennsylvania 19006 and North Penn Towns, LP (the "Assignee"), a Pennsylvania limited partnership with its principal office located at 1030 Reed Avenue, Suite 100, Wyomissing, Pennsylvania 19610.

FOR VALUE RECEIVED, the Assignor hereby sells and transfers to the Assignee and its successors and assigns any and all claims, demands, and cause or causes of action of any kind whatsoever which Assignor has, may have, may have, or may have had on or before March 1, 2017 against Concert Golf Partners LLC, Concert Philmont Properties, LLC, Concert Philmont, LLC, Peter Nanula, Ridgewood Real Estate Partners, Michael Plotnick, and Jonathan Grebow and their respective affiliates, successors, agents, attorneys, and assigns. Assignee expressly acknowledges and agrees that Assignor is not assigning, and is specifically reserving to itself, any and all of its claims that it has against any and/or all the Concert and Ridgewood Real Estate Partners, Michael Plotnick, and Jonathan Grebow under that certain Purchase and Sale Agreement dated February 6, 2017 by and among Philmont County Club, Concert Philmont, LLC, and Concert Philmont Properties, LLC.

IN WITNESS WHEREOF, the parties, intending to be legally bound hereby, have executed this Limited Assignment on the day and year first above written.

**Assignor**

Philmont Country Club

By: _____

Name: Edwin M. Goldsmith, III

Title:   Receiver for Philmont
        Country Club

**Assignee**

North Penn Towns, LP

By: _____

Name: Michael V Db.

## Limited Assignment of Claims

This Limited Assignment of Claims (this "Assignment") is made and effective this 18th day of September 2019, by and between Philmont Country Club (the "Assignor"), a Pennsylvania non-profit corporation with an office or place of business located at 301 Tomlinson Road, Huntingdon Valley, Pennsylvania 19006 and North Penn Towns, LP (the "Assignee"), a Pennsylvania limited partnership with its principal office located at 1030 Reed Avenue, Suite 100, Wyomissing, Pennsylvania 19610.

FOR VALUE RECEIVED, the Assignor hereby sells and transfers to the Assignee and its successors and assigns any and all claims, demands, and cause or causes of action of any kind whatsoever which Assignor has, may have, may have, or may have had on or before March 1, 2017 against Concert Golf Partners LLC, Concert Philmont Properties, LLC, Concert Philmont, LLC, Peter Nanula, Ridgewood Real Estate Partners, Michael Plotnick, and Jonathan Grebow and their respective affiliates, successors, agents, attorneys, and assigns. Assignee expressly acknowledges and agrees that Assignor is not assigning, and is specifically reserving to itself, any and all of its claims that it has against any and/or all the Concert and Ridgewood Real Estate Partners, Michael Plotnick, and Jonathan Grebow under that certain Purchase and Sale Agreement dated February 6, 2017 by and among Philmont County Club, Concert Philmont, LLC, and Concert Philmont Properties, LLC.

IN WITNESS WHEREOF, the parties, intending to be legally bound hereby, have executed this Limited Assignment on the day and year first above written.

**Assignor**

Philmont Country Club

By: _____

Name: Edwin M. Goldsmith, III

Title:   Receiver for Philmont
         Country Club

**Assignee**

North Penn Towns, LP

By: _____

Name: _____

Title: _____

STATE OF PENNSYLVANIA                    :
                                         ss
COUNTY OF _Philadelphia_                 :


On this 23ʳᵈ day of _September_ 2019, before me, the undersigned authority, personally appeared _Edwin M. Caldwell Jr_ who acknowledged himself to be the authorized representative of Philmont Country Club, a Pennsylvania non-profit corporation, and as such authorized representative, being authorized to do so, executed the foregoing instrument for the purposes contained therein by signing the name of the company, by himself as authorized representative.

Notary Public

Commonwealth of Pennsylvania - Notary Seal
STEPHANIE JOYCE, Notary Public
Philadelphia County
My Commission Expires September 2, 2023
Commission Number 1264480

2

# EXHIBIT 2

## AGREEMENT OF SALE

**THIS AGREEMENT OF SALE** (this "Agreement") is made this ~~23rd~~ of _____, 2015 (the "Effective Date"), by and between **PHILMONT COUNTRY CLUB**, a Pennsylvania non-profit corporation with an address of 301 Tomlinson Road, Huntingdon Valley, Pennsylvania 19006 ("Seller"), and **NORTH PENN TOWNS LP**, a Pennsylvania limited partnership with an address of 1030 Reed Avenue, Suite 100, Wyomissing PA 19610, or its nominee ("Buyer").

### WITNESSETH:

In consideration of the covenants and provisions contained herein, and subject to the terms and conditions hereinafter set forth, the parties hereto, intending to be legally bound, agree as follows:

**1.** **Sale**. Seller hereby agrees to sell and convey to Buyer, who hereby agrees to purchase from Seller, all that certain parcel of land comprised of approximately 61.60 gross acres and located in the Township of Lower Moreland ("Township"), Montgomery County, Pennsylvania as more particularly described on Exhibit A attached hereto (the "Property"). The Property includes (i) all tenements, hereditaments, appurtenances, easements, covenants, permits, approvals, escrows and other rights arising from or appertaining to the land; (ii) all improvements, topsoil, trees, shrubbery and landscaping situated on, in or under or used in connection with the land; (iii) all permits, approvals and agreements that are in force and effect and benefit the Property; (iv) all intangible property now or hereafter owned by Seller and used by Seller in the ownership or operation of the Property, excluding trademarks and logos of the Seller and (v) all surveys, plans, specifications, reports and other engineering information to which Seller now or hereafter has access regarding the Property (together, "Seller's Property Materials"). In addition, Buyer has the option to purchase all or a portion of the Additional Land (as hereinafter defined in Subparagraph 13(a) below, without any adjustment to the Purchase Price (as hereinafter defined) in order to achieve the desired yield to satisfy Buyer's Intended Use (as hereinafter defined) in accordance with Subparagraph 2(a) below, while addressing any environmental constraints on the Property.

**2.** **Purchase Price and Payment of Purchase Price**.

(a) Purchase Price. The purchase price (the "Purchase Price") for the Property shall be Twelve Million, Two Hundred Thousand and no/100 Dollars ($12,200,000) assuming a yield of one hundred sixty-two (162) single family market rate semi-attached residential townhome fee simple footprint lots as allowed for under the Uniformed Planned Community Act (the "UPCA") (each fee simple lot shall hereinafter be referred to as the "Units") in conformance with all conditions to Settlement (as hereinafter defined) in Section 16 below. The Purchase Price shall be increased or decreased, as appropriate, by an amount equal to Seventy-Five Thousand, Three Hundred Eight and 64/100 Dollars ($75,308.64) per Unit for each Unit more or less than one hundred sixty-two (162) which the Property yields; provided, however, that the minimum Purchase Price paid for the Property will be no less than the product of $75,308.64 multiplied by 150 or Eleven Million, Two Hundred Ninety-Six Thousand, Two

1

Hundred Ninety-Six and no/100 Dollars ($11,296,296) (the "Minimum Price") irrespective of Unit yield but subject to the satisfaction of all remaining conditions to Settlement. The development of the Property by Buyer into a residential townhome community shall sometimes be referred to hereinafter as "Buyer's Intended Use."

   (b) <u>Payment of Purchase Price</u>.  The Purchase Price shall be paid as follows:

     (i) As of the date of this Agreement, Buyer has delivered to the Title Company (as hereinafter defined), as escrow agent (the "Escrow Agent"), the sum of Two Hundred Thousand and no/100 Dollars ($200,000) (the "First Deposit"), which shall be held in escrow in accordance with the terms of this Agreement.

see p.7

     (ii) Upon the expiration of the Due Diligence Period, Buyer shall deliver to the Title Company, as Escrow Agent, an additional check, wire or letter of credit in the amount of Four Hundred Thousand and no/100 Dollars ($400,000) as additional Deposit funds (the "Second Deposit").  The First Deposit and the Second Deposit, together with any interest thereon, and all amounts released therefrom to the Seller, shall hereinafter sometimes be referred to collectively as the "Deposit."

     (iii) At Settlement, Buyer shall pay the outstanding balance of the Purchase Price, subject to all adjustments as provided in this Agreement, by certified or title company check or by wire transfer of immediately available funds.  The Deposit, and any interest accrued thereon, shall be credited toward the Purchase Price at Settlement.

  **3.** **Title**.

   (a) Seller has provided Buyer with a copy of all title policy(ies) for the Property in Seller's possession, if any.

   (b) Seller has provided Buyer with a copy of all survey(s) of the Property in Seller's possession, if any.

   (c) Within thirty (30) days after the Effective Date, Buyer will obtain, at Buyer's sole cost and expense, a current title insurance commitment or report of title (as applicable, the "Title Commitment") from Main Street Abstract Company (the "Title Company"), a title insurance company licensed in Pennsylvania and selected by Buyer and underwritten by a national underwriter such as Chicago Title Insurance Company, First American Title Insurance Company, Fidelity Title Insurance Company, Stewart Title Insurance Company or Ticor Title Insurance Company.

   (d) The Title Commitment shall include copies of all documents referred to therein as exceptions.

   (e) Within five (5) business days after Buyer's receipt of the Title Commitment, Buyer shall furnish Seller with a copy of such Title Commitment and all documents related thereto.

(f)     Within twenty (20) days after Buyer's receipt of the Title Commitment, Buyer may object to any exceptions which appear in the Title Commitment. Such objection(s) must be made in writing (each an "Objection Notice"). Any title exception appearing in the Title Commitment which is not objected to by Buyer shall be deemed a "Permitted Exception."

(g)     Seller shall have the right, but not the obligation, to cure (i.e. cause to be removed of record at no cost to Buyer prior to Settlement) all title exceptions which are the subject of an Objection Notice. Seller shall respond to any Objection Notice in writing, within fifteen (15) days of its receipt of the Objection Notice ("Seller's Response Period").

(h)     If Seller elects in writing to cure a title exception which is the subject of an Objection Notice then that exception shall be deemed an "Unpermitted Exception." If Seller does not elect in writing to cure a title exception which is the subject of an Objection Notice then that exception shall be deemed an "Unresolved Exception." If Seller shall fail to deliver a response to an Objection Notice in a timely manner, Seller shall be deemed to have declined to cure the subject title exception and such title exception shall be deemed an Unresolved Exception.

(i)     If Buyer is not satisfied with the matters which are deemed either Permitted Exceptions or Unresolved Exceptions then Buyer's sole remedy shall be to terminate this Agreement by giving written notice to Seller on or prior to the later of: (i) the conclusion of the Due Diligence Period; and (ii) five (5) business days after the expiration of the Seller Response Period, whereupon Escrow Agent shall immediately return the Deposit plus any accrued interest to Buyer, and the parties shall thereafter have no further liabilities, rights or obligations under this Agreement except for those which expressly survive termination of this Agreement. If the Buyer does not elect to terminate this Agreement within the time period stated above, then Buyer shall be deemed to have accepted all Permitted Exceptions as well as all Unresolved Exceptions, and thereafter such Unresolved Exceptions shall be deemed Permitted Exceptions.

(j)     For purposes of this Agreement, "Monetary Encumbrances" shall mean collectively any (i) mortgages or related security documents or similar encumbrances given to secure indebtedness for money borrowed, (ii) mechanic's liens, or (iii) judgment liens or specified sum attachments, which by their nature may be discharged by the payment of a specific sum of money, or bonding in lieu thereof. Notwithstanding anything to the contrary contained herein, all Monetary Encumbrances affecting the Property at Settlement (irrespective of whether such encumbrances affect the Property as of the date of this Agreement) shall be deemed Unpermitted Exceptions, shall not require any notice from Buyer and shall be cured by Seller at or prior to Settlement.

(k)     The following shall also be deemed to be <u>Permitted Exceptions</u>:

(i)     All matters that would be revealed by a survey of the Property as of the date of the Title Commitment;

3

(ii)    The lien for general and special real property taxes and assessments which are not yet due and payable as of the Settlement, it being understood that all taxes will be apportioned as of Settlement as provided in this Agreement; and

(iii)    All federal, state and local laws, statutes, ordinances, rules and regulations affecting or in any way relating to any of the Property, including, without limitation and by way of illustration only, all legal requirements involving the development, construction, occupancy and use of the Property, all environmental laws, and all laws regulating use or development of wetlands areas, as amended from time to time, provided the same are consistent with the satisfaction of the conditions to Settlement set forth in Section 16 below.

(l)    The following shall also be deemed to be Unpermitted Exceptions, shall not require any notice from Buyer and shall be cured by Seller prior to Settlement:

(i)    All matters affecting title to the Property which first appear of record after the date of this Agreement; and

(ii)    All matters affecting the Property which first arise after the date of this Agreement (and therefore can only appear on a survey which is performed/updated after the date of this Agreement).

(m)    The Property is to be conveyed to Buyer at Settlement subject only to the Permitted Exceptions. At Settlement, title to the Property shall be good and marketable (subject to the Permitted Exceptions) and such as will be insured by the Title Company, at regular rates. At Settlement, Seller shall execute and deliver to the Title Company a customary affidavit of title, FIRPTA and Form 1099. Seller shall be entitled to use the proceeds of the sale of the Property to effect any cure of any Monetary Encumbrances then outstanding. Buyer shall be responsible to pay all premiums with respect to the Title Commitment.

(n)    If at Settlement the title to the Property does not conform with the requirements of this section, then Settlement shall automatically be extended for a period of thirty (30) days (the "Extended Settlement Date") in order to permit Seller to remove any Unpermitted Exceptions. If by the Extended Settlement Date Seller shall have failed to remove any Unpermitted Exceptions, then Seller shall be deemed to be in default under this Agreement, and Buyer shall be entitled to the remedies specified in Section 9 below.

(o)    With the exception of mortgages as to which Buyer receives prior written notice from Seller and which shall be removed from the title of the Property or the Additional Land at or prior to Closing, Seller shall not, after the Effective Date of this Agreement, voluntarily alter title to the Property or voluntarily seek any zoning changes or other governmental approvals with respect to the Property or the Additional Land, except for the zoning changes and government approvals provided for in this Agreement, without Buyer's prior written approval.

4

**4.**     **Settlement**.  The "Settlement" or "Closing" shall be made at the offices of the Title Company (within the five county Philadelphia area) and on or by the date which is sixty (60) days following the satisfaction of the conditions contained herein, including, without limitation, those set forth in Section 16, upon at least ten (10) days' notice from Buyer to Seller (the "Settlement Date") but not later than an "Outside Settlement Date" of eighteen (18) months following the expiration of the Due Diligence Period.  If Buyer is diligently pursuing the satisfaction of the conditions to Settlement as described in Section 16 below and the conditions to Settlement are pending but not satisfied as of the Outside Settlement Date, and provided that Buyer is not otherwise in default under this Agreement, then at Buyer's election, Buyer may extend the Outside Settlement Date for up to one (1) initial period of six (6) months and a second period of one hundred thirty- five (135) days, provided that (1) Buyer continues in good faith to diligently pursue the satisfaction of the conditions to Settlement, (2) with respect to the first six (6) month extension, Buyer pays to the Seller an additional One Hundred Fifty Thousand and no/100 Dollars ($150,000) (the "First Extension Fee"), and (3) with respect to the second one hundred five (105) day extension, Buyer pays to the Seller an additional One Hundred Fifty Thousand and no/100 Dollars ($150,000) (the "Second Extension Fee").   Both the First Extension Fee and the Second Extension Fee (hereinafter sometimes collectively referred to as the "Extension Fees") shall be nonrefundable except upon (1) Seller's inability to convey title to Buyer as required pursuant to Section 3, (2) a Seller's default under Section 9, or (3) a termination of the Agreement due to condemnation pursuant to Section 10 (collectively, the "Carve-Out Events").  The Extension Fees will both be applied as a credit to the Purchase Price for the benefit of the Buyer at Settlement (similar to the Deposit).

**5.**     **Possession**.  Possession is to be given at the time of Settlement, free of all leases and other occupancy, by special warranty deed.

**6.**     **Apportionments**.  Real estate taxes (including assessments) shall be apportioned pro-rata as of the date of Closing based upon the ratio of the acreage of the Property (plus any Additional Land Buyer acquires to achieve the Intended Use) to the total acreage of the land owned by the Seller as of the date of the execution of this Agreement  Seller represents that the entire tract owned by Seller (of which the Property is a part) is subject to two assessment appeal matters, as described more fully in Section 14(b).  Any tax refunds due, or any supplemental payments due, as a result of such litigation, shall be apportioned pro-rata in the same proportion as stated above, but only to the extent the same relate to any periods following Settlement.  This obligation shall survive closing until after the litigation has been resolved beyond any and all appeal periods and the terms of this Section have been satisfied.  Any transfer taxes arising out of the sale of the Property pursuant to this Agreement, including interest, shall be shared equally by Seller and Buyer (the "Transfer Tax"), except that if any additional transfer taxes are imposed by any governmental body because of one or more assignments (or termination and re-execution) of this Agreement by either Seller or Buyer, such additional transfer tax shall be the sole responsibility of the party so assigning (or requesting the termination and re-execution of) the Agreement and shall be promptly paid when due by that party.  All "roll-back" taxes, "agricultural recoupment" taxes, Act 515 recoupment, or other such recoupment for a "preferential open space/golf course treatment/assessment" and penalties for non-payment of the same, which accrue prior to the date of Settlement, are applicable to time periods prior to the date of Settlement, or which arise solely as a result of the transaction contemplated herein, plus

any applicable interest, shall be paid by Seller (Seller must cause, or will be deemed to have caused, the "breach" triggering recoupment of such taxes to occur on or prior to Settlement). With respect to roll back or agricultural recoupment taxes, in the event that the applicable charges are not due at Settlement or calculations thereof have not been finalized by the appropriate taxing authority, then Seller shall pay into escrow with the Title Company one hundred ten percent (110%) of the estimated applicable taxes as determined by the taxing authority having jurisdiction (if Seller is unable to obtain an estimate for such taxes from the applicable taxing authority, then the escrow amount shall be one hundred fifty percent (150%) of the Title Company's reasonably estimated tax amount). Prorations and reimbursements to Seller shall be calculated when actual bills and final numbers are issued for the applicable taxes. The terms of this section shall survive Settlement under this Agreement.

**7.** **Formal Tender Waived**. Formal tender of an executed deed and purchase money is hereby waived in order to declare default.

**8.** **Buyer's Default**. Should Buyer fail to complete Settlement by the date required herein, or fail to perform any of Buyer's obligations under this Agreement after thirty (30) days prior written notice from Seller (or ten (10) days written notice in the event of a monetary default), then the Deposit and any Extension Fees which have actually been paid by Buyer as of the date of such failure shall be retained by the Seller or released by Escrow Agent to, and retained by, Seller as Seller's sole and exclusive remedy for such breach as liquidated damages.

**9.** **Seller's Default**. Should Seller violate or fail to fulfill and perform any of the terms or conditions of this Agreement at or prior to Settlement (subject to the same Notice and Cure provisions as are set forth in paragraph 8 above for the benefit of Buyer), and if as a result thereof Settlement hereunder shall not occur, then Buyer shall be entitled to either specifically enforce this Agreement against Seller or terminate this Agreement. If Buyer chooses to terminate this Agreement of Sale under this paragraph, this Agreement shall become null and void and the Deposit shall be returned to Buyer and Seller shall reimburse Buyer for all reasonable, verifiable, out-of-pocket costs incurred in connection with this transaction up to a maximum reimbursement of Three Hundred Thousand and no/100 Dollars ($300,000). If specific performance is not available to Buyer as a remedy solely because of Seller's conveying or encumbering title to the Property or the Additional Land in violation of the terms of this Agreement, Buyer shall be entitled to all remedies at law or in equity.

**10.** **Condemnation; Casualty**.

(a)     All risk of loss or damage to the Property by casualty of any nature prior to Settlement shall be borne by Seller.

(b)     If, prior to Settlement, any material portion of the Property is condemned or destroyed, Buyer shall have the option of (i) terminating this Agreement, in which event this Agreement shall be null and void and Buyer shall be paid the Deposit, plus fifty percent (50%) of all actual and reasonable due diligence and approval costs expended in connection with the contemplated acquisition of the Property, up to a maximum of $150,000.00 or fifty percent (50%) of the actual condemnation proceeds received by Seller, whichever is less, or

(ii) proceeding with the Settlement at the full Purchase Price, in which event the entire condemnation or insurance proceeds shall be delivered to Buyer at Settlement, less any casualty insurance proceeds attributable to damage to buildings, vehicles, equipment or supplies on the Property at the time of the casualty (and, in connection with the foregoing, Seller expressly acknowledges and agrees that the foregoing insurance or condemnation proceeds shall not be applied to restoration of the Property without Buyer's prior written consent, which consent is not to be unreasonably delayed, conditioned or withheld), or, if they have not yet been paid, the right to receive such proceeds shall be assigned by Seller to Buyer at Settlement hereunder by instrument acceptable to Buyer. Buyer shall exercise its option within fifteen (15) days after it receives notice from Seller of any such condemnation or casualty. The parties agree that a "material" condemnation is one which (1) will prevent Buyer from achieving at least 150 Units (the "Minimum Yield"), or (2) results in a material increase in the development costs that will be incurred by the Buyer in connection with Buyer's Intended Use, or (3) materially and adversely impacts the Buyer's marketing or sale of homes on the Property. If there is a condemnation which results in a reduction of the reasonably likely and demonstrated Unit yield and Buyer proceeds to Settlement at the Minimum Price, then Seller will be entitled to the portion of the condemnation proceeds applicable to the loss of Units from the site down to a yield of 150 Units; Buyer shall be entitled to the proceeds of any such condemnation applicable to a loss of Units below 150 Units. Accordingly, if the yield but for the condemnation was 152 Units, and a condemnation results in a yield of 147 Units, but the Buyer elects to proceed with the acquisition at the 150 Units Minimum Price, then the Seller will be entitled to the portion of the condemnation proceeds applicable to the loss of 2 Units and the Buyer will be entitled to the balance of the condemnation proceeds.

**11.** **Compliance with Notices, Ordinances**.  Seller shall comply with any notices given or ordinances enacted by any governing authority prior to the date of Settlement for which a lien could be filed against the Property.

**12.** **Brokers**.  Buyer shall be solely responsible for all brokerage commissions payable to ARD Brokerage, LLC per separate agreement between Buyer and ARD Brokerage, LLC. Buyer and Seller mutually represent to each other that no other brokers, agents or finders brought about this Agreement or the conveyance of the Property from Seller to Buyer. Buyer and Seller each agree to indemnify, defend and hold the other harmless from and against any liability arising from a breach of the above representation and covenant.

**13.** **Due Diligence Period**.  Between the time of complete execution of this Agreement by Buyer and Seller and Settlement, Seller agrees that Buyer, its representatives and consultants shall have the right to enter upon the Property, at reasonable times and upon reasonable advance notice, to perform engineering, environmental and such other feasibility studies as Buyer determines in its sole discretion; however, Buyer shall not perform any invasive or destructive tests or investigations other than standard feasibility tests conducted by Buyer with respect to similar properties and provided further that (i) Buyer must restore any damage caused by such tests as hereinafter provided in this Section 13, and (ii) Buyer will perform all such tests in a manner that will reasonably avoid interference with Seller's ongoing golf, tennis and other country club operations. Buyer and Seller further agree that within ninety (90) days following the Effective Date (the "Due Diligence Period"), should Buyer desire not to purchase the

Property as a result of such studies, or as a result of Buyer's dissatisfaction with the Property based upon Buyer's review of Seller's Property Materials or for any other reason whatsoever, Buyer shall have the right to terminate this Agreement upon written notice to Seller in which case the Deposit shall be returned to Buyer and there shall be no further liability of the parties hereunder. Failure to notify Seller prior to the expiration of the Due Diligence Period shall act as Buyer's election to waive this contingency. If Buyer causes any damage to the Property as a result of its studies performed pursuant to this Section, Buyer shall restore the Property (as quickly as is commercially reasonable) to the condition in which it existed immediately prior to such damage. Buyer further agrees to indemnify, defend and hold Seller harmless from any and all claims, actual damages or costs (including attorneys' fees) arising out of Buyer's entry onto the Property and the performance of Buyer's tests and inspections, except that this indemnification shall not cover any costs or expenses which are determined to have been solely caused by the negligence of the Seller or its subcontractors, employees and agents. Prior to entry upon the Property by Buyer or any agent of Buyer, Buyer shall furnish Seller with proof of *Insurance* general liability insurance (specifically covering the entry of Buyer and Buyer's agents upon the Property) in the minimum amount of One Million and no/100 Dollars ($1,000,000) per occurrence and Two Million and no/100 Dollars ($2,000,000) in the aggregate. If Buyer is any entity other than NVR, Inc., such insurance shall specifically name the Seller as an additional insured and shall be endorsed to provide that the same may not be cancelled or amended without at least thirty (30) days' prior notice to Seller.

(a)     In the event Buyer determines,  during the Due Diligence Period, that all or a portion of certain contiguous real estate owned by Seller on the 14th hole of the Seller's south course (the "Additional Land"), as shown on Exhibit C attached hereto, is required (by reason of environmental conditions on the Property or the need for additional land for remediation of an environmental condition, beyond the available acreage of the Property) to achieve the desired Unit yield, then Buyer shall immediately notify Seller in writing of its determination to add the Additional Land to the Property, such notice shall include documentation upon which Buyer has relied upon to make determination (the "Determination Notice"). Seller shall confirm its acceptance of Buyer's determination to add the Additional Land within ten (10) days of receipt of the Determination Notice; whereupon the Due Diligence Period shall automatically be extended for an additional ninety (90) days (the "Rezoning Period"). Buyer shall make application to the Township's Board of Commissioners within ten (10) days of Buyer's receipt of Seller's written acceptance of the determination to rezone the Additional Land to RSD-2, and Buyer shall use its good faith and best efforts to obtain the requested rezoning. If prior to the end of the Rezoning Period, Buyer is unable to obtain the requested rezoning beyond any appeal period despite its good faith and best efforts, the Rezoning Period shall be automatically extended for an additional ninety (90) days (the "Extended Rezoning Period").

(b)     To eliminate doubt, for purposes of this Agreement the "Due Diligence Period" shall be deemed to include the Rezoning Period and the Extended Rezoning Period where applicable.

(c)     If permitted to do so by the Township, and subject entirely to Township ordinances and regulations, Buyer shall have the right, at Buyer's cost, after the satisfaction or waiver of the Due Diligence Period, and provided Buyer has filed an application for preliminary subdivision and land development plan approval to the Township, to install a sign on the Property's frontage on each of Pine Road and Philmont Avenue (and commence media advertising) for Buyer's Intended Use.

**14.     Seller's Representations, Warranties and Covenants**.     Seller covenants, represents and warrants to Buyer as follows (each such representation and warranty being true and correct as of the date of the Agreement and shall be true and correct on the date of Settlement):

(a)     Seller is the sole legal owner of the Property in fee simple and the Property is not subject to any lease, option, right of first refusal or agreement of sale.  Seller has the full power and authority to execute, deliver and perform this Agreement and all agreements and documents referred to in this Agreement.  The person who has executed this Agreement on behalf of Seller has the authority to do so.

(b)     Seller hereby advises Buyer that the Property is the subject of an assessment appeal action filed by Seller which is docketed at Montgomery County Court of Common Pleas Number 2010-34196, and also an assessment appeal action filed by Lower Moreland School District which is docketed at 2010-33892.  The outcome of these actions could affect the assessed value of the Property.  With the exception of the matters described above, there is no action, suit or proceeding pending or threatened against or affecting Seller or the Property or relating to or arising out of the ownership of the Property, including without limitation, general or special assessment proceedings of any kind, or condemnation or eminent domain actions or proceedings of any kind.

(c)     Neither the entering into of this Agreement, the consummation of the sale, nor the conveyance of the Property to Buyer, has or will constitute a violation or breach of any of the terms of any contract or other instrument to which Seller is a party or to which Seller is subject.

(d)     To Seller's actual knowledge, without having conducted any special investigation, and with the exception of fertilizers and other chemicals used in the normal operation and maintenance of a golf course facility in conformance with all Applicable Laws (as hereinafter defined) no portion of the Property contains any substance which may be classified as a hazardous, toxic, chemical or radioactive substance, or a contaminant or pollutant (together, "Hazardous Substances") under applicable federal, state or local law, ordinance, rule or regulation ("Applicable Laws") or which may require any cleanup, remediation or other corrective action pursuant to such Applicable Laws.  Seller has not used any portion of the Property, nor permitted any other person or entity to use the Property for the purpose of the storage, generation, manufacture, disposal, transportation or treatment of any such Hazardous Substances in violation of Applicable Laws. Seller believes that there may be one or more underground storage tanks on the Property in the vicinity of its maintenance buildings.

ACTIVE 30380617v3 07/20/2015

(e)     There are no commitments or agreements which would require Buyer to pay any money or perform any obligation or which would otherwise affect the ownership or development of the Property by Buyer.

(f)     No notice by any governmental or other public authority has been served upon Seller, or anyone on Seller's behalf, relating to violations of any applicable housing, building, safety, fire or other ordinances or any of the Applicable Laws.

(g)     Seller has provided to Buyer Seller's Property Materials in accordance with Section 1 above and the Seller's Property Materials have been paid for in full by Seller.

**15.     Operations Pending Settlement.**  Between the date of the complete execution of this Agreement by Buyer and Seller and the Settlement Date:

(a)     Seller shall maintain the Property in substantially its present state of repair and in substantially the same condition as on the date of this Agreement.

(b)     Seller shall not enter into any lease (unless the same can be terminated and the Property vacated at least thirty (30) days prior to Settlement and the use is approved by Buyer, such approval not to be unreasonably withheld), agreement of sale, option, or any other agreement or contract affecting the Property, nor shall Seller grant any easements or further encumber the Property (except for mortgages which Seller agrees will be satisfied at Settlement provided the aggregate amount of all liens against the Property at any time during the term of this Agreement shall in no event exceed Four Million and no/100 Dollars ($4,000,000)), without the prior written consent of Buyer.  Notwithstanding the foregoing, the amount of such mortgages may exceed the cap set forth in the previous sentence if such mortgages encumber other property in excess of the Property provided that the subject lender executes a recognition agreement in form and substance reasonably acceptable to Buyer confirming that the lender will recognize Buyer's rights to purchase the Property on the terms hereof and will release the lien from the Property at Settlement.

(c)     Seller shall comply with all covenants, conditions, restrictions, laws, statutes, rules, regulations and ordinances applicable to the Property.

(d)     Seller shall maintain comprehensive general liability insurance covering the Property in the amount of One Million Dollars ($1,000,000.00) per occurrence, and Two Million Dollars ($2,000,000.00) in the aggregate, that is (1) written on an occurrence basis, (2) includes premises and operations coverage, broad form property damage coverage (including theft, vandalism and malicious mischief, Seller's protective liability coverage, independent contractors coverage, and (3) containing endorsement for personal injury.

(e)     Seller shall not use, manufacture, store, generate, handle, or dispose of any Hazardous Substances (except for the use, storage, and/or handling of materials of such type and in such amounts as are commercially reasonable in connection with the operation of a country club and golf course, in which event the same shall be handled in strict accordance with applicable hazardous materials laws), or use or permit the Property to be used for such purposes,

10

or emit, release or discharge any such Hazardous Substances into the air, soil, surface water or groundwater comprising the Property.

(f)     Between the date of complete execution of this Agreement by Buyer and Seller and the Settlement Date, Seller shall not remove or damage any structures, fixtures, systems, improvements, standing trees, shrubbery, plants, landscaping or soil now in or on the Property (it being understood that routine pruning, cutting and maintenance of the golf course may continue).  Seller shall not dispose of any trash, debris, building materials or organic material (including without limitation trees and stumps) on the Property.  In the event such disposal occurs at any time prior to Settlement (including any time prior to the date of this Agreement), Seller shall remove all such materials at Seller's expense prior to the Settlement and replace the same with clean, properly compacted fill and provide certification from and engineer of Buyer's choice that the soil can support standard residential infrastructure and structures without extraordinary construction methods.

### 16.     **Conditions to Buyer's Obligations**.

(a)     Buyer's obligation to complete Settlement under this Agreement is expressly conditioned upon the following (each a "Condition Precedent" and collectively, the "Conditions Precedent"), and Buyer shall have the further right, exercisable at any time and from time to time, to waive any one or more of such conditions without affecting any of Buyer's other rights, conditions or obligations under this Agreement:

(i)     all representations and warranties of Seller herein being true and correct at the time of Settlement; and

(ii)     Seller having performed all of its covenants and obligations hereunder; and

(iii)     the receipt by Buyer, at Buyer's sole cost and expense, of final, unappealable site plan approval (and any required subdivision approval) of the Property permitting the Buyer's Intended Use, all as depicted on development applications submitted by Buyer, as such applications may be amended by Buyer from time to time, if Buyer, in its discretion, elects to do so; and

(iv)     the receipt by Buyer of "will-serve" letters for water and sewer from the applicable public/quasi-public agency(ies), as well as all other written agreements, arrangements and other evidence satisfactory to Buyer to the effect that (1) all applicable federal, state and local governing agencies have fully approved sewer service for the Property, (2) public sewer treatment and capacity is available to serve the proposed subdivision at the Property line for the effluent from the subdivision as intended to be developed, (3) sufficient public water is available at the Property line to service adequately the subdivision as intended to be developed, (4) sufficient storm drainage discharge is available to adequately service the Property as intended to be developed, and (5) any services provided by public utilities including but not limited to electric, gas, cable, and telephone are available to the Property, with all of (1) through (5) being available at connecting fees and expenses (to be borne solely by the Buyer) that are not greater

than those which are customary and ordinary for similar developments in the Township in effect on the date of this Agreement; and

(v)     the receipt by Buyer of all permits, licenses, easements, variances, certificates, exceptions, authorizations, approvals (including all municipal, county, state and federal permits and approvals necessary to obtain building permits from the Township to commence construction and ultimately obtain certificates of occupancy for all homes constructed in accordance with the applicable building code, and all approvals as may be required by the Board of Health and DEP and PA Department of Transportation – DOT and Montgomery County Conservation District – MCCD), agreements and changes as may be required to permit the lawful construction, installation, maintenance and operation of the number of homes described in Section 2 above. This shall not include actual building permits, execution of any required developers agreements with the Township or funding of any financial security required in connection with the development of the Property, although the parties agree that following Settlement the sole condition to obtaining (1) building permits for all infrastructure shall be payment of the applicable permits fees, (2) building permits for all homes shall be Buyer's submission of building plans for each such home in accordance with municipal requirements and the payment of the applicable permit fees, and (3) certificates of occupancy for all homes shall be completion of construction in accordance with the applicable building code requirements and the Approved Plans.

(vi)     No development moratorium has been imposed which prohibits or would delay the Buyer's Intended Use and sale of homes on the Units (unless such prohibition or delay can be eliminated by the payment by Buyer of an amount of $5,000 per Unit or less), or otherwise increases construction costs by an amount in excess of $5,000 per Unit. In the event that any moratorium or construction costs increase related to a moratorium condition off the Property by an amount less than $5,000 per Unit, the Purchase Price will be reduced by fifty percent (50%) of the same amount times the number of Units. In the event that any moratorium or construction costs increase is related to a condition on the Property, then there shall be no reduction in Purchase Price.

(b)     The conditions set forth in Section 16(a)(iii), (iv), (v) and (vi) shall be unappealable at the time of Settlement and shall be subject only to commercially reasonable conditions.

(c)     If, on or before the date of Settlement, the parties discover that any of the Conditions Precedent described in Sections 16(a)(iii)-(vi) have not been satisfied despite Buyer's good faith efforts to satisfy such Conditions Precedent, then Buyer shall have the option of (i) completing Settlement hereunder if it so chooses at the Minimum Price (subject to a surviving obligation to pay any increase in the Purchase Price, if applicable, based upon Units actually yielded from the Property in excess of 150 Units, if and when the Conditions Precedent are satisfied, but in no event later than six (6) months from the date of Settlement, or (ii) terminating this Agreement, in which case this Agreement shall become null and void, and the Deposit (but not any Extension Fees paid to Seller under Section 4 of this Agreement) shall be paid to Buyer. In the event such failure constitutes a failure of the condition set forth in Section 16(a)(i) or

12

Section 16(a)(ii), Buyer shall be entitled to treat such failure as Seller's Default entitling Buyer to exercise the remedies set forth in Section 9 above.

(d)     In connection with the approvals, Seller agrees to sign any development applications which are required to be signed by the owner of the Property. Seller further agrees that if, at Buyer's election, Buyer desires Seller's assistance in pursuing the development approvals, then Seller agrees to work jointly in cooperation with Buyer (provided there is no cost to Seller in doing so) in the pursuit of such approvals from any and all governmental agencies having jurisdiction; it being understood, however, that Buyer shall continue to be solely responsible for all third party costs incurred at Buyer's direction in pursuing said approvals including engineering, surveys, approval fees and permits, and professional and expert studies.

(e)     Buyer agrees to use diligent, good faith efforts to expeditiously, and in a commercially reasonable manner, satisfy the conditions set forth in subsection (a) above. If at any time it becomes commercially unreasonable to expect to receive the approvals required to support the satisfaction of the conditions to Settlement set forth above (for example, an approving agency having jurisdiction indicates that it is not favorably disposed towards, or that it will not consider, Buyer's request for approvals for Buyer's Intended Use with at least the Minimum Yield, or there is an adverse rezoning), then Buyer shall have the unilateral right to immediately terminate this Agreement upon written notice to the Seller and receive a refund of the Deposit (not including any Extension Fees). Under no circumstances will the Buyer be deemed to have an obligation to prosecute litigation or pursue any appeals of governmental denials of approvals or permits in connection with Buyer's pursuit of the satisfaction of the conditions to Settlement, but if Buyer does not elect to prosecute such litigation, then upon Buyer's election to terminate and the return of the Deposit to Buyer, Seller shall be entitled to an immediate, cost free assignment of Buyer's position with regard to such appeal or litigation, so that Seller may timely pursue such litigation or appeal if it chooses to do so.

(f)     Notwithstanding anything to the contrary contained herein, any performance date, payment date (including Extension Fee payment date), Settlement Date, Outside Settlement Date, or other such date or time period or payment(s) shall be tolled (the "Tolling Period") during the pendency of litigation which prohibits or delays (1) the satisfaction of the conditions to Settlement in Section 16(a)(iii), (iv), (v) and (vi) above – i.e. the receipt of all required approvals and permits, or (2) the intended development, sale or occupancy of all of the remaining homes on the Units; or (3) during any moratorium which prohibits or delays the satisfaction of the conditions to Settlement in Section 16(a)(iii), (iv), (v), and (vi) above – i.e. the receipt of all required approvals and permits, or (4) the intended development, sale, or occupancy of all the remaining homes on the Units, unless such moratorium prohibition or delay can be eliminated by the payment of an amount equal to or less than $5,000 per Unit. Notwithstanding anything above to the contrary, no such tolling shall, in the aggregate, exceed a period of twenty-four (24) months. The first eight (8) months of the Tolling Period shall not require the payment of any fee by the Buyer, but prior to the first of each month of the Tolling Period thereafter (to the maximum of 24 total months), Buyer shall be obligated to pay to Seller a tolling fee of $10,000 per month which shall be non-refundable but applicable to the Purchase Price for months 9 through 24 (the "Tolling Fee"). Seller acknowledges that Buyer shall have no obligation to prosecute (or defend) litigation for approvals or utilities (but Buyer shall still have

the assignment obligation set forth in the last sentence of Section 16(e) above); Buyer acknowledges that tolling under this Section 16(f) will only be available to Buyer if Buyer elects to prosecute (or defend) such litigation diligently and in good faith and at Buyer's sole cost and expense. In addition, and notwithstanding anything above to the contrary, Buyer understands and agrees that no tolling period shall be available in connection with litigation related to Buyer's failure to adhere to any building code requirement related to Buyer's plans or Buyer's actual construction of the homes on the Units; nor shall a tolling period be available on or after the date on which either party hereto reasonably determines that litigation (not including litigation brought by any member of Philmont Country Club or such member's immediate family), resulting in a tolling period hereunder, can be settled for an amount less than $150,000 in the aggregate of all claims.

(g)     Except as may be required in connection with a development consistent with the Buyer's Intended Use, Buyer shall not submit a sketch plan, preliminary plan or final plan to the Township which necessitates the receipt of a variance or special exception from the Township's Zoning Hearing Board or a conditional use or a rezoning from the Township's Board of Commissioners without first obtaining the prior written consent of the Seller. That consent may be granted or withheld in the sole discretion of the Seller if such zoning relief is not necessary for the normal development of the Property under the existing zoning. In all other cases, Seller's consent to the same shall not be unreasonably withheld.

(h)     In furtherance hereof, Buyer agrees to: (1) within seventy five (75) days after the expiration of the Due Diligence Period (as may be extended pursuant to Section 13(a)), submit an application for conditional use approval for Buyer's Intended Use, and thereafter diligently pursue the same in good faith and with due diligence; (2) within one hundred twenty (120) days after Buyer's receipt of final, unappealable conditional use approval in conformance with Buyer's submission under Section 16(h)(1) above, Buyer shall submit an application for preliminary subdivision approval in accordance with Buyer's Intended Use, and thereafter diligently pursue the same in good faith and with due diligence; and (3) within ninety (90) days after Buyer's receipt of final, unappealable, preliminary subdivision approval in conformance with Buyer's submission under Section 16(h)(2) above, Buyer shall submit an application for final subdivision approval in accordance with Buyer's Intended Use, and thereafter diligently pursue the same in good faith and with due diligence. Seller acknowledges that the dates in this Section 16(h) are subject to the cooperation of all applicable governing bodies and will be adjusted for scheduling delays directly attributable thereto.

17.     **Survival.**   Sections 6 ,12, 17, 22(c), 22(i), 22(h), 24 and 26 of this Agreement shall survive Settlement hereunder.   Section 14(d) shall survive for six (6) months after the Settlement Date.  Any covenant, promise or obligation in this Agreement which is not (by expressed language) intended to be fulfilled or performed at Settlement, or which necessarily involves performance after Settlement, shall not merge into the deed of conveyance but shall remain in full force and effect and be binding on the parties hereto until fully performed or fulfilled.

14

**18.    Recording**.  Upon full execution of this Agreement, Buyer shall have the right to record a memorandum of this Agreement in the local land records, which memorandum shall recognize Buyer's rights under this Agreement.  Prior to such recording, Seller and Seller's Counsel (as identified below) shall have a reasonable right to approve the language of such memorandum, but such approval shall not be unreasonably withheld, conditioned or delayed.  Upon such approval, Seller agrees to join in any such memorandum and to otherwise cooperate with Buyer in protecting Buyer's rights hereunder (except that Seller's cooperation shall not extend to any out of pocket costs to Seller).  If Buyer elects to record any such memorandum, then Buyer shall also provide Seller's Counsel with a discharge of memorandum of agreement of sale which shall be maintained in escrow by Seller's Counsel until Settlement under this Agreement or until this Agreement is terminated for any reason other than a Seller's default.  In the event that Buyer initiates or threatens to initiate litigation, to prevent the proper recording of the discharge of memorandum, and Buyer is subsequently found by a Court to have acted in bad faith, Seller shall be entitled to receive from the Buyer all of Seller's costs and attorneys' fees incurred in such litigation.

**19.    Notices**.  Any notice required to be given hereunder shall be given in writing and either (i) sent by United States registered or certified mail, with postage prepaid, return receipt requested, (ii) sent by Federal Express or another nationally recognized overnight courier, (iii) hand delivered, or (iv) sent by facsimile transmission.  All notices shall be deemed to have been given seventy-two (72) hours following deposit in the United States Postal Service, or upon delivery if sent by overnight courier service, facsimile, courier or hand delivery.  All notices shall be addressed to the following address or at such other address as may hereafter be substituted by notice in writing thereof.

To Seller:

> Philmont Country Club
> Attn: Club Manager and Glenn Meyer, President
> 301 Tomlinson Road
> Huntingdon Valley, PA 19006
> Telephone:  (215) 947-1271
> Fax:  (215) 947-1565

With a copy to:

> James J. Garrity, Esq.
> Wisler Pearlstine, LLP
> Blue Bell Executive Campus
> 460 Norristown Road, Suite 110
> Blue Bell, PA 19422-2323
> Telephone: (610) 825-8400
> Fax: (610) 828-4887

ACTIVE 30380617v3 07/20/2015

To Buyer:

>  North Penn Towns LP
>  1030 Reed Avenue, Suite 100
>  Wyomissing PA 19610
>  Attn:   Kevin Timochenko, President
>  Telephone:  (610) 288-7700
>  Fax:      (610) 378-9315

With a copy to:

>  Kimberly A. Freimuth, Esquire
>  Fox Rothschild LLP
>  2700 Kelly Road, Suite 300
>  Telephone: (215) 918-3627
>  Fax: (215) 345-7500

**20.**   **Entire Agreement**.   This Agreement contains the entire agreement between Seller and Buyer and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise, of any kind whatsoever. This Agreement may be amended only by a writing signed by both parties.

**21.**   **Assignment**.   Buyer shall have the right, without the prior written consent of Seller, to assign this Agreement to NVR, Inc. Buyer shall have the right, subject to Seller's prior written consent, to assign this Agreement to any other party. This Agreement shall extend to and bind the heirs, executors, administrators, successors and assigns of the respective parties hereto. Any assignment permitted under this paragraph shall be subject to the transfer tax adjustment provisions of Section 6 above.

**22.**   **Miscellaneous**.

(a)   Effective Date.   As used herein, the phrases "the date hereof" and "the date of this Agreement" shall mean the date of execution (and delivery of the fully executed Agreement to the first party to sign) by the last party to sign this Agreement.

(b)   Counterpart Execution.   This Agreement may be signed in one or more counterparts (or with counterpart signature pages) which, taken together, shall constitute a fully executed Agreement and shall be considered a single document. Any signature delivered by a party by facsimile transmission shall be deemed to be an original signature to this Agreement. In such event, the parties hereto shall promptly thereafter deliver to each other executed counterpart originals of this Agreement.

(c)   Cooperation Covenant.   Buyer and Seller hereby covenant and agree to cooperate with each other and to take such further actions as may be reasonably requested by the other in order to facilitate the timely purchase and sale of the Property, and Buyer's development of the Property following Settlement. Accordingly, Seller agrees to execute (or to cause Seller's

affiliates as applicable) such other documents reasonably requested by Buyer, including any agreements of easement over other lands now or hereafter owned by Seller or Seller's affiliates for piped storm water drainage (not involving a point discharge onto any lands of Seller), or utilities in connection with such development but only to the extent such items are unavoidably required for Buyer's commercially reasonable development of the Property in conformance with Section 16 above and as reflected on the final approved subdivision and development plans and with the understanding that no such easements will adversely impact Seller's continued historic use of its retained property or materially and adversely impact the future development of its retained property for purposes other than a golf course and country club. It is understood and agreed that necessary easements (contemplated by this subsection), located entirely in building setback areas, shall not be deemed to adversely impact the future development of the Seller's retained property. Regardless of the location of such easements, each shall be memorialized in an easement agreement (prior to any exercise thereof) which shall provide for non-disturbance of Seller's activities on the easement area and expeditious restoration of the easement area by the Buyer immediately after any exercise of the easement privileges. Any such easement shall be commercially reasonable and negotiated by the parties in good-faith. Buyer agrees that all development-related activities conducted on the Property prior to, on the date of, and following Settlement shall be conducted in such a manor so as to not unreasonably interfere with Seller's use of its retained property. Specifically, and not in limitation of the foregoing, Buyer agrees that its development-related activities shall be conducted in such a manner so as to not interfere with the use and enjoyment of the first hole of Seller's North Golf Course.

(d)     Timing.  If any date on which a time period scheduled to expire herein is a Saturday, Sunday or holiday, the subject date shall be extended to the next business day.

(e)     Confidentiality.  Buyer and Seller each agree to keep confidential the economic terms of this Agreement, including, without limitation, the Purchase Price, except for disclosure to Seller's or Buyer's attorneys, accountants, financial advisors, lenders, employees, executives, directors, members, investors and developers, or as required by a court of competent jurisdiction.

(f)     Drafting.  This Agreement has been drafted by counsel for both the Buyer and Seller, and accordingly, any ambiguities contained herein shall not be interpreted in favor of or against either party.

(g)     Severability.  If any term or provision of this Agreement or application thereof shall to any extent be invalid or unenforceable, the remainder of this Agreement shall not be affected thereby and each other term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

(h)     Bulk Sales.  If required by law, at Closing Seller shall provide Buyer with a Bulk Sales clearance certificate and shall be responsible for the payment of all bulk sales taxes and the like due at Closing or due in connection with the sale contemplated hereby.  Seller agrees to indemnify, defend, and save harmless Buyer, its successors and assigns, from and against any and all claims made by the Commonwealth of Pennsylvania (or any agency or division thereof) in connection with the Seller's failure to comply with any bulk sales notice statutes, provisions or taxes due or payable in connection therewith.  To the extent legally necessary, Seller shall

ACTIVE 30380617v3 07/20/2015

provide Buyer with proof that all such payments have been made. Seller shall indemnify, defend and save harmless Buyer, its successors and assigns, from and against any and all tax claims made by the Commonwealth of Pennsylvania, in connection with bulk sales notice statutes, provisions or taxes.

(i)      Due Diligence Materials. In the event this Agreement is terminated during the Due Diligence Period for any reason other than a Seller default or condemnation, Buyer shall deliver to Seller, complete copies of all reports, studies, plans, surveys, topographic surveys, title reports, subdivision maps, wetlands delineations and wetlands classifications prepared by or on behalf of Buyer with regard to the Property, and Buyer shall assign (to the extent assignable without third party consent) to Seller all of Buyer's right, title and interest therein, without warranty as to the accuracy thereof or suitability for purpose, except that Buyer shall warrant that it has paid the preparers thereof all sums due and payable in connection with Buyer's use thereof (any pre-disclosed assignment costs required to be paid by the third parties preparing such information/materials shall be Seller's responsibility). Notwithstanding the foregoing, Buyer shall not be required to provide Seller with any proprietary materials (i.e., marketing studies, or architectural plans for the single family houses intended to be constructed on the Units or any documents, reports, studies, analyses or plans prepared internally by Buyer). In addition, Buyer shall be obligated to transfer to Seller any unused sanitary sewer "EDU's" which Buyer has purchased for use on the Property, at the price paid by Buyer for such EDU's. The provisions of this subsection shall survive the termination of the Agreement.

### 23.    **Escrow of Deposit**.

(a)      The First Deposit shall be deposited on or before five (5) business days after the Effective Date of this Agreement and the Second Deposit shall be deposited at the expiration of the Due Diligence Period, with and shall be held by the Title Company in escrow as the Escrow Agent. The parties and Title Company agree that the Deposit shall be applied as follows:

(i)      If Settlement is held, the Deposit shall be paid over to Seller and credited to the Purchase Price.

(ii)      If Settlement is not held by reason of Buyer's default, the Deposit shall be paid over to Seller and shall be retained by Seller as provided for in Section 8 above.

(iii)      If Settlement is not held by reason of Seller's default, and Buyer does not elect the remedy of specific performance, the Deposit shall be paid over to Buyer for use and application by Buyer as provided for in Section 9 above.

(iv)      If Settlement is not held by reason of a failure of condition and not by reason of a default by Seller or Buyer hereunder, the Deposit (to the extent refundable as more particularly described above) shall be paid over to Buyer, neither party shall have any further liability or obligation hereunder, and this Agreement shall terminate.

(v)     Notwithstanding anything in this Agreement to the contrary, Buyer shall have the right to replace the letter of credit with a cash deposit which shall be tendered to Seller or Title Company, as applicable, in lieu of negotiation of the letter of credit.

(b)     The Deposit shall be held in an interest bearing account.

(c)     The Title Company and its partners and employees are acting as agents only, and will in no case be held liable either jointly or severally to either party for the performance of any term or covenant of this Agreement or for damages for the nonperformance hereof, nor shall the Title Company be required or obligated to determine any questions of fact or law.   Title Company's only responsibility hereunder shall be for the safekeeping of the Deposit and the full and faithful performance by the Title Company of the duties imposed by this Section 23.

(d)     The Title Company shall be obligated to disburse the Deposit at Settlement or upon any cancellation or termination of this Agreement, only upon the written instructions of both parties.  In the event of any dispute, Title Company shall be and is hereby authorized, but not obligated, to pay the entire amount of the Deposit into court, and any expenses to Title Company for so doing shall be payable out of the Deposit.  Notwithstanding the foregoing, until the expiration of the Due Diligence Period, Title Company shall be obligated to return the Deposit to Buyer upon the unilateral instructions of Buyer following notice of Buyer's termination of this Agreement pursuant to Section 13 above.

**24.     Responsibility for Costs**.  The Buyer shall bear the sole responsibility for any and all investigation, planning, engineering or other costs whatsoever, including all application and permit fees which are required in the active pursuit by the Buyer of the approvals and permits described in Section 16.  If the Buyer proceeds with the development of Buyer's Intended Use, then: (1) Buyer shall also be responsible for the payment of all costs related to the provision, upgrading or improvement of utilities for the Property including, but not limited to, any charges for sanitary sewer or public water allocations, tapping fees or connection fees affecting the Property; (2) to the extent the Buyer's subdivision plans presume the demolition or removal of any improvement on the Property, Buyer shall be responsible for any and all costs associated with demolition and removal of such improvements including the appropriate capping or treatment of any wells or septic systems previously connected thereto provided, however, that all such improvements (except those discussed in Section 26 below) will be delivered by Seller at Settlement clean, vacant and empty of all personal property, and all septic systems will have been pumped dry by Seller, and all fuel storage tanks pumped dry by Seller (the terms of this Section 24 are subject in all respects to the terms of Section 14(d) and Section 15(e)); and (3) Buyer shall be responsible for the execution, funding and securing of any necessary development agreements with the Township or with any of the other governmental authorities for whom Buyer may be constructing public improvements.

**25.     Intentionally Left Blank**.

26.   **Tennis Facilities, Golf Course Maintenance Facilities**.

(a)     The Property is improved with a tennis facility and nearby golf course maintenance facilities.  The tennis facilities, and golf course maintenance facilities (the "Tennis Facilities and Golf Course Maintenance Facilities") together with access to such Tennis Facilities and Golf Course Maintenance Facilities from Pine Road are more fully identified on Exhibit B attached hereto (the "Occupied Property").  Seller shall have the right to use the Tennis Facilities and Golf Course Maintenance Facilities, to dismantle the Tennis Facilities and Golf Course Maintenance Facilities, and to remove the Tennis Facilities and Golf Course Maintenance Facilities from the Occupied Property (all at Seller's sole cost and expense), for a period of time expiring one (1) year following Settlement (the "Wind Down Period").  Access by Seller (and Seller's invitees) to the Tennis Facilities will be through the Occupied Property at the Pine Road entrance as shown on Exhibit B.  Access to the Golf Course Maintenance Facilities shall be primarily from Seller's Retained Property, but Seller will cooperate with Buyer after Settlement so that Seller's access to the Golf Course Maintenance Facilities, and Buyer's need to install utilities and otherwise develop the Property are both reasonably accommodated.   At the expiration of the Wind Down Period, all of Seller's activities under this Section 26 on the Property will wind down and ultimately cease and Seller shall leave the Occupied Property, including the Tennis Facilities and Golf Course Maintenance Facilities in a clean, vacant and empty manner (all personal property shall have been removed by Seller).

(b)     During the term of this Agreement, including the Wind Down Period, Seller will maintain general liability insurance with policy coverage limits of $2,000,000 per occurrence and in the aggregate, automobile liability coverage with policy coverage limits of $1,000,000 per occurrence and in the aggregate, workers compensation insurance as required by local law, employer's liability insurance with policy coverage limits of $500,000.  At Settlement, Seller shall provide Buyer with certificates of insurance for the described insurance policies.  Buyer will be named/endorsed as an additional insured under the general liability and automobile liability insurance policies, as evidenced on the described certificates of insurance.  Insurance policies for general liability and automobile liability will include deductibles which do not exceed $25,000.

(c)     Seller hereby indemnifies, defends and holds Buyer harmless from all claims, costs, damages and liabilities arising from Seller's activities under this Section 26.

(d)     Buyer will exercise commercially reasonable efforts to minimize activity within the Occupied Property during the Wind Down Period.  If, however, Buyer reasonably requires access to, and use of, the Occupied Property during the Wind Down Period, Seller shall cooperate with Buyer in allowing Buyer such access and use as may be reasonably required for Buyer's activities, provided the use of the Tennis and Golf Course Maintenance Facilities is not unreasonably interrupted.

(e)     If Seller fails to cease all tennis and golf course maintenance operations and to vacate the Property (including the removal of all Tennis and Golf Course Maintenance Facilities) on or prior to the expiration of the Wind Down Period, then Buyer shall have the right (upon fifteen (15) days written notice to Seller) to remove all such Tennis and Golf Course

20

Maintenance Facilities at Seller's cost, to cause all of Seller's operations under this Section 26 to cease at Seller's cost, and to cause Seller to immediately vacate the Occupied Property at Seller's cost. All actual, out-of-pocket costs incurred by Buyer in enforcing the terms of this Section shall be promptly reimbursed by Seller to Buyer.

(f)     Other than those rights specifically stated in this Section 26, Seller shall have no claims or rights to the Property, Occupied Property, Additional Land (to the extent acquired by the Buyer) or Tennis Facilities and Golf Course Maintenance Facilities, after Closing.

(g)     The terms of this Section 26 shall survive Settlement.

[Signature page follows]

21

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals the day and year first above written.

**BUYER:**

**NORTH PENN TOWNS LP**
By: North Penn GP LLC, its general partner

By: _____
　　　Kevin Timochenko, President

**SELLER:**

**PHILMONT COUNTRY CLUB**

By: _____
　　　Name:  Glenn Meyer
　　　Title:  President

22

## JOINDER BY TITLE COMPANY AS ESCROW AGENT

Main Street Abstract Company, the Title Company named in the foregoing Agreement of Sale, hereby joins in such Agreement to evidence its agreement to hold the Deposit, and otherwise to perform its obligations as Escrow Agent, all as provided for in Section 23.

**TITLE COMPANY:**

By: _____

      Name:

      Title:

Date of Execution: _____

ACTIVE 30380617v3 07/20/2015

## Exhibit A

### DESCRIPTION OF PROPERTY

(exhibit begins on the following page)

ACTIVE 30380617v3 07/20/2015



**GILMORE & ASSOCIATES, INC.**
ENGINEERING & CONSULTING SERVICES

Description of A PORTION OF BLOCK 7A UNIT 1, located in Lower Moreland Township, Montgomery County, Pennsylvania, as shown on a plan titled "Exhibit Plan Proposed Active Adult Residential Community Philmont Country Club", dated February 19, 2008, prepared by Gilmore & Associates, Inc., Consulting Engineers and Land Surveyors, 350 E. Butler Avenue, New Britain, Pennsylvania.

| | |
|---|---|
| Beginning | at a Point in or near the intersection of Tomlinson Road with Pine Road; |
| Thence | from the Point of Beginning, in and along Tomlinson Road, North 39 degrees 51 minutes 00 seconds West, 910 and 00/100 feet to a point; |
| Thence | the four (4) following courses and distances through Block 7A Unit 1 of which this is a part; |
| #1 | North 47 degrees 17 minutes 15 seconds East, 1,920 feet to a point; |
| #2 | North 10 degrees 45 minutes 18 seconds West, 387 feet to a point; |
| #3 | North 55 degrees 42 minutes 46 seconds East, 530 feet to a point; |
| #4 | North 80 degrees 30 minutes 12 seconds East, 684 feet to a point in line of Block 7A Unit 32; |
| Thence | along said lands, South 49 degrees 57 minutes 00 seconds East, 83 feet to a point in line of Block 7A Unit 7; |
| Thence | along Block 7A Unit 7 and also along Block 7A Unit 6, South 40 degrees 03 minutes 00 seconds West, 194 and 60/100 feet to a point; |
| Thence | continuing along Block 7A Unit 6, South 52 degrees 00 minutes 00 seconds East, 405 and 73/100 feet to a point in or near the bed of Pine Road; |

Page 1 of 2

| Thence | the three (3) following courses and distances in and along the bed of Pine Road; |
|---|---|
| #1 | South 40 degrees 00 minutes 00 seconds West, 166 and 61/100 feet to a point; |
| #2 | South 41 degrees 38 minutes 00 seconds West, 1,624 and 84/100 feet to a point; |
| #3 | South 43 degrees 32 minutes 00 seconds West, 1,170 and 78/100 feet to the Point of Beginning. |

Containing 61 and 06/10 Acres, more or less.

Dated:      February 20, 2008
File No.    07-01088
/cbs



Page 2 of 2

- Exhibit A



EXHIBIT PLAN

PROPOSED ACTIVE ADULT RESIDENTIAL COMMUNITY

**PHILMONT COUNTRY CLUB**

LOWER MORELAND TOWNSHIP, MONTGOMERY COUNTY, PENNSYLVANIA

**GILMORE & ASSOCIATES, INC.**

ENGINEERING & CONSULTING SERVICES

| JOB NO. | 07-01058 |
| DATE | 02/20/08 |
| SCALE | 1"=250' |

NOTES:
1. THIS EXHIBIT WAS BASED ON CURRENT DEEDS OF RECORD, LANDS OBTAINED FROM MONTGOMERY COUNTY, COMMONWEALTH OF PENNSYLVANIA.
2. THIS EXHIBIT DOES NOT REPRESENT A BOUNDARY SURVEY.
3. THIS EXHIBIT IS TO ACCOMPANY LEGAL DESCRIPTION ONLY.

## Exhibit B

TENNIS AND GOLF COURSE MAINTENANCE FACILITIES

(exhibit appears on the following page)

# Exhibit "B"



NVP_109847\Philmont Country Club 138\Client or 3rd Party Provided\ Philmont LPA Exhibit B (rec'd 4-2-15)\5536349_1

## Exhibit C

### DESCRIPTION OF ADDITIONAL LAND

(exhibit appears on the following page)



**GILMORE & ASSOCIATES, INC.**
ENGINEERING & CONSULTING SERVICES

Description of **A PORTION OF BLOCK 7A UNIT 1**, located in Lower Moreland Township, Montgomery County, Pennsylvania, as shown on a plan titled "Exhibit Plan Proposed Residential Community, Philmont Country Club", dated September 28, 2009, and last revised February 17, 2015, prepared by Gilmore & Associates, Inc., Consulting Engineers and Land Surveyors, 65 E. Butler Avenue, New Britain, Pennsylvania.

| | |
|---|---|
| Beginning | at a point in the bed of Tomlinson Road, said point being located, North 39 degrees 51 minutes 00 seconds West, 910 and 00/100 feet from a point in or near the intersection of Tomlinson Road with Pine Road; |
| Thence | from the Point of Beginning, in and along Tomlinson Road, North 39 degrees 51 minutes 00 seconds West, 153 and 84/100 feet to a point; |
| Thence | the four (4) following courses and distances through Block 7A Unit 1 of which this is a part; |
| #1 | North 40 degrees 13 minutes 50 seconds East, 748 and 20/100 feet to a point; |
| #2 | North 52 degrees 46 minutes 13 seconds East, 689 and 67/100 feet to a point; |
| #3 | South 89 degrees 04 minutes 26 seconds East, 260 and 36/100 feet to a point; |
| #4 | South 47 degrees 17 minutes 15 seconds West, 1,625 and 15/100 feet to the Point of Beginning. |

Containing 7 and 02/10 Acres, more or less.

Dated:        February 17, 2015
File No.       07-01088-03
Prepared by:  Donald P. Rapsinski, Professional Land Surveyor
Pennsylvania License No. SU043355E
*DPR/jm*



Page 1 of 1



# EXHIBIT 3

## AMENDMENT TO AGREEMENT OF SALE

THIS AMENDMENT TO AGREEMENT OF SALE (this "Amendment") is made this 21st day of October, 2015, by and between PHILMONT COUNTRY CLUB, a Pennsylvania non-profit corporation ("Seller") and NORTH PENN TOWNS LP, a Pennsylvania limited partnership ("Buyer").

### Background

A. Buyer and Seller are parties to that certain Agreement of Sale, dated July 23, 2015 (the "Agreement of Sale"), pursuant to which Buyer has agreed to buy, and Seller has agreed to sell, that certain parcel of land containing approximately 61.60 acres located in Lower Moreland Township, Montgomery County, Pennsylvania, as more particularly described in the Agreement of Sale (the "Property"). In addition, Buyer has the option under the Agreement of Salle to purchase the Additional Land in order to achieve the desired yield to satisfy Buyer's Intended Use while addressing any environmental constraints on the Property.

B. Buyer and Seller now desire to amend the Agreement of Sale as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and conditions set forth herein, the parties, intending to be legally bound, hereby agree as follows:

1. Terms. Capitalized terms not defined herein shall have the meanings given to them in the Agreement of Sale.

2. Due Diligence Period. The Due Diligence Period is hereby extended through November 18, 2015. Notwithstanding this extension, Buyer shall retain all of its rights under Section 13(a) of the Agreement of Sale.

3. Miscellaneous.

(a) Unless specifically modified by the terms of this Amendment, all of the other terms of the Agreement of Sale shall remain unmodified and in full force and effect.

(b) This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

(c) This Amendment may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument. Any counterpart of this Amendment may be executed and delivered by electronic transmission (including, without limitation, e-mail) or by portable document format (pdf)) and shall have the same force and effect as an original.

[Signature page follows]

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals the day and year first above written.

**BUYER:**                                **SELLER:**

**NORTH PENN TOWNS LP**          **PHILMONT COUNTRY CLUB**
By:  North Penn GP LLC, its general partner

By: _____          By: _____
      Michael V. Tulio,                      Samuel A. Silverman, Treasurer

{01147919v2 }2

NPT000775

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals the day and year first above written.

BUYER:                                        SELLER:

**NORTH PENN TOWNS LP**               **PHILMONT COUNTRY CLUB**
By: North Penn GP LLC, its general partner

By: _____               By: _____
    Michael V. Tulio, Vice President          Glenn Meyer, President

NPT000776

## SECOND AMENDMENT TO AGREEMENT OF SALE

THIS SECOND AMENDMENT TO AGREEMENT OF SALE (this "Amendment") is made this ___18th___ day of November, 2015, by and between PHILMONT COUNTRY CLUB, a Pennsylvania non-profit corporation ("Seller") and NORTH PENN TOWNS LP, a Pennsylvania limited partnership ("Buyer").

### Background

A.     Buyer and Seller are parties to that certain Agreement of Sale, dated July 23, 2015, as amended by the Amendment to Agreement of Sale, dated October 21, 2015 (collectively, the "Agreement of Sale"), pursuant to which Buyer has agreed to buy, and Seller has agreed to sell, that certain parcel of land containing approximately 61.60 acres located in Lower Moreland Township, Montgomery County, Pennsylvania, as more particularly described in the Agreement of Sale (the "Property"). In addition, Buyer has the option under the Agreement of Salle to purchase the Additional Land in order to achieve the desired yield to satisfy Buyer's Intended Use while addressing any environmental constraints on the Property.

B.     Buyer and Seller now desire to amend the Agreement of Sale as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and conditions set forth herein, the parties, intending to be legally bound, hereby agree as follows:

1.     Terms. Capitalized terms not defined herein shall have the meanings given to them in the Agreement of Sale.

2.     Due Diligence Period. The Due Diligence Period is hereby extended through March 31, 2016. Notwithstanding this extension, Buyer shall retain all of its rights under Section 13(a) of the Agreement of Sale.

3.     Miscellaneous.

(a)     Unless specifically modified by the terms of this Amendment, all of the other terms of the Agreement of Sale shall remain unmodified and in full force and effect.

(b)     This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

(c)     This Amendment may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument. Any counterpart of this Amendment may be executed and delivered by electronic transmission (including, without limitation, e-mail) or by portable document format (pdf)) and shall have the same force and effect as an original.

ACTIVE 32357948v1

NPT000777

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals the day and year first above written.

**BUYER:**                                    **SELLER:**

**NORTH PENN TOWNS LP**          **PHILMONT COUNTRY CLUB**
By:  North Penn GP LLC, its general partner

By: _____     By: _____
    Michael V. Tulio, Vice President          Glenn Meyer, President

NPT000778

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals the day and year first above written.

**BUYER:**                                    **SELLER:**

**NORTH PENN TOWNS LP**          **PHILMONT COUNTRY CLUB**
By:  North Penn GP LLC, its general partner

By: _____         By: _____
        Michael V. Tulio, Vice President              Glenn Meyer, President

ACTIVE 32357948v1

NPT000779

## THIRD AMENDMENT TO AGREEMENT OF SALE

THIS THIRD AMENDMENT TO AGREEMENT OF SALE (this "Amendment") is made this 30th day of March, 2016 (the "Effective Date"), by and between PHILMONT COUNTRY CLUB, a Pennsylvania non-profit corporation ("Seller") and NORTH PENN TOWNS LP, a Pennsylvania limited partnership ("Buyer").

### Background

A.     Buyer and Seller are parties to that certain Agreement of Sale, dated July 23, 2015 (the "Original Agreement"), as amended by the Amendment to Agreement of Sale, dated October 21, 2015, and the Second Amendment to Agreement of Sale, dated November 18, 2015 (collectively, the "Agreement of Sale"), pursuant to which Buyer has agreed to buy, and Seller has agreed to sell, that certain parcel of land containing approximately 61.60 acres located in Lower Moreland Township, Montgomery County, Pennsylvania, as more particularly described in the Agreement of Sale (the "Property"). In addition, Buyer has the option under the Agreement of Sale to purchase the Additional Land in order to achieve the desired yield to satisfy Buyer's Intended Use while addressing any environmental constraints on the Property.

B.     Buyer and Seller now desire to amend the Agreement of Sale as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and conditions set forth herein, the parties, intending to be legally bound, hereby agree as follows:

1.     Terms. Capitalized terms not defined herein shall have the meanings given to them in the Agreement of Sale.

2.     Due Diligence Period. The Due Diligence Period is hereby extended through April 21, 2016. Notwithstanding this extension, Buyer shall retain all of its rights under Section 13(a) of the Agreement of Sale.

3.     Miscellaneous.

(a)     Unless specifically modified by the terms of this Amendment, all of the other terms of the Agreement of Sale shall remain unmodified and in full force and effect.

(b)     This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

(c)     This Amendment may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument. Any counterpart of this Amendment may be executed and delivered by electronic transmission (including, without limitation, e-mail) or by portable document format (pdf)) and shall have the same force and effect as an original.

[Signature page follows]

NPT000780

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals the day and year first above written.

**BUYER:**                                              **SELLER:**

**NORTH PENN TOWNS LP**                    **PHILMONT COUNTRY CLUB**
By:  North Penn GP LLC, its general partner

By: _____              By: _____
        Michael V. Tulio, Vice President              Glenn Meyer, President

2

NPT000781

## <u>FOURTH AMENDMENT TO AGREEMENT OF SALE</u>

THIS FOURTH AMENDMENT TO AGREEMENT OF SALE (this "<u>Amendment</u>") is made this 21st day of April, 2016 (the "<u>Effective Date</u>"), by and between PHILMONT COUNTRY CLUB, a Pennsylvania non-profit corporation ("<u>Seller</u>") and NORTH PENN TOWNS LP, a Pennsylvania limited partnership ("<u>Buyer</u>").

### <u>Background</u>

A.      Buyer and Seller are parties to that certain Agreement of Sale, dated July 23, 2015 (the "<u>Original Agreement</u>"), as amended by the Amendment to Agreement of Sale, dated October 21, 2015, the Second Amendment to Agreement of Sale, dated November 18, 2015, and the Third Amendment to Agreement of Sale, dated March 30, 2016 (collectively, the "<u>Agreement of Sale</u>"), pursuant to which Buyer has agreed to buy, and Seller has agreed to sell, that certain parcel of land containing approximately 61.60 acres located in Lower Moreland Township, Montgomery County, Pennsylvania, as more particularly described in the Agreement of Sale (the "<u>Property</u>").  In addition, Buyer has the option under the Agreement of Sale to purchase the Additional Land in order to achieve the desired yield to satisfy Buyer's Intended Use while addressing any environmental constraints on the Property.

B.      Buyer and Seller now desire to amend the Agreement of Sale as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and conditions set forth herein, the parties, intending to be legally bound, hereby agree as follows:

1.      <u>Terms</u>.  Capitalized terms not defined herein shall have the meanings given to them in the Agreement of Sale.

2.      <u>Due Diligence Period</u>.  The Due Diligence Period is hereby extended through April 25, 2016.  Notwithstanding this extension, Buyer and Seller shall retain all of their rights under Section 13(a) of the Agreement of Sale.

3.      <u>Miscellaneous</u>.

(a)      Unless specifically modified by the terms of this Amendment, all of the other terms of the Agreement of Sale shall remain unmodified and in full force and effect.

(b)      This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

(c)      This Amendment may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.  Any counterpart of this Amendment may be executed and delivered by electronic transmission (including, without limitation, e-mail) or by portable document format (pdf)) and shall have the same force and effect as an original.

ACTIVE 39974879v1

NPT000782

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals the day and year first above written.

BUYER:                                   SELLER:

**NORTH PENN TOWNS LP**          **PHILMONT COUNTRY CLUB**
By:  North Penn GP LLC, its general partner

By: _____          By: _____
        Michael V. Tulio, Vice President            Glenn Meyer, President

2

NPT000783

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals the day and year first above written.

**BUYER:**                                    **SELLER:**

**NORTH PENN TOWNS LP**              **PHILMONT COUNTRY CLUB**
By:  North Penn GP LLC, its general partner

By: _____          By: _____
    Michael V. Tulio, Vice President          Glenn Meyer, President

## FIFTH AMENDMENT TO AGREEMENT OF SALE

THIS FIFTH AMENDMENT TO AGREEMENT OF SALE (this "Amendment") is made this 25th day of April, 2016, by and between PHILMONT COUNTRY CLUB, a Pennsylvania non-profit corporation ("Seller") and NORTH PENN TOWNS LP, a Pennsylvania limited partnership ("Buyer").

## Background

A.    Buyer and Seller are parties to that certain Agreement of Sale, dated July 23, 2015 (the "Original Agreement"), as amended by Amendments to Agreement of Sale, dated October 21, 2015, November 18, 2015, March 30, 2016 and April 21, 2016 (the "Amendments" and, together with the Original Agreement, the "Agreement of Sale"), pursuant to which Buyer has agreed to buy, and Seller has agreed to sell, that certain parcel of land containing approximately 61.60 acres located in Lower Moreland Township, Montgomery County, Pennsylvania, as more particularly described in the Agreement of Sale (the "Property"). In addition, Buyer has the option under the Agreement of Sale to purchase the Additional Land in order to achieve the desired yield to satisfy Buyer's Intended Use while addressing any environmental constraints on the Property.

B.    Buyer and Seller now desire to amend the Agreement of Sale as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and conditions set forth herein, the parties, intending to be legally bound, hereby agree as follows:

1.    Terms.  Capitalized terms not defined herein shall have the meanings given to them in the Agreement of Sale.

2.    Due Diligence Period.  The Due Diligence Period is hereby extended through September 1, 2016. Notwithstanding this extension, Buyer and Seller shall retain all of its rights under Section 13(a) of the Agreement of Sale.

3.    Density for Buyer's Intended Use.

(a)    Buyer and Seller acknowledge and agree that, at the time the Original Agreement was executed, it was the mutual understanding of the parties that the by-right density yield for Buyer's Intended Use under the Township Zoning Ordinance was approximately 150 units. However, during the Due Diligence Period, the parties discovered that the Township had previously amended its Zoning Ordinance which resulted in a reduction in the by-right density yield for Buyer's Intended Use down to approximately 105 units.

(b)    During the extended Due Diligence Period, Buyer and Seller hereby agree, in coordination with each other, to utilize commercially reasonable efforts and due diligence to obtain a text amendment to the current Township Zoning Ordinance and/or a rezoning of the Additional Land to provide for a permitted density for Buyer's Intended Use of at least 150 units (collectively, the "Required Zoning Relief").

1

NPT000785

(c)     In the event that Buyer and Seller are unable to obtain the Required Zoning Relief, on terms and conditions that are acceptable to both parties and are commercially reasonable, then Buyer shall have the right to terminate the Agreement of Sale on or prior to the expiration of the Due Diligence Period.  Buyer acknowledges and agrees that commercially reasonable conditions to the receipt of the Required Zoning Relief are as follows:  (i) the requirement to convey certain right-of-way to the Township for the traffic improvements at the intersection of Tomlinson Road, Philmont Avenue and Pine Road, as generally shown on the plans previously provided by the Township to Buyer (with the understanding that the area is subject to adjustment as part of the approval process for the Project); and (ii) the requirement to pay a traffic improvement contribution fee of One Million Dollars ($1,000,000); all provided that the Required Zoning Relief provides for a permitted by-right density of at least 150 units (or such lesser number of units accepted by Buyer in Buyer's sole discretion).  Each party shall be responsible for their own legal fees related to the Required Zoning Relief.  Buyer will pay for the engineering fees associated with the Required Zoning Relief.

4.     Miscellaneous.

(a)     Unless specifically modified by the terms of this Amendment, all of the other terms of the Agreement of Sale shall remain unmodified and in full force and effect.

(b)     This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

(c)     This Amendment may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.  Any counterpart of this Amendment may be executed and delivered by electronic transmission (including, without limitation, e-mail) or by portable document format (pdf)) and shall have the same force and effect as an original.

**[Signature page follows]**

ACTIVE 39807617v5 04/25/2016

NPT000786

**IN WITNESS WHEREOF,** the parties hereto have hereunto set their hands and seals the day and year first above written.

**BUYER:**                                              **SELLER:**

**NORTH PENN TOWNS LP**                **PHILMONT COUNTRY CLUB**
By:  North Penn GP LLC, its general partner

By: _____          By: _____
    Michael V. Tulio, Vice President              Glenn Meyer, President

3

NPT000787

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals the day and year first above written.

**BUYER:**                                    **SELLER:**

**NORTH PENN TOWNS LP**              **PHILMONT COUNTRY CLUB**
By:  North Penn GP LLC, its general partner


By: _____         By: _____
    Michael V. Tulio, Vice President         Glenn Meyer, President

## SIXTH AMENDMENT TO AGREEMENT OF SALE

THIS SIXTH AMENDMENT TO AGREEMENT OF SALE (this "Amendment") is made this 31st day of August, 2016, by and between PHILMONT COUNTRY CLUB, a Pennsylvania non-profit corporation ("Seller") and NORTH PENN TOWNS LP, a Pennsylvania limited partnership ("Buyer").

### Background

A.    Buyer and Seller are parties to that certain Agreement of Sale, dated July 23, 2015, as amended by the Amendment to Agreement of Sale, dated October 21, 2015, the Second Amendment to Agreement of Sale, dated November 18, 2015, the Third Amendment to Agreement of Sale, dated March 30, 2016, the Fourth Amendment to Agreement of Sale, dated April 21, 2016, and the Fifth Amendment to Agreement of Sale, dated April 25, 2016 (collectively, the "Agreement of Sale"), pursuant to which Buyer has agreed to buy, and Seller has agreed to sell, that certain parcel of land containing approximately 61.60 acres located in Lower Moreland Township, Montgomery County, Pennsylvania, as more particularly described in the Agreement of Sale (the "Property"). In addition, Buyer has the option under the Agreement of Sale to purchase the Additional Land in order to achieve the desired yield to satisfy Buyer's Intended Use while addressing any environmental constraints on the Property.

B.    Buyer and Seller now desire to amend the Agreement of Sale as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and conditions set forth herein, the parties, intending to be legally bound, hereby agree as follows:

1.    Terms.  Capitalized terms not defined herein shall have the meanings given to them in the Agreement of Sale.

2.    Due Diligence Period.  The Due Diligence Period is hereby extended through September 9, 2016. Notwithstanding this extension, Buyer and Seller shall retain all of its rights under Section 13(a) of the Agreement of Sale.

3.    Miscellaneous.

(a)    Unless specifically modified by the terms of this Amendment, all of the other terms of the Agreement of Sale shall remain unmodified and in full force and effect.

(b)    This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

(c)    This Amendment may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.  Any counterpart of this Amendment may be executed and delivered by electronic transmission (including, without limitation, e-mail) or by portable document format (pdf)) and shall have the same force and effect as an original.

### [Signature page follows]

NPT000789

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment as of the day and year first above written.

**BUYER:**                                     **SELLER:**

**NORTH PENN TOWNS LP**            **PHILMONT COUNTRY CLUB**
By:  North Penn GP LLC, its general partner

By: _____      By: _____
    Michael V. Tulio, Vice President          Glenn Meyer, President

ACTIVE 42020665v1 08/30/2016

NPT000790

## SEVENTH AMENDMENT TO AGREEMENT OF SALE

THIS SEVENTH AMENDMENT TO AGREEMENT OF SALE (this "Amendment") is made this 9th day of September, 2016, by and between PHILMONT COUNTRY CLUB, a Pennsylvania non-profit corporation ("Seller") and NORTH PENN TOWNS LP, a Pennsylvania limited partnership ("Buyer").

### Background

A.      Buyer and Seller are parties to that certain Agreement of Sale, dated July 23, 2015 (the "Original Agreement"), as amended by the Amendment to Agreement of Sale, dated October 21, 2015, the Second Amendment to Agreement of Sale, dated November 18, 2015, the Third Amendment to Agreement of Sale, dated March 30, 2016, the Fourth Amendment to Agreement of Sale, dated April 21, 2016, the Fifth Amendment to Agreement of Sale, dated April 25, 2016, and the Sixth Amendment to Agreement of Sale dated August 31, 2016 (collectively, the "Agreement of Sale"), pursuant to which Buyer has agreed to buy, and Seller has agreed to sell, that certain parcel of land containing approximately 61.60 acres located in Lower Moreland Township, Montgomery County, Pennsylvania, as more particularly described in the Agreement of Sale (the "Property").  In addition, Buyer has the option under the Agreement of Sale to purchase the Additional Land in order to achieve the desired yield to satisfy Buyer's Intended Use while addressing any environmental constraints on the Property.

B.      Buyer and Seller now desire to amend the Agreement of Sale as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and conditions set forth herein, the parties, intending to be legally bound, hereby agree as follows:

1.      Terms.  Capitalized terms not defined herein shall have the meanings given to them in the Agreement of Sale.

2.      Due Diligence Period.  The Due Diligence Period is hereby extended through September 16, 2016.

3.      Miscellaneous.

(a)      Unless specifically modified by the terms of this Amendment, all of the other terms of the Agreement of Sale shall remain unmodified and in full force and effect.

(b)      This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

(c)      This Amendment may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.  Any counterpart of this Amendment may be executed and delivered by electronic transmission (including, without limitation, e-mail) or by portable document format (pdf)) and shall have the same force and effect as an original.

NPT000791

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals the day and year first above written.

**BUYER:**                                                    **SELLER:**

**NORTH PENN TOWNS LP**                        **PHILMONT COUNTRY CLUB**
By:  North Penn GP LLC, its general partner

By: _____           By: _____
    Michael V. Tulio, Vice President                     Glenn Meyer, President

NPT000792

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals the day and year first above written.

**BUYER:**                                    **SELLER:**

**NORTH PENN TOWNS LP**                        **PHILMONT COUNTRY CLUB**
By:  North Penn GP LLC, its general partner

By: _____            By: _____
       Michael V. Tulio, Vice President                Glenn Meyer, President

ACTIVE 42180260v1

NPT000793

## EIGHTH AMENDMENT TO AGREEMENT OF SALE

THIS EIGHTH AMENDMENT TO AGREEMENT OF SALE (this "Amendment") is made this __16th__ day of September, 2016, by and between PHILMONT COUNTRY CLUB, a Pennsylvania non-profit corporation ("Seller") and NORTH PENN TOWNS LP, a Pennsylvania limited partnership ("Buyer").

## Background

A.      Buyer and Seller are parties to that certain Agreement of Sale, dated July 23, 2015 (the "Original Agreement"), as amended by the Amendment to Agreement of Sale, dated October 21, 2015, the Second Amendment to Agreement of Sale, dated November 18, 2015, the Third Amendment to Agreement of Sale, dated March 30, 2016, the Fourth Amendment to Agreement of Sale, dated April 21, 2016, the Fifth Amendment to Agreement of Sale, dated April 25, 2016, the Sixth Amendment to Agreement of Sale dated August 31, 2016, and the Seventh Amendment to Agreement of Sale, dated September 9, 2016 (collectively, the "Agreement of Sale"), pursuant to which Buyer has agreed to buy, and Seller has agreed to sell, that certain parcel of land containing approximately 61.60 acres located in Lower Moreland Township, Montgomery County, Pennsylvania, as more particularly described in the Agreement of Sale (the "Property").  In addition, Buyer has the option under the Agreement of Sale to purchase the Additional Land in order to achieve the desired yield to satisfy Buyer's Intended Use while addressing any environmental constraints on the Property.

B.      Buyer and Seller now desire to amend the Agreement of Sale as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and conditions set forth herein, the parties, intending to be legally bound, hereby agree as follows:

1.      Terms.  Capitalized terms not defined herein shall have the meanings given to them in the Agreement of Sale.

2.      Due Diligence.  The Due Diligence Period is hereby extended through September 26, 2016.

3.      Miscellaneous.

(a)      Unless specifically modified by the terms of this Amendment, all of the other terms of the Agreement of Sale shall remain unmodified and in full force and effect.

(b)      This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

(c)      This Amendment may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.  Any counterpart of this Amendment may be executed and delivered by

1

NPT000794

electronic transmission (including, without limitation, e-mail) or by portable document format (pdf)) and shall have the same force and effect as an original.

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals the day and year first above written.

**BUYER:**                                    **SELLER:**

**NORTH PENN TOWNS LP**            **PHILMONT COUNTRY CLUB**
By:  North Penn GP LLC, its general partner

By: _____      By: _____
    Kevin Timochenko, President          Glenn Meyer, President

Eighth Amendment to AOS -- North Penn and Philmont V2 EXECUTION

NPT000795

# EXHIBIT 4

## NINTH AMENDMENT TO AGREEMENT OF SALE

THIS NINTH AMENDMENT TO AGREEMENT OF SALE (this "Amendment") is made this 26th day of September, 2016, by and between PHILMONT COUNTRY CLUB, a Pennsylvania non-profit corporation ("Seller") and NORTH PENN TOWNS LP, a Pennsylvania limited partnership ("Buyer").

### Background

A.       Buyer and Seller are parties to that certain Agreement of Sale, dated July 23, 2015 (the "Original Agreement"), as amended by the Amendment to Agreement of Sale, dated October 21, 2015, the Second Amendment to Agreement of Sale, dated November 18, 2015, the Third Amendment to Agreement of Sale, dated March 30, 2016, the Fourth Amendment to Agreement of Sale, dated April 21, 2016, the Fifth Amendment to Agreement of Sale, dated April 25, 2016, the Sixth Amendment to Agreement of Sale dated August 31, 2016, the Seventh Amendment to Agreement of Sale, dated September 9, 2016, and the Eighth Amendment to Agreement of Sale dated September 16, 2016 (collectively, the "Agreement of Sale"), pursuant to which Buyer has agreed to buy, and Seller has agreed to sell, that certain parcel of land containing approximately 61.60 acres located in Lower Moreland Township, Montgomery County, Pennsylvania, as more particularly described in the Agreement of Sale (the "Property"). In addition, Buyer has the option under the Agreement of Sale to purchase the Additional Land in order to achieve the desired yield to satisfy Buyer's Intended Use while addressing any environmental constraints on the Property.

B.       Buyer and Seller now desire to amend the Agreement of Sale as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and conditions set forth herein, the parties, intending to be legally bound, hereby agree as follows:

1.       Terms. Capitalized terms not defined herein shall have the meanings given to them in the Agreement of Sale.

2.       Additional Land. Buyer and Seller acknowledge and agree that Buyer has exercised the option to purchase all of the Additional Land, along with the Property, and Seller has consented to the purchase of the Additional Land by Buyer, without any adjustment to the Purchase Price. Therefore, the term "Property", as defined in the Original Agreement, shall hereafter be deemed to include the Additional Land.

3.       Purchase Price Adjustments.

(a)       The Minimum Price, as defined in the Original Agreement, is hereby revised to mean the product of $75,308.64, multiplied by 160, which is equal to Twelve Million Forty-Nine Thousand Three Hundred Eighty-Two Dollars and Forty Cents ($12,049,382.40).

(b)       Notwithstanding anything contained in the Original Agreement to the contrary, in the event Buyer obtains approval for more than 160 townhouse units to be developed

1

NPT000796

on the Property, for each additional unit over 160 which is approved, and up to 165 units, Buyer shall pay to Seller the sum of Forty-Five Thousand Dollars ($45,000). For each additional unit over 165 which is approved, Buyer shall pay to Seller the sum of Seventy-Five Thousand Three Hundred Eight Dollars and Sixty-Four Cents ($75,308.64).

(c)     At Closing, Seller shall grant to Buyer a credit against the Purchase Price in the amount of Three Hundred Seventy-Five Thousand Dollars ($375,000) (the "Purchase Price Credit"). In the event that Buyer's costs to construct and install the proposed clubhouse and related clubhouse amenities on the Property, as part of the proposed age-restricted community (including, but not limited to the pool, related parking facilities and any other amenities associated therewith), is less than One Million Six Hundred Thousand Dollars ($1,600,000), then the Purchase Price Credit shall be decreased by one-third ($^1/_3$) of the savings by way of a reimbursement from Buyer to Seller. The Buyer's costs to construct and install the proposed clubhouse and related clubhouse amenities on the Property shall include, without limitation, costs related to the following: clubhouse; pool; site improvements (such as parking lot and walkways); engineering and architectural design fees; building permit and inspection fees; and furniture, equipment, appliances and other personal property purchased for the clubhouse. This Section 3(c) shall survive Closing.

4.     Due Diligence Period.

(a)     The Due Diligence Period is hereby extended through October 3, 2016.

(b)     As of October 4, 2016, the Due Diligence Period shall be further extended for six (6) months following the date on which approval of the Text Amendment (hereinafter defined) is granted by the Township; provided, however, that the work to be performed by Buyer during this six (6) month Due Diligence Period extension shall be limited to environmental assessment work on the Property and the assessment of the scope and cost of any remediation work related thereto.

5.     Text Amendment Contingency.

(a)     Buyer hereby agrees to utilize commercially reasonable efforts and due diligence, in coordination with Seller, to obtain a text amendment to the current Township Zoning Ordinance to (i) rezone the portion of the Property containing the Additional Land to the RSD-2 zoning district, and (ii) permit age-restricted townhouses to be permitted within the RSD-2 zoning district (collectively, "Text Amendment").

(b)     Buyer shall have obtained, subject only to such commercially reasonable terms and conditions as are acceptable to Buyer in Buyer's reasonable discretion, approval of the Text Amendment. If Buyer is unable to obtain approval of the Text Amendment, on or before February 28, 2017 (the "Zoning Approval Deadline Date"), or if Buyer determines at any time that Buyer will be unable to obtain the Text Amendment on commercially reasonable terms and conditions as are acceptable to Buyer in Buyer's reasonable discretion, then Buyer shall have the option to terminate this Agreement by delivery of written notice to Seller at any time prior to the Zoning Approval Deadline Date. The Text Amendment contingency shall not be deemed to

NPT000797

have been satisfied until any applicable appeal periods have expired without an appeal having been filed in opposition thereto.

(c)　Buyer obtaining the Text Amendment in accordance with **Section 5(b)** above shall be deemed an additional Condition Precedent under Section 16(a) of the Original Agreement and Buyer shall have all rights related thereto as set forth in Section 16(c) of the Original Agreement.

6.　**Application Requirements**.  Section 16(h) of the Original Agreement is hereby deleted in its entirety and replaced with the following:

> In furtherance hereof, Buyer agrees to:  (A) file a petition requesting the Text Amendment on or before October 14, 2016; (B) submit an application for conditional use approval for Buyer's Intended Use within one (1) month following receipt of approval of the subdivision; and a complete land development application (with all required plans) for Buyer's Intended Use within two (2) months following Buyer's receipt of unappealable conditional use approval on commercially reasonable terms and conditions acceptable to Buyer in Buyer's reasonable discretion; and (D) submit a complete application for final subdivision and land development approval for Buyer's Intended Use within two (2) months following Buyer's receipt of unappealable preliminary subdivision and land development plan approval.  Buyer shall diligently pursue all of the above in good faith and with due diligence.  Seller acknowledges that the dates in this Section 16(h) are subject to the cooperation of all applicable governing bodies and will be adjusted for scheduling delays directly attributable thereto.

7.　The Tomlinson Land.  Seller is the owner of approximately four (4) golf course holes located on the opposite side of Tomlinson Road from the Property, consisting of approximately 22 acres, as more particularly shown on the plan attached hereto as **Exhibit "A"** (the "**Tomlinson Land**").  In connection with the Text Amendment and/or the conditional use approval for Buyer's Intended Use, and only if required by the Township, Seller hereby agrees to impose a conservation easement upon the Tomlinson Lands to prohibit the development of such land other than for private recreational uses, including any uses normally conducted by country clubs in the Philadelphia metropolitan area and specifically including a golf course.  Seller also agrees to grant to Buyer, as part of the subdivision and land development plan approval process (and assuming Closing hereunder occurs), upon request by Buyer, an easement over and across a portion of the Tomlinson Land to provide for stormwater drainage, provided such easement does not adversely impact Seller's continued use of the Tomlinson Land.  The form of the conservation easement and the form of the stormwater easement shall be reasonably acceptable to Seller, Buyer and the Township.

NPT000798

8.     **Landscape Buffers**.  Seller shall have the right to review and provide reasonable comments as to any proposed landscape buffers between the Property and the remaining lands owned by Seller.

9.     Miscellaneous.

(a)     Unless specifically modified by the terms of this Amendment, all of the other terms of the Agreement of Sale shall remain unmodified and in full force and effect.

(b)     This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

(c)     This Amendment may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.  Any counterpart of this Amendment may be executed and delivered by electronic transmission (including, without limitation, e-mail) or by portable document format (pdf)) and shall have the same force and effect as an original.

[Signature page follows]

ACTIVE 41618589v4

NPT000799

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals the day and year first above written.

**BUYER:**                                                    **SELLER:**

**NORTH PENN TOWNS LP**                    **PHILMONT COUNTRY CLUB**
By:  North Penn GP LLC, its general partner

By: _____                  By: _____
　　　Michael V. Tullo, Vice President　　　　　　　Glenn Meyer, President

# EXHIBIT 5

**To:**     Glenn Meyer[glenn@gdmplan.com]
**From:**  Peter Nanula
**Sent:**   Mon 9/19/2016 6:27:36 PM
**Subject:** Re: Philmont CC info

Wide open.  At my desk, 949.715.0602.

Look forward to speaking with you.

-------------------

Peter Nanula

Concert Golf Partners

Tel:  949.715.0602

Cell:  415.260.8806

www.concertgolfpartners.com

Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

---

**From:** Glenn Meyer <glenn@gdmplan.com>
**Date:** Monday, September 19, 2016 at 3:19 PM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Subject:** RE: Philmont CC info

Peter,

Do you have any time to speak today?  I can update you on the real estate deal.

Best regards.

Glenn Meyer, CPA/PFS, CFP®, AIF®, ChFC, CLU
GDM Advisory Group, Ltd.
123 Old York Road, Suite 200

PCC-1044

Jenkintown, PA  19046
**215**-886-5800
**215**-886-6575 FAX
www.gdmplan.com



The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.  Please also be advised that all e-mail sent to or from this address may be received or otherwise recorded by the firm's e-mail system and is subject to archival and review by someone other than the recipient.

Please remember to contact GDM Advisory Group, Ltd. if there are any changes in your personal/financial situation or investment objectives for the purpose of reviewing/evaluation/revising our previous recommendations and/or services, or if you want to impose, add, or modify any reasonable restrictions to our investment advisory services.  A copy of our current written disclosure statement discussing our advisory services and fees continues to remain available for your review upon request.

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Monday, September 19, 2016 2:01 PM
**To:** Samuel Silverman <ssilverman@skllc.com>
**Cc:** Dave Fields (davidfi73@comcast.net) <davidfi73@comcast.net>; Glenn Meyer <glenn@gdmplan.com>
**Subject:** Re: Philmont CC info

Good stuff here, Sam.

1. On #12 below, can you tell me what's in the $255K in Deferred Revenue?

2. Can you guys share with me any and all details on the pending NVR deal for the South Course acreage?

 I will work on a preliminary proposal to share this week, and we can get on the phone to discuss it.  I will be in the Philly area in mid-October for another club Board meeting, so we can have a tour and face-to-face meeting then.

   Peter
-------------------
Peter Nanula
Concert Golf Partners
Tel:  949.715.0602
Cell:  415.260.8806
www.concertgolfpartners.com

Watch Now.
*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

**From:** Samuel Silverman <ssilverman@skllc.com>

**Date:** Monday, September 12, 2016 at 8:09 PM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Cc:** "Dave Fields (davidfi73@comcast.net)" <davidfi73@comcast.net>, "Glenn Meyer (glenn@gdmplan.com)" <glenn@gdmplan.com>
**Subject:** RE: Philmont CC info

Peter,

Some answers below and the questions I cannot answer will require some digging with the staff at the Club so I want to avoid that for now.

Glenn – please chime in if you have any thoughts.

Samuel A. Silverman, CPA
Silverman Kendall, LLC
200 Gibraltar Road, Suite 115
Horsham, PA 19044
215.259.4100 x100
267.481.0032 (cell)
267.387.6284 (fax)
ssilverman@skllc.com
www.skllc.com

Disclaimer:

Any accounting, business or tax advice contained in this communication, including attachments and enclosures, is not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it sufficient to avoid tax-related penalties. If desired, Silverman Kendall LLC would be pleased to perform the requisite research and provide you with a detailed written analysis. Such an engagement may be the subject of a separate engagement letter that would define the scope and limits of the desired consultation services.

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Monday, September 12, 2016 4:55 PM
**To:** Samuel Silverman
**Cc:** Dave Fields (davidfi73@comcast.net); Glenn Meyer (glenn@gdmplan.com)
**Subject:** Re: Philmont CC info

Samuel:

Thanks for all of this information.  Very helpful.  A few follow-up questions for you:

  1)    In Tennis, what is Indoor Contract revenue?

We have three indoor courts and members and non-members buy contract times during the winter.

  2)    In F&B, how are service charges collected and how much goes to the employees?

Prior to this year we had a 20% service charge that the Club kept.  The Club paid all servers an hourly wage between maybe $12 - $17 per hour.  As of 5/1/16 we changed our policy to have no service charge and full tipping with the servers keeping the tip like any other restaurant.  We reduced the server hourly rate to about $6 per hour.  For banquets and certain member events, there is no tipping and the 20% service charge for the

Club is still in force with the servers earning the higher hourly wage.

3) Please confirm the Pro owns the Golf Pro Shop merchandise.  What was the revenue in the last 12 months?  What is his/her deal?

Yes the Pro owns the shop and I do not have the revenue for the last 12 months readily available.

4) Do you currently have a Membership Director?

No – our GM has performed this function.

5) Is any of your turf equipment leased?  What is the annual payment?

No operating leases on the equipment.  The capital leases/notes are disclosed in the financials.

6) In Building Maint, is the $89K water bill just for the clubhouse?

The water bill is for clubhouse, pool, and parts of the golf course.  The water was only $41K for Y/E 4/30/16 and 4/30/15 and the sewer was $54K for 4/30/16 and $45K for 4/30/15.

7) What is your water source for the golf course?  Cost and term of your water contract?

I do not have this information

8) In Admin Expenses, what is $31K in bad debt?  Why was it all incurred in April?  What is in the $27K of Misc. Expense?

I am looking at the internally generated financials (not Brown Golf financials).  We increased bad debt reserve as of 4/30/16.  I do not see the Misc. Expense – in the internal p&L, the misc expense in Admin includes the $31K of bad debt expense.

9) What is the property currently assessed at for Real Estate taxes?

I will copy the bill for you the next time I am at the Club.

10) Your cart lease looks a bit low.  How many carts do you lease? How old are they?

Lease started May 2015 at $5,904 per month for May-Oct and $0 between Nov-Apr. = total payments of $5,904 x 6 mos. per year x 5 years = $177,120.  We have 62 electric carts and 8 gas carts and we also received a six passenger cart in the deal.  All 2015 models.  The lease looks low because we traded in 80 gas carts that we owned and received a $88,925 reduction in the total lease.

11) How do the Preview memberships work?  When does a Preview member have to convert to a regular member?  Can we get a schedule of when those mature?

The preview is just a one year deal for someone to get the feel of the Club.  The previews are only on the Flex membership and this past year we sold the preview memberships at 50% of the Flex membership for the appropriate age bracket.  The Flex membership is our new social membership but we included golf on our South course as part of the membership.  There is no commitment from the preview member after the one year.

We started the preview membership in the 2015-16 year but it was only for social members under the age of

46 and it did not include the South course golf. We had 37 preview members and 27 converted into members the following year. This year (2016-17) there is certainly a different makeup of the preview members and I would be surprised if we had the same retention results.

We can talk in more detail regarding membership at some time.

12) On the balance sheet, how far out does the $307K in Prepaid Dues go?  What is $221K in Restricted Funds?  What's in the $255K in Deferred Revenue?

Prepaid dues:  Members pay dues prior to 5/1/16 for the upcoming year and receive a 2% discount.  The prepaid dues are amortized throughout the year.

Restricted funds:  not really restricted as all the money is in one bank account at the Club.  This is golf, tennis, bridge and other activity fees that are exclusively used for the golf, tennis and bridge member programs.  Members pay the fee and the expenses are then taken out of the "fund".

13) How do the Membership Incentives work and when do they run out?

We had a membership push a few years back bringing in new members at an amount that was lower than the existing members and the existing member that would bring the new member in would receive an annual credit equal to a portion of the dues differential.  The credit stays with the member as long as the new member stays at the club.  We are thinking of revising this anyway and the membership incentive credit would go away.
Thanks much.  After we get these answers, let's get on a conference call to discuss the real estate deal and I can walk through how our member-owned club recapitalizations usually work.
OK sounds good.

Peter
-------------------
Peter Nanula
Concert Golf Partners
Tel:  949.715.0602
Cell:  415.260.8806
www.concertgolfpartners.com

Watch Now.
*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

---

**From:** Samuel Silverman <ssilverman@skllc.com>
**Date:** Saturday, September 10, 2016 at 10:35 AM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Cc:** "Dave Fields (davidfi73@comcast.net)" <davidfi73@comcast.net>, "Glenn Meyer (glenn@gdmplan.com)" <glenn@gdmplan.com>
**Subject:** Philmont CC info

Peter,

I attached a bunch of information.

The real estate deal is with NVR, Inc. not Toll Brothers.  It will be easier to explain verbally as we are in the process of receiving an amendment to the APA that will better clarify the details.

The current GM has a list of potential capital projects with some detail but we will need to get a copy of that list from him and forward to you.

Please review and let me know if you have any questions and if you need additional information.

Samuel A. Silverman, CPA
Silverman Kendall, LLC
200 Gibraltar Road, Suite 115
Horsham, PA 19044
215.259.4100 x100
267.481.0032 (cell)
267.387.6284 (fax)
ssilverman@skllc.com
www.skllc.com

Disclaimer:

Any accounting, business or tax advice contained in this communication, including attachments and enclosures, is not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it sufficient to avoid tax-related penalties. If desired, Silverman Kendall LLC would be pleased to perform the requisite research and provide you with a detailed written analysis. Such an engagement may be the subject of a separate engagement letter that would define the scope and limits of the desired consultation services.


**From:** David Fields [mailto:davidfi73@comcast.net]
**Sent:** Tuesday, August 30, 2016 11:52 PM
**To:** Samuel Silverman
**Subject:** Fwd: Signed NDA; Info Request
  Sent from my iPad
  Begin forwarded message:

  **From:** peter nanula <pnanula@yahoo.com>
**Date:** August 30, 2016 at 4:50:43 PM EDT
**To:** "davidfi73@comcast.net" <davidfi73@comcast.net>
**Cc:** Peter Nanula <pnanula@concertcapital.com>
**Subject: Signed NDA; Info Request**
**Reply-To:** peter nanula <pnanula@yahoo.com>

David:

Good chatting with you today about Philmont CC.  I have read some of the articles about the Toll Brothers deal, and understand your predicament better.

Attached is a signed NDA, protecting our discussion today and any information you might share with me about the club.  To get us started, please send me the following:
1.  Detailed income statements for 2012-2015 with the 2016 budget.  It helps us to see the department-level detail, which is usually 10-15 pages, as opposed to a one-page summary.  It also helps for us to see this in Excel, so that we can work with it.

2.  A recent balance sheet.

3.  A membership summary, including the number of members in each category, the dues and other charges for each category, and the add and drops for the past few years.

4.  The membership bylaws and the application / agreement each member signs with the club.

5.  A payroll and wages summary.

6.  A listing of recent capital improvements made, and the **current list of potential capital projects (with estimated scope and costs, if any) that are being considered.**

     7.  A summary of your current real estate deal and the Toll deal.

This will get us started; I'm sure we will have some questions once we receive the information.

I will ask my COO, Susan Dunnavant, to call you and swing by PCC next Tuesday, September 6th while she is in town.  You can give her the tour, so that we are better prepared to make a proposal.

Peter

Peter J. Nanula
Concert Golf Partners
Office:      (949) 715-0602
Cell:        (415) 260-8806
Email: pnanula@concertcapital.com
   www.concertgolfpartners.com

# EXHIBIT 6

PETER NANULA

## Page 1

IN THE COURT OF COMMON PLEAS
MONTGOMERY COUNTY, PENNSYLVANIA
- - -

NORTH PENN TOWNS, LP,      : No  2017-04395
        Plaintiff   : (Lead Case)
        vs          :
CONCERT GOLF PARTNERS, LLC,  :
and PHILMONT COUNTRY CLUB,   :
        Defendants  :
--------------------------------
NORTH PENN TOWNS, LP,       : No  2018-00605
        Plaintiff   :
        vs          :
CONCERT PHILMONT PROPERTIES, :
LLC and CONCERT PHILMONT, LLC:
        Defendants  :
- - -
Thursday, November 1, 2018
- - -
        Videotaped deposition of PETER NANULA,
taken pursuant to notice, was held at the offices
of Kang Haggerty & Fetbroyt, LLC, 123 South Broad
Street, Suite 1670, Philadelphia, Pennsylvania
19109, beginning at 9:36 a m , on the above date,
before DEBRA ANNE GERSTEMEIER, Registered
Professional Reporter and Notary Public of the
Commonwealth of Pennsylvania

- - -

ELITE LITIGATION SOLUTIONS, LLC
One Penn Center
1617 JFK Boulevard, Suite 340
Philadelphia, Pennsylvania  19103
www elitelsllc com ~ (215) 563-3703

## Page 2

1
2   A P P E A R A N C E S :
3
4   KANG HAGGARTY & FETBROYT, LLC
      BY:  EDWARD KANG, ESQUIRE
5        DAVID R  SCOTT, ESQUIRE
      123 South Broad Street, Suite 1670
6     Philadelphia, Pennsylvania  19109
      Telephone:  (215) 525-5850
7     E-mail: ekang@KHFlaw com
         dscott@KHFlaw com
8     --Representing the Plaintiff
9
10  WEIR & PARTNERS, LLP
      BY:  WALTER WEIR, JR , ESQUIRE
11    The Widener Building, Suite 500
      1339 Chestnut Street
12    Philadelphia, Pennsylvania  19107
      Telephone: (215) 665-8181
13    E-mail:  wweir@weirpartners com
      --Representing Defendants Concert Golf,
14
15
16  GOLDBERG SEGALLA, LLP
      BY:  MICHAEL P  LUONGO, ESQUIRE
17    1700 Market Street, Suite 1418
      Philadelphia, Pennsylvania  19103
18    Telephone:  (267) 519-6801
      E-mail:  mluongo@goldbergsegalla com
19    --Representing Defendant Philmont Country Club
20
21  ALSO PRESENT:
22  Michael Tulio - Metropolitan/North Penn Towns
23  Scot Dantzer - Videographer
24

## Page 3

1
2            C O N T E N T S
             - - - - - - - - -
3
4   TESTIMONY OF:            PETER NANULA
5                     Page Number
6   By:  Mr  Kang            7
    By:  Mr  Luongo          357
7
8            E X H I B I T S
             - - - - - - - - - -
9
10  "NANULA" EXHIBIT NO         PAGE
11   1  Peter Nanula LinkedIn profile      14
       (No Bates)
12   2  Concert Golf web page re team      14
       (No Bates)
13   3  Concert Golf Production Missing Docs   43
       (No Bates)
14   4  Def Answer to Pltf Third Amended Complaint 60
       (No Bates)
15   5  Purchase & Sale Agreement 2/6/17      70
       (Bates No  CGP001798-1853)
16   6  Corporation Filing of Concert Philmont    84
       (No Bates)
17   7  Corporation Filing of Concert Phil Prop  84
       (No Bates)
18   8  Corporation Filing of FC Golf Partners II 87
       (No Bates)
19   9  Concert Philmont LLC Agreement      88
       (Bates No  CGP005121-5160)
20  10  Concert Philmont Properties LLC Agreement 94
       (Bates No  CGP005080-5098)
21  11  Unanimous Written Consent & Approval   98
       (Bates No  CGP002703-2704)
22  12  US SEC Form D re FC Golf Partners II    99
       (No Bates)
23  13  9/16/14 email chain re Philmont CC    110
       (Bates No  CGP001-2)
24  14  9/19/16 email chain re Philmont CC opp  119

## Page 4

1   EXHIBITS CONTINUED:
2   15  Lower Moreland Twp Contract for services  170
       (No Bates)
3   16  9/9/16 email chain re Philmont Cc info   177
       (Bates No  PCC-1044 to 1050)
4   17  US SEC Form D re FC Golf Partners II    213
       (No Bates)
5   18  Concert Golf web page re Investments   218
       (No Bates)
6   19  11/2/16 email chain re Philmont CC info  225
       (Bates No  PCC-1331 to 1341)
7   20  11/1/16 memorandum re proposed recapital 226
       (Bates No  PCC-1538 to 1539)
8   21  10/25/16 email chain re Meet at the Club  262
       (Bates No  CGP022-24)
9   22  2/8/17 email chain re Philmont CC/NPT   266
       (Bates No  PCC-7418 to 7420)
10  23  9/9/16 email chain re Philmont      290
       (No Bates)
11  24  10/19/17 HRMM&L letter re Philmont CC   290
       (No Bates)
12  25  Van Cleef sketch plan re PCC       295
       (No Bates)
13  26  Bohler Engineering CU site plan re PCC   295
       (No Bates)
14  27  4/9/18 ClubCorp letter re Portfolio Sale  309
       (Bates No  CGP006643-6653
15  28  10/19/18 email chain re PCC resig letter  330
       (No Bates)
16
17
18
19
20
21
22
23
24

ELITE LITIGATION SOLUTIONS, LLC

PETER NANULA

Page 213

1             - - -
2             (Whereupon, US SEC Form D re
3       PC Golf Partners II LP was marked as
4       Nanula Exhibit No. 17 for
5       identification.)
6             - - -
7    BY MR. KANG:
8       Q.   Nanula-17 is a Form D Notice of
9    Exempt Offering of Securities filed by the
10   issuer, FC Golf Partners II LP.  We saw the
11   initial version earlier.  This is a revised
12   version or the amended version.  You can see
13   that on Page 4 under paragraph 7, it says
14   type of filing.  Instead of new notice, it
15   says this is an amendment.
16          Do you see that?
17      A.   Yes.
18      Q.   On Page 5, paragraph 13, it talks
19   about the total amount sold, $81 million.
20          And this is what you meant earlier by
21   the dollar amount investment has increased
22   substantially, right?
23      A.   Correct.
24      Q.   And paragraph 14, number of investors

Page 214

1    is 160?
2       A.   Correct.
3       Q.   So the average amount of investment
4    is about half-million dollars?
5       A.   I guess so, yes.
6       Q.   Was there one round of -- well, how
7    many rounds of securities were offered in
8    2015?
9       A.   I believe this all closed in two
10   separate closings.  I could be wrong, but I
11   think there was just two closings.
12      Q.   And how many different private
13   placement memorandum were prepared?
14      A.   I think just the one.
15      Q.   How often do you give updates to the
16   investors about their investment status or
17   any updates?
18      A.   There is a quarterly update.  There
19   is an annual letter that is more fulsome.
20      Q.   So, quarterly and annual update?
21      A.   Yes.
22      Q.   And in the updates that you provide
23   to the investors, those updates, do they
24   contain the operations of each club?

Page 215

1       A.   There's not a lot of detail, no.
2       Q.   Does it contain lawsuits filed
3    against Concert Golf Partners or any of the
4    Concert Golf entities?
5       A.   The quarterly update to the investors
6    I don't believe gets into that level of
7    detail.
8       Q.   Annual update?
9       A.   I don't believe so, no.
10      Q.   Why do you think that updates or
11   information relating to lawsuit is not
12   included in the annual updates or annual
13   reports?
14      A.   It's a fairly short document that I'm
15   remembering, because I'm the one that has to
16   review it, revise it, draft it, and it's
17   a -- there might be some mention of some
18   litigation in there, but I just don't
19   recall.
20      Q.   Let's go back to Exhibit 16.  And now
21   we're back to the preliminary proposal.
22          In September 2016, whether it's
23   September 20, 21, whenever it was, did you
24   convey to Mr. Meyer about the material terms

Page 216

1    of the financial commitment that Concert
2    Golf was willing to make?
3       A.   I believe I did.
4       Q.   And what were those terms?
5       A.   Roughly speaking, without looking at
6    notes or a document:  We would pay off all
7    the Club's current debt, which I think was
8    on the order of a million dollars; we would
9    commit to funding and completing a series of
10   capital projects that the board wanted to
11   get done that was on the order of $4
12   million; we would fund, thirdly, the
13   necessary working capital amounts to get
14   their bills paid.  In other words, this was
15   a club in arrears with many of their vendors
16   and may be unable to pay their own lawyers,
17   so we'll pick up the tab.
18          So I think those were three principle
19   components of the upfront financial
20   commitment.  And then the last piece of the
21   transaction was if and when we can get the
22   excess land parcel entitled and sold, we
23   will take $5 million of the proceeds from
24   that and put it back into the club.

54 (Pages 213 to 216)

Page 217

1 So in total, the way the members
2 viewed it, they were basically getting about
3 a $10 million transaction here, but we were
4 the ones fixing their club immediately and
5 we were the ones taking the risk on the
6 whole real estate development, not them.
7 Q. You took on the financial risk,
8 that's what you're saying?
9 A. Correct.
10 Q. What was Mr. Meyer's reaction when
11 you gave him this proposal over the phone?
12 A. I mean, I can't remember specifically
13 the very first conversation, but I think it
14 was positive enough that he brought it to
15 the rest of his board and we, you know,
16 moved toward a deal over the next several
17 months.
18 Q. You know that your website, it talks
19 about how you close within a few weeks or so
20 and that you're all cash buyer.
21 Do you know what I'm talking about?
22 A. Very much so.
23 Q. Those statements, I think we marked a
24 few of them already. Are they all accurate?

Page 218

1 A. Yes.
2 Q. Let's mark one.
3 - - -
4 (Whereupon, Concert Golf
5 Partners Investments web page
6 section was marked as Nanula Exhibit
7 No. 18 for identification.)
8 - - -
9 BY MR. KANG:
10 Q. And Nanula-18, this is a page from
11 your website
12 concertgolfpartners.com/investments.
13 Is this -- can you, can you identify
14 that this is an accurate page from your
15 website?
16 A. Yes.
17 Q. And here it talks about how -- on the
18 part in the middle where it says "Deal
19 Process," in the third paragraph or fourth
20 paragraph where it begins, "We will submit
21 an all-cash investment proposal within a
22 week or quick 'no' if your investment
23 situation doesn't fit our parameters."
24 Did I read that correctly?

Page 219

1 A. Yes.
2 Q. That's one of the representations
3 that you make to people, the general public
4 who visit your website, right?
5 A. Yes.
6 Q. And then, "We only require 30 days
7 for due diligence and 5 days to close,"
8 right?
9 A. Yes.
10 Q. So inconsistent with your general
11 representation you make on your website, did
12 you make that all-cash investment proposal
13 within a week?
14 A. Well, the description on the website
15 refers to when a club has a specific request
16 and is ready to transact with us. If you
17 say to me today, November 1st, "Our board is
18 ready to transact with you. We would like
19 to see a proposal within a week," we can
20 have it.
21 Q. Then you make a proposal.
22 A. We can absolutely do that, yeah.
23 Oftentimes the club is not in a position.
24 Their board hasn't met, they haven't had a

Page 220

1 town hall meeting with their members, and
2 they're not in a position to transact that
3 quickly. But we can, is the point of the
4 website page.
5 Q. So, let's go back to your
6 conversations that you had with Mr. Meyer on
7 the phone after you sent that email on
8 September 19, 2016.
9 The terms that you mentioned,
10 material terms you mentioned - I'm talking
11 about financial component - is a debt
12 assumption of about a million dollars?
13 A. No. Debt payoff of a million
14 dollars.
15 Q. Debt payoff of about a million
16 dollars.
17 And about $4 million of capital
18 injection, and about a -- well, I don't
19 think you --
20 A. Undetermined amount of working
21 capital.
22 Q. Undetermined amount of funding
23 operating capital.
24 And second-phase funding of about

55 (Pages 217 to 220)

PETER NANULA

Page 361

```
 1
 2                CERTIFICATE
 3
 4
 5         I HEREBY CERTIFY that the
           witness was duly sworn by me and that the
           deposition is a true record of the testimony
 6         given by the witness.
 7              It was requested before
           completion of the deposition that the
 8         witness, PETER NANULA, have the opportunity
           to read and sign the deposition transcript.
 9
10
11         Debra Anne Gerstemeier,
           Registered Professional Reporter,
12         Notary Public
           Dated:  November 1, 2018
13
14
15
16
17         (The foregoing certification
18     of this transcript does not apply to any
19     reproduction of the same by any means,
20     unless under the direct control and/or
21     supervision of the certifying reporter.)
22
23
24
```

Page 363

```
 1          - - - - - -
            E R R A T A
 2          - - - - - -
 3     PAGE  LINE  CHANGE
 4     ____  ____  _____
 5     ____  ____  _____
 6     ____  ____  _____
 7     ____  ____  _____
 8     ____  ____  _____
 9     ____  ____  _____
10     ____  ____  _____
11     ____  ____  _____
12     ____  ____  _____
13     ____  ____  _____
14     ____  ____  _____
15     ____  ____  _____
16     ____  ____  _____
17     ____  ____  _____
18     ____  ____  _____
19     ____  ____  _____
20     ____  ____  _____
21     ____  ____  _____
22     ____  ____  _____
23     ____  ____  _____
24     ____  ____  _____
```

Page 362

```
 1         INSTRUCTIONS TO WITNESS
 2
 3              Please read your deposition
 4     over carefully and make any necessary
 5     corrections.  You should state the reason in
 6     the appropriate space on the errata sheet
 7     for any corrections that are made.
 8              After doing so, please sign
 9     the errata sheet and date it.
10              You are signing same subject
11     to the changes you have noted on the errata
12     sheet, which will be attached to your
13     deposition.
14              It is imperative that you
15     return the original errata sheet to the
16     deposing attorney within thirty (30) days of
17     receipt of the deposition transcript by you.
18     If you fail to do so, the deposition
19     transcript may be deemed to be accurate and
20     may be used in court.
21
22
23
24
```

Page 364

```
 1         ACKNOWLEDGMENT OF DEPONENT
 2
 3          I,_____, do
 4     hereby certify that I have read the
 5     foregoing pages,  1 - 360, and that the same
 6     is a correct transcription of the answers
 7     given by me to the questions therein
 8     propounded, except for the corrections or
 9     changes in form or substance, if any, noted
10     in the attached Errata Sheet.
11
12
13     _____
14     PETER NANULA            DATE
15
16
17
18     Subscribed and sworn
       to before me this
19     _____ day of _____, 20_____.
20     My commission expires:_____
21
22     _____
23     Notary Public
24
```

# EXHIBIT 7

**From:** Peter Nanula <pnanula@concertcapital.com>
**Sent:** Tuesday, September 20, 2016 3:24 PM
**To:** Thomas Moran
**Subject:** Re: Philmont CC info

Plenty for now.  This deal will be long and slow.

They are under contract with our pals at NVR homes to sell off 9 of their 36 holes for $12.2m.  Not sure how they would sell the club to us, and let us have the real estate upside.  Trying for that.  Enough work on the pro forma for now.

-------------------

Peter Nanula

Concert Golf Partners

Tel:  949.715.0602

Cell:  415.260.8806

www.concertgolfpartners.com

Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

**From:** Thomas Moran <tmoran49@gmail.com>
**Date:** Tuesday, September 20, 2016 at 4:20 PM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Subject:** RE: Philmont CC info

Correct.  Open issues:

Confirm what PS Merch revenue really is.  I just guessed conservatively $150K.
Hire a Membership Director?  $0 in there now
Determine how you want to do service charges in F&B.  Club recently went away from mandatory charges that the club kept to employees truly working for their tips now.
A couple of Admin expense line items we didn't get good answers for

1

2CGP012895

Tom

*Please note my new office number:*
*480-656-4757*

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Tuesday, September 20, 2016 12:15 PM
**To:** Thomas Moran
**Subject:** Re: Philmont CC info

So, the Club makes $457k on $4.95m revenues as of today, right?

-------------------

Peter Nanula

Concert Golf Partners

Tel:   949.715.0602

Cell:  415.260.8806

www.concertgolfpartners.com

Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

**From:** Thomas Moran <tmoran49@gmail.com>
**Date:** Tuesday, September 20, 2016 at 3:52 PM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Subject:** RE: Philmont CC info

Updated to show that one change.

*Please note my new office number:*
*480-656-4757*

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Monday, September 19, 2016 11:53 AM
**To:** Thomas Moran
**Subject:** FW: Philmont CC info

Fyi

**2CGP012896**

Also, the Clubhouse Assessment was a one-time item.  Delete that.

The Capital Assessment is ongoing, and people expect it to be part of their dues bill.  Keep that.

--------------------

Peter Nanula

Concert Golf Partners

Tel:  949.715.0602

Cell:  415.260.8806

www.concertgolfpartners.com


Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*


**From:** Samuel Silverman <ssilverman@skllc.com>
**Date:** Monday, September 19, 2016 at 3:39 PM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Cc:** "Dave Fields (davidfi73@comcast.net)" <davidfi73@comcast.net>, Glenn Meyer <glenn@gdmplan.com>
**Subject:** RE: Philmont CC info

Peter,

Sorry...the deferred revenue is mostly related to the dues billing for the next month. For example, the Club bills its members for August dues on July 31st.

In addition, deferred revenue includes some other charges that are billed in one month but are amortized over the year such as locker fee and bag storage, as well as tennis indoor contract revenue that is paid up front.

Glenn will address the real estate question.

Looking forward to connecting in October.


Samuel A. Silverman, CPA
Silverman Kendall, LLC
200 Gibraltar Road, Suite 115
Horsham, PA 19044
215.259.4100 x100

3

2CGP012897

267.481.0032 (cell)
267.387.6284 (fax)
ssilverman@skllc.com
www.skllc.com

**Disclaimer:**

Any accounting, business or tax advice contained in this communication, including attachments and enclosures, is not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it sufficient to avoid tax-related penalties. If desired, Silverman Kendall LLC would be pleased to perform the requisite research and provide you with a detailed written analysis. Such an engagement may be the subject of a separate engagement letter that would define the scope and limits of the desired consultation services.

---

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Monday, September 19, 2016 2:01 PM
**To:** Samuel Silverman
**Cc:** Dave Fields (davidfi73@comcast.net); Glenn Meyer (glenn@gdmplan.com)
**Subject:** Re: Philmont CC info

Good stuff here, Sam.

1. On #12 below, can you tell me what's in the $255K in Deferred Revenue?

2. Can you guys share with me any and all details on the pending NVR deal for the South Course acreage?

I will work on a preliminary proposal to share this week, and we can get on the phone to discuss it.  I will be in the Philly area in mid-October for another club Board meeting, so we can have a tour and face-to-face meeting then.

Peter

--------------------

Peter Nanula

Concert Golf Partners

Tel:  949.715.0602

Cell:  415.260.8806

www.concertgolfpartners.com

Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

4

**From:** Samuel Silverman <ssilverman@skllc.com>
**Date:** Monday, September 12, 2016 at 8:09 PM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Cc:** "Dave Fields (davidfi73@comcast.net)" <davidfi73@comcast.net>, "Glenn Meyer (glenn@gdmplan.com)" <glenn@gdmplan.com>
**Subject:** RE: Philmont CC info

Peter,

Some answers below and the questions I cannot answer will require some digging with the staff at the Club so I want to avoid that for now.

Glenn – please chime in if you have any thoughts.

Samuel A. Silverman, CPA
Silverman Kendall, LLC
200 Gibraltar Road, Suite 115
Horsham, PA 19044
215.259.4100 x100
267.481.0032 (cell)
267.387.6284 (fax)
ssilverman@skllc.com
www.skllc.com

**Disclaimer:**

Any accounting, business or tax advice contained in this communication, including attachments and enclosures, is not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it sufficient to avoid tax-related penalties. If desired, Silverman Kendall LLC would be pleased to perform the requisite research and provide you with a detailed written analysis. Such an engagement may be the subject of a separate engagement letter that would define the scope and limits of the desired consultation services.

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Monday, September 12, 2016 4:55 PM
**To:** Samuel Silverman
**Cc:** Dave Fields (davidfi73@comcast.net); Glenn Meyer (glenn@gdmplan.com)
**Subject:** Re: Philmont CC info

Samuel:

Thanks for all of this information.  Very helpful.  A few follow-up questions for you:


1)   In Tennis, what is Indoor Contract revenue?

We have three indoor courts and members and non-members buy contract times during the winter.

2)   In F&B, how are service charges collected and how much goes to the employees?

Prior to this year we had a 20% service charge that the Club kept.  The Club paid all servers an hourly wage between maybe $12 - $17 per hour.  As of 5/1/16 we changed our policy to have no service charge and full tipping with the servers keeping the tip like any other restaurant.  We reduced the server hourly rate to about $6 per hour.  For banquets

5

and certain member events, there is no tipping and the 20% service charge for the Club is still in force with the servers earning the higher hourly wage.

3) Please confirm the Pro owns the Golf Pro Shop merchandise. What was the revenue in the last 12 months? What is his/her deal?

Yes the Pro owns the shop and I do not have the revenue for the last 12 months readily available.

4) Do you currently have a Membership Director?

No – our GM has performed this function.

5) Is any of your turf equipment leased? What is the annual payment?

No operating leases on the equipment. The capital leases/notes are disclosed in the financials.

6) In Building Maint, is the $89K water bill just for the clubhouse?

The water bill is for clubhouse, pool, and parts of the golf course. The water was only $41K for Y/E 4/30/16 and 4/30/15 and the sewer was $54K for 4/30/16 and $45K for 4/30/15.

7) What is your water source for the golf course? Cost and term of your water contract?

I do not have this information

8) In Admin Expenses, what is $31K in bad debt? Why was it all incurred in April? What is in the $27K of Misc. Expense?

I am looking at the internally generated financials (not Brown Golf financials). We increased bad debt reserve as of 4/30/16. I do not see the Misc. Expense – in the internal p&L, the misc expense in Admin includes the $31K of bad debt expense.

9) What is the property currently assessed at for Real Estate taxes?

I will copy the bill for you the next time I am at the Club.

10) Your cart lease looks a bit low. How many carts do you lease? How old are they?

Lease started May 2015 at $5,904 per month for May-Oct and $0 between Nov-Apr. = total payments of $5,904 x 6 mos. per year x 5 years = $177,120. We have 62 electric carts and 8 gas carts and we also received a six passenger cart in the deal. All 2015 models. The lease looks low because we traded in 80 gas carts that we owned and received a $88,925 reduction in the total lease.

11) How do the Preview memberships work? When does a Preview member have to convert to a regular member? Can we get a schedule of when those mature?

The preview is just a one year deal for someone to get the feel of the Club. The previews are only on the Flex membership and this past year we sold the preview memberships at 50% of the Flex membership for the appropriate age bracket. The Flex membership is our new social membership but we included golf on our South course as part of the membership. There is no commitment from the preview member after the one year.

We started the preview membership in the 2015-16 year but it was only for social members under the age of 46 and it did not include the South course golf. We had 37 preview members and 27 converted into members the following

6

2CGP012900

year. This year (2016-17) there is certainly a different makeup of the preview members and I would be surprised if we had the same retention results.

We can talk in more detail regarding membership at some time.

12) On the balance sheet, how far out does the $307K in Prepaid Dues go? What is $221K in Restricted Funds? What's in the $255K in Deferred Revenue?

Prepaid dues: Members pay dues prior to 5/1/16 for the upcoming year and receive a 2% discount. The prepaid dues are amortized throughout the year.

Restricted funds: not really restricted as all the money is in one bank account at the Club. This is golf, tennis, bridge and other activity fees that are exclusively used for the golf, tennis and bridge member programs. Members pay the fee and the expenses are then taken out of the "fund".

13) How do the Membership Incentives work and when do they run out?

We had a membership push a few years back bringing in new members at an amount that was lower than the existing members and the existing member that would bring the new member in would receive an annual credit equal to a portion of the dues differential. The credit stays with the member as long as the new member stays at the club. We are thinking of revising this anyway and the membership incentive credit would go away.

Thanks much. After we get these answers, let's get on a conference call to discuss the real estate deal and I can walk through how our member-owned club recapitalizations usually work.

OK sounds good.

Peter

-------------------

Peter Nanula

Concert Golf Partners

Tel: 949.715.0602

Cell: 415.260.8806

www.concertgolfpartners.com

Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

7

2CGP012901

**From:** Samuel Silverman <ssilverman@skllc.com>
**Date:** Saturday, September 10, 2016 at 10:35 AM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Cc:** "Dave Fields (davidfi73@comcast.net)" <davidfi73@comcast.net>, "Glenn Meyer (glenn@gdmplan.com)" <glenn@gdmplan.com>
**Subject:** Philmont CC info

Peter,

I attached a bunch of information.

The real estate deal is with NVR, Inc. not Toll Brothers.  It will be easier to explain verbally as we are in the process of receiving an amendment to the APA that will better clarify the details.

The current GM has a list of potential capital projects with some detail but we will need to get a copy of that list from him and forward to you.

Please review and let me know if you have any questions and if you need additional information.

Samuel A. Silverman, CPA
Silverman Kendall, LLC
200 Gibraltar Road, Suite 115
Horsham, PA 19044
215.259.4100 x100
267.481.0032 (cell)
267.387.6284 (fax)
ssilverman@skllc.com
www.skllc.com

**Disclaimer:**

Any accounting, business or tax advice contained in this communication, including attachments and enclosures, is not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it sufficient to avoid tax-related penalties. If desired, Silverman Kendall LLC would be pleased to perform the requisite research and provide you with a detailed written analysis. Such an engagement may be the subject of a separate engagement letter that would define the scope and limits of the desired consultation services.


**From:** David Fields [mailto:davidfi73@comcast.net]
**Sent:** Tuesday, August 30, 2016 11:52 PM
**To:** Samuel Silverman
**Subject:** Fwd: Signed NDA; Info Request

Sent from my iPad

Begin forwarded message:

**From:** peter nanula <pnanula@yahoo.com>
**Date:** August 30, 2016 at 4:50:43 PM EDT
**To:** "davidfi73@comcast.net" <davidfi73@comcast.net>
**Cc:** Peter Nanula <pnanula@concertcapital.com>
**Subject: Signed NDA; Info Request**
**Reply-To:** peter nanula <pnanula@yahoo.com>

8

David:

Good chatting with you today about Philmont CC. I have read some of the articles about the Toll Brothers deal, and understand your predicament better.

Attached is a signed NDA, protecting our discussion today and any information you might share with me about the club. To get us started, please send me the following:

1. Detailed income statements for 2012-2015 with the 2016 budget. It helps us to see the department-level detail, which is usually 10-15 pages, as opposed to a one-page summary. It also helps for us to see this in Excel, so that we can work with it.

2. A recent balance sheet.

3. A membership summary, including the number of members in each category, the dues and other charges for each category, and the add and drops for the past few years.

4. The membership bylaws and the application / agreement each member signs with the club.

5. A payroll and wages summary.

6. A listing of recent capital improvements made, and the **current list of potential capital projects (with estimated scope and costs, if any) that are being considered.**

  7. A summary of your current real estate deal and the Toll deal.

This will get us started; I'm sure we will have some questions once we receive the information.

I will ask my COO, Susan Dunnavant, to call you and swing by PCC next Tuesday, September 6th while she is in town. You can give her the tour, so that we are better prepared to make a proposal.

Peter

Peter J. Nanula
Concert Golf Partners
Office:    (949) 715-0602
Cell:      (415) 260-8806
Email: pnanula@concertcapital.com
www.concertgolfpartners.com

2CGP012903

# EXHIBIT 8

| | |
|---|---|
| **From:** | John Brown |
| **To:** | Michael Plotnick |
| **Subject:** | RE: Presentation & Intro |
| **Date:** | Friday, September 23, 2016 11:58:00 AM |
| **Attachments:** | image001.jpg |
| | image002.jpg |
| | image003.jpg |
| | image004.jpg |
| | image005.jpg |
| | image006.jpg |
| | image007.jpg |
| | image008.jpg |
| | image009.jpg |
| | image010.jpg |

glenn@gdmplan.com  This is Glenn's email....email him and he will call you back.........  Marvin Waters Little River G and CC  910-315-2918

John Brown | Chief Executive Officer
C:  843.540.2353
E:  Jbrown@browngolf.net
W:  www.BrownGolfManagement.com



**From:** Michael Plotnick [mailto:mplotnick@ridgewoodrep.com]
**Sent:** Thursday, September 22, 2016 11:53 AM
**To:** John Brown
**Subject:** RE: Presentation & Intro

Great, just sent.

**From:** John Brown [mailto:jbrown@browngolf.net]
**Sent:** Thursday, September 22, 2016 11:35 AM
**To:** Michael Plotnick
**Subject:** Re: Presentation & Intro

Dial in would be perfect.

Sent from my iPhone

On Sep 22, 2016, at 11:13 AM, Michael Plotnick <mplotnick@ridgewoodrep.com> wrote:

11am?  Do you want me to call you in the office or I can send around a dial-in number?

**From:** John Brown [mailto:jbrown@browngolf.net]
**Sent:** Thursday, September 22, 2016 11:12 AM
**To:** Michael Plotnick
**Cc:** Todd Brown
**Subject:** Re: Presentation & Intro

Yes, you pick the time. I spoke with Glenn Meyer recently. They are interested to discuss. I also chatted with him about selling the entire Club. John

Sent from my iPhone

On Sep 22, 2016, at 11:09 AM, Michael Plotnick <mplotnick@ridgewoodrep.com> wrote:

> John - Are you free for a call tomorrow at some point to discuss your Pinehurst opportunity as well as Philmont?
>
> Mike
>
> ---
>
> **From:** Michael Plotnick
> **Sent:** Monday, September 19, 2016 12:34 PM
> **To:** 'John Brown'
> **Cc:** 'tbrown@browngolf.net'
> **Subject:** RE: Presentation & Intro
>
> John/Todd - It was a pleasure meeting you both at the conference last week.  Would love to discuss both your Pinehurst opportunity as well as Philmont when you have some time.  Let me know some times that work for you, and we can put a call on the calendar.
>
> Thanks,
>
> Mike
>
>
> **Michael Plotnick**
> Vice President
> Ridgewood Real Estate Partners, LLC
> 25A Hanover Road
> Suite 310
> Florham Park, NJ 07932
>
> (p) 973.593.0003 x213
> (c) 617.835.2431
> (f) 973.593.0077
> mplotnick@ridgewoodrep.com
>
>
> ---
>
> **From:** John Brown [mailto:jbrown@browngolf.net]
> **Sent:** Monday, September 19, 2016 12:00 PM
> **To:** VTengberg@foley.com
> **Cc:** Michael Plotnick
> **Subject:** Re: Presentation & Intro

Real enjoyed working with you both ! John

Sent from my iPhone

On Sep 12, 2016, at 4:28 PM, "VTengberg@foley.com"
<VTengberg@foley.com> wrote:

> Sounds good. Thanks
>
>
> **Van A. Tengberg, Esq.**
> Foley & Lardner LLP
> 3579 Valley Centre Drive, Ste. 300
> San Diego, CA 92130
> Phone: (858) 847-6700 (Main)
> Phone: (858) 847-6758 (Direct)
> Phone: (858) 414-5020 (Cell)
> Fax: (858) 792-6773
> email: vtengberg@foley.com
>
> ---
> **From:** John Brown [mailto:jbrown@browngolf.net]
> **Sent:** Monday, September 12, 2016 1:27 PM
> **To:** Tengberg, Van A.
> **Cc:** Michael Plotnick
> **Subject:** Re: Presentation & Intro
>
> Van, I will send you a short Bio tomorrow. John
>
> Sent from my iPhone
>
> On Sep 12, 2016, at 4:24 PM, "VTengberg@foley.com"
> <VTengberg@foley.com> wrote:
>
>> Got it. Thanks
>>
>>
>> **Van A. Tengberg, Esq.**
>> Foley & Lardner LLP
>> 3579 Valley Centre Drive, Ste. 300
>> San Diego, CA 92130
>> Phone: (858) 847-6700 (Main)
>> Phone: (858) 847-6758 (Direct)
>> Phone: (858) 414-5020 (Cell)
>> Fax: (858) 792-6773
>> email: vtengberg@foley.com
>>
>> ---
>> **From:** Michael Plotnick
>> [mailto:mplotnick@ridgewoodrep.com]
>> **Sent:** Monday, September 12, 2016 12:14 PM
>> **To:** Tengberg, Van A.

**Cc:** jbrown@browngolf.net
**Subject:** Presentation & Intro

Van - Attached, please find the final version of my presentation for the panel. I have also, per your request, attached below a short bio on myself for my introduction. I hope this was what you had in mind, but please let me know if you would like anything additional.

Thanks,

Mike

**Michael Plotnick BIO**

Mike Plotnick is the Vice President in charge of Acquisitions and Asset Management at Ridgewood Real Estate Partners, a national real estate developer, investor, and advisor who has developed and sold residential and mixed-use projects throughout the United States. Since the inception of Ridgewood Real Estate Partners in 2008, Mike has been integrally involved the development of more than 8,500 lots with projected lot sales exceeding $300 million. After recognizing an opportunity in golf course redevelopment, Mike has played a large part in the acquisition of 3 golf courses to date, all of which are slated for redevelopment.

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message,

and may not be relied upon by any other party.

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

# EXHIBIT 9

**From:** Glenn Meyer
**To:** Michael Plotnick
**Subject:** RE: Philmont CC
**Date:** Friday, September 23, 2016 6:22:58 PM
**Attachments:** image002.png
image003.png

Yes.  At Philmont?

Best regards.



Glenn Meyer, CPA/PFS, CFP®, AIF®, ChFC, CLU

GDM Advisory Group, Ltd.

123 Old York Road, Suite 200

Jenkintown, PA  19046

215-886-5800

215-886-6575 FAX

www.gdmplan.com



The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.  Please also be advised that all e-mail sent to or from this address may be received or otherwise recorded by the firm's e-mail system and is subject to archival and review by someone other than the recipient.

Please remember to contact GDM Advisory Group, Ltd. if there are any changes in your personal/financial situation or investment objectives for the purpose of reviewing/evaluation/revising our previous recommendations and/or services, or if you want to impose, add, or modify any reasonable restrictions to our investment advisory services.  A copy of our current written disclosure statement discussing our advisory services and fees continues to remain available for your review upon request.

**From:** Michael Plotnick [mailto:mplotnick@ridgewoodrep.com]
**Sent:** Friday, September 23, 2016 6:21 PM
**To:** Glenn Meyer <glenn@gdmplan.com>
**Subject:** Re: Philmont CC

No problem, does 10:30 or 11 Tuesday morning work for you!

Sent from my iPhone

On Sep 23, 2016, at 6:12 PM, Glenn Meyer <glenn@gdmplan.com> wrote:

Unfortunately not.  I have to be in Scranton from 7AM-7PM.

Best regards.

<image003.png>

Glenn Meyer, CPA/PFS, CFP®, AIF®, ChFC, CLU
GDM Advisory Group, Ltd.
123 Old York Road, Suite 200
Jenkintown, PA  19046
215-886-5800
215-886-6575 FAX
www.gdmplan.com

<image004.png>

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.  Please also be advised that all e-mail sent to or from this address may be received or otherwise recorded by the firm's e-mail system and is subject to archival and review by someone other than the recipient.

Please remember to contact GDM Advisory Group, Ltd. if there are any changes in your personal/financial situation or investment objectives for the purpose of reviewing/evaluation/revising our previous recommendations and/or services, or if you want to impose, add, or modify any reasonable restrictions to our investment advisory services.  A copy of our current written disclosure statement discussing our advisory services and fees continues to remain available for your review upon request.

---

**From:** Michael Plotnick [mailto:mplotnick@ridgewoodrep.com]
**Sent:** Friday, September 23, 2016 6:08 PM
**To:** Glenn Meyer <glenn@gdmplan.com>
**Subject:** Re: Philmont CC

Any chance you can do Monday afternoon around 3:30? We have a planning board meeting in Edgmont Monday night, so we will be in Pennsylvania anyways?  If not, we can make Tuesday work.

Sent from my iPhone

On Sep 23, 2016, at 4:25 PM, Glenn Meyer <glenn@gdmplan.com> wrote:

> 5?
>
> Best regards.
>
> Glenn Meyer, CPA/PFS, CFP, AIF, ChFC, CLU

GDM Advisory Group, Ltd.

123 Old York Road, Suite 200

Jenkintown, PA. 19046

215-886-5800

Sent from my iPhone

On Sep 23, 2016, at 3:53 PM, Michael Plotnick
<mplotnick@ridgewoodrep.com> wrote:

> Absolutely, what time were you thinking?  I am free for the
> rest of the afternoon.

> **From:** Glenn Meyer [mailto:glenn@gdmplan.com]
> **Sent:** Friday, September 23, 2016 3:53 PM
> **To:** Michael Plotnick
> **Subject:** Re: Philmont CC
>
> Any chance you can speak later today?
>
> Best regards.
>
> Glenn Meyer, CPA/PFS, CFP, AIF, ChFC, CLU
> GDM Advisory Group, Ltd.
> 123 Old York Road, Suite 200
> Jenkintown, PA. 19046
> 215-886-5800
> Sent from my iPhone
>
> On Sep 23, 2016, at 2:00 PM, Michael Plotnick
> <mplotnick@ridgewoodrep.com> wrote:
>
>> Glenn - I am not sure if you remember, but you
>> and I had spoken about a year ago regarding
>> Philmont CC.  I am the Vice President of
>> Acquisitions for Ridgewood Real Estate
>> Partners, a national real estate
>> developer/investor who has developed
>> residential and mixed-use projects throughout
>> the country.   We have purchased 3 golf
>> courses to date, including most recently
>> Edgmont Country Club, in Edgmont,
>> Pennsylvania.
>>
>> After speaking on a panel together, John Brown
>> suggested I reach out to you again to discuss a
>> potential relationship at Philmont.  We are

currently working on a number of deals that
include upgrading an existing club to create
Championship caliber golf, to supplement a
quality residential development.  In my opinion,
our ability to handle both the upgrading of the
golf and the development side of things would
make us a great fit to work together at
Philmont.  We also have the ability to structure
a deal in a  number of creative ways to best
address the needs of the Club.

I would love to set up a call or a meeting to
further discuss.  Please let me know what
works for you.

Regards,

Mike

**Michael Plotnick**
Vice President
Ridgewood Real Estate Partners, LLC
25A Hanover Road
Suite 310
Florham Park, NJ 07932

(p) 973.593.0003 x213
(c) 617.835.2431
(f) 973.593.0077
mplotnick@ridgewoodrep.com

# EXHIBIT 10

**To:**      Glenn Meyer[glenn@gdmplan.com]
**From:**    Samuel Silverman
**Sent:**    Thur 9/22/2016 12:58:31 PM
**Subject:** RE: Financial Statements

Me too but Mitch's concerns regarding an NVR lawsuit with Metropolitan and/or us is real in my mind and that alone might delay this whole process.  Jim Garrity needs to figure this part out for us and guide us at your meeting.

Samuel A. Silverman, CPA
Silverman Kendall, LLC
200 Gibraltar Road, Suite 115
Horsham, PA 19044
215.259.4100 x100
267.481.0032 (cell)
267.387.6284 (fax)
ssilverman@skllc.com
www.skllc.com

Disclaimer:

Any accounting, business or tax advice contained in this communication, including attachments and enclosures, is not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it sufficient to avoid tax-related penalties. If desired, Silverman Kendall LLC would be pleased to perform the requisite research and provide you with a detailed written analysis. Such an engagement may be the subject of a separate engagement letter that would define the scope and limits of the desired consultation services.

---

**From:** Glenn Meyer [mailto:glenn@gdmplan.com]
**Sent:** Thursday, September 22, 2016 8:54 AM
**To:** Samuel Silverman
**Subject:** RE: Financial Statements

Agreed.  I'm ready to commit to Metro once our deal expires Monday.

Best regards.



Glenn Meyer, CPA/PFS, CFP®, AIF®, ChFC, CLU
GDM Advisory Group, Ltd.
123 Old York Road, Suite 200
Jenkintown, PA  19046
215-886-5800
215-886-6575 FAX
www.gdmplan.com



The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.  Please also be advised that all e-mail sent to or from this address may be received or otherwise recorded by the firm's e-mail system and is subject to archival and review by someone other than the recipient.

Please remember to contact GDM Advisory Group, Ltd. if there are any changes in your personal/financial situation or investment objectives for the purpose of reviewing/evaluation/revising our previous recommendations and/or services, or if you want to impose, add, or modify any reasonable restrictions to our investment advisory services.  A copy of our current written disclosure statement discussing our advisory services and fees continues to remain available for your review upon request.

**From:** Samuel Silverman [mailto:ssilverman@skllc.com]
**Sent:** Thursday, September 22, 2016 8:53 AM
**To:** Glenn Meyer <glenn@gdmplan.com>
**Subject:** RE: Financial Statements

I looked on NVR's website and throughout their audited financial statement it states they do not engage in land development.

The problem with staying with NVR for us is time.  It seems like they will take considerable time to engage another land developer if Metropolitan is out.

Samuel A. Silverman, CPA
Silverman Kendall, LLC
200 Gibraltar Road, Suite 115
Horsham, PA 19044
215.259.4100 x100
267.481.0032 (cell)
267.387.6284 (fax)
ssilverman@skllc.com
www.skllc.com

**Disclaimer:**

Any accounting, business or tax advice contained in this communication, including attachments and enclosures, is not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it sufficient to avoid tax-related penalties. If desired, Silverman Kendall LLC would be pleased to perform the requisite research and provide you with a detailed written analysis. Such an engagement may be the subject of a separate engagement letter that would define the scope and limits of the desired consultation services.

**From:** Glenn Meyer [mailto:glenn@gdmplan.com]
**Sent:** Thursday, September 22, 2016 8:34 AM
**To:** Samuel Silverman
**Subject:** FW: Financial Statements

FYI

Best regards.



Glenn Meyer, CPA/PFS, CFP®, AIF®, ChFC, CLU
GDM Advisory Group, Ltd.
123 Old York Road, Suite 200
Jenkintown, PA  19046
215-886-5800
215-886-6575 FAX
www.gdmplan.com



The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.  Please also be advised that all e-mail sent to or from this address may be received or otherwise recorded by the firm's e-mail system and is subject to archival and review by someone other than the recipient.

Please remember to contact GDM Advisory Group, Ltd. if there are any changes in your personal/financial situation or investment objectives for the purpose of reviewing/evaluation/revising our previous recommendations and/or services, or if you want to impose, add, or modify any reasonable restrictions to our investment advisory services.  A copy of our current written disclosure statement discussing our advisory services and fees continues to remain available for your review upon request.

**From:** Marty Stallone [mailto:mstallone@mmgapts.com]
**Sent:** Thursday, September 22, 2016 7:51 AM
**To:** Glenn Meyer <glenn@gdmplan.com>
**Cc:** Mike Tulio <mtulio@mmgapts.com>
**Subject:** Re: Financial Statements

Glenn,
    Good morning. I was rehashing our recent conversations last evening with Kevin, and he made an excellent point to me. When looking at the financial wherewithal of Metropolitan as compared to NVR, it is critical to remember that NVR Will never, in fact cannot legally purchase the property from you. Their corporate charter requires that they can only ever purchase finished developed building lots from a developer.
   So the financial question or comparison should not be a $2 billion public company as compared to Metropolitan, but rather what other developer has the financial wherewithal and expertise to buy your property? There are no other developers who have the expertise we have, comparable balance sheet, and readiness with all the due diligence we have already done who can step in to this transaction like Metropolitan. If NVR were a $10 billion company it would not impact in anyway this transaction; they must bring in a new developer and there is nobody better than us for your job.
    Good luck with your deliberations, if you have any follow-up questions, you can of course call me at anytime

Sent from my iPhone
Marty Stallone
Metropolitan Companies
W: (610) 288-7700 x31
C: (610) 574-1542
On Sep 20, 2016, at 2:30 PM, Glenn Meyer <glenn@gdmplan.com> wrote:

    Marty,

    Can you send over some financial information for my real estate committee to evaluate?  We'd

like to understand more about the strength of Metropolitan.

Best regards.

<image003.png>

Glenn Meyer, CPA/PFS, CFP®, AIF®, ChFC, CLU
GDM Advisory Group, Ltd.
123 Old York Road, Suite 200
Jenkintown, PA  19046
215-886-5800
215-886-6575 FAX
www.gdmplan.com

<image004.png>

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.  Please also be advised that all e-mail sent to or from this address may be received or otherwise recorded by the firm's e-mail system and is subject to archival and review by someone other than the recipient.

Please remember to contact GDM Advisory Group, Ltd. if there are any changes in your personal/financial situation or investment objectives for the purpose of reviewing/evaluation/revising our previous recommendations and/or services, or if you want to impose, add, or modify any reasonable restrictions to our investment advisory services.  A copy of our current written disclosure statement discussing our advisory services and fees continues to remain available for your review upon request.

# EXHIBIT 11

**To:**      'Jack Wilson'[jwilson@theirlwilsonlaw.com]
**Cc:**      Glenn Meyer[glenn@gdmplan.com]
**From:**    James J. Garrity
**Sent:**    Thur 2/9/2017 11:09:29 PM
**Subject:** RE: Philmont

Jack,

   I could not open the attachment you sent me, but I saw a termination letter today in an email from Glenn Meyer to Peter Nanula.  The letter, however, was from North Penn to us.  I assume you want it anyway and I will send it to you.  Jim

_____

**James J. Garrity , Esq.**

Wisler Pearlstine, LLP
Blue Bell Executive Campus
460 Norristown Road, Suite 110
Blue Bell, PA 19422-2323
Telephone:  (610) 825-8400
Facsimile:  (610) 828-4887

jgarrity@wispearl.com
http://www.wislerpearlstine.com/
🖶 **Please consider the environment before printing this e-mail.**

The information contained in this e-mail transmission is privileged and confidential and intended only for the use of the individual(s) and/or entity(ies) named above. If you are not the intended recipient, you are hereby notified that any unauthorized disclosure, copying, distribution or taking of any action in reliance on the contents of the e-mail materials is strictly prohibited. The review of this material by any individual other than the intended recipient shall not constitute waiver of the attorney/client privilege. If you have received this e-mail transmission in error, please immediately notify us by telephone at 610.825.8400. Thank you.

---

**From:** Jack Wilson [mailto:jwilson@theirlwilsonlaw.com]
**Sent:** Thursday, February 09, 2017 6:05 PM
**To:** James J. Garrity
**Subject:** FW: Philmont

Jim, perchance can you open the attached.  It is purportedly a copy of the termination letter sent to North Penn Towns.  Thanks, Jack

---

**Jackson D. Wilson II**

*Theirl Wilson PLLC*
Two Energy Square
4849 Greenville Avenue
Suite 1255
Dallas, TX  75206
Direct Dial:  (214) 389-5402
Mobile:      (214) 587-1649
Fax:         (214) 389-5404
*jwilson@TheirlWilsonLaw.com*

---

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Thursday, February 09, 2017 4:15 PM
**To:** Jack Wilson <jwilson@theirlwilsonlaw.com>
**Subject:** FW: Philmont

fyi

-------------------
Peter Nanula
Concert Golf Partners
Tel:   949.715.0602
Cell:  415.260.8806
www.concertgolfpartners.com

Watch Now.
*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

---

**From:** Glenn Meyer <glenn@gdmplan.com>
**Date:** Thursday, February 9, 2017 at 1:59 PM
**To:** Peter Nanula <pnanula@concertcapital.com>, "jgarrity@wispearl.com" <jgarrity@wispearl.com>
**Subject:** FW: Philmont

See below as well.

Best regards.

[cid:image006.png@01D282F6.1A561320]

Glenn Meyer, CPA/PFS, CFP®, AIF®, ChFC, CLU
GDM Advisory Group, Ltd.
123 Old York Road, Suite 200
Jenkintown, PA  19046

215-886-5800
215-886-6575 FAX
www.gdmplan.com<x-msg://10/www.gdmplan.com>

[Description: Description: Description: GDM Advisory Group.gif]

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.  Please also be advised that all e-mail sent to or from this address may be received or otherwise recorded by the firm's e-mail system and is subject to archival and review by someone other than the recipient.

Please remember to contact GDM Advisory Group, Ltd. if there are any changes in your personal/financial situation or investment objectives for the purpose of reviewing/evaluation/revising our previous recommendations and/or services, or if you want to impose, add, or modify any reasonable restrictions to our investment advisory services.  A copy of our current written disclosure statement discussing our advisory services and fees continues to remain available for your review upon request.

From: Glenn Meyer
Sent: Tuesday, September 27, 2016 8:31 AM
To: 'James J. Garrity' <jgarrity@wispearl.com>
Subject: RE: Philmont

Thanks Jim.  I received 2 copies of the letter, one to me and one at Philmont.  I'm surprised Tulio hasn't reached out to me yet.

Best regards,

[cid:image005.png@01D21899.7893F0F0]

Glenn Meyer, CPA/PFS, CFP®, AIF®, ChFC, CLU
GDM Advisory Group, Ltd.
123 Old York Road, Suite 200
Jenkintown, PA  19046
215-886-5800
215-886-6575 FAX

www.gdmplan.com<x-msg://10/www.gdmplan.com>

[Description: Description: Description: GDM Advisory Group.gif]

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.  Please also be advised that all e-mail sent to or from this address may be received or otherwise recorded by the firm's e-mail system and is subject to archival and review by someone other than the recipient.

Please remember to contact GDM Advisory Group, Ltd. if there are any changes in your personal/financial situation or investment objectives for the purpose of reviewing/evaluation/revising our previous recommendations and/or services, or if you want to impose, add, or modify any reasonable restrictions to our investment advisory services.  A copy of our current written disclosure statement discussing our advisory services and fees continues to remain available for your review upon request.

From: James J. Garrity [mailto:jgarrity@wispearl.com]
Sent: Tuesday, September 27, 2016 8:22 AM
To: Glenn Meyer <glenn@gdmplan.com<mailto:glenn@gdmplan.com>>
Subject: RE: Philmont

Glenn,

        As expected, Tom King called me last night to find out what was going on.  I told him that we wanted to catch our breath and consider other alternatives without constantly worrying about deadlines.  He was not happy; but he was resigned.  The termination letter soon followed.   Jim

_____
James J. Garrity, Esq.

Wisler Pearlstine, LLP
Blue Bell Executive Campus
460 Norristown Road, Suite 110
Blue Bell, PA 19422-2323
Telephone:  (610) 825-8400

Facsimile:  (610) 828-4887

jgarrity@wispearl.com<mailto:jgarrity@wispearl.com>
http://www.wislerpearlstine.com/
P  Please consider the environment before printing this e-mail.
The information contained in this e-mail transmission is privileged and confidential and intended only for the use of the individual(s) and/or entity(ies) named above. If you are not the intended recipient, you are hereby notified that any unauthorized disclosure, copying, distribution or taking of any action in reliance on the contents of the e-mail materials is strictly prohibited. The review of this material by any individual other than the intended recipient shall not constitute waiver of the attorney/client privilege. If you have received this e-mail transmission in error, please immediately notify us by telephone at 610.825.8400. Thank you.

From: Glenn Meyer [mailto:glenn@gdmplan.com]
Sent: Sunday, September 25, 2016 8:24 AM
To: James J. Garrity
Subject: RE: Philmont

Jim,

I thought it would be "proper" for us to advise Tom that we are going to let the agreement expire in some manner.

The Eagles have a tough challenge ahead but it will be a telling game.  Enjoy.

Best regards.

[cid:image003.png@01D21899.788FD240]

Glenn Meyer, CPA/PFS, CFP®, AIF®, ChFC, CLU
GDM Advisory Group, Ltd.
123 Old York Road, Suite 200
Jenkintown, PA  19046
215-886-5800
215-886-6575 FAX
www.gdmplan.com<x-msg://10/www.gdmplan.com>

[Description: Description: Description: GDM Advisory Group.gif]

The information contained in this e-mail message is intended only for the personal and

PCC-7791

confidential use of the recipient(s) named above.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.  Please also be advised that all e-mail sent to or from this address may be received or otherwise recorded by the firm's e-mail system and is subject to archival and review by someone other than the recipient.

Please remember to contact GDM Advisory Group, Ltd. if there are any changes in your personal/financial situation or investment objectives for the purpose of reviewing/evaluation/revising our previous recommendations and/or services, or if you want to impose, add, or modify any reasonable restrictions to our investment advisory services.  A copy of our current written disclosure statement discussing our advisory services and fees continues to remain available for your review upon request.

From: James J. Garrity [mailto:jgarrity@wispearl.com]
Sent: Sunday, September 25, 2016 8:18 AM
To: Glenn Meyer <glenn@gdmplan.com<mailto:glenn@gdmplan.com>>
Subject: RE: Philmont

Glenn,

        I am not entirely sure what you are looking for.  I don't think we need to do anything in order for the agreement to expire.  If you are talking about the amendment that "presses" Tom a little, I can certainly prepare that, but it now appears that you don't want to send it – at least not right away.  Let me know what you would like me to do.  Birthday party was a huge success.  Now it's time for the Eagles!!   Jim

_____
James J. Garrity, Esq.

Wisler Pearlstine, LLP
Blue Bell Executive Campus
460 Norristown Road, Suite 110
Blue Bell, PA 19422-2323
Telephone:  (610) 825-8400
Facsimile:  (610) 828-4887

jgarrity@wispearl.com<mailto:jgarrity@wispearl.com>
http://www.wislerpearlstine.com/

P  Please consider the environment before printing this e-mail.

The information contained in this e-mail transmission is privileged and confidential and intended only for the use of the individual(s) and/or entity(ies) named above. If you are not the intended recipient, you are hereby notified that any unauthorized disclosure, copying, distribution or taking of any action in reliance on the contents of the e-mail materials is strictly prohibited. The review of this material by any individual other than the intended recipient shall not constitute waiver of the attorney/client privilege. If you have received this e-mail transmission in error, please immediately notify us by telephone at 610.825.8400. Thank you.

From: Glenn Meyer [mailto:glenn@gdmplan.com]
Sent: Saturday, September 24, 2016 4:04 PM
To: James J. Garrity
Subject: Philmont

Hi Jim,

After further thought, we have decided to let the agreement expire and evaluate our position rather than continue to negotiate with NVR. Can you please draft something for Tom King that I can review prior to sending?

Hope you're enjoying the birthday party.

Best regards.

Glenn Meyer, CPA/PFS, CFP, AIF, ChFC, CLU
GDM Advisory Group, Ltd.
123 Old York Road, Suite 200
Jenkintown, PA. 19046
215-886-5800
Sent from my iPhone

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

PCC-7794

# EXHIBIT 12

**To:**      Glenn Meyer[glenn@gdmplan.com]
**From:**    Mike Tulio
**Sent:**    Wed 9/28/2016 2:17:41 AM
**Subject:** Philmont

Glenn


I know you spoke to Marty today and I also wanted to follow up as I'm leaving tomorrow to go out of town for a week as I'm getting married in Vegas.


I appreciate the time and effort you put into the deal and it was unfortunate the way it ended. I hope you understand it was never my intention to walk but based on my underlying contract with NV they had total control and I did not. With all of that being said I'm still the same person who remains committed to getting the deal done, approved and closed. When Tom King walked out of the room that day, I did not as I'm a deal maker and a person who gets things done. I hope you call our references to see how we operate and am willing to meet ( you or anyone else ) when I'm back to see if we can work it out.


Locking in with a buyer in advance assures that as the plan is advancing thru the approval process that it's exactly what the buyer wants.


I'm willing to post a deposit of 750K to show our commitment and when the zoning portion is approved and the appeal period passes I will release to the club 375K, then after the Enviromental release the balance making it fully non refundable and for the club to use as they see fit. I think that shows we are for real and committed to getting this deal done.


Enjoy the balance of your week, thanks




**Michael V. Tulio**
**Metropolitan Companies**
**Vice President of Land Acquisition and Development**
1030 Reed Avenue, Suite 100
Wyomissing, PA 19610
Email: mtulio@mmgapts.com
Phone: 610-288-7700 ext. 32 Fax: 610-378-9315
Cell: 215-429-4426

# EXHIBIT 13

| From: | Michael Plotnick |
|---|---|
| To: | glenn@gdmplan.com |
| Cc: | Jonathan Grebow |
| Subject: | Philmont |
| Date: | Tuesday, September 27, 2016 2:27:00 PM |

Glenn - Thanks again for taking the time to speak with and tour Jonathan and I today. As Jonathan mentioned, we very much intend to put a proposal in front of you, that at the least, we hope will open the stage for further discussion. If possible, can you please share everything you have from both Toll and NVR on the property, most importantly, the site plan, survey, and environmental reports. Also, if you could share the past few years detailed financials for the club, it would be extremely helpful in our analysis.

Thanks again,

Mike

## Michael Plotnick
Vice President
Ridgewood Real Estate Partners, LLC
25A Hanover Road
Suite 310
Florham Park, NJ 07932

(p) 973.593.0003 x213
(c) 617.835.2431
(f) 973.593.0077
mplotnick@ridgewoodrep.com



# EXHIBIT 14



## MEMORANDUM

TO:         Glenn Meyer

FROM:       Peter Nanula

DATE:       November 1, 2016

RE:         Proposed Recapitalization of Philmont Country Club **-** CONFIDENTIAL

---

We are interested in recapitalizing Philmont Country Club and operating the club for the long term as stewards for the membership.  The following are the basic elements of the proposed transaction.

**Financial.**  The financial components of the approx. $11m two-stage recapitalization would be as follows:

1. CGP will pay off the current mortgage loan and line of credit at closing.  Approx. $963k.

2. Assume or restructure capital leases and other obligations.  Approx. $84k.

3. Commit to fund within 12-24 months the jointly agreed Phase I Capital Projects.  Approx. $4.0m.
   a. Renovate Men's and Women's locker rooms to a modern country club standard.
   b. North Course bunker, cart path, tree removal, greens, and drainage improvements.
   c. Pool and pool area renovations.
   d. Upgrade HVAC infrastructure.

4. Commit to fund ongoing capital reserve at 3-4% of revenues.  Over 5 years, approx. $1.0m.
   a. Concert Golf manages these regular capital needs going forward.
   b. Other items on the project list will be dealt with over time here.

5. Upon closing of a real estate transaction in 2-4 years involving the sale of approx. 50-60 acres on the South Course and relocation of the maintenance facility, assuming that Town approval, environmental issues and other challenges can be overcome, Concert Golf will commit to fund within 12-24 months the jointly agreed Phase II Capital Projects.  Approx. $5.0m.
   a. South Course improvements.
   b. Additional North Course improvements from Andrew Green master plan.
   c. Tennis facility improvements.
   d. Clubhouse renovations.

**Member Covenants.**  The key covenants to protect the members in our agreement would include the following:

6. All PCC members in good standing will automatically become members of the new debt-free club.

7. Special member assessments will be permanently prohibited.

8. Regular Dues and Capital charges will be combined into a single Dues charge at $8,900 per year and frozen at today's rates for 2016-18.  Thereafter, limited to CPI increases or average of competitive club dues rate increases.

1

PCC-1538

9.  The Food & Beverage Minimum for 2016 will be maintained in 2017, as we evaluate it.

10. PCC will remain an exclusive private club with at least 27 holes after the South Course real estate transaction.

11. In the event of any future change (very unlikely – has never happened before), the membership will have the first right to buy the club back from Concert Golf.  (ROFD language attached.)

12. All members automatically become members of all other Concert Golf clubs – just arrange with your Pro and pay a cart fee on your next bill.  No green fees and no extra dues for these reciprocal playing privileges.  In addition, PCC members have reciprocal playing privileges at all 150+ clubs within the Pacific Links International network, including all TPC™ clubs, at 50% discount off regular rates.

13. We will form an Advisory Board of members to guide us on future capital and service priorities.

CONFIDENTIAL

# EXHIBIT 15



HOME   |   TESTIMONIALS   |   OUR INVESTMENTS   |   MEMBER-OWNED CLUBS   |   OUR CLUBS   |   NEWS   |   FAQs



## TARGET INVESTMENTS

We have very specific investment parameters, and can quickly assess whether your club or loan is a good fit for us.

- Existing golf clubs with at least $4 million in annual revenues
- 1 million+ population in the metro area
- Private clubs only
- Performing or non-performing loans secured by these kinds of golf properties

## Deal Process

Having invested in, operated or made loans on 100+ golf properties, we pride ourselves on quickly and discreetly closing golf transactions on an all-cash basis from our committed funds.

- We respond to information about your club within 1-2 days of receipt
- We will make a quick inquiry for additional information
- We will submit an all-cash investment proposal within a week, or a quick "no" if your situation doesn't fit our parameters
- We have no lengthy committee or board level approvals - we are the principals
- We only require 30 days for due diligence and 5 days to close
- We close all-cash from our committed funds — we do not utilize debt financing or raise capital
- We are discreet — many golf club or note owners prefer a quiet process with no disruption to the members or the club operations

BOARD MEMBERS SPEAK - How 3 Private Go...



03:54



 

© 2019 Concert Golf Partners     (949) 715-0602 | pnanula@concertgolfclubs.com     Contact Us

# EXHIBIT 16

**To:** Glenn Meyer[glenn@gdmplan.com]
**From:** Peter Nanula
**Sent:** Wed 11/2/2016 2:58:37 PM
**Subject:** Re: Philmont CC info

Exactly.

You have 2 choices:

1. Do this yourselves over the next 4-5 years, get all the real estate proceeds, if any, and bear all the risks and costs during the process - while trying to sustain the club.

2. Use us to rescue and fix the club now, and get 2 tranches of improvements to the club that will approximate roughly $9-10m - without taking any risk or bearing any cost at all.

If we can pull this off, we could get back some of our initial risk capital from future real estate proceeds - maybe zero, maybe never - and this prospect allows us to be interested in PCC.


Peter Nanula
Concert Golf Partners
Tel:  (949) 715-0602
Cell: (415) 260-8806

On Nov 2, 2016, at 6:57 AM, Glenn Meyer <glenn@gdmplan.com> wrote:


> Hi Peter,
>
> I reviewed your info and have only one major question/comment.  I thought upon closing the real estate transaction we would have the full proceeds of the sale available towards capital improvements but I'm seeing only $5M listed.  Am I missing something here?
>
> Best regards.
>
> <image005.png>
>
> Glenn Meyer, CPA/PFS, CFP®, AIF®, ChFC, CLU
> GDM Advisory Group, Ltd.
> 123 Old York Road, Suite 200
> Jenkintown, PA  19046
> 215-886-5800
> 215-886-6575 FAX
> www.gdmplan.com
>
> <image006.png>
>
> The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.  Please also be advised that all e-mail sent to or from this address may be received or otherwise

recorded by the firm's e-mail system and is subject to archival and review by someone other than the recipient.

Please remember to contact GDM Advisory Group, Ltd. if there are any changes in your personal/financial situation or investment objectives for the purpose of reviewing/evaluation/revising our previous recommendations and/or services, or if you want to impose, add, or modify any reasonable restrictions to our investment advisory services.  A copy of our current written disclosure statement discussing our advisory services and fees continues to remain available for your review upon request.

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Tuesday, November 1, 2016 1:22 PM
**To:** Glenn Meyer <glenn@gdmplan.com>
**Subject:** Re: Philmont CC info

Glenn:

Here are my preliminary thoughts on a proposed transaction, attached.

We have to assume no real estate transaction might ever be possible, due to the environmental remediation vagaries and cost; the extensive infrastructure costs for the Philmont Ave. intersection project; and the Town approval uncertainties. If we can pull all of that off in 2-4 years, a Phase II capital project program would be triggered in our original agreement with the Club.

Please review and let me know your thoughts.  If this is directionally interesting, then I need to get my team to visit in the next 2-3 weeks and firm up our interest before you take a more formal step with your Board and membership.

Peter
-------------------
Peter Nanula
Concert Golf Partners
Tel:  949.715.0602
Cell:  415.260.8806
www.concertgolfpartners.com

Watch Now.
*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

**From:** Glenn Meyer <glenn@gdmplan.com>
**Date:** Monday, October 31, 2016 at 2:05 PM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Subject:** RE: Philmont CC info

Hi Peter,

Is there anything else you need from me or Philmont?

Best regards.

<image003.png>

Glenn Meyer, CPA/PFS, CFP®, AIF®, ChFC, CLU
GDM Advisory Group, Ltd.
123 Old York Road, Suite 200
Jenkintown, PA  19046
215-886-5800
215-886-6575 FAX
www.gdmplan.com

<image004.png>

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.  Please also be advised that all e-mail sent to or from this address may be received or otherwise recorded by the firm's e-mail system and is subject to archival and review by someone other than the recipient.

Please remember to contact GDM Advisory Group, Ltd. if there are any changes in your personal/financial situation or investment objectives for the purpose of reviewing/evaluation/revising our previous recommendations and/or services, or if you want to impose, add, or modify any reasonable restrictions to our investment advisory services.  A copy of our current written disclosure statement discussing our advisory services and fees continues to remain available for your review upon request.

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Wednesday, October 26, 2016 6:10 PM
**To:** Samuel Silverman <ssilverman@skllc.com>; jkendall@skllc.com
**Cc:** Dave Fields (davidfi73@comcast.net) <davidfi73@comcast.net>; Glenn Meyer <glenn@gdmplan.com>
**Subject:** Re: Philmont CC info

Gents:

Thanks so much for the full tour of Philmont CC today, Glenn.  I really enjoyed it and see why you are so proud of your club and hopeful for what it can be.

Sam, sorry we missed you today, but it was good to have lunch with Jordan and David.  I learned more, and hopefully answered a lot of the typical questions you will get from other Board members and the broader membership, if we get that far.

Next steps:
    1. I would suggest you guys call a few of our Board members who were in your shoes just a year or two ago at their longtime member-owned clubs.

Attached is a list; I would start with Tim Nelson at Blue Hill CC, since that is a formerly all-Jewish club with 27 holes and the possibility of real estate development, and therefore has a lot of similarities with your situation.

2. I would also suggest you plan to visit 1-2 of these clubs also, preferably before the winter hits hard.

3. Glenn, you were going to send me (or upload to the Dropbox we established that is called Philmont CC Board) documents you have on the real estate development, Toll / NVR deal terms, property survey, environmental reports, etc. as well as any information you have about the various capital projects you have considered, scoped, costed, etc.

4. Once I get this additional information, I will prepare a brief deal outline so you can start to socialize the idea among your Board colleagues.


Peter
--------------------
Peter Nanula
Concert Golf Partners
Tel:  949.715.0602
Cell:  415.260.8806
www.concertgolfpartners.com

Watch Now.
*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

---

**From:** Samuel Silverman <ssilverman@skllc.com>
**Date:** Monday, September 19, 2016 at 4:39 PM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Cc:** "Dave Fields (davidfi73@comcast.net)" <davidfi73@comcast.net>, Glenn Meyer <glenn@gdmplan.com>
**Subject:** RE: Philmont CC info


Peter,

Sorry...the deferred revenue is mostly related to the dues billing for the next month. For example, the Club bills its members for August dues on July 31st.

In addition, deferred revenue includes some other charges that are billed in one month but are amortized over the year such as locker fee and bag storage, as well as tennis indoor contract revenue that is paid up front.

Glenn will address the real estate question.

Looking forward to connecting in October.


Samuel A. Silverman, CPA
Silverman Kendall, LLC
200 Gibraltar Road, Suite 115
Horsham, PA 19044
215.259.4100 x100
267.481.0032 (cell)
267.387.6284 (fax)
ssilverman@skllc.com
www.skllc.com

Disclaimer:

Any accounting, business or tax advice contained in this communication, including attachments and enclosures, is not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it sufficient to avoid tax-related penalties. If desired, Silverman Kendall LLC would be pleased to perform the requisite research and provide you with a detailed written analysis. Such an engagement may be the subject of a separate engagement letter that would define the scope and limits of the desired consultation services.

---

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Monday, September 19, 2016 2:01 PM
**To:** Samuel Silverman
**Cc:** Dave Fields (davidfi73@comcast.net); Glenn Meyer (glenn@gdmplan.com)
**Subject:** Re: Philmont CC info

Good stuff here, Sam.

1. On #12 below, can you tell me what's in the $255K in Deferred Revenue?

2. Can you guys share with me any and all details on the pending NVR deal for the South Course acreage?

 I will work on a preliminary proposal to share this week, and we can get on the phone to discuss it.  I will be in the Philly area in mid-October for another club Board meeting, so we can have a tour and face-to-face meeting then.

   Peter
-------------------
Peter Nanula
Concert Golf Partners
Tel:  949.715.0602
Cell:  415.260.8806
www.concertgolfpartners.com

Watch Now.
*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

PCC-1335

**From:** Samuel Silverman <ssilverman@skllc.com>
**Date:** Monday, September 12, 2016 at 8:09 PM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Cc:** "Dave Fields (davidfi73@comcast.net)" <davidfi73@comcast.net>, "Glenn Meyer
(glenn@gdmplan.com)" <glenn@gdmplan.com>
**Subject:** RE: Philmont CC info

Peter,

Some answers below and the questions I cannot answer will require some digging with the staff
at the Club so I want to avoid that for now.

Glenn – please chime in if you have any thoughts.

Samuel A. Silverman, CPA
Silverman Kendall, LLC
200 Gibraltar Road, Suite 115
Horsham, PA 19044
215.259.4100 x100
267.481.0032 (cell)
267.387.6284 (fax)
ssilverman@skllc.com
www.skllc.com

Disclaimer:

Any accounting, business or tax advice contained in this communication, including attachments and enclosures,
is not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it
sufficient to avoid tax-related penalties. If desired, Silverman Kendall LLC would be pleased to perform the
requisite research and provide you with a detailed written analysis. Such an engagement may be the subject of a
separate engagement letter that would define the scope and limits of the desired consultation services.

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Monday, September 12, 2016 4:55 PM
**To:** Samuel Silverman
**Cc:** Dave Fields (davidfi73@comcast.net); Glenn Meyer (glenn@gdmplan.com)
**Subject:** Re: Philmont CC info

Samuel:

Thanks for all of this information.  Very helpful.  A few follow-up questions for you:

1)    In Tennis, what is Indoor Contract revenue?

We have three indoor courts and members and non-members buy contract times during the
winter.

2)    In F&B, how are service charges collected and how much goes to the employees?

Prior to this year we had a 20% service charge that the Club kept.  The Club paid all servers an hourly wage between maybe $12 - $17 per hour.  As of 5/1/16 we changed our policy to have no service charge and full tipping with the servers keeping the tip like any other restaurant.  We reduced the server hourly rate to about $6 per hour.  For banquets and certain member events, there is no tipping and the 20% service charge for the Club is still in force with the servers earning the higher hourly wage.

3)  Please confirm the Pro owns the Golf Pro Shop merchandise.  What was the revenue in the last 12 months?  What is his/her deal?

Yes the Pro owns the shop and I do not have the revenue for the last 12 months readily available.

4)  Do you currently have a Membership Director?

No – our GM has performed this function.

5)  Is any of your turf equipment leased?  What is the annual payment?

No operating leases on the equipment.  The capital leases/notes are disclosed in the financials.

6)  In Building Maint, is the $89K water bill just for the clubhouse?

The water bill is for clubhouse, pool, and parts of the golf course.  The water was only $41K for Y/E 4/30/16 and 4/30/15 and the sewer was $54K for 4/30/16 and $45K for 4/30/15.

7)  What is your water source for the golf course?  Cost and term of your water contract?

I do not have this information

8)  In Admin Expenses, what is $31K in bad debt?  Why was it all incurred in April?  What is in the $27K of Misc. Expense?

I am looking at the internally generated financials (not Brown Golf financials).  We increased bad debt reserve as of 4/30/16.  I do not see the Misc. Expense – in the internal p&L, the misc expense in Admin includes the $31K of bad debt expense.

9)  What is the property currently assessed at for Real Estate taxes?

I will copy the bill for you the next time I am at the Club.

10)  Your cart lease looks a bit low.  How many carts do you lease? How old are they?

Lease started May 2015 at $5,904 per month for May-Oct and $0 between Nov-Apr. = total payments of $5,904 x 6 mos. per year x 5 years = $177,120.  We have 62 electric carts and 8 gas carts and we also received a six passenger cart in the deal.  All 2015 models.  The lease looks low because we traded in 80 gas carts that we owned and received a $88,925 reduction in the total lease.

11)   How do the Preview memberships work?  When does a Preview member have to convert to a regular member?  Can we get a schedule of when those mature?

The preview is just a one year deal for someone to get the feel of the Club.  The previews are only on the Flex membership and this past year we sold the preview memberships at 50% of the Flex membership for the appropriate age bracket.  The Flex membership is our new social membership but we included golf on our South course as part of the membership.  There is no commitment from the preview member after the one year.

We started the preview membership in the 2015-16 year but it was only for social members under the age of 46 and it did not include the South course golf.  We had 37 preview members and 27 converted into members the following year.  This year (2016-17) there is certainly a different makeup of the preview members and I would be surprised if we had the same retention results.

We can talk in more detail regarding membership at some time.

12)   On the balance sheet, how far out does the $307K in Prepaid Dues go?  What is $221K in Restricted Funds?  What's in the $255K in Deferred Revenue?

Prepaid dues:  Members pay dues prior to 5/1/16 for the upcoming year and receive a 2% discount.  The prepaid dues are amortized throughout the year.

Restricted funds:  not really restricted as all the money is in one bank account at the Club.  This is golf, tennis, bridge and other activity fees that are exclusively used for the golf, tennis and bridge member programs.  Members pay the fee and the expenses are then taken out of the "fund".

13)   How do the Membership Incentives work and when do they run out?

We had a membership push a few years back bringing in new members at an amount that was lower than the existing members and the existing member that would bring the new member in would receive an annual credit equal to a portion of the dues differential.  The credit stays with the member as long as the new member stays at the club.  We are thinking of revising this anyway and the membership incentive credit would go away.
Thanks much.  After we get these answers, let's get on a conference call to discuss the real estate deal and I can walk through how our member-owned club recapitalizations usually work.  OK sounds good.

Peter
------------------
Peter Nanula

Concert Golf Partners
Tel:  949.715.0602
Cell:  415.260.8806
www.concertgolfpartners.com

Watch Now.
*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

---

**From:** Samuel Silverman <ssilverman@skllc.com>
**Date:** Saturday, September 10, 2016 at 10:35 AM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Cc:** "Dave Fields (davidfi73@comcast.net)" <davidfi73@comcast.net>, "Glenn Meyer
(glenn@gdmplan.com)" <glenn@gdmplan.com>
**Subject:** Philmont CC info

Peter,

I attached a bunch of information.

The real estate deal is with NVR, Inc. not Toll Brothers.  It will be easier to explain verbally as we
are in the process of receiving an amendment to the APA that will better clarify the details.

The current GM has a list of potential capital projects with some detail but we will need to get a
copy of that list from him and forward to you.

Please review and let me know if you have any questions and if you need additional information.

Samuel A. Silverman, CPA
Silverman Kendall, LLC
200 Gibraltar Road, Suite 115
Horsham, PA 19044
215.259.4100 x100
267.481.0032 (cell)
267.387.6284 (fax)
ssilverman@skllc.com
www.skllc.com

<u>Disclaimer:</u>

Any accounting, business or tax advice contained in this communication, including attachments and enclosures,
is not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it
sufficient to avoid tax-related penalties. If desired, Silverman Kendall LLC would be pleased to perform the
requisite research and provide you with a detailed written analysis. Such an engagement may be the subject of a
separate engagement letter that would define the scope and limits of the desired consultation services.

**From:** David Fields [mailto:davidfi73@comcast.net]
**Sent:** Tuesday, August 30, 2016 11:52 PM
**To:** Samuel Silverman
**Subject:** Fwd: Signed NDA; Info Request

PCC-1339

Sent from my iPad
Begin forwarded message:

**From:** peter nanula <pnanula@yahoo.com>
**Date:** August 30, 2016 at 4:50:43 PM EDT
**To:** "davidfi73@comcast.net" <davidfi73@comcast.net>
**Cc:** Peter Nanula <pnanula@concertcapital.com>
**Subject: Signed NDA; Info Request**
**Reply-To:** peter nanula <pnanula@yahoo.com>

David:

Good chatting with you today about Philmont CC.  I have read some of the articles about the Toll Brothers deal, and understand your predicament better.

Attached is a signed NDA, protecting our discussion today and any information you might share with me about the club.  To get us started, please send me the following:
1.  Detailed income statements for 2012-2015 with the 2016 budget.  It helps us to see the department-level detail, which is usually 10-15 pages, as opposed to a one-page summary.  It also helps for us to see this in Excel, so that we can work with it.
2.  A recent balance sheet.
3.  A membership summary, including the number of members in each category, the dues and other charges for each category, and the add and drops for the past few years.
4.  The membership bylaws and the application / agreement each member signs with the club.
5.  A payroll and wages summary.
6.  A listing of recent capital improvements made, and the **current list of potential capital projects (with estimated scope and costs, if any) that are being considered.**
    7.  A summary of your current real estate deal and the Toll deal.

This will get us started; I'm sure we will have some questions once we receive the information.

I will ask my COO, Susan Dunnavant, to call you and swing by PCC next Tuesday, September 6th while she is in town.  You can give her the tour, so that we are better prepared to make a proposal.

Peter

Peter J. Nanula
Concert Golf Partners
Office:    (949) 715-0602

Cell:  (415) 260-8806
Email: pnanula@concertcapital.com
    www.concertgolfpartners.com

# EXHIBIT 17



November 17, 2016

Dear Fellow Philmonter,

This is undoubtedly the most important communication I have drafted in my six years as President and I respectfully request that you take the time to read this in its entirety (perhaps even multiple times) to understand the full importance of this information.

When I agreed to become President in May 2011, I shared my goals and objectives for Philmont Country Club. My first goal was to preserve Philmont Country Club to be enjoyed by our children, grandchildren and great grandchildren. This is why I am communicating with you.

You are certainly aware that the Club has experienced financial challenges since 2008, similar to most private country clubs nationwide. Our nominal long-term debt has enabled us to survive strains on our cash flow. We have openly and honestly attempted to navigate our operational challenges with limited success. During the past two years, the Board has made extraordinarily difficult decisions in hopes of moving Philmont forward.

Brown Golf Management has helped us greatly during our relationship with a wide variety of items too detailed to share in this letter. Suffice it to say without their guidance, which involved some very gut wrenching decisions involving our management team and staff, our financial position would have been depleted much earlier.

The South Course land sale has been a frustrating one for me personally and for the Club. The recent expiration of our agreement with NVR, however, presented an opportunity for us that I'm sharing with you now.

This opportunity is likely our best option for long-term success as a premiere full service, **private** country club. We have been approached by Concert Golf Partners (www.concertgolfpartners.com) to recapitalize Philmont Country Club. This would result in the Club converting to a non-equity club. While many Philmont members are successful in business, none of us have any expertise and capabilities in operating a private country club.

Concert Golf Partners is a private firm specializing in recapitalizing private country clubs nationwide. Currently they own and operate 14 private clubs (we would be 15). Concert is funded by patient, long-term capital from a select group of wealthy families not looking solely to maximize investment returns via turnaround or sale.

The potential advantages of a transaction with Concert Golf are numerous and significant:

1. Concert Golf will pay off all of our current debt and obligations (mortgage, line of credit, capital leases and other) which approximates $1,000,000.
2. Concert Golf will commit to invest approximately $4,000,000 into the Club **immediately** over a 12-24 month time frame (based on an agreed upon priority list established by Philmont). This would potentially include:
   a. Modernizing both the Men's and Women's locker rooms and card rooms to a country club standard.
   b. Improvements to the North Course as identified by the golf course master plan (bunker renovations, drainage/irrigation, additional tree removal, cart paths, etc.).
   c. Pool and pool area renovations.

## CONFIDENTIAL – PLEASE DO NOT SHARE



    d.  Upgrade HVAC infrastructure.
3.  Concert Golf will commit to fund ongoing capital reserves at 3-4% of annual revenues. This will equate to approximately $1,000,000 over a five year period.
4.  Upon closing the real estate deal (which Concert would control), Concert will commit an additional $5,000,000 towards various agreed upon projects and additional items identified by Concert Golf. This could include:
    a.  Relocation of the maintenance facility.
    b.  South Course improvements and remaining North Course improvements.
    c.  Clubhouse renovations.
    d.  Tennis facility improvements.
5.  Two to three year freeze on dues increases and limits on annual increases thereafter based on CPI or market competitive market conditions.
6.  **Elimination of assessments _FOREVER_ (including the assessment announced last month payable in January, February and March 2017).**
7.  Guarantee of maintaining 27 holes of golf after the South Course land is sold.
8.  Numerous other benefits.

Given these benefits and the operational and management obstacles we continue to experience, the Board of Directors is **pursuing** a transaction with Concert Golf Partners. Concert should reach a decision on whether to move forward with Philmont prior to Thanksgiving. This transaction is subject to approval by a majority of the eligible voting members of the Club. To provide all Members with a forum to discuss and inquire about this significant transaction, we will conduct a Membership meeting at the Crown Plaza Hotel in Feasterville, PA (4700 Street Rd, Feasterville-Trevose, PA 19053) on **December 8th @ 6:30PM**. For those unable to physically attend, we will provide a live audio/video feed (instructions will be e-mailed prior to the meeting).

As I've communicated previously and many of you are aware, the country club business is a very difficult with declining memberships, increased costs and complex management issues. Over the last few years, the Board has studied many options to fix/improve our membership, food and beverage operations, debt, and overall management issues. We are faced with a number of unpleasant decisions that need to be made concerning ways to fund our needed capital improvement projects while also trying to contain increases in our dues through limiting services and/or reducing overhead and labor expenses.

The Board unanimously believes that this is our best option towards securing Philmont's success in the years ahead. We are in need of more than capital funding. We need active, independent management expertise and an immediate infusion of operating and capital support.

The Board of Directors and I look forward to sharing our enthusiasm about joining forces with Concert Golf Partners as we move Philmont forward when we meet on **December 8th**.

Respectfully submitted,

*GLENN MEYER*

Glenn Meyer
President

# CONFIDENTIAL – PLEASE DO NOT SHARE

# EXHIBIT 18

**Ethan OShea**

| From: | Michael Plotnick <mplotnick@ridgewoodrep.com> |
| Sent: | Friday, October 21, 2016 11:18 AM |
| To: | Peter Nanula (pnanula@concertcapital.com) |
| Cc: | Jonathan Grebow |
| Subject: | Philmont Country Club Proposal |

Peter - My initial thoughts to a structure of a deal at Philmont Country Club are as follows:

- Concert Golf purchases Philmont CC from the members, including both 18 hole courses.
- Ridgewood has no involvement on the golf side. We are brought in as a joint venture partner solely on the redevelopment portion of the property.
- Ridgewood will be responsible for overseeing all of the approvals for the redevelopment of the south course, or portion thereof.
- The cost of pursuing the approvals will be split 50/50 by Ridgewood and Concert Golf - we anticipate a budget of approximately $1MM total
- Upon the sale of the fully entitled redeveloped portion of the property to a homebuilder, the waterfall will be as follows:
  - ○ First, 50/50 to Concert and Ridgewood to repay the actual Approval Costs expended
  - ○ Second, 100% to Concert for the next $5MM of proceeds
  - ○ Last, 50/50 to Concert and Ridgewood for all additional proceeds
- We anticipate the fully entitled residential development for approximately 160 age restricted townhomes is worth between $12 - $14 million to a builder. The property will be delivered shovel ready, meaning the builder can break ground immediately after closing.

I assumed that the first $5MM or some negotiated portion of that money committed as additional CapX spend will probably satisfy the members.

If this general structure is in line with your expectations, I am happy to craft a more formal term sheet for your review. In the meantime, looking forward to getting together next Thursday. As your schedule becomes more clear, let me know and we can coordinate a time and place to meet.

If you have any questions or comments regarding this proposal, please feel to reach out.

Thanks,

Mike

**Michael Plotnick**
Vice President
Ridgewood Real Estate Partners, LLC
25A Hanover Road
Suite 310
Florham Park, NJ 07932

(p) 973.593.0003 x213
(c) 617.835.2431
(f) 973.593.0077
mplotnick@ridgewoodrep.com



1

# EXHIBIT 19

**From:** Peter Nanula <pnanula@concertcapital.com>
**Sent:** Friday, October 21, 2016 7:07 PM
**To:** Nick Cicero
**Subject:** Re: Philmont Country Club Proposal

True. Talk on Monday.

--------------------

Peter Nanula
Concert Golf Partners
Tel:  949.715.0602
Cell: 415.260.8806
www.concertgolfpartners.com

Watch Now.
*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

**From:** Nick Cicero <Nick@FreestoneCapital.com>
**Date:** Friday, October 21, 2016 at 3:59 PM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Subject:** Re: Philmont Country Club Proposal

I thought your initial email was explicitly invoking the scenario where we eject Ridgewood and do it on our own (by which I meant go find a way to do the entitlement work ourself, prospectively by paying fair fees to a new 3rd party that isn't Ridgewood.)

**From:** Peter Nanula <pnanula@concertcapital.com>
**Sent:** Friday, October 21, 2016 1:20 PM
**To:** Nick Cicero
**Subject:** Re: Philmont Country Club Proposal

Yes, but this firm is in advanced talks with club president about buying this 35 acre parcel from the club for
So getting them to back off to a small fee will be difficult.

--------------------

Peter Nanula

Concert Golf Partners

Tel:  949.715.0602

1

Cell: 415.260.8806

www.concertgolfpartners.com

Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

**From:** Nick Cicero <Nick@FreestoneCapital.com>
**Date:** Friday, October 21, 2016 at 12:24 PM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Subject:** RE: Philmont Country Club Proposal

Headed out now, but ▮▮▮▮ seems awfully high instead of just some set fee that is relatively nominal. Plus, we know some age-restricted developers already that I'm sure can assist with that sort of entitlement work.

**NICK CICERO, CAIA** SM

*Partner – Alternative Investments*

**PHONE** 206 707.7351 | **FAX** 206 707.7399

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Friday, October 21, 2016 10:04 AM
**To:** Nick Cicero <Nick@FreestoneCapital.com>
**Subject:** Re: Philmont Country Club Proposal

Great.

-------------------

Peter Nanula

Concert Golf Partners

Tel: 949.715.0602

2CGP027012

Cell: 415.260.8806

www.concertgolfpartners.com

Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

**From:** Nick Cicero <Nick@FreestoneCapital.com>
**Date:** Friday, October 21, 2016 at 9:56 AM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Subject:** RE: Philmont Country Club Proposal

I'll take a look and give you a call, about to hop on another call.

**NICK CICERO, CAIA** SM

*Partner – Alternative Investments*

**PHONE** 206 707.7351 | **FAX** 206 707.7399

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Friday, October 21, 2016 9:55 AM
**To:** Nick Cicero <Nick@FreestoneCapital.com>
**Subject:** FW: Philmont Country Club Proposal

Nick:

3

2CGP027013

Need your input on a golf-adjacent deal:

- Early stages of trying to buy a club in Philly called Philmont CC, in the northern suburbs.
- 36 hole club with lots of capex needed. Only 18 or 27 holes truly needed for the membership.
- 4-5 years has been spent by Club to try to sell off 9 holes to Toll, NVR or other builders for $10m+, to no avail. Enviro issue; ingress / egress issues; both are solvable, we think; but the basic problem is that Club has financial problems (no staying power) and governance challenges (no builder can negotiate with them because they cannot make decisions).
- We would buy the Club as usual, by paying off debt and agreeing to certain immediate capex ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ Then, if sale of 9 holes happens, our PSA would trigger a Part 2 obligation to do more capex at the Club (members will demand this to get the votes for the sale to us).
- Below is initial proposal from golf-adjacent developer (Ridgewood) we know well. They have been talking to Club about buying the 9 holes for ▒▒▒▒ but they need a credible golf operator to sell the members on this; I told them to back off completely so I can buy the whole Club and then deal them in as our real estate partner.
- It looks like they think we can spend ▒▒ over 2 years to get an age-restricted development entitled, then flip to builders for ▒▒▒▒ Not bad work, if you can get it.
- I told them initially that we want to be 50-50 partners in real estate opportunities that we create. Below, we (CGP) would spend extra ▒▒ on entitlements, and get ▒▒▒▒▒▒▒ after satisfying member capex promises. Not too shabby. Juices our normal deal returns nicely.
- Now I am thinking: why do we need Ridgewood at all? They are not putting up any real capital at all here, ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

Thoughts? At my desk all day.

-------------------

Peter Nanula

Concert Golf Partners

Tel:  949.715.0602

Cell:  415.260.8806

www.concertgolfpartners.com

2CGP027014

Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

---

**From:** Michael Plotnick <mplotnick@ridgewoodrep.com>
**Date:** Friday, October 21, 2016 at 8:18 AM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Cc:** Jonathan Grebow <jgrebow@ridgewoodrep.com>
**Subject:** Philmont Country Club Proposal

Peter - My initial thoughts to a structure of a deal at Philmont Country Club are as follows:

\* Concert Golf purchases Philmont CC from the members, including both 18 hole courses.

\* Ridgewood has no involvement on the golf side. We are brought in as a joint venture partner solely on the redevelopment portion of the property.

\* Ridgewood will be responsible for overseeing all of the approvals for the redevelopment of the south course, or portion thereof.

\* The cost of pursuing the approvals will be split 50/50 by Ridgewood and Concert Golf - we anticipate a budget of approximately $1MM total

\* Upon the sale of the fully entitled redeveloped portion of the property to a homebuilder, the waterfall will be as follows:

5

2CGP027015

o  First,        o Concert and Ridgewood to repay the actual Approval Costs expended

o  Second,        to Concert for the next        of proceeds

o  Last,        to Concert and Ridgewood for all additional proceeds

\*        We anticipate the fully entitled residential development for approximately 160 age restricted townhomes is worth between                                    The property will be delivered shovel ready, meaning the builder can break ground immediately after closing.

I assumed that the first $5MM or some negotiated portion of that money committed as additional CapX spend will probably satisfy the members.

If this general structure is in line with your expectations, I am happy to craft a more formal term sheet for your review.  In the meantime, looking forward to getting together next Thursday.  As your schedule becomes more clear, let me know and we can coordinate a time and place to meet.

If you have any questions or comments regarding this proposal, please feel to reach out.

Thanks,

Mike

Michael Plotnick

Vice President

Ridgewood Real Estate Partners, LLC

6

2CGP027016

25A Hanover Road

Suite 310

Florham Park, NJ 07932

(p) 973.593.0003 x213

(c) 617.835.2431

(f) 973.593.0077

mplotnick@ridgewoodrep.com<mailto:mplotnick@ridgewoodrep.com>

DISCLAIMER: This Freestone email message, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not the intended recipient, any review, re-transmission, dissemination, distribution, copying or other use of the contents of this email is prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by email and delete this email and its contents. Nothing in this email message is intended to provide, and it should not be relied upon for, accounting, legal, tax or investment advice or recommendations. In addition, nothing in this email constitutes an offer to sell or a solicitation of an offer to purchase any investment or security.

DISCLAIMER: This Freestone email message, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not the intended recipient, any review, re-transmission, dissemination, distribution, copying or other use of the contents of this email is prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by email and delete this email and its contents. Nothing in this email message is intended to provide, and it should not be relied upon for, accounting, legal, tax or investment advice or recommendations. In addition, nothing in this email constitutes an offer to sell or a solicitation of an offer to purchase any investment or security.

DISCLAIMER: This Freestone email message, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not the intended recipient, any review, re-transmission, dissemination, distribution, copying or other use of the contents of this email is prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by email and delete this email and its contents. Nothing in this email message is intended to provide, and it should not be relied upon for, accounting, legal, tax or investment advice or recommendations. In addition,

2CGP027017

nothing in this email constitutes an offer to sell or a solicitation of an offer to purchase any investment or security.

2CGP027018

# EXHIBIT 20

| | |
|---|---|
| **From:** | Michael Plotnick <mplotnick@ridgewoodrep.com> |
| **Sent:** | Monday, November 21, 2016 3:40 PM |
| **To:** | Peter Nanula |
| **Cc:** | Jonathan Grebow |
| **Subject:** | RE: Philmont update |

Peter - Per our conversation from a little earlier, I wanted to get back to you on some deal points as well as a few tweaks to our deal structure.

Deal Points:

- We need to ensure there is NO confidentiality provision precluding you from speaking with the township at any time. Can you please confirm?
- We really need 75 days of due diligence to have a complete understanding of the development opportunity, a large chunk of which is the environmental testing and the timing to get the reports back.
- We estimate a due diligence budget of $100,000, which will be split according to our investment percentages. The budget presented assumes we will not be able to use any of the NVR/Toll due diligence and we will need to recreate everything. In the event we can use their reports, we will hopefully be able to save some money. The due diligence budget is broken down as follows:
  - Legal (Zoning/Environmental Attorney) - $15,000
  - Phase 1 Environmental - $5,000
  - Further Environmental Testing - $50,000
  - Engineering Feasibility - $20,000
  - Land Planning - $10,000
- Since we will be utilizing the golf course clubhouse as the amenity for the residential community, we are going to want a commitment from you that a portion of the CapX will be spent on the clubhouse. This is very important in the value of the residential development. Please keep in mind, the HOA will be contributing once residents move into the community, either through a use fee, social memberships, golf memberships, etc.

Deal Structure:

- We would like for everything to be pro rata. Therefore, based upon your proposal of a 60/40 split of the profits, we propose splitting all due diligence and entitlement costs 60/40 (Concert/RW). If you would like the costs split 50/50, we would request a 50/50 profit split as well and the waterfall to follow would adjust accordingly as well.
- Upon the sale of the real estate, the net proceeds will flow through the following waterfall:
  - First, 60/40 (Concert/Ridgewood) until all out of pocket costs have been returned to both parties
  - Second, 100% to Concert for the next $7MM. All future club required CapX will be the responsibility of Concert.
  - Third, 60/40 (Concert/Ridgewood) of all additional proceeds
- Ridgewood will earn a $10,000 monthly management fee (split according to the 60/40 investment), which will be a cost to both parties, and reimbursed with the costs in the first step of the waterfall. The management fee will be capped at 24 months.

Let me know if all of the above works for you, and we can then begin to paper an agreement between us.

I look forward to your thoughts.

Mike

1

2CGP016513

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Wednesday, November 02, 2016 11:08 AM
**To:** Michael Plotnick
**Subject:** Re: Philmont update

Michael:

We continue to be intrigued here, with the caveat that we still have to get comfortable with the Club in the event that no real estate proceeds are ever realized (enviro, Town, intersection, buyers).

We would only pursue the real estate angle with Ridgewood; I am prepared to sign an agreement to that effect.  My counter-proposal on the real estate is as follows:

- We split the entitlement costs 50-50, to keep everyone honest.  You incur; you seek our approval only on material items; you submit to us for 50% reimbursement; we pay promptly.
- We take the next $7m, as you suggested, in order to deal with member capex obligations, which could go higher than the $5-6m I have discussed with Glenn as we open up walls and as members put more pressure on us.  It usually goes this way.  We will try to save $1-2m here for ourselves, but there is risk here for us based on past experience.
- We split the remainder 60-40.  (60% Concert Golf, 40% Ridgewood)

My math shows that Ridgewood still makes 7-14x your invested capital in any reasonable scenario.  We get a little more of the total proceeds because (1) we have to deal with member pressures and capex vagaries 3-5 years down the road, and (2) we upfronted the capital to buy all 300+ acres of land so that Ridgewood does not have to do this.  In a normal deal where we are both fronting the land cost, I would still presume a straight-up 50-50 deal, but here the fact pattern and risks are different.

Let me know if this works for you guys.  If so, send me a simple agreement and I will sign it.

Peter

-------------------

Peter Nanula
Concert Golf Partners
Tel:  949.715.0602
Cell:  415.260.8806
www.concertgolfpartners.com

Watch Now.
*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

2

2CGP016514

**From:** Peter Nanula <pnanula@concertcapital.com>
**Date:** Wednesday, November 2, 2016 at 8:40 AM
**To:** Michael Plotnick <mplotnick@ridgewoodrep.com>
**Subject:** Philmont update

Sent Glenn a proposal yesterday. He emailed me yesterday about it, and we spoke again today.

He wanted to explore how we could give the club 100% of all our real estate proceeds in 2-4 years when a deal happens. I said no; about $5m is all we could afford to plow back. We are taking the risk in this scenario, not the club. He understood. Now he goes back to his Board.

I offered up Nov 14-15 when I will be in Philly again for town hall meetings and member vote at this other Philly club we are recapitalizing. My guess is that I will be in front of his Board or at least Executive Committee then, and we will see if a consensus can be reached on our proposal. If so, great – we will move ahead on our club deal, and start working with you on the real estate deal. If not, then he may come back to you, and ask for $7m instead of $5m. For now, I hope you guys will stand back, profess some concerns about the real estate risks, and just wait to see if I can strike a better deal for all of us here.

More soon, including ideas for deal structure between us.

Peter

-------------------
Peter Nanula
Concert Golf Partners
Tel:  949.715.0602
Cell:  415.260.8806
www.concertgolfpartners.com

Watch Now.
*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

3

2CGP016515

# EXHIBIT 21

| | |
|---|---|
| **From:** | Peter Nanula <pnanula@concertcapital.com> |
| **Sent:** | Saturday, November 19, 2016 6:27 PM |
| **To:** | Michael Plotnick |
| **Subject:** | Re: Philmont update |

Michael:

Good news: the Philmont Board approved our proposal, by unanimous vote on Thursday night. They want to move fast and get this closed asap (possibly as early as Dec 31). I was there on Monday this past week, met with the Executive Committee, presented the proposal and our company's entire value proposition, I got the usual questions and then I got a very strong positive vibe from them all, and on the spot helped Glenn Meyer to craft a letter to his Board and to his membership about our proposed deal. They need us, they want us, and they have capitulated in every respect. Now it is just a matter of executing; I can tell that the member vote will be 90%+ in favor. My ops team was there on Friday, and we see a path to making this work at least marginally, even if the real estate deal falls apart after much effort.

It is time to paper our deal on the real estate opportunity. You had said you wanted to propose some tweaks to the below proposal. Send me your thoughts, or call me tomorrow or Monday.

Peter

-------------------

Peter Nanula

Concert Golf Partners

Tel:  949.715.0602

Cell:  415.260.8806

www.concertgolfpartners.com

Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

1

2CGP027064

**From:** Michael Plotnick <mplotnick@ridgewoodrep.com>
**Date:** Wednesday, November 9, 2016 at 10:33 AM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Subject:** RE: Philmont update

Sounds good, good luck!

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Tuesday, November 08, 2016 4:06 PM
**To:** Michael Plotnick
**Subject:** Re: Philmont update

10am meeting with Glenn and Board guys on Monday.  Will post you after.

--------------------

Peter Nanula

Concert Golf Partners

Tel:  949.715.0602

Cell:  415.260.8806

www.concertgolfpartners.com


Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*


**From:** Michael Plotnick <mplotnick@ridgewoodrep.com>
**Date:** Tuesday, November 8, 2016 at 2:33 PM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Subject:** RE: Philmont update

Peter - Are you coming back to town next week?

Mike

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Friday, November 04, 2016 10:43 AM
**To:** Michael Plotnick
**Cc:** Jonathan Grebow
**Subject:** Re: Philmont update

2

**2CGP027065**

Ok, thanks.

Peter Nanula
Concert Golf Partners
Tel: (949) 715-0602
Cell: (415) 260-8806

On Nov 4, 2016, at 7:33 AM, Michael Plotnick <mplotnick@ridgewoodrep.com> wrote:

> Peter - I completely understand what you are trying to do and I think your proposal is pretty close. With a little minor tweaking, I think we have the basis for a deal here.
>
> My suggestion is for you to get the feedback from Glenn and the board, prior to papering anything. In the meantime, we will continue to stand on the sidelines and let you do your thing. Keep me posted as to any progress made, and when you are closer to a deal with the club, we can paper our agreement. If you want to get together next time you are in town, let me know and happy to come meet again.
>
> I really look forward to working together on this.
>
> Thanks,
>
> Mike
>
> ---
>
> **From:** Peter Nanula [mailto:pnanula@concertcapital.com]
> **Sent:** Wednesday, November 02, 2016 11:08 AM
> **To:** Michael Plotnick
> **Subject:** Re: Philmont update
>
> Michael:
>
> We continue to be intrigued here, with the caveat that we still have to get comfortable with the Club in the event that no real estate proceeds are ever realized (enviro, Town, intersection, buyers).
>
> We would only pursue the real estate angle with Ridgewood; I am prepared to sign an agreement to that effect. My counter-proposal on the real estate is as follows:
>
> ? We split the entitlement costs 50-50, to keep everyone honest. You incur; you seek our approval only on material items; you submit to us for 50% reimbursement; we pay promptly.
>
> ? We take the next ███ as you suggested, in order to deal with member capex obligations, which could go higher than the ███ have discussed with Glenn as we open up walls and as members put more pressure on us. It usually goes this way. We will try to save ███ here for ourselves, but there is risk here for us based on past experience.
>
> ? We split the remainder ███████████████████████

3

My math shows that Ridgewood still makes ██████████████████ in any reasonable scenario. We get a little more of the total proceeds because (1) we have to deal with member pressures and capex vagaries 3-5 years down the road, and (2) we upfronted the capital to buy all 300+ acres of land so that Ridgewood does not have to do this. In a normal deal where we are both fronting the land cost, I would still presume a straight-up ██ deal, but here the fact pattern and risks are different.

Let me know if this works for you guys. If so, send me a simple agreement and I will sign it.

Peter

-------------------

Peter Nanula
Concert Golf Partners
Tel:  949.715.0602
Cell:  415.260.8806
www.concertgolfpartners.com

Watch Now.
*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

---

**From:** Peter Nanula <pnanula@concertcapital.com>
**Date:** Wednesday, November 2, 2016 at 8:40 AM
**To:** Michael Plotnick <mplotnick@ridgewoodrep.com>
**Subject:** Philmont update

Sent Glenn a proposal yesterday. He emailed me yesterday about it, and we spoke again today.

He wanted to explore how we could give the club 100% of all our real estate proceeds in 2-4 years when a deal happens. I said no; about $5m is all we could afford to plow back. We are taking the risk in this scenario, not the club. He understood. Now he goes back to his Board.

I offered up Nov 14-15 when I will be in Philly again for town hall meetings and member vote at this other Philly club we are recapitalizing. My guess is that I will be in front of his Board or at least Executive Committee then, and we will see if a consensus can be reached on our proposal. If so, great – we will move ahead on our club deal, and start working with you on the real estate deal. If not, then he may come back to you, and ask for $7m instead of $5m. For now, I hope you guys will stand back, profess some concerns about the real estate risks, and just wait to see if I can strike a better deal for all of us here.

4

**2CGP027067**

More soon, including ideas for deal structure between us.

Peter

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

Peter Nanula
Concert Golf Partners
Tel:  949.715.0602
Cell:  415.260.8806
www.concertgolfpartners.com

Watch Now.
*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

**2CGP027068**

# EXHIBIT 22

**To:**    Samuel A. Silverman (Ssilverman@skllc.com)[Ssilverman@skllc.com]; Jordan M. Kendall (Jkendall@skllc.com)[Jkendall@skllc.com]
**From:**   Glenn Meyer
**Sent:**   Tue 12/20/2016 10:11:51 PM
**Subject:**   FW: Revised Metropolitan proposal for Philmont
Philmont Country Club revised offer   12-20-16.pdf

Hot off the press.  Not interested.

Best regards.



Glenn Meyer, CPA/PFS, CFP®, AIF®, ChFC, CLU
GDM Advisory Group, Ltd.
123 Old York Road, Suite 200
Jenkintown, PA  19046
215-886-5800
215-886-6575 FAX
www.gdmplan.com



The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.  Please also be advised that all e-mail sent to or from this address may be received or otherwise recorded by the firm's e-mail system and is subject to archival and review by someone other than the recipient.

Please remember to contact GDM Advisory Group, Ltd. if there are any changes in your personal/financial situation or investment objectives for the purpose of reviewing/evaluation/revising our previous recommendations and/or services, or if you want to impose, add, or modify any reasonable restrictions to our investment advisory services.  A copy of our current written disclosure statement discussing our advisory services and fees continues to remain available for your review upon request.

**From:** Marty Stallone [mailto:mstallone@mmgapts.com]
**Sent:** Tuesday, December 20, 2016 4:27 PM
**To:** Glenn Meyer <glenn@gdmplan.com>
**Cc:** Mike Tulio <mtulio@mmgapts.com>; Paul Bauer <pbauer@mmgapts.com>
**Subject:** Revised Metropolitan proposal for Philmont

Glenn,
        Attached is the revised Metropolitan proposal for the purchase of the land we previously had under agreement.  I appreciate the extension of time as I know you want to get this out to your membership.
        We tried to keep it very simply and straight forward.  Please call with any questions. Thank you.


**Marty Stallone**
*Executive VP of Development*
Metropolitan Companies

PCC-2909

1030 Reed Avenue, Suite 100
Wyomissing, PA 19610

610-288-7700 ext 31
610-574-1542 (mobile)
mstallone@mmgapts.com

# EXHIBIT 23

***LIMITED APPRAISAL REPORT OF REAL PROPERTY***
***SUMMARY FORMAT OF REPORT***
**PHILMONT COUNTRY CLUB**
**301 TOMLINSON ROAD**
**LOWER MORELAND TOWNSHIP**
**MONTGOMERY COUNTY, PA**
***PREPARED BY MICHAEL F. DELANEY & ASSOCIATES, INC.***

# MICHAEL F. DELANEY & ASSOCIATES, INC.
## MICHAEL F. DELANEY SRPA

Real Estate Appraisers
and Consultants
P. O. Box 1368
Southampton, PA 18966
Phone #(215) 860-5700
Fax #(215) 860-5382

November 14, 2003

Fox Chase Bank
1225 Industrial Boulevard
Southampton, PA 18966
Attn: Mr. David Waltz, Vice President

RE:   PHILMONT COUNTRY CLUB
301 TOMLINSON ROAD
LOWER MORELAND TOWNSHIP
MONTGOMERY COUNTY, PA

Dear Mr. Waltz:

In accordance with your request, we have inspected the above referenced property and have analyzed the pertinent market data in connection with establishing the as is market value of the subjects fee simple interest as of November 7, 2003, the date of our last inspection. The subject consists of an 36 hole private golf club with clubhouse facilities including a pro shop, locker rooms, banquet room, dining room, cocktail lounge and two grill rooms plus an indoor tennis club, outdoor tennis facilities and a swimming pool. The improvements are situate on one parcel embracing a gross land area of 295.45 acres which is held in fee simple ownership by Philmont Country Club. The existing facilities, golf course and site improvements were observed to be in good condition as of the effective date of the appraisal on November 7, 2003. It is our conclusion that the highest and best use of the subject would be for continued use of the existing facilities and golf course improvements.

In accordance with prior agreement between the client and the appraiser, the document presented is a Limited Summary appraisal report as defined herein. The reader is assumed to be in possession of the Uniform Standards of Professional Appraisal Practice as published by the Appraisal Foundation. A description of the various types of appraisals is provided herein. The appraisal has been prepared for Fox Chase Bank, the intended user of the report. This appraisal may not be used or relied upon by anyone other than the intended user, for any purpose whatsoever, without the express written consent of the appraisers.

Based upon the data analysis and conclusions set forth in this report it is our opinion that the as is market value of the fee simple interest for the subject, excluding all Furniture, Fixtures, Equipment and Licenses was

**TEN MILLION AND SIX HUNDRED THOUSAND ($10,600,000) DOLLARS**

The value estimate is reported as of the effective date of this appraisal on November 7, 2003, the date of our last inspection.

**THIS LETTER MUST REMAIN ATTACHED TO THE REPORT, WHICH CONTAINS 52 PAGES PLUS RELATED EXHIBITS, IN ORDER FOR THE VALUE OPINION SET FORTH TO BE CONSIDERED VALID.**

We have assumed that there are no hidden or undisclosed conditions of the land or of the improvements which would render the property more or less valuable. Furthermore, we have conducted no review of matters environmental in nature and assume the absence of asbestos, radon and any other environmentally hazardous or sensitive materials or deposits on the property, nor have we conducted a review of matters in nature relating to compliance of the property with the American with Disabilities Act ("ADA") or state or local laws or building codes as they may pertain to the property, and we do not render any opinion as to whether or not nor to the extent or failure to comply with the ADA or such laws or codes may impact on the value of the property.

We are not experts in the field of hazardous materials. The appraisal does not constitute an expert environmental inspection of the property. The only way to be certain as to the condition of the property with respect to "environmental hazard" is to have an expert in the field inspect the property. The appraisal should not be relied upon as to whether or not environmental hazards actually exist on the property.

The analyses contained in this report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during the period covered by our analysis will vary from our estimates and the variations may be material.

If you have any questions or comments regarding this appraisal report, please feel free to call our office.

Very truly yours,

CRAIG W. GLEASON, MAI
PA. Certified General
Real Estate Appraiser GA-000269-L


MICHAEL F. DELANEY, SRPA
PA. Certified General
Real Estate Appraiser GA-000528-L

# TABLE OF CONTENTS

|  | PAGE NO. |
|---|---|
| LETTER OF TRANSMITTAL | 2-3 |
| CERTIFICATION OF APPRAISERS | 5 |
| SUBJECT PHOTOGRAPHS | 6-11 |
| CERTIFICATIONS, ASSUMPTIONS AND LIMITING CONDITIONS | 12-14 |
| SUMMARY OF SALIENT FACTS | 15 |
| PURPOSE - DEFINITION OF MARKET VALUE | 16 |
| PROPERTY RIGHTS-OWNERSHIP & OCCUPANCY | 17-18 |
| SCOPE OF INVESTIGATION | 19 |
| PROPERTY DATA | 20-21 |
| REGIONAL ANALYSIS | 22-23 |
| MONTGOMERY COUNTY ANALYSIS | 24-26 |
| NEIGHBORHOOD ANALYSIS | 27-29 |
| SITE DESCRIPTION | 30 |
| BUILDING & SITE IMPROVEMENTS | 31-33 |
| GOLF COURSE IMPROVEMENTS | 33-34 |
| MARKET ANALYSIS | 35-39 |
| HIGHEST & BEST USE | 40 |
| METHOD OF VALUATION | 41 |
| SALES COMPARISON APPROACH | 42-49 |
| RECONCILIATION | 50 |
| CERTIFICATION OF MARKET VALUE | 51 |
| ADDENDUM | 52 |

## CERTIFICATION OF APPRAISERS

Except as otherwise noted in the appraisal report, the undersigned do hereby certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct;

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, unbiased, professional analyses, opinions and conclusions;

3. We have no present or prospective interest in the property that is the subject of this report, and we have no personal interest or bias with respect to the parties involved;

4. Our compensation for the preparation of this report is not in any sense contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, a minimum valuation, the attainment of a stipulated result, the approval of a loan, or the occurrence of a subsequent event;

5. Our analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute and the Uniform Standards of Professional Appraisal Practice;

6. CRAIG W. GLEASON, MAI and MICHAEL F. DELANEY, SRPA have made a personal inspection of the property that is the subject of this report;

7. No one has provided significant professional assistance to the undersigned in the preparation of the analyses, conclusions and opinions concerning real estate that are set forth in this appraisal report;

8. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives;

9. The appraisal assignment was not based on a requested minimum valuation, a specific valuation or the approval of a loan.

10. We have read and understood the competency provision of USPAP.


MICHAEL F. DELANEY, SRPA
PA. Certified General
Real Estate Appraiser GA-000528-L

CRAIG W. GLEASON, MAI
PA. Certified General
Real Estate Appraiser GA-000269-L


MICHAEL F. DELANEY & ASSOCIATES, INC.



FRONT VIEW OF CLUBHOUSE (NORTH SIDE)



FRONT VIEW OF CLUBHOUSE (SOUTH SIDE)



VIEW OF MAIN PARKING LOT



REAR VIEW OF CLUBHOUSE



VIEW OF POOL AREA



VIEW OF OUTSIDE TENNIS COURTS



VIEW OF MAINTENANCE BUILDING



FRONT VIEW OF CARETAKERS COTTAGE



EXTERIOR VIEW OF TENNIS BUILDING



INTERIOR VIEW OF TENNIS BUILDING



INTERIOR VIEW OF LADIES CARD ROOM



INTERIOR VIEW OF MAIN BALLROOM



INTERIOR VIEW OF MAIN RECEPTION AREA



INTERIOR VIEW OF MAIN KITCHEN



INTERIOR VIEW OF PHILMONT GRILLE ROOM



VIEW OF HOLE #9 (NORTH COURSE)



VIEW OF HOLE #8 (NORTH COURSE)



VIEW OF HOLE #5 (NORTH COURSE)



VIEW OF HOLE #2 (SOUTH COURSE)



VIEW OF HOLE #2 (NORTH COURSE)



VIEW OF HOLE #6 (SOUTH COURSE)



VIEW OF HOLE #12 (SOUTH COURSE)



VIEW OF TOMLINSON ROAD (NORTHWEST)



VIEW OF TOMLINSON ROAD (SOUTHEAST)

## ASSUMPTIONS, LIMITING CONDITIONS & CONTINGENCIES
Limited Summary Format of Report

1.  The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

2.  Information provided by parties not employed by us is assumed to be true and correct, and no liability resulting from misinformation is assumed by us.

3.  All mortgages, liens, encumbrances, leases and servitudes have been disregarded.

4.  We take no responsibility for events, actions, conditions or circumstances affecting the subject property or its market value that take place subsequent to either the date of value contained in this report, or to the date of field inspection, whichever occurs first.

5.  No responsibility is assumed by us for hidden or unapparent conditions of the subject property, subsoil or structures which would render it more or less valuable, or for engineering which may be required to discover such conditions.

6.  There are no existing judgments or pending or threatened litigation which could affect the value of the property.

7.  The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.

8.  No changes in any federal, state or local laws, regulations or codes (including, without limitation, the internal Revenue Code) are anticipated.

9.  We have made no survey of the property and have assumed no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.

10. No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials.

11. No responsibility is accepted by us for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters; geologic considerations, such as soils and seismic stability; and civil, mechanical, electrical, structural, and other engineering and environmental matters.

12. If the property is subject to one or more leases, any estimate of residual value may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time the lease (s) expire or otherwise terminate.

13. The value conclusion (s) applies to the real estate only, and does not include personal property, machinery and equipment, trade fixtures, business value, goodwill or other nonrealty items. Income tax considerations have not been included or valued. We make no representations as to the value increment which may be attributed to such considerations.

**MICHAEL F. DELANEY & ASSOCIATES, INC.**

14. The analyses necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during the period covered by our analysis will vary from our estimates, and the variations may be material.

15. The existence of potentially hazardous material used in the construction or maintenance of the improvements, such as the presence of urea formaldehyde foam insulation, asbestos, and/or existence of toxic waste or radon, which may or may not be present on or in the property, was not observed by us nor do we have any knowledge of the existence of such materials on or in the property. We, however, are not qualified to detect such substances  The existence of these potentially hazardous materials may have an affect on value. The client (s) is urged to retain an expert in this field, if needed and/or desired.

16. In completing the appraisal, it is understood and agreed that this report is not intended, and will not be used in connection with a Real Estate Syndication or Syndicates. This report and any liability or obligation on the part of us is invalid if used in connection with a syndication.

17. This appraisal is made for valuation purposes only. It is not intended, nor is it to be construed, to be an engineering report. We are not qualified structural engineers, therefore, not qualified to judge the structural integrity of the improvements. Consequently, no warranty, representation or liability is assumed for the structural soundness, quality, adequacy or capacities of said improvements and utility services, including the construction materials, particularly the roof, foundations, and equipment, including the HVAC system. Should there be any question concerning same, it is strongly recommended that an Engineering/Construction inspection be obtained. The value estimate (s) is predicated on the assumption that all improvements, equipment, and building services are structurally sound and suffer no concealed or latent defects or inadequacies.

18. We find no obvious evidence of insect infestation or damage, dry or wet rot. Since a thorough inspection by a competent inspector was not performed for us, the subject is assumed to be free of existing insect infestation, wet rot, dry rot, and any structural damage which may have been caused by pre-existing infestation or rot which was subsequently treated.

19. The client (s) by receipt of this appraisal, shall indemnify and hold harmless MICHAEL F. DELANEY & ASSOCIATES, INC. and/or its individual staff members from and against all damages, expenses, claims, demands and costs, including legal fees incurred in investigating and defending any claims, arising from or in any way connected to the inclusion of the aforesaid reference to MICHAEL F. DELANEY & ASSOCIATES, INC. and/or its individual staff member's opinion (s) of value.

   In any event, the maximum damages recoverable from MICHAEL F. DELANEY & ASSOCIATES, INC. or its employees relative to this engagement shall be the amount of the monies actually collected by MICHAEL F. DELANEY & ASSOCIATES, INC. for this assignment and under no circumstances shall any claim for consequential damages be made. In addition, there is no accountability or liability to any third party.

This appraisal report is to be used in whole and not in part. No part of it shall be used in conjunction with any other appraisal. No responsibility is assumed by me for matters which are of a legal nature, nor is any opinion on the title rendered herewith. Good and marketable title is assumed. Management is assumed to be competent and the ownership to be in responsible hands.

By reason of this appraisal report, We are not required to give testimony in court with reference to the property appraised unless arrangements have been previously made therefor.  However, We are prepared to give testimony in support of this appraisal report provided that arrangements are made prior to testimony.

Disclosure of this appraisal report is governed by the By-Laws and Regulations of the Appraisal Institute.  Therefore, except as hereinafter provided, the party for whom this appraisal report was prepared, may distribute copies of this appraisal report, in its entirety, to such third parties as may be selected by the party for whom this appraisal report was prepared; however, selected portions of this appraisal report shall not be given to third parties without the prior written consent of the signatory of this appraisal report.  Further, neither all nor any part of this appraisal report shall be disseminated to the general public by the use of advertising media, public relations media, sales media, or other media for public communication (including, without limitation, prospectuses, private offering memoranda, and other offering material provided to prospective investors) without the prior written consent of the signatory of this appraisal report, to ensure the accuracy and adequacy of such references to this appraisal report.

## SUMMARY OF SALIENT FACTS AND CONCLUSIONS

**PROPERTY TYPE:**  Private Country Club with 36 hole Golf Course

**LOCATION:**  301 Tomlinson Road
Lower Moreland Township
Montgomery County, PA

**DATES INSPECTED:**  November 7, 2003

**DATE OF VALUATION:**  November 7, 2003

**OWNER OF RECORD:**  Philmont Country Club

**LAND AREA:**  295.45 Acres

**GROSS BUILDING AREA:**  58,658 SF

**ZONING:**  PR Park Recreation & L-Residential District

**HIGHEST & BEST USE:**

**AS VACANT:**  Development of two championship golf courses with tennis facilities, pool and clubhouse facilities.

**AS IMPROVED:**  Continued utilization of the existing building and site improvements as a private non-equity country club.

**VALUE ESTIMATE:**  **$10,600,000 (AS IS, Excluding F, F & E)**

## PURPOSE

The purpose of this appraisal report is to estimate the as is Market Value of the fee simple interest for the subject property, excluding all Furniture, Fixtures, Equipment and licences (F, F & E) as of a current date.

## FUNCTION:

It is our understanding that the function of this report is for internal financial analysis by Fox Chase Bank, the intended user of the report, as a basis for a potential mortgage loan.

## DEFINITION OF MARKET VALUE

Market Value may be defined as follows:

> The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently and knowledgeably and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
> 1. buyer and seller are typically motivated;
> 2. both parties are well informed or well advised, and acting in what they consider their best interests;
> 3. a reasonable time is allowed for exposure in the open market;
> 4. payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and
> 5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale[1].

* Adjustments to the comparables must be made for special or creative financing or sales concessions.  No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area;  these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction.  Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession, but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

---

1. *The Appraisal Standards Board (ASB) of The Appraisal Foundation, Uniform Standards of Appraisal Practice (USPAP), (2003 Edition), page #224.*

**MICHAEL F. DELANEY & ASSOCIATES, INC.**

## PROPERTY RIGHTS APPRAISED

The fee simple estate constituted the real property evaluated in this report.  Aside from zoning controls, deed restrictions, and easements of record, the fee simple title was assumed to be free and clear of all liens or encumbrances.

## DEFINITIONS
## FEE SIMPLE ESTATE

Absolute ownership unencumbered by any other interest or estate, subject only to limitations imposed by governmental powers of taxation, eminent domain, police power, and escheat[1].

## COMPLETE APPRAISAL

The act or process of developing an opinion of value or an opinion of value developed without invoking the DEPARTURE RULE[2].  Note.  To develop this type of appraisal, the appraiser will use applicable approaches to value and the value conclusion will reflect all known information about the subject property, market conditions and available data.

## LIMITED APPRAISAL

The act or process of developing an opinion of value or an opinion of value developed under and resulting from invoking the DEPARTURE RULE[3].

## DEPARTURE RULE

This RULE permits exceptions from sections of the Uniform Standards that are classified as specific requirements rather than binding requirements.  **The burden of proof is on the appraiser to decide before accepting an assignment and invoking this Rule that the scope of work applied will result in opinions or conclusions that are credible**.  The burden of disclosure is also on the appraiser to report any departures from specific requirements.

An appraiser may enter into an agreement to perform an assignment in which the scope of work is less than, or different from, the work that would otherwise be required by the specific requirements, provided that prior to entering into such an agreement:

1)   the appraiser has determined that the appraisal process to be performed is not so limited that the results of the assignment are no longer credible;

2)   the appraiser has advised the client that the assignment calls for something less than, or different from, the work required by the specific requirements and that the report will clearly identify and explain the departure(s); and

3)   the client has agreed that the performance of a limited appraisal service would be appropriate, given the intended use[4].

---

1.      Appraisal Institute, The Dictionary of Real Estate Appraisal, 3rd Edition (Chicago: AI, 1993), Page 140.
2.      The Appraisal Standards Board (ASB) of The Appraisal Foundation, Uniform Standards of Appraisal Practice (USPAP), page #1, 2003 Edition.
3.      USPAP, 2003, page #1.
4.      USPAP, 2003, page #1.

## SELF-CONTAINED APPRAISAL REPORT

A written report prepared under the Standards Rule 2-2(a) or 8-2 (a) of a Complete or Limited Appraisal performed under Standard 1[1]. Note. This report contains to the fullest extent possible, practical explanations of the data, reasoning, and analyses that were used to develop the opinion of value. It also includes thorough descriptions of the subject property, the properties locale, the market for the property type, and the appraisers opinion of highest and best use.

## SUMMARY APPRAISAL REPORT

A written report prepared under the Standards Rule 2-2(b) or 8-2 (b) of a Complete or Limited Appraisal performed under Standard 1[2]. Note. This report contains to the fullest extent possible, practical explanations of the data, reasoning, and analyses that were used to develop the opinion of value. It also includes thorough descriptions of the subject property, the properties locale, the market for the property type, and the appraisers opinion of highest and best use.

In accordance with prior agreement between the client and the appraiser, this report is the result of a **limited appraisal process reported in a summary format** in that certain allowable departures from specific requirements of the Uniform Standards of Professional Appraisal Practice were invoked. The intended user of this report is warned that the reliability of the value conclusion provided may be impacted to the degree there is departure from specific requirements of USPAP. The following is a **Limited Summary Appraisal Report** which is intended to comply with the reporting requirements set forth under Standards Rule 2-2 (b) of USPAP.

## IDENTIFICATION OF SUBJECT PROPERTY

The property being appraised consists of an 36 hole private golf club known as Philmont Country Club. It is situated on the northwest corner of Tomlinson and Pine Roads in the "Huntingdon valley" section of Lower Moreland Township, Montgomery County, Pennsylvania. The building and site improvements are also identified as Montgomery County uniform tax assessment parcel #41-00-09022-009 with a mailing address of 301 Tomlinson Road, Huntingdon Valley, PA 19006.

## HISTORY OF OWNERSHIP & OCCUPANCY

Fee title for the subject is currently vested in Philmont Country Club by five deed transfers recorded in the early 1920's. There were no recorded sales within the last three years and the property has not been recently offered for sale on the open market. Philmont Country Club was founded in 1907 and currently has a membership of 420 active (golf) members, 30 Tennis members and 100 social members.

---

1.     The Appraisal Standards Board (ASB) of The Appraisal Foundation, Uniform Standards of Appraisal Practice (USPAP), page
       #4, 2003 Edition.
2.     USPAP, 2003, page #4.

## SCOPE OF THE INVESTIGATION

As part of the appraisal, we have made a number of investigations and analyses. We have relied on data retained in our office files, which are updated regularly. The investigations undertaken and the major data sources used are listed below.

## LOCATION & AREA ANALYSIS

Examined Lower Moreland Township and Montgomery County public records for demographic data, land use policies and trends and zoning information. Interviewed local real estate brokers active in the subject market area.

## SITE DESCRIPTION & ANALYSIS

Consulted Lower Moreland Township zoning and engineering departments, tax records and reviewed legal description provided by the lender. Physically inspected the site November 7, 2003, walked perimeter of property, and photographed subject site, surrounding area, and street scenes.

## IMPROVEMENT DESCRIPTION & ANALYSIS

Physically inspected the interior and exterior of the subject buildings and entire golf course obtaining measurements, photographs and a detailed description of the improvements. Interviewed Mr. Stuart Waters, the club manager on November 7, 2003 and several subsequent occaisons.

## MARKET DATA PROGRAM

Obtained data on golf course transfers occurring between February, 1997 and August, 2003 which were located in the tri-state area. Obtained copies of deeds and financing instruments from the courthouse and attempted to contact buyers, sellers, or both to verify transaction data and ensure that sales were at arms length. Details of the verified sales are included in the Sales Comparison Approach.

Interviewed golf professionals, club managers and greens superintendents in the subject market area on revenue, expense and maintenance data for competitive golf courses in the subjects market area.

Under the "competency" provision of USPAP, an appraiser is required to describe the lack of knowledge and/or experience and the steps taken to complete the assignment competently in the report. The client is hereby informed that Mr. Craig W. Gleason, MAI has previous experience in the valuation of both daily fee and private golf courses. Also, Mr. Gleason is an experienced golfer with a registered handicap in the United States Golf Association. In addition, Mr. Gleason has served on the North Hills Country Club Board of Governors from 1997-2000 serving on the house committee.

## ASSESSMENT & REAL ESTATE TAXES:

The subject is presently assessed for a total of $8,364,390 based on a reassessment completed in 1997. The current millage ratios for the various taxing authorities totals 26.43 mills per thousand. At this rate total taxes on the property at present are $221,069. The calculation is as follows:

$$\$8,364,390 \times .02643 = \$221,069$$

The current state tax equalization board (STEB) ratio used by Montgomery County is 76.7% indicating an assessed market value of $10,905,332. **A tax assessment appeal is recommended based on our as is value conclusion.**

## FLOOD PLAIN:

The subject site is located within a HUD identified Flood Plain Area as per map #s 42091C 0318E and 42091C 0406E for Lower Moreland Township dated December 19, 1996 (See Addendum). A small creek and pond are located on the site and are incorporated into the design of the North golf course. The South Course is located adjacent to and within a 100 year flood plain with significant wetlands vegetation noted along the adjacent property. This area has been subject to heavy flooding in recent years.

## ZONING:

The subject has approximately 18.359 acres located on the south side of Tomlinson Road which are zoned L-Residential district. The remaining 277+ acres are currently zoned PR Park Recreation District as per the Lower Moreland Township Zoning Map (See Addendum).

The L-Residential district permits development of single family dwellings on square foot (.50 acre) lots. The purpose of the PR district is to encourage the retention of open space and provide areas for recreation while protecting the natural scenic beauty of the site. Permitted uses include recreational uses including country clubs similar to the subject.

| SUMMARY OF STREET IMPROVEMENTS | | | | |
|---|---|---|---|---|
| Name of Street | Buck Road | Tomlinson Road | Pine Road | Philmont Ave. |
| Frontage | 778.8' | 2,337.5' | 3,178.77' | 729.65' |
| Direction of Traffic | NE-SW | NW-SE | NE-SW | NE-SW |
| Cartway Width | 50' | 50' | 50' | 80' |
| Medial Strip/Barrier | None | None | None | None |
| Sidewalk | None | None | None | None |
| Curb | No | No | No | No |
| Street Lights | Yes | Yes | Yes | Yes |
| On-Street Parking | No | No | No | No |
| Access | Good | Good | Good | Average |
| Visibility | Good | Good | Good | Average |

The subject site and improvements are presently serviced by all public utilities.  On site wells contribute to the golf course irrigation system.

## REGIONAL ANALYSIS

The subject property is situated in Lower Moreland Township, Montgomery County, Pennsylvania. Montgomery County is a part of the Philadelphia Standard Metropolitan Statistical Area. Philadelphia is the geographic and economic center of a dynamic region identified as the Delaware Valley.

### Delaware Valley Overview

The Delaware Valley is comprised of a cluster of nine counties oriented to the Delaware River and united by a common identity reinforced by bonds of culture, industry and commerce. Philadelphia is at the geographic center of the region and has historically provided the focal point of the region's patterns of growth and change. The region includes five counties on the Pennsylvania side of the Delaware River, being Bucks, Chester, Delaware, Montgomery and Philadelphia; as well as four counties on the New Jersey side, to include Camden, Burlington, Gloucester and Mercer.

Philadelphia's strategic location in the Northeast region has allowed it to maintain its position as the fifth most industrialized region in the nation. In recent years, the MSA has experienced a shift in its economic activity with service/wholesale and retail sectors becoming increasingly important. Paralleling many Northeastern cities, employment losses have occurred in traditionally strong segments that include government and manufacturing. Offsetting these losses have been gains in construction, FIRE, service and wholesale/retail sectors.

In 1990, the SMSA had a total nonagricultural employment of 2,660,000 people, an increase from 2,366,300 people in 1980. These figures reflect a compound annual growth rate of 1.24 percent over the ten year period. The economic shift to service-oriented businesses is expected to continue as companies are attracted to the region because of available space, a good labor pool, and favorable economic conditions relative to other metropolitan areas. Philadelphia's central business district has experienced a great expansion in office construction. This growth has drawn new businesses and has facilitated the expansion of existing ones. New corporate tenants which have been attracted to Philadelphia's central core include IBM, Mellon Bank, CIGNA, and Verizon Corporation. Manufacturing in the region, although in a downward trend, is expected to continue to be an important economic base, and along with the inclusion of the expanded service-oriented base, it will undoubtedly strengthen the area.

As previously noted, the region is conveniently located within the northeast corridor which provides convenient access to a comprehensive network of transportation systems. The highway network is a particular strength of the region. Regional routes serving the area include I-95, which extends north-south from Maine to Florida and provides a focal point to the northeast corridor. U. S. Route 1 basically parallels I-95 and provides a more localized transportation and commercial corridor. The regional turnpike system features the Pennsylvania Turnpike (I-76; 276) extending east-west across the state, and the New Jersey Turnpike, extending north-south. These two regional highways connect within the region at their intersection with the Delaware River. The Pennsylvania Turnpike also has a Northeast Extension which extends north from Plymouth Meeting (Montgomery County) and connects with I-81 in the northeast section of the state. I-76, also known as the Schuylkill Expressway, extends from the Pennsylvania Turnpike to Philadelphia and joins with the Atlantic City Expressway south of the city providing access to Atlantic and Cape May County shore points. I-476, also known as the Blue Route or Mid-County Expressway, provides a limited access outer loop to the Pennsylvania suburban side of the region. On the New Jersey side, I-295 parallels the Delaware River, connecting Trenton, New Jersey with Wilmington, Delaware to the south. I-95 extends east from Trenton, providing a connection with Ocean County shore points. Numerous intermediate routes blanket the region and provide ready accessibility throughout the Delaware Valley. Also, the Pennsylvania Department of Transportation has recently announced plans to connect the PA turnpike with the I-95 expressway in lower Bucks County.

Public transportation is provided to national points by either rail or air. Philadelphia International Airport is centrally situated within the region and provides full service travel throughout the nation and internationally. The

airport was recently improved with a new international terminal to replace its outmoded predecessor. The domestic terminals are undergoing an expansion and renovation with expanded parking at this time. Rail transportation is provided by AMTRAK. Metroliner service is extensive to the northeast corridor and provides ready access to the cities listed previously. Access is also available to cities throughout the nation, although this service has been curtailed somewhat in recent years. These sources of national transportation are supplemented by regional systems, most notably SEPTA (Southeastern Pennsylvania Transportation Authority) on the Pennsylvania side and New Jersey Transit on the New Jersey side.

Industrial transport is accommodated throughout the region as well by an intermodal system. CSX has an intensive network of freight lines which connect with other regional systems. Air freight service is available from Philadelphia International Airport. Numerous truck lines are based in the region and operate nationally. The region even boasts a port system which is in the process of undergoing regional coordination.

## CONCLUSION

The Delaware Valley is a vast socio-political area which benefits from numerous advantages. Situated centrally within the dynamic northeast corridor, the region has all of the ingredients necessary to realize ongoing success and continued growth. I expect areas throughout the region to continue to be competitive and grow for the foreseeable future.

## MONTGOMERY COUNTY ANALYSIS

Montgomery County is located just northwest of the City of Philadelphia and is within a 200 mile radius of major metropolitan centers such as Baltimore, New York Washington, D.C. and Boston. Its proximity to the city of Philadelphia allows it to benefit from many of the conveniences of the city without incurring the problems associated with most major cities.

Encompassing approximately 492 square miles, Montgomery County contains 62 municipalities ranging in size from the Borough of Green Lane with 0.311 square miles and a population of 450 to Lower Merion Township with 23.64 square miles and a population of 58,818. The county shares a 29 mile common boundary with Philadelphia on the east. The townships located along this boundary are the most densely developed and house the greatest concentration of population in the county. The western end of the county is still somewhat rural.

### POPULATION

Montgomery County remains firmly entrenched as the third most populous county in the commonwealth behind Philadelphia and Allegheny (Pittsburgh). Population in Montgomery County per the 1998 estimated Census was 719,718 persons, a 6.12 percent increase from 1990. This reflects significant increases in population in the recently developed townships of Central and Western Montgomery County, but a general decline in the eastern townships. The growth in Central and Western Montgomery County is primarily a reflection of improved accessibility, continued municipal sewer service and the great influx of new jobs in the area. The municipalities which experienced a population decline during the 1990's are primarily the older boroughs and townships which border the City of Philadelphia. The population declines were nominal and are directly related to the smaller household composition, which is a national trend.

### EMPLOYMENT

Montgomery County is second only to Philadelphia as a center for employment in the region. This trend is a reflection of the migration of industry to the suburbs and a favorable industrial mix. The major source of employment in Montgomery County has been white collar employment which has developed in the fast growing office and industrial corridors bordering the Pennsylvania Turnpike and Route #202. These corridors include affluent industrial and office parks such as Pennsylvania Business Campus, King of Prussia Business Park, Fort Washington Office Park and Whitemarsh Industrial Campus. A current trend within these parks has been conversion of the light industrial buildings constructed in the 1960's through 1980's to Class A office space due to increased demand from the increased employment from the service sector.

Also, Montgomery County is creating recognition as an employment center for the pharmaceutical industry. It is home to such prestigious firms as Merck, McNeill, Rhom & Haas; and Smith-Kline Beecham. Smith-Kline Beecham recently purchased the former headquarters of Sterling Drug Company in the Collegeville section of Upper Providence Township relocating approximately 2,000 employees to their new research and development facility. Another notable addition is the Philadelphia Newspapers facility in Upper Merion Township. The company relocated all of its printing, warehousing and distribution business to this $300 million facility. This relocation resulted in employment of approximately 1,200.

Service related jobs currently account for the largest share of Montgomery County's total employment (32.8%). Durable manufacturing declined during the 1980's and 1990's while wholesale and retail trade remained stable. The main impetus of growth in the service sector is the growth of white collar jobs in Professional and Business services. This employment sector includes fast growth in such fields as health, law, engineering, accounting, and data processing.

According to the Delaware Valley Regional Planning Commission's 1990 census figures, employment in Montgomery county increased by 26.9% from 1980 to 1990 (from 360,3999 employed to 457,500). Employment was anticipated to have grow an additional 6.3 percent to 486,200 at the end of 2000.

<u>INCOME</u>

Montgomery County's per capita income has historically been the highest of any county in the state. In comparison, the second highest per capita income in 1990 was Chester County at $20,601. Montgomery County's median family income ($51,353) is the highest in Pennsylvania. The county's percentage of families in the $50,000 and over income category (42.1%) is the highest in the Delaware Valley Region. The county's percentage of families in the $10,000 and under income category (6.6%) is the lowest in the region. Montgomery County's highest median family incomes are found in its eastern and central municipalities. With the exception of Lower Salford Township, each of the top fifteen municipalities in median family income also appear among the top fifteen in percentage of families in the $50,000 and overall family income bracket.

The Montgomery County municipalities with the lowest median family incomes are the Schuylkill River boroughs, western boroughs and townships with close economic ties to the western boroughs. Most of the municipalities with the fifteen lowest median family incomes are also among those municipalities with the fifteen highest percentages of families in the $10,000 and under family income category.

<u>TRANSPORTATION</u>

Being an integral part of the Philadelphia Metropolitan area, Montgomery County enjoys the benefits of the highly developed transportation system which serves the area. The Pennsylvania Turnpike and its Northeast Extension intersect in the county. The Turnpike links the area with Philadelphia, Harrisburg, Allentown and Scranton. Interchanges available in Montgomery County are situated in Willow Grove at Route #611, Fort Washington at Route #309, Norristown at Route #422, and King of Prussia at Route #202. A major impact on the county is Interstate 476 (the Blue Route), which connects Montgomery County with Interstate 95 through Delaware County.

An excellent public transportation system serves the eastern and, to some degree, the western portions of the county. Bus is limited, but commuter rail lines to Center City Philadelphia are bountiful. These are operated under the administration of the Southeastern Pennsylvania Transportation Authority (SEPTA).

<u>HOUSING DEVELOPMENT</u>

Housing in the metropolitan area is a diverse mix of detached single family dwellings, semi-detached and attached townhouses. Approximately 17.3 percent of total housing is in rental complexes of five units or more. An extremely positive feature of the metropolitan area is that the average price of a new or existing home is slightly less than the national average which affords a good "quality of living" at reasonable prices and tends to attract a quality work force. This is an extremely important factor to corporations considering relocation to and/or remaining in the Philadelphia metropolitan area.

**<u>CONCLUSION</u>**

The MSA has exhibited a shift in population away from the older counties of Philadelphia and Delaware toward the outlying suburban counties. This trend is expected to continue. The MSA and Montgomery County economies have shifted from a manufacturing base to a service/wholesale concentration and this trend is also expected to continue. The historical economic and development statistics for both the MSA and the county indicate the previous sluggishness of the economy during the period from 1989 to 1991 with increased unemployment rates and significant decreases in development activity. This trend had been reversed with significant increases in

development activity from 1992-93 and from 1996-98. Per capita income statistics reflect increases, and reflect the long-term strength of Montgomery County.

In conclusion, the continued growth and economic stability of Montgomery county is assured by its orientation and linkage to Philadelphia and the other suburban counties, by the perpetuation of a sound industrial base and by the existence of an excellent transportation network. I anticipate that it will maintain its position as the second wealthiest county in the state and the prospects for its future are favorable.

# NEIGHBORHOOD & AREA ANALYSIS

The subject property is located at the northwest corner of Tomlinson Road and Pine Road in the Huntingdon Valley section of Lower Moreland Township, Montgomery County, Pennsylvania. Lower Moreland Township is located in the eastern portion of Montgomery County and is bordered by Upper Southampton Township (Bucks County) to the north, Abington Township to the south, Upper Moreland Township to the west and the Northeast section of the City of Philadelphia to the east. The subject is approximately twenty miles north of Center City Philadelphia.

The area surrounding subject along is built-up primarily single family detached residential homes in the $200,000 to $900,000 price range. The subject property is located within one half-mile of the "Stonegate Estates" detached single family subdivision completed in 1999 on Paper Mill Road. Stonegate Estates offered 10 semi custom homes with an average lot size of 26,900 square feet with on site septic systems in the $475,000-$600,000 price range. The subject is also located near the Pennypack Watershed which encompasses over 2,000 acres of permanently preserved open space along the Pennypack Creek. The watershed is maintained by the Pennypack Ecological Trust which promotes the growth of wildlife and maintains walking trails through most of the watershed. There are several other new developments in the area which were completed within the last decade including Arcadia at Inverness Glen, the Fretz Tract, Pennock Woods and Long Lane III with custom homes in the $500,000 to in excess of $1,000,000. There is minimal vacant land available for development in Lower Moreland.

Highways as well as freight and water transportation serving the area are excellent. The Pennsylvania Turnpike may be accessed via Willow Grove, less than four miles west of the subject. Access is also available at the Philadelphia interchange located seven miles to the east. The I-95 Expressway is located nine miles east of the subject and connects the neighborhood with New Jersey to the north and Delaware to the south. The Schuylkill Expressway is a circumferential toll free limited access road connecting the Pennsylvania Turnpike with the New Jersey Bridges and Interstate 95. Transportation for the area is primarily by automobile; however, public bus and rail service are available along York Road (Route #611), approximately 1.5 miles west of the subject.

What commercial development there is in "Huntingdon Valley" is mostly confined to Route #232 (Huntingdon Pike), York Road and Route #63 (Welsh Road) with professional offices, retail stores, banks and several restaurants nearby. Community shopping is located at the Bethayres and Huntingdon Valley Shopping Centers located .5 miles and 3.5 miles southeast of the subject. Larger community and regional shopping centers are located west of the subject in Willow Grove and Montgomeryville.

The subject township is primarily residential in character and some of the pertinent demographic information is summarized as follows:

# INCOME

Lower Moreland Township is one of the most affluent areas in Montgomery County and Pennsylvania as depicted below by the income figures, which are significantly higher than the county as a whole as discussed previously in the Regional Analysis.

The income levels shown below are reported by the Delaware Valley Regional Planning Commission (DVRPC) in 1990. Per capita income increased by 33.9 percent over the estimated 1989 level to $40,129 as of 1999. Average median family and median household incomes increased by approximately 41 and 100 percent over the estimated 1989 levels to $98,656 and $82,597 respectively for 1999.

### LOWER MORELAND TOWNSHIP INCOME STATISTICS
### 1989 TO 1999

| INCOME CATEGORY | 1989 (CENSUS) | 1999 (CENSUS) | % CHANGE 1989-99 |
|---|---|---|---|
| Per Capita | $29,971 | $40,129 | +33.9% |
| Median Family | $69,743 | $98,656 | +41.4% |
| Median Household | $60,925 | $82,597 | +35.6% |

## POPULATION

The population in the areas surrounding Lower Moreland Township experienced minor growth over the past two decades; however, Lower Moreland has experienced moderate declines from 1980-2000. According to the U.S. Census, the population was 11,281 residents as of 2000, which represents a 4.1 percent decline from the 1990 figure of 11,768 residents. The   The following table presents the 1980 to 2000 population trends of neighboring Montgomery County municipalities.

### TOWNSHIP AND VICINITY
### 1980, 1990 AND 2000 POPULATION

| MUNICIPALITY | 1980 POPULATION | 1990 POPULATION | CHANGE 1980-90 | 2000 POPULATION | CHANGE 1990-2000 |
|---|---|---|---|---|---|
| Lower Moreland Township | 12,472 | 11,768 | (5.6%) | 11,281 | (4.1%) |
| Horsham Township | 15,959 | 21,896 | 37.2% | 24,232 | 10.6% |
| Upper Moreland Township | 25,874 | 25,313 | (2.2%) | 24,993 | (1.2%) |
| Abington Township | 59,084 | 56,322 | (4.7%) | 56,103 | -0.03 |
| Upper Dublin Township | 22,348 | 24,028 | 7.5% | 25,878 | 7.7% |
| TOTAL | 113,389 | 139,327 | 18.6% | 142,487 | 2.3% |

Source: U.S. Census Bureau

The table reveals a population decline within the subject township and moderate growth in the vicinity from 1990-2000 which is lower than experienced in Montgomery County (10.6%). This overall growth has been stimulated by the continued development of available land and out-migration of residents from Philadelphia and relocation of employees to Montgomery County.

## HOUSEHOLDS

The number of households in Lower Moreland Township experienced moderate growth over the past decade. According to the U.S.Census, the number of households totaled 4,154 as of 1990, which represents a 6.8% increase over the 1980 figure of 3,889 households. The number of households declined to 4,100 as per the 2000 census. The data reveals moderate household growth in the subjects vicinity in the past decade. This overall growth has been stimulated by the moderate development of available land and out-migration of residents from Philadelphia to neighboring counties.

**MICHAEL F. DELANEY & ASSOCIATES, INC.**

## HOUSING UNITS

The number of housing units in Lower Moreland Township in 1980 was 3,964 according to the U.S. Census, and increased 7% as of 1990 to 4,243 housing units. This rate of increase is typical of the percentage of increases among a majority of the surrounding municipalities, especially those with a limited amount of vacant residential land such as Lower Moreland township. Figures depicting the increases in housing units for the surrounding municipalities are presented in the following table.

### LOWER MORELAND & VICINITY
### HOUSING UNITS, 1980-2000

| MUNICIPALITY | 1980 UNITS | 1990 UNITS | % CHANGE 1980-90 | 2000 UNITS | % CHANGE 1990-2000 |
|---|---|---|---|---|---|
| **Lower Moreland Township** | **1,980** | **4,243** | **7.0%** | **4,209** | **(0.1%)** |
| Upper Moreland Township | 9,180 | 10,362 | 5.6% | 10,403 | 0.4% |
| Horsham Township | 5,769 | 8,599 | 49.1% | 9,269 | 7.8% |
| Abington Township | 20,983 | 22,116 | 5.4% | 22,367 | 1.1% |
| Upper Dublin Township | 6,870 | 8,403 | 22.3% | 9,344 | 11.1% |
| TOTAL | 44,782 | 53,723 | 14.8% | 55,592 | 3.5% |

Source: U.S. Census Bureau and Montgomery County Planning Commission.

As the preceding chart reveals, it appears that the housing supply growth has surpassed population growth during the last ten years in Lower Moreland Township and the vicinity. It should be noted, however, that this is mainly a function of the nationwide phenomenon of decreasing household size.

In summary, the subject property was observed to be well located, readily accessible via a good highway system and convenient to shopping, commercial facilities and employment centers. There are ample community facilities and good schools nearby. These factors interact to attract a good labor force as well as provide a ready market for a variety of goods and services. The subject land presents a well located site with desirable locational attributes and the prospects for the future are optimistic.

## SITE DESCRIPTION

The subject site consists of an assemblage of five parcels currently identified as one tax parcel which contains a total gross land area of 295.45 acres according to Montgomery County Courthouse records. The site is an irregular shaped corner parcel with road frontage and access from four Lower Moreland Township streets. The entire site has a rolling to gently sloping contour and topography throughout the site by design. The perimeter of the site adjacent to most residential neighborhoods is open with some mature stands of trees along several golf holes. A tributary of the Huntingdon Valley creek bisects the site from a northeast to southwest direction. There is a small pond located on the north side of the site which has been incorporated into the golf course design.

The north side of the site is located within a 100 year HUD identified flood plain area according to flood map panel #318 included in the addenda. The flood plain area follows the creek which crosses under Tomlinson Road. The south side of the site is significantly impacted by a 100 year flood plain as per map panel #406. There were no adverse physical or external factors noted at time of inspection and the location of the stream and pond have no impact on the existing building improvements.

There were no adverse easements noted at time of inspection. We have not reviewed a soil map; however, based upon our inspection of the site and surrounding land uses, it appears the site is capable of supporting the existing improvements.

## BUILDING IMPROVEMENTS

The site is presently improved with nine structures including an equipment garage, a maintenance garage with greens keepers office, a two story residence, an indoor tennis facility, two snack bars, an equipment barn and the main club house facility.

## CLUBHOUSE

The subject clubhouse was originally a detached 3.0 story dwelling constructed in the late 19th century. The building has had a number of additions and renovations over the years. The building is constructed of masonry, steel and wood frame structural components with stucco, stone and dryvit panel exterior walls. It has a gabled fiberglass shingle and partial built-up roof with aluminum gutters and downspouts with some aluminum clad double hung and fixed pane thermopane sash with original double hung sash on the upper floors. The original dwelling has a stone foundation and the remaining areas were constructed with concrete block foundation walls.

This two and part three level building embraces approximately 27,800 square feet of finished space on the two main levels which is utilized as a main ballroom with capacity for over 300 patrons, cocktail lounge with reception area, two grill rooms for casual dining, a 30 card room, mens and womens locker rooms, a pro shop and golf bag storage area. The upper floor of the main building is utilized for business offices, reception lounges for brides and dry storage. The remaining lower level is unfinished and utilized for utilities and storage.

The interior finish for the building consists of commercial carpeting, decorated and fabric covered walls and acoustic tile suspended ceilings with recessed and suspended fluorescent and incandescent lighting. The ballroom has a parquet floor. The golfers grill room and the Philmont room were renovated within the last five years.

There is a fully equipped main commercial kitchen divided into a food prep area, a dishwashing area, dry storage area and a two piece male employee lavatory. It has several walk-in freezers and refrigerators, quarry tile floors with floor drains, ceramic tile and painted gypsum board walls, and acoustic tile suspended ceilings with recessed fluorescent lighting. There is a larger banquet kitchen adjacent to the ballroom with similar interior features.

The building has a 400 amp main electrical service split to several sub panels. Heat is supplied by two gas-fired low pressure steam boilers with distribution via several air handlers for the public areas and baseboard distribution in the office areas and the second floor. Cooling is provided by several roof mounted and grade level central air units. The building is 100% wet sprinklered and there are hard wired smoke detectors and a centrally monitored security system with closed circuit cameras. There are two large gas-fired hot water heaters supplying domestic hot water with a rapid recovery system with holding tanks.

The overall condition of this building is rated as good with an effective age estimated to be 20 years with an economic life of 45 years due to the present condition. Thus, the remaining economic life is estimated to be 25 years considering future neighborhood trends, other similar properties in the area, the observed condition of the subject as well as physical life expectancies for a property of this type. There were no physical or functional inadequacies observed.

## EQUIPMENT MAINTENANCE BUILDINGS

There are two older maintenance buildings which were constructed of masonry and wood frame structural components with painted concrete block and wood siding exterior walls. They have gabled fiberglass shingle roofs over wood decking, aluminum gutters and downspouts. The improvements were constructed on concrete slab

foundations.

Each building has a 200 amp electrical service. Heat is supplied by gas-fired warm air heater with forced air distribution. There is a 20 gallon electric hot water heater providing domestic hot water. The overall condition of these two buildings is rated as above average with an effective age estimated to be 25 years with an economic life of 40 years due to the present condition. Thus, the remaining economic life is estimated to be 15 years considering future neighborhood trends, other similar properties in the area, the observed condition of the subject as well as physical life expectancies for a property of this type. There were no physical or functional inadequacies observed.

## INDOOR TENNIS BUILDING

This one and part two story building is located adjacent to the maintenance buildings with a private entrance from Pine Road. The facility is approximately 30 years old and embraces 23,160 square feet with three courts, a pro shop and a mezzanine for spectators. It has painted concrete block and galvalume metal panel walls, a Hartru tennis surface and concrete floor for public areas, steel support columns with steel roof framing members and a galvalume metal roof deck. It has one overhead door for access and some casement style sash. There is a 200 amp electrical service with gas-fired ceiling suspended space heaters.

These improvements were observed to be in above average condition. The effective age is estimated to be 20 years with an economic life of 35 years due to the present condition. Thus, the remaining economic life is estimated to be 15 years considering future neighborhood trends, other similar properties in the area, the observed condition of the subject as well as physical life expectancies for a property of this type.

## CARETAKERS HOUSE

This 1,992 SF two story dwelling is reportedly occupied by a long time club employee. The occupant does not pay rent but is responsible for some utilities. The building has a stucco and wood shingle exterior with wood double hung windows and aluminum storm sash and screens with a gabled fiberglass shingle roof cover. The dwelling contains a living room, dining room, kitchen, three bedrooms and one bathroom.

## ADDITIONAL IMPROVEMENTS

Additional improvements on the site include a large in-ground swimming pool, pool locker rooms and two snack bars/halfway houses located in close proximity of the clubhouse. The swimming pool has concrete decking and a maximum depth of 9 feet in the diving well with a separate baby pool.

There are eight (8) HARTRU surface tennis courts with cyclone fencing located southeast of the clubhouse with a 735 SF one story building utilized as a tennis office. The tennis courts have been recently resurfaced and relined and are in good condition.

## GROSS BUILDING AREA CALCULATIONS

The area calculations and building dimensions were obtained from our inspection, an insurance inspection report and building plans included in the addendum.  The area calculations are summarized as follows:

| | |
|---|---|
| CLUBHOUSE (2 LEVELS) | 27,800 SF |
| 2 EQUIPMENT MAINTENANCE BUILDINGS | 5,706 SF |
| INDOOR TENNIS | 23,160 SF |
| TWO STORY DWELLING | 1,992 SF |
| TOTAL | 58,658 SF |

## SITE IMPROVEMENTS

The various site improvements include professionally designed landscaping and a parking lot with a total capacity of 400+ cars.  There is extensive landscaping in front of the clubhouse and a rear concrete deck with awning.  The site is connected to municipal water and sewer with several wells on the site contributing water for the irrigation system.

## SUMMARY

The overall condition of the building and site improvements is rated as good.  The floor plans for the public areas are considered above average and its functional utility is also rated as above average when compared to competitive facilities.  In summary, the clubhouse facility and other building improvements currently represent a modern functional facility with custom interior improvements and all of the necessary amenities required by members in the local market area.

## GOLF COURSE IMPROVEMENTS

The subject site is improved with two 18 hole championship golf course which were developed and constructed circa 1907 (South Course) and 1924 for the more renowned North Course.  The South course measures 6,047 yards from the blue tees with U.S.G.A. rating of 68.6 from the rear tees which places the subject in the middle of the range of difficulty when compared to competitive courses.  A majority of the holes have mature stands of trees on both sides of the fairway and there are several creeks which bisect fairways which increases the level of difficulty.  The perimeter holes have wooded areas plus out of bounds stakes which is subject to a penalty stroke.

The North course measures 6,516 yards from the blue tees with U.S.G.A. rating of 71.4 from the rear tees which places the subject in the upper end of the range of difficulty when compared to competitive courses.  A majority of the holes have mature stands of trees on both sides of the fairway which increases the level of difficulty.  The perimeter holes have wooded areas plus out of bounds stakes which is subject to a penalty stroke.

The overall condition of the courses is considered good as per our physical inspection on November 7, 2003.  The golf course superintendent reports that the fairways, tees and greens are bent grass with poe annuae and fescue and rye turf grasses in the rough.  The North course is irrigated with a new triple row TORO system installed in 2001 at an estimated cost of $825,000.  The South course is improved with a single row remote control system with Toro sprinkler heads  servicing the tees, fairways and greens which was installed in 1985.  Additional improvements noted consist of a putting green and practice range area measuring approximately 275 yards.

The overall condition of the courses is rated as good with an active maintenance program in place and a restriction to "soft" spike shoes. The functional utility and appeal of the North course is considered to be well above average and is known as one of the premier courses in the Delaware Valley which recently hosted a NIKE tour event. The South Course is rated as above average in comparison with competitive private courses in the local area. Recent capital improvements to the course include upgrading tee boxes and replacement of several cart paths. There were no forms of physical, functional or external inadequacies observed on November 7, 2003, the date of our last inspection.

## MARKET ANALYSIS

Market Analysis is defined as follows:  a study of market conditions for a specific type of property[1].  When estimating market value, the appraiser is required to estimate the exposure time linked to the value estimate. Reasonable exposure time is always presumed to precede the effective date of the appraisal.  Exposure time may be defined as follows:  the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based upon an analysis of past events assuming a competitive and open market[2].

Exposure time is different for various types of real estate and under various market conditions.  It is noted that the overall concept of reasonable exposure encompasses not only adequate, sufficient and reasonable time but also adequate, sufficient and reasonable effort.  This statement focuses on the time component.

The fact that exposure time is always presumed to occur prior to the effective date of the appraisal is substantiated by related facts in the appraisal process:  supply/demand conditions as of the effective date of the appraisal; the use of current cost information; the analysis of historical sales information (sold after exposure and after completion of negotiations between  the seller and buyer); and the analysis of future income expectancy estimated from the effective date of the appraisal.

The estimate of the time period for reasonable exposure may be expressed as a range and can be based on one or more of the following:

- statistical information about days on market;
- information gathered through sales verification; and,
- interviews of market participants.

Related information garnered through this process include the identification of typical buyers and sellers for the type of real estate involved and typical equity investment levels and/or financing terms.  The reasonable exposure period is a function of price, time and use, not an isolated estimate of time alone.

My market analysis includes a review of surveys published by prominent market analysts, including the National Golf Foundation who specialize in analysis of golf course trends.  In addition, I have conducted my own survey of current activity from competitive courses in the immediate market area.

---

1. Uniform Standards of Professional Appraisal Practice, 2003 Edition, pg.#3
2. Ibid., pg. 93.

MICHAEL F. DELANEY & ASSOCIATES, INC.

## GOLF TRENDS

Golf course/club transaction activity topped out in late 1998 after eight years of increasing development and acquisition activity by regional and national companies, who were building portfolios backed by large equity capital investors; and the availability of mortgage loans. The new courses were all developed and financed based on aggressive rounds, memberships and revenue projections. Many existing courses and clubs were purchased to be included in portfolios based on unrealistic pro forma, but the view was that the portfolio value was enhanced by having more courses and operating efficiencies would be created.

By late 1998/early 1999 it was becoming apparent that development activity over the past 10 years had largely outgrown demand as the number of golfers and rounds were relatively flat or regressing on a golfer per hole basis in most markets. The new development or new acquisition pro forma on which purchases and financing were based proved to be aggressive; therefore lenders came under pressure. The largest single golf lender, Bank of America, left the business and sold most of its portfolio, after two years of marketing for a buyer, to Heller Financial, a cash flow lender, who was subsequently purchased by GE Capital. Daimler Chrysler Financial also had a golf lending division, but decided to leave the business in 2001 and sold its portfolio also to GE Capital. Textron Financial, First National of America, Clubhouse Capital and regional banks now make up the major lending sources for golf course/clubs.

The over capacity of courses in most areas and restrictive loan terms based on "in place" or more realistic revenue projections has put downward pressure on transaction prices which have dropped on some same course sales by 20% - 25% on courses purchased in 1997/1998 and resold in 2001/2002. Some of this activity has come from resales by Golf Trust (in liquidation), National Golf Properties, National Fairways, and Club Corporation of America, as well as single course operators.

All those forces along with the recessionary economy in 2001/2002 have resulted in a golf market which has several challenges. First, availability of capital for new development or refinancing of old loans is available but the choices are fewer; and underwriting terms are tight (many requiring guarantees). All require real equity and realistic income projections compared with historical "in place" income. Secondly, there is still a schism between sellers who remember the 9% - 10% cap rates and aggressive pro forma based sales prices of yesteryear, and who are reluctant to sell at today's more realistic prices, or can't because their mortgage balance exceeds current value; and buyers who are offering to buy based on trailing 12 months income at higher rates than in 1998/1999.

Most analysts anticipate that as current income levels are recognized as reality, (not an aberration), then transactions will be more active with regional companies becoming more active in creating regional portfolios versus more national groups. Still, the golf ownership business is very fragmented with less than 10% of all courses owner/operated by the 15 largest owners/operators. The move towards institution ownership and operation has increased from about 5% in 1988 to about 10% today.

## CURRENT NATIONAL TRENDS

Since the game of golf was introduced to this country more than 100 years ago, it has grown dramatically in popularity. The following table represents growth in the golf industry in the United States between 1985 and 2001.

### GROWTH OF GOLF IN THE UNITED STATES 1985-2001

| Year | Total Golfers (Millions) | Rounds Played (Millions | Golf Facilities Total | Private | Daily Access |
|---|---|---|---|---|---|
| 1985 | 17.5 | 415 | 12,346 | 4,861 | 7,485 |
| 1994 | 24.3 | 455 | 13,683 | 4,367 | 9,316 |
| 1999 | 26.4 | 524 | 14,849 | 4,500 | 10,349 |
| 2001 | 27.6 | 518.1 | 17,816 | 4,906 | 12,910 |
| 2002 | N/A | 502.4 | | | |
| Compound Annual Growth Rate 1985-1994 | 3.88% | 1.06% | 1.08% | (1.0%) | 2.44% |
| Compound Annual Growth Rate 1994-1999 | 2.26% | 3.04% | 1.70% | 0.6% | 11.08% |
| Compound Annual Growth Rate 1999-2002 | N/A | (3.0%) | N/A | N/A | N/A |

Source: National Golf Foundation

As noted in the preceding table, the number of golfers in the United States had increased at a compound annual rate of 3.88% from 1985 to 1994; however, this trend had declined in 1994-99 and further declined from 1999-2001. Essentially, golf continues to expand at the same rate as the U. S. population. In addition, total annual rounds played had increased at a compound annual growth rate of .96% up until 1993 and then increased dramatically from 1994-99. The rate increased by 6.4% compounded annually from 1999-2001.

According to the National Golf Foundation (NGF), the significant growth in the number of rounds played from 1994-99 was fueled by the extra-ordinary increase in the number of core golfers and a significant increase in the Junior Golfer segment. Core golfers are identified as individuals ages 18 or older who played more than 8 rounds

in 1999.  Junior golfers are identified as individuals ages 12-17  who played more than 1 round in 1999.

These two segments are again responsible for increasing this growth rate from 1999-2001.  According to the NGF's latest surveys, the game of golf is showing signs of a recovery from the soft economy that had gripped it and the nation in the early 1990's.  This prognosis is based upon the recent increases in the number of rounds played which increased by 3.43% annually since 1994, while the total number of golfers increased at only 1.70% annually.  Other positive trends noted were as follows:

- The number of core golfers (those aged 18 and older who played at least 8 rounds a year) increased by 700,000 golfers from 1996-2001 or 6.1% to in excess of 12.1 million, breaking that mark for the first time.

- Rounds played in 2001 reached the highest point ever, roughly 580  million, due to an increase in participation while the average rounds played per golfer remained relatively stable @ 21.0 annually.

- The long term trends remain steady with positive trends : i.e. from 1994 through 1999, the number of  and rounds played had increased at a compound annual growth rate of 4.79% while the growth rate for total golf facilities was only 1.70% annually resulting in a shortage of facilities.  This trend has been reversed  from 1999-2001 as the number of  and rounds played had increased at a compound annual growth rate of 6.40% while the growth rate for total golf facilities was 6.67% annually.

Overall, golf participation in the United States had increased tremendously in recent years.  National Golf Foundation statistics indicate that 12.1% of the U.S. population played golf in 2001, as compared to 8.0% of the population in 1985 and approximately 11.7% of the U.S. population in 1999.

My review of several local country clubs competitive with the subject indicates some minor declines in membership due to the local and regional economy.  Several clubs in the area report waiting lists with initiation fees in excess of $10,000.  The subject has lost membership in recent year due to changing demographics.  The club's board of directors has recently refocused their efforts to diversify their membership and their membership classifications which has improved their census.

Based on the above findings and demographic information, I conclude that there is sufficient demand for the use of the subject as a private country club with two golf courses and the prospects for the future are somewhat favorable as there is  limited land available for construction of new golf courses.  The only potential for new golf course development is from deed restricted parcels which are permanently preserved as active open space for a new residential development.   The cost of residential land which is suitable for  development  would preclude development of a new public course.  A new planned residential development was  recently proposed in Lower Salford Township which will be surrounded by a new upscale daily fee golf course.  The proposal includes a rezoning of the site with higher density of detached residential development and the golf course utilized as open space.  This project is currently under construction will cost in excess of $4,000,000 to construct without land costs resulting in fee structures which will be higher than the direct competition from older courses.

## MARKETING-EXPOSURE TIME

Marketing time is defined as the time it takes an interest in real property to sell on the market subsequent to the date of an appraisal[1]. Exposure time is defined as the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal[2].

I have interviewed several local real estate professionals including Mr. Richard Goredesky of Colliers Lanard & Axilbund Real Estate, who recently sold a daily fee golf course in Philadelphia within a four month marketing period. He reports that a property similar to the subject could be sold within a 4-6 month time period at a reasonable marketing price. It is my conclusion that a marketing time of 4 to 6 months would be required at my value estimates. Also, I estimate an exposure time period of 6 months at my value estimate.

---

1.          Appraisal Institute, The Dictionary of Real Estate Appraisal, Third Edition, (Chicago: Appraisal Institute, 1933), pg. 221
2.          Ibid, pg. 126

## HIGHEST AND BEST USE

Highest and Best Use is the most profitable likely use to which a property can be put. The opinion of such use may be based on the highest and most profitable continuous use to which the property is adapted and needed, or likely to be in demand in the reasonably near future. However, elements affecting value which depend upon events or a combination of occurrences which, while in the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration. Also, if the intended use is dependent on an uncertain act of another person, the intention cannot be considered. Highest and Best Use is that use of land which may be reasonably be expected to produce the greatest net return to land over a given period of time. That legal use which will yield to land the highest present value.

Several criteria must be met for the Highest and Best Use:
1.      The use must be legal.
2.      The use must be within the realm of probability; that is it must be likely , not speculative or conjectural.
3.      There must be a demand for such use.
4.      The use must be profitable.
5.      The use must return to land the highest net return.
6.      The use must deliver the return for the longest period of time.

Highest and Best Use analysis requires that the site first be studied as if vacant and ready to be put to its highest and best use, and then as improved.

## HIGHEST & BEST USE AS VACANT

Our interviews of golf course developers and managers indicates that construction of a new private golf club would be economically feasible in the local marketplace assuming the acquisition cost for the land was less than $20,000/acre. We conclude that sufficient entrepreneurial profit would be available for development of the subject site as an upscale private golf club plus an additional upscale daily fee golf course based on the current zoning and demographics for the surrounding market area  Our conclusions are based on the analysis completed in the valuation and market analysis sections of this report.

## HIGHEST AND BEST USE, AS IMPROVED

The subject has been operating as an 36 hole private golf club since the early 1900's. Our analysis completed in the valuation and market analysis sections indicates that the subjects prospective income potential would provide ownership with a superior return as opposed to an investment of time and money in obtaining a zoning change and redeveloping the site as a residential subdivision.

In conclusion, it is our opinion that the highest and best use of the subject property, as improved, would be for continued use of the existing buildings, golf courses and site improvements as a private country club and/or upscale daily fee golf course or a combination of the two uses with retention of the North Course as a private course. Obviously, the value conclusions, as estimated in this report suggest that the improvements provide a return to the real estate (land and improvements) considerably above the sites market value as raw land alone with over 80% of the site restricted to recreational use by zoning.

## VALUATION THE APPRAISAL PROCESS

The traditional methods of processing market data into a value indication include:

▶    Sales Comparison Approach

▶    Cost Approach

▶    Income Approach

The Sales Comparison Approach assumes that an informed purchaser would pay no more for a property than the cost of acquiring another existing property with the same utility. The approach utilizes a comparative technique by which recent sales of similar properties are related to the subject. Adjustments are often required for differences in order to reach a value indication. The Cost Approach renders an estimate of value based upon the price of obtaining a site and constructing improvements, both with equal desirability and utility as that of the subject property. The Income Approach renders an estimate of value based upon the present worth of the potential benefits derived from ownership of the subject property.

We have determined that the highest and best use of the subject site as improved would be for continued operations of the two golf courses. We have processed the Sales Comparison to determine the as is market value of the subject, exclusive of any furniture, fixtures, equipment or licenses.

**Per prior agreement with the client, I did not  process the Income Approach to value although reasonable appraisers would generally consider this approach to be meaningful in appraising a property of this type. Also, the analysis has been presented in a summary format. Therefore, the appraisal process involved departure from Standards Rule 1-4(b)I and II.** The Cost Approach was not processed in this assignment due to the inherent difficulty in estimating accrued depreciation.

## SALES COMPARISON APPROACH

### INTRODUCTION

The Sales Comparison Approach is a method of estimating market value which uses recently sold market derived, comparable sales.  This approach to value assumes that the market will determine a price for the property being appraised in the same manner that it determines the price of comparable, competitive properties.  In applying the Sales Comparison Approach, the appraiser employs a number of appraisal principles.  One of the major principles is the principle of substitution, which holds that the value of a property, as replaceable in the marketplace, tends to be set by the cost of acquiring an equally desirable substitute property.  Other principles inherent in this approach are the principles of supply and demand, balance and externalities.  The following pages explain our development of the Sales Comparison Approach.

### ANALYSIS OF COMPARABLE SALES:

In developing the Direct Sales Comparison Approach, we have researched the market area for recent sales of golf course properties in the Tri-state and surrounding areas.  From our investigations, we have obtained data on four sales which are considered similar to the subject property.  These sales have occurred since February, 1997.  We have analyzed the comparable sales and have compared them to the subject property based on the sale price per hole on a unit rate basis, which excludes F,F&E.  Prior to making any adjustments, the comparables indicate a unit price range from a low of $305,556 to a high of $430,556 per hole.

An outline description of these comparable sales, our analysis and our conclusion as to the estimated market value of the subject property by the direct sales comparison approach are found on the following pages.

**COMPARABLE GOLF COURSE SALE #1**

| | |
|---|---|
| Name/Location: | Concord Country Club |
| | U.S. Route #322 & 202 |
| | Concord Township |
| | Delaware County, PA |
| Grantor: | Gerret Van Copeland |
| Grantee: | Board of Directors for the membership of Concord Country Club |
| Date of Sale: | August, 1997 |
| Deed Book/Page: | 1622/1385 |
| Consideration: | $5,700,000 (See Comments) |
| Financing: | Cash to seller |
| Verification: | Public Records and interview of various board members. |
| Site Size: | 179 acres |

Course Data:
| | |
|---|---|
| Description | 18 hole private country club course |
| Length | 6,660 yards |
| PAR | 72 |
| # of Rounds | 32,000 |
| # of Members | 335 |

Unit of Comparison:
| | |
|---|---|
| Price per Hole | $316,666 excluding F, F & E |

Remarks:

This site has a rolling topography and the course was considered to be in good condition at time of sale. The club had 335 members. Total number of annual rounds is estimated to be 32,000 and the site also has an elaborate clubhouse with full service dining facilities; pro shop, tennis courts and an Olympic size pool.

The membership voted to acquire the property from private ownership. The club had been operated by the membership under a thirty year lease which was about to expire and the grantor desired to sell the club. The actual sale price was $4,800,000 plus a reimbursement of $900,000 owed by the lessor for capital improvements indicating a total consideration of $5,700,000. The purchase will be partially financed by a $6,500 bond for each golfing member and a yet to be determined assessment for a social member. The consideration did not include F, F & E.

## COMPARABLE GOLF COURSE SALE #2

| | |
|---|---|
| Name/Location: | Great Bay Resort & Country Club<br>Route #9 and Mays Landing Road<br>Borough of Somers Point<br>Atlantic County, NJ |
| Grantor: | Cornwells Enterprises Inc. |
| Grantee: | Great Bay LLC |
| Date of Sale: | February, 1997 |
| Deed Book/Page: | 6093/73 |
| Consideration: | $4,705,000 (Real Estate) $7,750,000 total consideration with $3,045,000 ($169,167/hole) allocated to F, F, & E, licenses and goodwill. |
| Financing: | $5,550,000 cash to seller, $2,000,000 PMM at a market oriented rate and term. $4,000,000 conventional financing by PNC Bank. |
| Verification: | Deed, attorney for the Grantee. |
| Site Size: | 153 acres |

Course Data:

| | |
|---|---|
| Description | 18 hole daily fee regulation course |
| Length | 6,730 yards (Blue Tees) |
| PAR | 72 |
| Greens Fees | $53.75/Average |
| # of Rounds | 37,452 |
| # of Members | N/A |

Unit of Comparison:

| | |
|---|---|
| Price per Hole | $261,839 excluding F, F & E |

Remarks:

The course adjoins a hotel and residential development. It was originally constructed in the 1920's and redesigned by George Fazio in 1978 with bent grass tees and Bermuda greens.

The additional improvements include a one and part two story clubhouse building embracing 23,000 SF, swimming pool, pro shop and maintenance shop. Since 1988 the course has hosted the LPGA Shop-Rite Classic. At the time of sale the club was generating a reported net operating income of $828,807 indicating an overall rate of 10.69%.
At the time of sale, the course and building improvements were considered to be in above average condition.

## COMPARABLE GOLF COURSE SALE #3

| | |
|---|---|
| Name/Location: | Bucks County Country Club<br>W. S. Old York Road<br>Warwick Township<br>Bucks County, PA |
| Tax Parcel: | 51-003-052 |
| Grantor: | Albert & Renee Sussman |
| Grantee: | L & W Partners LP |
| Date of Sale: | 3/25/98 |
| Deed Book/Page: | 1556/881 |
| Consideration: | $6,336,000 (Deed)<br>$5,324,000 (Cash Equivalent) |
| Financing: | Cash to seller, $5,500,000 conventional financing by Wilmington Trust. |
| Verification: | Representative of grantor |
| Site Size: | 141.52 acres (see remarks) |

Course Data:

| | |
|---|---|
| Description | 18 hole semi-private daily fee course |
| Length | 6,379 yards |
| PAR 71 | |
| # of Rounds | 41,000 |
| Avg. Green Fee | $26 |
| # of Members | 400 |

Financial Indicators:

| | |
|---|---|
| Avg. Green Fee: | $26.00 |
| Greens Fee Multiplier: | 5.0 |
| Price Per Acre | $ 44,771 |
| Price per Hole | $295,778 including F, F & E. |

Remarks:

This site has a rolling topography and the course was considered to be in average condition at time of sale. The club has 400 members of which a majority belong to the swim club. Total number of annual rounds is 41,000 and the site also has a two story clubhouse with banquet facilities for 200; pro shop, 8 tennis courts; an Olympic size inground pool, maintenance building and cart storage building. The building improvements and golf course were reported to be in average condition at the time of sale. The purchaser exchanged approximately 25 acres with adjacent land owner (Toll Brothers) in exchange for five new golf holes, a new residence and $2,000,000. The grantee estimated the cash equivalent sale price to be $5,324,00 which included F, F & E.

**MICHAEL F. DELANEY & ASSOCIATES, INC.**

## COMPARABLE GOLF COURSE SALE #4

| | |
|---|---|
| Name/Location: | Twin Lakes Country Club<br>North & South Sides of Shankweiler Road<br>North Whitehall Township<br>Lehigh County, PA |
| Grantor: | J. F. Peters Inc. |
| Grantee: | Twin Lakes Associates |
| Date of Sale: | 3/28/2001 |
| Consideration: | $5,100,000 |
| Financing: | Cash to seller, Ambassador Bank provided conventional financing of $3,000,000. |
| Verification: | Mr. Ron Peters, representative of Grantor |
| Site Size: | 120.2 Acres |

Course Data:

| | |
|---|---|
| Description | 18 hole daily fee regulation course |
| Length | 6,450 yards |
| PAR | 72 |
| Greens Fees | $37.00/Average |
| # of Rounds | 32,500 |
| # of Members | N/A |

Financial Indicators:

| | |
|---|---|
| Price Per Acre | $42,429 |
| Price per Hole | $283,333 |

Remarks:

The property consists of a 6,450 yard (Blue Tees) 18-hole daily fee regulation golf course with practice putting green and full irrigation system, par 72 from white tees. There is a pro shop and a restaurant on-site plus a 400 seat banquet facility within a 40 year old 14,000 square foot club house. Deed price reflects the Real Estate only and did not include F, F & E, goodwill or liquor license. At the time of sale, the course and building improvements were considered to be in good to average condition.

## SUMMARY OF COMPARABLE IMPROVED PROPERTY SALES

| # | Location | Date of Sale | Land Area | Holes/Par/Length/ Annual Rounds | Condition Course/ Facilities | COMMENTS | Sale Price/ Hole |
|---|----------|--------------|-----------|-------------------------------|------------------------------|----------|------------------|
| 1 | Concord Country Club U.S. Route #322 & 202 Concord Township Delaware County, PA | 8/97 | 179 Acres | 18/72/6,660 Yards/ 32,000 | Good/ Good | This site was improved with a 2-3 story clubhouse with full service dining facilities; pro shop, tennis courts and an Olympic size pool. The consideration did not include F, F & E. | $316,666 |
| 2 | Great Bay Resort & Country Club Route #9 and Mays Landing Road Borough of Somers Point Atlantic County, NJ | 2/97 | 153 Acres | 18/72/6,730 Yards/ 37,542 | Ab. Average/ Ab. Average | The course was originally constructed in the 1920's and redesigned by George Fazio in 1978 with bent grass tees and Bermuda greens. The additional improvements include a one and part two story clubhouse building embracing 23,000 SF, swimming pool, pro shop and maintenance shop. At the time of sale the club was generating a reported net operating income of $828,807 indicating an overall rate of 10.69%. | $261,839 |
| 3 | Bucks County Country Club W. S. Old York Road Warwick Township Bucks County, PA | 3/98 | 141.52 Acres | 18/71/6,379 Yards/ 40,000 Rounds | Average/ Average | The site was improved with a two story clubhouse with banquet facilities for 200; pro shop, 8 tennis courts; an Olympic size inground pool, maintenance building and cart storage building. | $295,778 |
| 4 | Twin Lakes Country Club North & South Sides of Shankweiler Road North Whitehall Township Lehigh County, PA | 3/2001 | 120.2 Acres | 18/72/6,450 Yards/ 32,500 Rounds | Good/Average/ Good/Average | One-story clubhouse facility consisting of a banquet room, and restaurant (14,000 SF) inclusive of pro shop and locker rooms. The course was fully irrigated with a core design. | $283,333 |

## ANALYSIS OF COMPARABLE GOLF COURSE PROPERTY SALES

The market data indicates that improved properties with a similar highest and best use as the subject have sold within the range of $261,839 to $316,666 per Hole before adjustment for the elements of comparison which cause this variation. A synopsis of the four sales reported has been reproduced on the facing page. The methodology for adjusting for elements of comparison is as follows: when an aspect of the subject site is superior to that of an actual transaction, a positive adjustment is made to the unit rate indicated by the comparable sale. No adjustment is required when an element of comparison is similar or equal.

The following table is a summary of the elements of comparison between the subject and the comparable market transactions.

### STATISTICAL ANALYSIS OF COMPARABLE SALES

| SALE # | Subject | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|
| Sal e Price/HOLE | | $316,666 | $261,839 | $295,778 | $283,333 |
| ADJUSTMENTS: | | | | | |
| Real Property Rights Conveyed | Fee Simple | 1.000 | 1.000 | 1.000 | 1.000 |
| Financing Terms | Cash | 1.000 | 1.000 | 1.000 | 1.000 |
| Conditions of Sale | Arms-Length | 1.000 | 1.000 | 1.000 | 1.000 |
| Market Conditions | Current | 1.000 | 1.000 | 1.000 | 1.000 |
| ADJUSTED SP/HOLE | | $316,666 | $261,839 | $295,778 | $283,333 |
| Location | Good | 1.000 | 0.950 | 1.050 | 1.100 |
| Land Area/Site Characteristics | 147.7 Acres (Avg.)/ Good | 0.925 | 1.000 | 1.000 | 1.100 |
| Size | 36 Holes, 2 Courses | 0.900 | 0.900 | 0.900 | 0.900 |
| Course Condition | Good | 1.000 | 1.050 | 1.100 | 1.025 |
| Facilities Condition/Utility | Good | 1.000 | 1.050 | 1.100 | 1.050 |
| Net Adjustment | | 0.825 | 0.950 | 1.150 | 1.175 |
| ADJUSTED UNIT RATE | | $261,249 | $248,747 | $340,145 | $332,916 |
| | MEAN= | $295,764 | | | |

### FEE SIMPLE VALUE BY THE SALES COMPARISON APPROACH (AS IS)
### 36 GOLF HOLES @ $295,000 PER HOLE = $10,600,000

**NOTE:**   All adjustments are qualitative and are based upon our appraisal experience in the market area and interviews with local property owners and investors. Quantitative adjustments were requested; however, there was insufficient data available to complete a specific quantitative analysis.

## ELEMENTS OF COMPARISON

## REAL PROPERTY RIGHTS CONVEYED

The first category for comparison for the subject and the four sales is for real property rights conveyed. We have previously discussed that the purpose of this appraisal is to estimate the market value of the subjects fee simple interest. The four sales reported were all fee simple transactions and no adjustments are required.

## FINANCING

The next element of comparison between the subject and the reported sales is the financing terms of the transaction. Market financing in terms of cash or its equivalent is inherent in the definition of market value for the subject as of the effective date. Each of the comparable sales in this analysis involved an exchange for cash and debt funds at the then prevailing market rates. As market financing with either cash or its equivalency is assumed, no adjustment is required this particular element of comparison.

## CONDITIONS OF SALE

Adjustments for this element of comparison reflect the motivations of buyers and sellers in the marketplace. Market value, as defined in this appraisal assumes a buyer and seller are knowledgeable, prudent and not under duress as they are involved in a transaction. These circumstances are commonly referred to as an arm's length transaction. All four sales have been confirmed as arm's length transactions.

## MARKET CONDITIONS

This element of comparison is commonly referred to as a "time" adjustment and reflects changes in market conditions caused by inflation, deflation, changes in supply and demand and other factors. Our analysis completed in the regional and neighborhood section indicates that market conditions have not improved in recent years and there is no market data to support an adjustment to any of the four sales.

## LOCATION

The subject is located in a market area with a good demographic base surrounding the site with convenient access to major traffic arteries. Sale #1 is located in an area with similar population demographics and no adjustment is required. Sale #2 is located in a New Jersey shore resort community and the location is considered superior to the subject site requiring a downward adjustment. Sale #3 is located in a market area with population demographics that are somewhat inferior to the subjects location and corresponding demographics requiring an upward adjustment for this factor. Sale #4 is located in a somewhat rural location and is considered inferior to the subject requiring an upward adjustment.

## LAND/SITE

The subject property contains a gross land area of 295.45 acres with an above average size practice range and good spacing between the routing of the holes. The site has frontage on four streets with room for expansion of the club facilities. Sale #1 is considered superior as compared to the subjects average of 147.7 acres for the two courses and a downward adjustment is required to this sale. Sales #2 and #3 are considered similar to the subject within a relevant range and no adjustments are required. Sale #4 has an inferior land area as compared to the subjects average for the two courses and an upward adjustment is required to this sale.

## PHYSICAL CHARACTERISTICS
Course Condition & Utility

The subject is in good condition with a new irrigation system on the North course and a modern system on the South course. Sales #2-4 were operated and maintained as daily fee courses at the time of sale and were in average to above average condition which is inferior to the subjects condition and status as a private club requiring upward adjustments to each sale. Sale #1 is considered similar within a relevant range and no adjustment is required.

Facilities Condition & Utility

The subject is in good condition with above average size kitchen and clubhouse facilities plus an indoor tennis facility. Sale #1 has similar facilities and no adjustments are required to this sale. The facilities for sales #2-4 were in inferior condition with inferior utility as compared to the subject property and upward adjustments of various degree are required to these sales.

## RECONCILIATION

The four sales reported ranged from $261,839 to $316,666 per hole. The sales were analyzed for the various factors which impact market value and the adjusted unit rates ranged from $248,747 to $340,145 per hole. The indicated mean from the analysis was equivalent to $295,764 per hole. Applying the adjusted range per hole to the subjects 36 holes indicates a value range of approximately $8,955,000 to $12,245,000®. It is our conclusion that the subjects as is market value as indicated by the Sales Comparison on November 7, 2003 was equivalent to $295,000 per hole for 36 holes or $10,600,000® for the real estate, excluding all Furniture, Fixtures and Equipment.

**FEE SIMPLE MARKET VALUE BY THE SALES COMPARISON APPROACH**
**(REAL ESTATE EXCLUDING F, F & E)**
**$10,600,000**

**FINAL RECONCILIATION**

Our analysis concluded in the Highest and Best Use section indicates that continued utilization of the existing improvements as a private country club with the option of converting the south course to an upscale daily fee course would represent the Highest and Best Use of the subject as improved.  The subject is in excess of 80 years old and due to the inherent difficulty in estimating accrued depreciation, the Cost Approach to value was not considered pertinent to this valuation. The subject is not considered an investment type property and the Income Approach was not considered to be meaningful.  **Per prior agreement with the client, I did not process the Income Approach to value although reasonable appraisers would generally consider this approach to be meaningful in appraising a property of this type.  Also, the analysis has been presented in a summary format.  Therefore, the appraisal process involved departure from Standards Rule 1-4(b)I and II.**

The application of one of the three conventional approaches to value has produced an acceptable result for the as is market value for the fee simple estate.

Based on the total analysis contained in this report, it is our considered opinion that the as is Market Value of the subject property, excluding the Furniture, Fixtures, Equipment and licenses, as of the effective date of this appraisal on November 7, 2003 was $10,600,000.

**AS IS MARKET VALUE (REAL ESTATE, EXCLUDING F, F & E)**
**$10,600,000**

# MICHAEL F. DELANEY & ASSOCIATES, INC.
## MICHAEL F. DELANEY SRPA
**Real Estate Appraisers
and Consultants
P. O. Box 1368
Southampton, PA 18966
Phone #(215) 860-5700
Fax #(215) 860-5382**
November 7, 2003

# CERTIFICATION OF MARKET VALUE

**CRAIG W. Gleason, MAI and MICHAEL F. DELANEY, SRPA do hereby certify that upon application for valuation by:**

Fox Chase Bank
1225 Industrial Boulevard
Southampton, PA 18966
Attn: Mr. David Waltz, Vice President

**They have personally inspected the following described property:**

PHILMONT COUNTRY CLUB
301 TOMLINSON ROAD
LOWER MORELAND TOWNSHIP
MONTGOMERY COUNTY, PA

**And that they are of the opinion that as of November 7, 2003 the as is market value of the above referenced property, excluding all F, F & E was:**

TEN MILLION AND SIX HUNDRED THOUSAND ($10,600,000) DOLLARS

**THIS VALUATION IS CONTINGENT UPON THE FOLLOWING CONDITIONS:**
1.  See standard limiting conditions on pages 12-14.


CRAIG W. GLEASON, MAI
P.A. Certified General
Real Estate Appraiser GA-000269-L

MICHAEL F. DELANEY, SRPA
P.A. Certified General
Real Estate Appraiser GA-000528-L

# __ADDENDUM__

MICHAEL F. DELANEY & ASSOCIATES, INC.





**Plat Map**

Tennis Bldg.

Grounds Garage

Grounds Superintenents Residence

Storage Bldg.

Grounds Office and Garage

Tennis Shop

Round House

Swim. Pool

Wading Pool

Orig.

Add.

Clubhouse

Snack Bar

Pump House

North Course Barn

Tomlinson            Road

PLAT PLAN
OF
PHILMONT    COUNTRY    CLUB
HUNTINGTON VALLEY          PA
SCALE  None   DATE  Feb. 1999
APPRAISED BY
INDUSTRIAL APPRAISAL COMPANY
BLVD. OF THE ALLIES    PITTSBURGH, PENNA.



Township of
Lower Moreland
420702

**Community-Panel Number**
42091C 0406 E

**Effective Date:**
December 19, 1996

# Flood Plain Map



**Flood Plain Map**

# EXHIBIT A

## LEGAL DESCRIPTION

All those five certain lots or pieces of ground with the buildings and improvements thereon erected, situate in the Township of Moreland, County of Montgomery and State of Pennsylvania, described as follows, to wit:—

One thereof, Beginning at a point in the center line of Red Lion Road (thirty-three feet wide) where same is intersected by the center line of Mill Road (thirty-three feet wide) and the Bethayres and Huntingdon Road (fifty feet wide); thence along the center line of the Red Lion Road, South forty-three degrees seventeen minutes West Six hundred and six tenths feet to a corner of land now or late of N. Markey; thence along the same, crossing the Bethayres and Huntingdon Road, North forty-seven degrees eleven minutes West Eight hundred and twenty-three and five hundredths feet to a corner of land now or late of J. H. Bergen thence along the same the two following courses and distances, to wit: North forty-two degrees thirty-nine minutes East Four hundred and twenty-seven and twenty-three hundredths feet to a stone, a corner, and North forty-six degrees twenty-nine minutes West Seven hundred and ninety-six and forty-five hundredths feet to a stone, being a corner of Plot "A" of the said Philmont Country Club ground; thence along the same North forty-two degrees East Three hundred and fifty-eight and thirty-eight hundredths feet to a point in the center line of Mill Road (thirty-three feet wide); thence along the same the two following courses and distances, to wit: South forty-three degrees twenty-seven minutes East Two hundred and forty and fifteen hundredths feet to an angle and South thirty-nine degrees fifty-one minutes East One thousand four hundred and two and five-tenths feet to the place of beginning. Containing Eighteen and three hundred and fifty-nine, thousandths Acres.          18.359

Another thereof, Beginning at a point in the center line of Red Lion Road, (thirty-three feet wide) where the same is intersected by the center line of Mill Road (thirty-three feet wide) and in the bed of the Bethayres and Huntingdon Road (fifty feet wide); thence extending along the said Mill Road the two following courses and distances, to wit:   North thirty-nine degrees fifty-one minutes West One thousand four hundred and two and five tenths feet to an angle and North forty-three degrees twenty-seven minutes West Two hundred and forty and fifteen hundredths feet to a point in line of Plot "A" of the Philmont Country Club ground; thence along the same North Forty-two degrees East One thousand five hundred and ninety-nine and thirty-six hundredths feet to a stone; being a point in line of the Thomas Jackson Estate; thence along the same the following five courses and distances, to wit:   South forty-six degrees thirty minutes East Six hundred and seventeen and ninety-two hundredths feet to a stone, a corner; North forty-two degrees twenty-three minutes East Seven hundred and eighty-two and eighty-two hundredths feet to a stone, a corner; South forty-eight degrees thirty-two minutes East One hundred and seventy-seven and sixty-two hundredths feet to a stone, a corner; North forty-one degrees fifty-four minutes East Four hundred and seven and forty-four hundredths feet to a stone, a corner; and South Forty-eight degrees ten minutes East Eight hundred and forty-seven and seventy-nine hundredths feet to a stone in the aforementioned center line of Red Lion Road; thence along the said center line South forty-one degrees thirty-eight minutes West One thousand eight hundred and twenty-four and eighty-four hundredths feet to a stone and an angle and South forty-three degrees thirty-two minutes West One thousand one hundred and seventy and seventy-eight hundredths feet to the place of beginning.  Containing Ninety and four hundred and ninety-five thousandths Acres.   90.495

Another thereof, Beginning at a point in the center line of Mill Road, (thirty-three feet wide) being also a corner of land now or late of H. V. Lott; thence by said Lott's land the three following courses and distances, to wit:  North thirty-six degrees twenty-four minutes East Seven hundred and eight and twenty-six hundredths feet to a stone; North Seventy-one degrees twenty-one minutes East Two hundred and ninety and eight tenths feet to an angle and North twelve degrees fourteen minutes East Two hundred and eighty-six and thirty-one hundredths feet to a corner of land of C. W. Fetter, Estate; thence by the same the five following courses and distances, to wit:

-1-

# EXHIBIT A

## LEGAL DESCRIPTION

South eighty-one degrees twenty-three minutes East Eighty-three and fifty-five hundredths feet to an angle; North forty-seven degrees forty-four minutes East One hundred and one and six tenths feet to an angle; North fifty-eight degrees forty-nine minutes East One hundred and one and two tenths feet to an angle; North seventy-five degrees nineteen minutes East eighty-three and eighty-one hundredths feet to an angle and North thirty-six degrees twenty-eight minutes East forty-eight and ninety-one hundredths feet to a point in the line of land of the Thomas Jackson Estate; thence along the same South forty-six degrees thirty minutes East Five hundred and fifty-six and seventy-seven hundredths feet to a stone in said line; thence by Plot "C", being other ground of the Philmont Country Club, crossing Mill Road, South forty-two degrees West One thousand nine hundred and fifty-seven and seventy-four hundredths feet to a stone, being a point in line of land now or late of J. H. Bergen; thence along the same North forty-six degrees twenty-nine minutes West One thousand and seventeen and eleven hundredths feet to a stone in the center line of Mill Road, being a corner of land of W. Branson; thence along the same North forty-two degrees seven minutes East Three hundred and thirty-six and forty-three hundredths feet to a point in line of land now or late of H. V. Lott; thence along the same South fifty-three degrees fifty-five minutes East Three hundred and seventy-nine and eighty-seven hundredths feet to the place of beginning.  Containing Thirty-two and one hundred and nineteen thousandths Acres.

32.119

Another thereof, Beginning at a stone set for a corner between this and Gerard Wynkoop's land, in a public Road, and extending on the said road South forty-one degrees and a half degree West forty-seven perches and two tenths of a perch to a corner stone; thence by another part of the same tract South forty-eight and one half degrees East Thirty-seven and six tenths perches to a corner stone and South forty-one degrees West forty-three and seven-tenths perches to a corner stone in the line of land late of Casper Fetter, deceased, thence by the same and land now or late of Christian Snyder South forty-eight and a half degrees East Two hundred and twelve and nine-tenths perches to a corner stone; thence by land formerly of Cornelius Wynkoop North forty-one and half degrees East forty-seven and three tenths perches to a corner stone; thence South forty-eight and a half degrees East Ten and seven tenths perches to a corner stone, thence by land now or late of George Newell North forty-one and a half degrees East thirty-three and one-tenth perches to a corner stone; thence by the said land now or late of Gerard Wynkoop North Fifty and a half degrees West Ninety-three and seven tenths perches to a corner stone; thence by the same North Twenty degrees East Sixteen and one-fourth perches to a corner stone; thence North forty-eight and a half degrees West One hundred and sixty-two perches to the place of beginning.  Containing one hundred and thirty-one Acres and sixty-six perches, be the same more or less.

31

And the other thereof, Beginning at a corner in the Pine Road, thence extending by land now or late of John Chappell and Esther, his wife, North fifty degrees West fifty-one and five-tenths perches to a corner in the line of land sometime of George Fetter, now or late of Thomas Jackson, thence by the same North forty degrees East eight and fifty one-hundredths perches to a corner stone; thence by land of Gerard Wynkoop, deceased, South fifty-two degrees East fifty-one and four-tenths perches to a corner in the aforesaid Pine Road; thence along the same South forty-eight degrees West ten and eleven one-hundredths perches to the place of beginning.  Containing Three Acres, be the same more or less.

3

ALL THAT CERTAIN LOT OR PIECE OF GROUND situate in the Township of Lower Moreland, County of Montgomery and State of Pennsylvania according to a survey made by George B. Mebus, Registered Professional Engineer, Glenside, Pa. as follows:

BEGINNING at a point in the centerline of Buck Road (thirty-three feet wide) at a distance of one thousand four hundred seven and eight tenths feet measured South forty two degrees forty two minutes eighteen seconds West from the intersection which the said centerline of Buck Road makes with the centerline of Byberry Road (thirty three feet wide); thence through land of Robert H. Hewitt, of which this is a part, the six following courses and distances:  (1) South forty seven degrees fifty five minutes twenty seconds East (passing over a stone on the southeasterly side of Buck Road) one thousand one hundred feet to a stone; (2) North forty two degrees four minutes forty seconds East one hundred feet to a stone; (3) South forty seven

# EXHIBIT A

# LEGAL DESCRIPTION

degrees fifty five minutes twenty seconds East one thousand five hundred ninetyfive and seven hundredths feet to a stone: (4) South thirteen degrees sixteen minutes twenty seconds East four hundred twenty three and nine hundredths feet to a stone: (5) South forty nine degrees fifty seven minutes East one thousand seven hundred thirty five and forty six hundredths feet to a stone: and (6) South forty degrees three minutes West two hundred feet to a stone set in the northeasterly property line of the Philmont Country Club, said stone being at the distance of four hundred feet measured North forty nine degrees fifty seven minutes West from a point in the centerline of Pine Road (thirty three feet wide); thence from the last mentioned stone and along the said northeasterly property line of the Philmont Country Club, the three following courses and distances: (1) North forty nine degrees fifty seven minutes West two thousand one and two hundredths feet to a stone: (2) North twenty degrees fourteen minutes fifty one seconds East two hundred sixty nine and thirteen hundredths feet to a stone: and (1) North forty seven degrees fifty five minutes twenty seconds West two thousand six hundred eighty five and eighty three hundredths feet to a point in the said centerline of Buck Road; thence along the same North forty two degrees forty two minutes eighteen seconds East one hundred and one hundredths feet to the place of BEGINNING. Containing 20.2128 acres, be the contents thereof more or less.

ALL THAT CERTAIN lot or piece of ground situate in the Township of Lower Moreland, County of Montgomery and Commonwealth of Pennsylvania, described according to a Survey and Plan thereof made the Fourth day of February 1957 by Russell S. Lyman, Registered Professional Engineer, Surveyor of Huntingdon Valley, Pennsylvania, as follows, to wit:
BEGINNING at a point, said point being Five Hundred Twenty-seven and Forty One-hundredths feet South Forty-nine degrees Five minutes East from a point in the center line of Buck Road (Thirty-three feet wide), said point being Two Thousand Two Hundred Eighty-seven and Eighteen One-hundredths feet Southwesterly from the intersection of the center line of Byberry Road (Thirty-three feet wide, proposed Sixty feet wide) with the center line of aforesaid Buck Road; thence from the first mentioned point and place of beginning and extending along the property line of the Philmont Country Club the two following courses and distances: (1) South Forty-nine degrees Five minutes East One Hundred feet to a point; (2) South Forty degrees Fifty-five minutes West One Hundred Ninety feet to a point; thence a new line cutting through the property of Robert H. Hewitt of which this was a part North Thirteen degrees Nine minutes Thirty seconds East Two Hundred Fourteen and Seventy-one One-hundredths feet to the point and place of beginning.

ALL THAT CERTAIN interior lot or piece of ground SITUATE in the Township of Lower Moreland, County of Montgomery, Commonwealth of Pennsylvania, being Lot Number 4 on the Revised Plan of Richhill Estates made for West Chelten Corporation by Russell S. Lyman, Registered Professional Engineer, Huntingdon Valley, Pennsylvania, dated June 21, 1965, and revised July 7, 1965 said Plan being recorded in the Office of the Recorder of Deeds of Montgomery County at Norristown, Pa., in Plan Book B-10 page 116, as follows, to wit:-
BEGINNING at a point on the Northwesterly corner of Lot Number 4 on said Plan, said point being at a distance of Three Hundred Fifty (350) feet measured in a course South Forty-eight (48) degrees Fifty-two (52) minutes Thirty-seven (37) seconds East from a point in the Southeasterly side of Buck Road (Forty-one and Five tenths (41.5) feet wide, as widened Eight and Five tenths (8.5) feet on the Southeasterly side thereof from its original width of Thirty-three (33) feet, said point being at the distance of Three Hundred Seventy-nine and Twenty-three one-hundredths (379.23) feet measured in a Northeasterly direction along said side of said Road from the boundary line between the Borough of Bryn Athyn and the Township of Lower Moreland; thence, by Lot Number 3 on said Plan, North Forty-one (41) degrees Seven (07) minutes Twenty-three (23) seconds East Two Hundred Eighty and Seventy-eight one-hundredths (280.78) feet to a corner; thence, still by Lot Number 3, North Ten (10) degrees Forty-five (45) minutes Fifty (50) seconds West One Hundred Ninety-nine and Twenty-nine one-hundredths (199.29) feet to a point in line of land of the Philmont Country Club; thence, by the same, the three (3) following courses and distances: (1) South Thirty-eight (38) degrees Twenty-one (21) minutes Twenty (20) seconds East Three Hundred Eleven and Sixty-nine one-hundredths (311.69) feet to a corner; (2) South Thirteen (13) degrees Nine (09) minutes Thirty (30) seconds West Two Hundred Fourteen and Seventy-one one-hundredths (214.71) feet to a corner; (3) South Forty (40) degrees

-3-

# EXHIBIT A

## LEGAL DESCRIPTION

Fifty-five (55) minutes West One Hundred Fifty-seven and Thirty-six one-hundredths (157.36) feet to the Southeasterly corner of Lot Number 2 on said Plan intended to be conveyed to Paul Asplundh and wife; thence, by the same, North Forty-eight (48) degrees Fifty-two (52) minutes Thirty-seven (37) seconds West Two Hundred Fifty-one and Fourteen one-hundredths (251.14) feet to the point and place of beginning.

ALL THAT CERTAIN lot or piece of ground, SITUATE in Lower Moreland Township, Montgomery County, Pennsylvania, as shown on a plan prepared by George B. Mebus, Inc., Consulting Engineers, dated March 2, 1984, last revised April 11, 1984 and recorded in the Office for the Recording of Deeds in and for the County of Montgomery, at Norristown, Pennsylvania, in Plan Book A-45, page 399, and more fully described as follows, to wit:

BEGINNING at a point on the ultimate southeasterly side of Buck Road (of variable widths, but being 46.50 feet wide as widened 5.00 feet on the southeasterly side from its former width of 41.50 feet), said point being at the distance of 30.55 feet measured South 38 degrees 21 minutes 20 seconds East from a point on the original center line of Buck Road, said last mentioned point being at the distance of 972.00 feet measured in a southwesterly direction along the said center line of Buck Road from a point of intersection which the center line of Buck Road makes with the center line of Woodward Drive (50 feet wide); thence from the place of beginning and along the southwesterly line of land of Philmont Country Club the following two (2) courses and distances: 1) South 38 degrees 21 minutes 20 seconds East 194.91 feet to a point; thence 2) South 10 degrees 45 minutes 50 seconds East 85.88 feet to a point; thence along land now or formerly of the Grantor herein, North 49 degrees 51 minutes 51 seconds West 258.56 feet to a point on the aforementioned ultimate southeasterly side of Buck Road; thence along the ultimate southeasterly side of Buck Road North 40 degrees 42 minutes 23 seconds East 93.05 feet to a point the place of BEGINNING.

CONTAINING 0.3651 Acres, more or less.



**Zoning Map**

**ARTICLE XV PR Park Recreation District**

[Amended 4-10-1972 by Ord. No. 183]

§208-95. Application of regulations.   | **Zoning Regulations**

in PR Park Recreation Districts, the following regulations shall apply.

## §208-96. Permitted uses.

A. building or group of buildings may be erected or used and land may be used or occupied for any of the following purposes and no other:

A. Nonprofit private or public country clubs, golf courses, tennis courts, swimming pools; ice-skating rinks, playing fields and similar recreational uses.

B. Accessory uses on the same lot or tract of land customarily incidental to any use permitted in this district. The term "accessory use" shall not include a business conducted for profit, except that an accessory use shall not include a restaurant, coffee shop, the sale and repair of equipment for use on the premises, the providing of athletic instruction for a charge and like uses.

C. Living accommodations for watchmen and caretakers.

D. Telecommunications facility, subject to the provisions of §208-132.3. (Added 8-19-1998 by Ord. No. 487]

## §208-97. Area and height regulations.

In the case of each lot or tract or land used by a building or a group of buildings within this district, the following area and height regulations shall apply:

A. Lot area. Not more than 10% of the area of each lot or tract of land may be occupied by buildings and the total floor area, excluding the basement, of all buildings on the lot or tract of land shall not exceed 20% of the lot area.

B. Height. No building shall exceed 40 feet in height.

## §208-98. Additional requirements.

[Amended 9-15-1982 by Ord. No. 322]

in addition to the other regulations of this district, the following requirements shall apply:

A. Adequate delivery and collection facilities shall be required on the site.

B. Provisions shall be made for safe and efficient ingress and egress to and from public streets and highways without undue congestion of or interference with normal traffic flow, and further provisions shall be made for internal driveways and pedestrian walkways.

C. The proposed underlined{development} or use shall be served by public sewer and water facilities or an approved equivalent.

D. Appropriate provision shall be made for safety from fire, including but not limited to compliance with the Township Building Code,"' covering provision for internal and supplemental on-site fire-fighting equipment. Additional requirements for compliance with standards of the American Insurance Association or like standards may be required by the Township Board of Commissioners.

E. All areas provided for use by vehicles and all pedestrian walkways shall be constructed in accordance with the Township Subdivision Ordinance and regulations, except as otherwise specifically provided herein."

F. A landscaped planting area shall be provided along street frontage and elsewhere on the premises, including but not limited to along property lines other than street frontage, as shall be deemed appropriate by the Township Board of Commissioners. All landscaped planting areas provided for herein shall be permanent and, where appropriate, shall include shrubbery and trees.

G. The developer shall be required by the Township Board of Commissioners to eliminate all conditions on the premises deemed hazardous by the Township Board of Commissioners and/or to provide such precautions as are deemed appropriate by said Commissioners to reduce any hazards as may exist.

## 208-99. Construction of recreational facilities; submission of plans.

A. Where a recreational facility permitted in this district is to be constructed or installed, plans therefor shall be submitted to the Township Building Inspector who shall make a report thereon to the Board of Township Commissioners. Such plans shall be drawn to a uniform scale and shall set forth the boundaries of the area and of the recreational facility or facilities, the nature of such facilities, an outline of existing proposed buildings, the parking area, the arrangement thereof, the means of ingress and egress, the sanitary arrangements, the provisions for surface water drainage and any other information or details deemed pertinent by the Township Board of Commissioners.

B. Said plans shall also set forth or clearly show the means of proposed compliance with all of the regulations as to use, area and height, yards and building placement, signs and illumination of signs and the special development regulations set forth hereinabove. All of the foregoing regulations shall be deemed to be the minimum required, and the Township Board of Commissioners shall impose such additional requirements and/or restrictions as may be appropriate.

## §208-100. Approval of plans prior to construction ; amendments to plans.

A. There shall be no construction of any building or use of any lot or tract of land for the facilities permitted in this Article until plans are approved, in writing, by the Township Board of Commissioners.

B. Any plan approved by the Township Board of Commissioners shall be binding upon the owner, his heirs, executors, administrators, successors and assigns. Said plans, as approved, shall limit and control the issuance and validity of all building permits and use regulation permits and shall limit the use and operation of all land, buildings and structures designated in such plans to the conditions appearing in such plans and the

approval thereof

C. Approved plans may be amended pursuant to the same procedures and subject to the same limitations and requirements by which such plans were originally approved.

### §208-101. liability of owner.

The approval of plans shall in no way be construed as relieving the owner or his successors in title from strict compliance with and liability under all provisions of this Article, the provisions of all other portions of this <u>Zoning Ordinance</u> of which this Article is a part, all other applicable ordinances of lower Moreland <u>Township</u> and all other applicable laws.

 next ● top

# CRAIG W. GLEASON, MAI
## REAL ESTATE APPRAISER

2076 COUNTY LINE ROAD #249
HUNTINGDON VALLEY, PA 19006
PHONE (215) 675-0376
FAX   (215) 442-1512

## STATEMENT OF QUALIFICATIONS

### PROFESSIONAL LICENSES & CERTIFICATIONS

State of Pennsylvania Certified General Appraiser - Certificate #GA-000269-L
State of New Jersey Certified General Appraiser - Certificate #RG-01652

### PROFESSIONAL MEMBERSHIPS

Appraisal Institute MAI Certificate Number 11726
Pennsylvania Association of Realtors
National Association of Realtors

### EDUCATION

West Chester State University
Bachelor of Science Degree, 1982

American Institute of Real Estate Appraisers
Residential Valuation - Exam: 8/2/83
Real Estate Appraisal Principles - Exam: 1A-1 1983
Basic Valuation Procedures - Exam: 1A-2 - 1983
Capitalization Theory and Techniques - Exam: 1-BA - 1984
Capitalization Theory and Techniques - Exam: 1-BB - 1984
Standards of Professional Practice - 1988
Case Studies in Real Estate Valuation - 1991
Report Writing and Valuation Analysis - 1992
USPAP Update - 2003
Standards of Professional Practice (Part C)- 2000

Bucks County Community College
Adjunct Professor Real Estate
Real Estate Appraisal 1988-89

**GLEASON REAL ESTATE INC.**

## SERVICES

Real Estate Broker - Pennsylvania License No. AB-04783-L (1988)
Real Estate Appraiser-Appraise all types of properties for Mortgage Loans
Condemnation, Feasibility Studies, Assessment Equalization, etc. Testimony as
expert witness in various jurisdictions including Philadelphia Court of Common
Pleas, Montgomery and Bucks County Court of Common Pleas and federal
bankruptcy court in the Philadelphia and Camden jurisdictions. Staff Appraiser from
1982-90 for William T. Gleason, MAI.  President of Gleason Real Estate Inc. from
1990-Present.

**GLEASON REAL ESTATE INC.**

# PARTIAL LIST OF CLIENTS

Banc One Corp.
Amresco Mortgage Capital
Paralell Capital Corp.
CS First Boston
Midland Loan Services LP
American City Mortgage Company
Citi-Bank - New York
First Union Financial Corp.
Chase Manhattan Financial Services
PNC Bank
PNC-Financial Corp.
Sovereign Bank
First Union Bank
Fleet Bank
Quakertown National Bank
Abington Savings Bank
Citizens Bank
Commerce Bank
Lincoln Mortgage Service Co.
Huntingdon Valley Federal Savings and Loan
Fox Chase Federal Savings and Loan
M & T Bank
Union National Bank
Hatboro Federal Savings and Loan
Prudential Insurance Co.
Abington School District.
Westrum Development Company
Philadelphia Department of Public Property
Merrill Lynch
Sun Oil Co.
Arco
Redevelopment Authority of the City of Philadelphia
Montgomery County Redevelopment Authority
Hatboro-Horsham School District
North Penn School District
Merrill-Lynch Relocation
LaSalle College-High School
Pitcairn Inc.
Ford Motor Company
BMW Financial Services Company
Philadelphia Port Corporation
Pennsylvania Department of Highways
Abington Township
Upper Dublin Township
Various Attorney's, Residential, Commercial and Industrial Developers

**GLEASON REAL ESTATE INC.**

## QUALIFICATIONS

## MICHAEL F. DELANEY, S.R.P.A., A.S.A.

### BUSINESS AFFILIATIONS

- President, Michael F. Delaney & Associates, Inc., a professional appraisal company with experience in all types of real property appraisals.

- Main office is located P. O. Box 1368, Southampton, Pennsylvania 18966 Phone: (215)860-5700 Fax: (215)860-5382.

### EDUCATIONAL BACKGROUND

- Graduated - LaSalle College with Bachelor of Arts Degree

- Completed the following courses at Pennsylvania State University

    Principles of Appraising
    Real Estate Law
    Real Estate Fundamentals
    Real Estate Management

- Completed the following courses sponsored by the Society of Real Estate Appraisers:

    | 1968 | - | Course 101 "Basic Principles" |
    | 1969 | - | Appraising Apartments |
    | 1971 | - | Course 201 "Principles of Income Property Appraising" |
    | 1984 | - | Cash Flow and Risk Analysis |
    | 1984 | - | Investment Feasibility |
    | 1984 | - | Marketability and Market Analysis |
    | 1989 | - | Course 202 "Principles of Income Property Appraising" |

- Completed the following courses sponsored by the American Institute of Appraisers:

    | 1973 | - | Course 1B "Capitalization Theory and Technique" |
    | 1973 | - | Course II "Urban Properties" |
    | 1974 | - | Course VI "Investment Analysis" |
    | 1999 | - | Case Studies on Highest and Best Commercial Use. |

Page Two

- Attended the following programs sponsored by the Appraisal Institute:

    1991  -  Standards of Professional Practice, Part A
    1991  -  Prep Seminar for State Certification
    1999  -  Web Page Design
    1999  -  Technical Forum

- Greater Philadelphia Realty Board School:

    1995  -  Real Estate Appraiser and the Law
    1995  -  USPAP Update 1995
    1995  -  Appraisal Review - Residential Properties
    1995  -  Residential Property Construction and Inspection

- McKissock Data Systems

    USPAP Update - 1999
    EDI Overview - 1999
    Regression Applications - 1999
    Regression Foundations - 1999
    Automated Valuation Models - 1999

## PERSONAL AFFILIATIONS

- Certified General Appraiser in the Commonwealth of Pennsylvania - No. GA-000528-L

- Certified General Appraiser, State of New Jersey - No. RG-01595

- Senior Real Property Appraiser, Society of Real Estate Appraisers

- Senior Member, Society of Residential Appraisers

- Senior Member, American Society of Appraisers

- Bucks County Board of Realtors

Page Three

## *SCOPE OF APPRAISAL ACTIVITY (A Partial Listing)*

- Appraisal experience since 1965 has included a wide variety of residential, commercial and industrial properties.  Assignments have included:

  1. Market Street East - land re-use project.

  2. Disston Manufacturing Plant - multi-structure industrial complex

  3. "Fiesta-Treadway Motor Inn"

  4. "Coakley Bay" mid-rise condominium - proposed development St. Croix, Virgin Islands

  5. 1420 Walnut Street, high-rise office building

  6. Rosemary Apartments - highway severance affects

  7. Aldine I, II - high-rise office building, Haddonfield, New Jersey

  8. 1845 Walnut Street - Rittenhouse Square Garage

  9. "Golden Horse" - motel and restaurant

  10. "Woodlyn Crossing" - planned unit development

  11. 9000 Roosevelt Boulevard - proposed multi-family complex

  12. Alden Park Manor - 700 unit cooperative community

  13. Numerous apartment complexes throughout the Philadelphia, Metropolitan area

  14. West Catholic High School for Boys

  15. Warminster Heights - a 646 unit proposed cooperative

  16. Numerous schools,  churches throughout metropolitan - Philadelphia.

  17. Various housing subdivisions in Philadelphia and suburbs.

  18. Conservation easements in Bucks and Chester Counties.

Page Four

## *COURT TESTIMONY*

- Qualified as an expert witness before Court of Common Pleas, City of Philadelphia

## *LICENSE*

- Licensed Real Estate Broker, Pennsylvania No. 22943

## *ACADEMIC*

- Real Estate Lecturer in following accredited courses:

      Real Estate Principles and Practices
      Real Estate Management
      Appraising

- Lectured at the following colleges:

      Penn State University, Ogontz Campus
      LaSalle University, Philadelphia, Pennsylvania

## *CLIENTS (A Partial Listing)*

Avstar Mortgage Corporation
Chase Manhattan Mortgage Corporation
Coakley Bay Development Corporation
Columbia National Mortgage Corporation
Eastern Mortgage Services, Inc.
FBI
Federal National Mortgage Corporation
Federal Housing Administration
Financial Mortgage Corporation
First Keystone Mortgage Company
Fox Chase Federal Savings Bank
Frankford Bank
GMAC Mortgage Corporation
Hamilton Mortgage Company
IGA Federal Savings Bank
Ivy Mortgage Corp.

Jefferson Bank
Jiffy Lube International
Key Mortgage Services, Inc.
Main Line Financial
Mellon Bank
Michigan National Bank
National Cooperative Bank
Prime Savings Bank
Redevelopment Authority of
Philadelphia
Sovereign Bank
The Archdiocese of Philadelphia
The School District of Philadelphia
U. S. Marshals Service
U-Haul Corporation

# EXHIBIT 24

| From: | Thomas Moran <tmoran49@gmail.com> |
|---|---|
| Sent: | Tuesday, December 13, 2016 9:13 AM |
| To: | 'Peter Nanula'; Susan Dunnavant |
| Cc: | padden@threeoaksclub.com |
| Subject: | RE: Philmont - Dues Chart |

Peter,

Are we still going for a 60 day DD period here to better understand the real estate play?  Which would push the close into late March?

I will call you to discuss the dues table.

Tom

*Please note my new office number:*
*480-656-4757*

---

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Tuesday, December 13, 2016 10:08 AM
**To:** Susan Dunnavant; Thomas Moran
**Cc:** padden@threeoaksclub.com
**Subject:** Re: Philmont - Dues Chart

Got through the Philmont member town hall last night.  People asked about the dues, but I was able to just say we are freezing full golf at $8,900 for 2 years with CPI thereafter, and all other lower categories will be the same as planned for 2017 then we will re-evaluate.

Support seems strong, as they have no other options and they all like us.  There are a few naysayers, but they do not have a large following.  We only need a 51% vote, and a 50% quorum, so Board thinks the vote is easy to get.  It may take 3-4 weeks, into mid-January, because we just sent them the draft PSA yesterday and holidays will interrupt this process.  Think in terms of a Feb 28 closing here.

Employment agreements – 2 assistant pros just quit, and the Board is OK with us not assuming any agreements. They will talk to staff and they understand staff will get to meet us and may or may not keep their jobs.  Board understands our strategy of leaving oldco with no cash to pay severance and CGP not assuming these agreements.

Full speed ahead.

-------------------

Peter Nanula

1

2CGP005349

Concert Golf Partners

Tel:  949.715.0602

Cell:  415.260.8806

www.concertgolfpartners.com


Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*


---

**From:** Susan Dunnavant <sdunnavant@concertgolfclubs.com>
**Date:** Monday, December 12, 2016 at 11:04 AM
**To:** Thomas Moran <tmoran49@gmail.com>
**Cc:** Peter Nanula <pnanula@concertcapital.com>, Michael Padden <padden@threeoaksclub.com>
**Subject:** Re: Philmont - Dues Chart

I know - another stupid move right before a sale .  Can we increase the loader categories to make up ?

Sent from my iPhone

On Dec 12, 2016, at 11:47 AM, Thomas Moran <tmoran49@gmail.com> wrote:

> All,
>
> The PSA calls for $8,700/year for Full Golf all in dues/capital, which is a $400/year decrease from what they are paying now.  I applied the same % savings (4.3%) to all other categories.  However, I left all the Previews the same….no decrease.  Peter, I'm assuming Previews don't vote??
>
> How does this look?
>
> Tom
>
> *Please note my new office number:*
> *480-656-4757*
>
> ---
> **From:** Peter Nanula [mailto:pnanula@concertcapital.com]
> **Sent:** Sunday, December 11, 2016 11:40 AM
> **To:** Susan Dunnavant
> **Cc:** Thomas Moran
> **Subject:** Philmont - Dues Chart

2

2CGP005350

Good news from Glenn Meyer.  He is OK with giving us carte blanche on the golf courses, so long as there is a great North Course.  We are sending him the PSA accordingly.  He doesn't understand what we will do with the $5-6k dues preview members who only get South Course access now, but that is our problem.  There will be howling and lots of questions from the members, but we will stay flexible until we know what is best to do in terms of the South Course.

Monday at 7pm I have my town hall meeting there.  I need a dues chart like the one we have been using at White Manor – showing all the categories and current vs. new dues.  Tom, can you take a crack at this and run it by Susan?

Thanks,

Peter
-------------------
Peter Nanula
Concert Golf Partners
Tel:  949.715.0602
Cell:  415.260.8806
www.concertgolfpartners.com

Watch Now.
*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

<New CGP dues table 12 12 2016.xlsx>

2CGP005351

# EXHIBIT 25

| | |
|---|---|
| **From:** | Thomas Moran <tmoran49@gmail.com> |
| **Sent:** | Tuesday, December 13, 2016 9:26 AM |
| **To:** | 'Peter Nanula'; Susan Dunnavant |
| **Cc:** | padden@threeoaksclub.com |
| **Subject:** | RE: Philmont - Dues Chart |

Peter,

Per our call just now, understood you have communicated to Board guys that dues will remain <u>where they would be otherwise</u> for next year without a CG deal for all non-full golf members, and $8,700 for the 115 full golf members.  There is an announcement coming shortly from the Board to the members as to what the 2017 dues increases will be.

Susan and Michael to determine those non-Full Golf dues once we get more info from the club and then we are free to do whatever we want for all member classes in 2018.

Understood on the 45 day DD so early March close.

Tom

*Please note my new office number:*
*480-656-4757*

---

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Tuesday, December 13, 2016 10:08 AM
**To:** Susan Dunnavant; Thomas Moran
**Cc:** padden@threeoaksclub.com
**Subject:** Re: Philmont - Dues Chart

Got through the Philmont member town hall last night.  People asked about the dues, but I was able to just say we are freezing full golf at $8,900 for 2 years with CPI thereafter, and all other lower categories will be the same as planned for 2017 then we will re-evaluate.

Support seems strong, as they have no other options and they all like us.  There are a few naysayers, but they do not have a large following.  We only need a 51% vote, and a 50% quorum, so Board thinks the vote is easy to get.  It may take 3-4 weeks, into mid-January, because we just sent them the draft PSA yesterday and holidays will interrupt this process.  Think in terms of a Feb 28 closing here.

Employment agreements – 2 assistant pros just quit, and the Board is OK with us not assuming any agreements. They will talk to staff and they understand staff will get to meet us and may or may not keep their jobs.  Board understands our strategy of leaving oldco with no cash to pay severance and CGP not assuming these agreements.

Full speed ahead.

2CGP005352

--------------------

Peter Nanula

Concert Golf Partners

Tel:  949.715.0602

Cell:  415.260.8806

www.concertgolfpartners.com


Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*


---

**From:** Susan Dunnavant <sdunnavant@concertgolfclubs.com>
**Date:** Monday, December 12, 2016 at 11:04 AM
**To:** Thomas Moran <tmoran49@gmail.com>
**Cc:** Peter Nanula <pnanula@concertcapital.com>, Michael Padden <padden@threeoaksclub.com>
**Subject:** Re: Philmont - Dues Chart

I know - another stupid move right before a sale .  Can we increase the loader categories to make up ?

Sent from my iPhone

On Dec 12, 2016, at 11:47 AM, Thomas Moran <tmoran49@gmail.com> wrote:

> All,
>
> The PSA calls for $8,700/year for Full Golf all in dues/capital, which is a $400/year decrease from what they are paying now.  I applied the same % savings (4.3%) to all other categories.  However, I left all the Previews the same….no decrease.  Peter, I'm assuming Previews don't vote??
>
> How does this look?
>
> Tom
>
> *Please note my new office number:*
> *480-656-4757*

---

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Sunday, December 11, 2016 11:40 AM

2

2CGP005353

**To:** Susan Dunnavant
**Cc:** Thomas Moran
**Subject:** Philmont - Dues Chart

Good news from Glenn Meyer.  He is OK with giving us carte blanche on the golf courses, so long as there is a great North Course.  We are sending him the PSA accordingly.  He doesn't understand what we will do with the $5-6k dues preview members who only get South Course access now, but that is our problem.  There will be howling and lots of questions from the members, but we will stay flexible until we know what is best to do in terms of the South Course.

Monday at 7pm I have my town hall meeting there.  I need a dues chart like the one we have been using at White Manor – showing all the categories and current vs. new dues.  Tom, can you take a crack at this and run it by Susan?

Thanks,

Peter
-------------------
Peter Nanula
Concert Golf Partners
Tel:  949.715.0602
Cell:  415.260.8806
www.concertgolfpartners.com

Watch Now.
*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

<New CGP dues table 12 12 2016.xlsx>

3

# EXHIBIT 26

| | |
|---|---|
| **From:** | Peter Nanula <pnanula@concertcapital.com> |
| **Sent:** | Tuesday, January 17, 2017 10:20 AM |
| **To:** | Jonathan Grebow |
| **Cc:** | Michael Plotnick |
| **Subject:** | Re: Philmont CC Timing |

I think you are right – we sent the check to you, but MLK mail delay.  You should get it today or tomorrow.

Philmont board meeting tonight to approve the PSA, then member vote on Feb 1.  Moving quickly here.

I asked John Theirl to launch the property survey, probably with your guy, asap instead of waiting for the member vote on Feb 1.  We will incur $30-35k of costs if the member vote fails (very unlikely) but we will have a running start on the real estate.  Feel free to call John Theirl anytime to get what you need done from a legal perspective for your own South Course entitlement purposes.  I am trusting you guys to take the lead on those issues, including any necessary discussions with our lawyer.

-------------------

Peter Nanula

Concert Golf Partners

Tel:  949.715.0602

Cell:  415.260.8806

www.concertgolfpartners.com


Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*


**From:** Jonathan Grebow <jgrebow@ridgewoodrep.com>
**Date:** Tuesday, January 17, 2017 at 8:02 AM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Cc:** Michael Plotnick <mplotnick@ridgewoodrep.com>
**Subject:** Re: Philmont CC Timing

i

2CGP026413

Ok thought you were sending to me. No problem I'll send mine in with signed agreement.

On Tue, Jan 17, 2017 at 10:42 AM -0500, "Peter Nanula" <pnanula@concertcapital.com> wrote:

Sent the lawyer check end of last week.  Probably a delay, as yesterday was a holiday.

Reviewing your agreement today.

--------------------

Peter Nanula

Concert Golf Partners

Tel:  949.715.0602

Cell:  415.260.8806

www.concertgolfpartners.com


Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*


---

**From:** Jonathan Grebow <jgrebow@ridgewoodrep.com>
**Date:** Tuesday, January 17, 2017 at 7:17 AM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Cc:** Michael Plotnick <mplotnick@ridgewoodrep.com>
**Subject:** RE: Philmont CC Timing

Peter –

Checking in on the check for the lawyer and comments to the agreement.

Thanks,

Jonathan

2

2CGP026414

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Monday, January 16, 2017 11:18 AM
**To:** Jonathan Grebow <jgrebow@ridgewoodrep.com>
**Cc:** Michael Plotnick <mplotnick@ridgewoodrep.com>
**Subject:** Philmont CC Timing

PSA is moving along quickly:

- Board will approve it on Wed Jan 18.
- Member vote on Wed Feb 1.
- PSA currently says target closing date is Feb 28, but no later than March 15.

Does this give you guys enough time to get through environmental and Town meetings, or should I buy some more time on our closing?

Peter

-------------------

Peter Nanula
Concert Golf Partners
Tel:  949.715.0602
Cell:  415.260.8806
www.concertgolfpartners.com

Watch Now.
*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

2CGP026415

# EXHIBIT 27

## Marie Blockowitch

| | |
|---|---|
| **From:** | Jonathan Grebow |
| **Sent:** | Friday, January 04, 2019 5:03 PM |
| **To:** | 'Weir, Walter'; 'Ethan OShea' |
| **Cc:** | 'Peter Nanula (pnanula@concertcapital.com)'; Michael Plotnick |
| **Subject:** | FW: NVR Call re Philmont CC |

Walter/Ethan,

See the email below which was notes of a call with Christen about her conversation with the town.  Check out the part about them being thrilled that Metropolitan was out...also the part about NVR trying to get in the deal with us is interesting especially with their history on the deal.

**From:** Peter Nanula <pnanula@concertcapital.com>
**Sent:** Friday, January 20, 2017 5:34 PM
**To:** Jonathan Grebow <jgrebow@ridgewoodrep.com>; Michael Plotnick <mplotnick@ridgewoodrep.com>
**Cc:** Brett Owings <bowings@ridgewoodrep.com>
**Subject:** Re: NVR Call re Philmont CC

Beautiful.  Over and out.

Thanks.

--------------------

Peter Nanula

Concert Golf Partners

Tel:  949.715.0602

Cell:  415.260.8806

www.concertgolfpartners.com

Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

**From:** Jonathan Grebow <jgrebow@ridgewoodrep.com>
**Date:** Friday, January 20, 2017 at 2:29 PM
**To:** Peter Nanula <pnanula@concertcapital.com>, Michael Plotnick <mplotnick@ridgewoodrep.com>

1

Cc: Brett Owings <bowings@ridgewoodrep.com>
Subject: RE: NVR Call re Philmont CC

Just hung up with Christen. Meeting with the manager went well. The manager is a young guy probably in his early 30s. He already knew about you and had been on your website. Was thrilled that there was going to be one owner who wanted to integrate homes into club. Really like that we are planning on utilizing 1 clubhouse and not 2.

Didn't flinch on the 160 units. As expected they want the $1mm contribution for traffic. Standard 55 and over community – mentioned something about no kids under 19 allowed. There are legal requirements that I don't believe they can supersede. We will check on this.

Wants to get the deal done. The chairman of the board is in the office every day and very active/involved in everything, so the next move is a meeting with staff and the chairman.

And they were thrilled that Metropolitan was out!

I know Tom King very well. We sold NVR 1000s of lots. They call us all the time about our deals. Once you own the club I will call him and tell him that we are working with you on the approvals and will be in touch once we get the entitlements farther along.

From: Peter Nanula [mailto:pnanula@concertcapital.com]
Sent: Friday, January 20, 2017 5:17 PM
To: Michael Plotnick <mplotnick@ridgewoodrep.com>; Jonathan Grebow <jgrebow@ridgewoodrep.com>
Subject: NVR Call re Philmont CC

Guys:

Tom King of NVR called and left me a message. I called him back. He knew about our Feb 1 member vote date, expressed interest in the Philmont parcel, made his pitch for tying us up now to get the entitlements themselves, so he could control it. He said the prior Board of the Club was not willing to give NVR enough time to "perfect the entitlements" (up to 150+ units from the current 98 units), said it was a broken deal for him. He mentioned the road improvements needed by the Town; he mentioned the need for enviro remediation on our site, and that they have done this before with arsenic and lead at the former Cedar Brook Hills golf course in Sheltenham Township (now called Wingate). I was polite about it, and said we would be in touch once we actually own the club.

He is the regional guy for NVR up there, he said they are building 1,200 units a year in his market and closed on 20-30 projects last year in his area, and he is reachable at 610.304.9919. All yours, whenever you guys decide to call him and others about it.

Peter

--------------------

Peter Nanula
Concert Golf Partners
Tel:   949.715.0602

2

Cell: 415.260.8806
www.concertgolfpartners.com

<u>Watch Now</u>.
*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

# EXHIBIT 28

**From:**          Peter Nanula <pnanula@concertcapital.com>
**Sent:**           Saturday, January 21, 2017 10:54 AM
**To:**             Susan Dunnavant
**Subject:**         FW: Philmont mini model
**Attachments:**    Philmont CC Mini Model with TTM Nov 2016 $4M land sale 1 17 2017.xlsx

S:



Philmont – this pro forma attached cannot be what you are currently thinking is realistic to expect at Philmont, but you are probably skittish about projecting more at this stage until you know more. Let me know, as I am getting the member vote on Feb 1, spending money on survey and lawyers ($100k combined), and drafting the deal memo so we can be prepared to close the deal around March 1. By the way, the South Course real estate development is looking good for now; met with the Town this week, and they want to get this deal done with us.

Peter

-------------------

Peter Nanula

Concert Golf Partners

Tel: 949.715.0602

Cell: 415.260.8806

www.concertgolfpartners.com


Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

**2CGP027177**

**From:** Thomas Moran <tmoran49@gmail.com>
**Date:** Tuesday, January 17, 2017 at 12:48 PM
**To:** Peter Nanula <pnanula@concertcapital.com>, 'Susan Dunnavant' <sdunnavant@concertgolfclubs.com>, 'Kathy Lagrange' <KLagrange@concertgolfclubs.com>, Aaron Straub <astraub@concertgolfclubs.com>, <jkopack@concertgolfclubs.com>
**Subject:** Philmont mini model

All,

Updated with TTM through November and now tabs for each department.

A few things to note:

Note my comments on F&B re: change in tipping procedure last year.

Note the small lease payment for the carts which runs until 2019.  They traded in some owned carts to get the payment lower.

Please let me know if you have questions.

Tom Moran
480-656-4757 Office
214-707-1898 Cell

2

**2CGP027178**

# EXHIBIT 29

| | |
|---|---|
| **From:** | Peter Nanula <pnanula@concertcapital.com> |
| **Sent:** | Tuesday, January 24, 2017 6:16 PM |
| **To:** | Jonathan Grebow |
| **Cc:** | Michael Plotnick |
| **Subject:** | Re: Philmont CC |

Sorry, been burning my lawyers' time on adversarial contracts instead of this friendly one.

Back to you shortly.

--------------------

Peter Nanula

Concert Golf Partners

Tel:   949.715.0602

Cell:  415.260.8806

www.concertgolfpartners.com

Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

**From:** Jonathan Grebow <jgrebow@ridgewoodrep.com>
**Date:** Tuesday, January 24, 2017 at 4:09 PM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Cc:** Michael Plotnick <mplotnick@ridgewoodrep.com>
**Subject:** Re: Philmont CC

Definitely great body language. Last step in DD is the environmental cost analysis. Our attorney went through things with the consultant today and we should have that in about 2 weeks.

Where are those comments to the agreement?

2CGP026419

On Tue, Jan 24, 2017 at 7:05 PM -0500, "Peter Nanula" <pnanula@concertcapital.com> wrote:

Excellent.  Town not wasting any time here.  Good body language.

Michael, can you call me about a deal in Boca?

--------------------

Peter Nanula

Concert Golf Partners

Tel:  949.715.0602

Cell:  415.260.8806

www.concertgolfpartners.com

Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

**From:** Jonathan Grebow <jgrebow@ridgewoodrep.com>
**Date:** Tuesday, January 24, 2017 at 12:17 PM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Cc:** Michael Plotnick <mplotnick@ridgewoodrep.com>
**Subject:** FW: Philmont CC

Peter see below and attached

**From:** Christen Pionzio [mailto:cpionzio@hrmml.com]
**Sent:** Tuesday, January 24, 2017 3:15 PM
**To:** Jonathan Grebow <jgrebow@ridgewoodrep.com>
**Subject:** FW: Philmont CC

Jonathon,
See the 2 intersection designs attached here and email from manager below. These are the favorites right now. Also, I confirmed that this ordinance is the same version that you have and gave to me. Lastly, I spoke to my partner, Carl Weiner, who is our HOA expert (he was Pres of the PA Committee of Communities). Carl confirmed that we can have a 55+ community and prohibit children under the age of 19. He has set them up where they limit "guests under the age

2CGP026420

of 19" to a time period to account for summer visits. It reaches the goal of no kids for the schools. Carl could help with your HOA docs when we get there.
CP


Christen G. Pionzio, Esquire
Hamburg, Rubin, Mullin, Maxwell & Lupin, P.C.
215.661.0400; Fax 215.661.0315
CPionzio@HRMML.com
www.HRMML.com


**From:** Christopher Hoffman [mailto:choffman@lower-moreland.org]
**Sent:** Monday, January 23, 2017 8:50 AM
**To:** Christen Pionzio
**Subject:** Philmont CC

Christen,

To follow up on our discussion from Friday, I've attached the two intersection plans and the most recent draft ordinance (not sure how this one compares to the copy you had). The intersection plans are just conceptual at this point, so any details will be worked out as projects would become more realistic in this immediate area. There may also be items in the ordinance which will be impacted by specific plans, so we could address that at the appropriate time.

I'll wait to hear from you once your client is prepared to request a staff meeting.

-Chris


Christopher R. Hoffman
Township Manager
Lower Moreland Township
640 Red Lion Road
Huntingdon Valley, PA 19006
215-947-3100

2CGP026421

# EXHIBIT 30

| | |
|---|---|
| **From:** | Tom Moran <tmoran49@gmail.com> |
| **Sent:** | Tuesday, February 14, 2017 9:46 PM |
| **To:** | Peter J. Nanula |
| **Subject:** | Re: Philmont - South Course Dirt |

Ok, will do.

On Feb 14, 2017 6:26 PM, "Peter Nanula" <pnanula@concertcapital.com> wrote:
> We have a ton of eyes on this already, but thanks.
>
> Next time you speak with Chris Hamill or John Kopack, feel free to chat with them about it.  They have architect Andrew Green involved also, local favorite, knows the course well, members love him, short money.  They are running this project, not you and me.
>
> _____
>
> Peter J. Nanula
> Concert Golf Partners
> (949) 715-0602 office
> (415) 260-8806 cell
> pnanula@concertcapital.com

**From:** tom moran <tmoran49@gmail.com>
**Date:** Tuesday, February 14, 2017 at 5:15 PM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Subject:** Re: Philmont - South Course Dirt

Peter,

60k yards of dirt is a bunch. We built Ridgeview ranch in plano and moved a total of 180k yards of dirt.

Now that was a small number for a new build golf course, but you aren't going to berm a driving range with 60k yards.

Let me call my buddy Jeff Brauer tomorrow and see what ideas he has. Golf architecture guy.

Tom

On Feb 14, 2017 5:59 PM, "Peter Nanula" <pnanula@concertcapital.com> wrote:
> Chris & John:

2CGP014143

Just closing the loop here. Ridgewood came back optimistic about enviro remediation on the South Course, so we are a go on the real estate project. They say it will take 12-18 months to get through Penn DEP, and we should have our entitlements for 165+ "carriage homes" within 24 months. Then we sell the nicely entitled 6-acre parcel to          or some other builder, and they start moving dirt and building homes about 2 years from now. Maybe a bit quicker, maybe a few more units, but this is the baseline plan.

Dirt – this is the big issue. They estimated 60,000 yards of South Course arsenic-infested dirt that might need to be moved. That is a lot. They are talking about putting it on the driving range and some berms to shield the new homes; just their initial thoughts, without our input. But of course, you two guys need to be hip-to-hip with Brett at Ridgewood on all the golf course plans. Ridgewood just wants to maximize our proceeds from selling the entitled parcel      ; they are our partner on the land deal, so it makes sense they are focused on that. But they don't own any part of the Club and don't need to care about it. We need to make sure we end up with a great North Course and some other workable club facilities. So **you** will be telling **them** where that 60k yards of dirt goes.

Call Brett now about the enviro remediation plans they are developing, and stay close to him as the process unfolds. And keep me posted.

Thanks,

Peter

_____

Peter J. Nanula
Concert Golf Partners
(949) 715-0602 office
(415) 260-8806 cell
pnanula@concertcapital.com

2

# EXHIBIT 31

| **From:** | Susan Dunnavant |
|---|---|
| **Sent:** | Thursday, December 8, 2016 11:14 AM |
| **To:** | pnanula@concertcapital.com |
| **Cc:** | Thomas Moran; Michael Padden; Aaron Straub; John S. Kopack; Brandon Collins; Joseph Nowell |
| **Subject:** | White Manor  Philmont |



Philmont- more complicated.

Need to figure out besides the capex and infrastructure issues, how we maintain 36 holes or not going forward.
Current budget is adequate to maintain one course at Woodmore levels.
Do we

1.  Go down to 18 hole immediately and maintain at levels that warrants the current higher level dues.
2.  Increase budget 300-400K to get North Course to sellable conditions and have South Course OK - Maybe do the public course ? (how do we service them?)

This has to be determined before we put together Mini Model Projections.  I also believe that when Brandon did his capex analysis he was only talking about one course (north) Correct?  Where do we source a super?

Current employment contracts?  Do they go away?  Current GM making     Lowest paid.

Kopack was scheduling site visit during next White Manor visit.

Susan Dunnavant
*Chief Operating Officer*
*407-489-0931*

ConcertGolf
Partners

**2CGP001794**

# EXHIBIT 32

**From:**                Peter Nanula <pnanula@concertcapital.com>
**Sent:**               Friday, December 9, 2016 11:19 AM
**To:**                  Susan Dunnavant
**Subject:**           Re: Philmont South Course

Ok, good thought, if we can get Board off the age-old love of having 36 holes.  Let me talk to Glenn about that first.

------------------

Peter Nanula

Concert Golf Partners

Tel:  949.715.0602

Cell:  415.260.8806

www.concertgolfpartners.com

Watch Now.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

**From:** Susan Dunnavant <sdunnavant@concertgolfclubs.com>
**Date:** Friday, December 9, 2016 at 6:08 AM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Subject:** Fwd: Philmont South Course

FYI

Sent from my iPhone

Begin forwarded message:

> **From:** Brandon Collins <BCollins@concertgolfclubs.com>
> **Date:** December 9, 2016 at 8:08:59 AM EST

1

2CGP005322

**To:** Susan Dunnavant <sdunnavant@concertgolfclubs.com>
**Subject: Philmont South Course**

Susan-

After thinking a little more on our conversation yesterday, I think I have a good plan for the South Course.  I would try to find a routing of 3-6 holes that start and end near the clubhouse and use them as a short course.  Any cart path additions that would be needed to connect these holes could be done cheaply by making gravel paths.  They make sense on this property and wouldn't look out of place; there are a few on the North Course.  Still abandon the other 12-15 and kill off and re-grass these.  I'm thinking a combination of fescues and wildflowers for aesthetics.  I would cap the irrigation leading in to these fields because if there is a leak in the future, it would be difficult to locate in the high grass.  Overall, this would be a really simple conversion.

The short course would not add that much operating expense, still look like a maintained entrance, and I believe you could use it for a number of different purposes.  Just a few ideas:

- People always complain that golf takes too long.  Promote events like "5 and dine" and "5 and wine" (if it's 5 holes-that title doesn't make sense otherwise =-)).  You could get people on and off the golf course in around and hour and pair it with a social event after.
- There is a lot of nervousness from golf newcomers to get on a "big course" for the first time.  The short course would provide a perfect venue to promote programs like "Get Golf Ready" and you could market to a different demographic than most clubs.  It could also be a great tool to get social members to make the leap to full golf.
- Great venue for junior golf and golf camps and not displace the regular members.
- Good place for playing lessons without disrupting normal play

I'm sure there are more if you really dive in to but I believe that this could be a win for everyone if Peter cannot sell the property.  It creates a pretty unique feature, keeps expenses down, and provides a venue for golf activities that could help improve revenue.

Best,

**Brandon Collins**
Concert Golf Partners
(301) 249-6100 ext 222



2CGP005323

# EXHIBIT 33

| | |
|---|---|
| **From:** | Peter Nanula <pnanula@concertcapital.com> |
| **Sent:** | Sunday, December 11, 2016 1:40 PM |
| **To:** | Susan Dunnavant |
| **Cc:** | Thomas Moran |
| **Subject:** | Philmont - Dues Chart |

Good news from Glenn Meyer.  He is OK with giving us carte blanche on the golf courses, so long as there is a great North Course.  We are sending him the PSA accordingly.  He doesn't understand what we will do with the $5-6k dues preview members who only get South Course access now, but that is our problem.  There will be howling and lots of questions from the members, but we will stay flexible until we know what is best to do in terms of the South Course.

Monday at 7pm I have my town hall meeting there.  I need a dues chart like the one we have been using at White Manor – showing all the categories and current vs. new dues.  Tom, can you take a crack at this and run it by Susan?

Thanks,

Peter
-------------------
Peter Nanula
Concert Golf Partners
Tel:  949.715.0602
Cell:  415.260.8806
www.concertgolfpartners.com

Watch Now.
*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

2CGP005329

# EXHIBIT 34

**From:** Susan Dunnavant
**Sent:** Wednesday, March 1, 2017 8:01 PM
**To:** Peter Nanula
**Subject:** Re: Philmont

Yes I will

Sent from my iPhone

> On Mar 1, 2017, at 7:51 PM, Peter Nanula <pnanula@concertcapital.com> wrote:
>
> S:
>
> I know you are jammed with takeovers, and we are both relying on Chris Hamill for golf course issues at Philmont, but I wanted to make sure you saw the attached "concept plan" from our real estate partner, Ridgewood, at Philmont.
>
> I like the fact that Ridgewood is trying to maximize our land sale proceeds, but we have to weight that against destroying the club and our future membership sales and P&L at the club.
>
> This plan would go across the current main entry road and grab some more of the South Course, so we can get 170+ units and make them larger units. This should mean more proceeds from             2 years. But we need to think about how it will feel to be a member of this club with all these new "carriage homes" and what the "sense of arrival" will be, and how the remaining 6-7 holes on the South Course will really work for our membership once remodeled, and what the remodeled driving range will look like.
>
> Talk to me, or talk to Chris, but I wanted to make sure you are in this loop before I make any big decisions with Ridgewood. No rush – so long as you weigh in by early next week is fine.
>
> Peter
> -------------------
> Peter Nanula
> Concert Golf Partners
> Tel:  949.715.0602
> Cell:  415.260.8806
> www.concertgolfpartners.com<http://www.concertgolfpartners.com/>
>
> Watch Now<https://youtu.be/f6pygnWS3sA>.
> Private club board members tell how they recapitalized their clubs with Concert Golf Partners.
>
>
> From: Peter Nanula <pnanula@concertcapital.com<mailto:pnanula@concertcapital.com>>
> Date: Tuesday, February 28, 2017 at 3:58 PM
> To: Chris Hamill <chamill@comprehensivegolfsolutions.com<mailto:chamill@comprehensivegolfsolutions.com>>
> Cc: Thomas Moran <tmoran49@gmail.com<mailto:tmoran49@gmail.com>>, John Theirl <jtheirl@theirlwilsonlaw.com<mailto:jtheirl@theirlwilsonlaw.com>>, Jack Wilson <jwilson@theirlwilsonlaw.com<mailto:jwilson@theirlwilsonlaw.com>>
> Subject: FW: Philmont
>

1

**2CGP006162**

**CONFIDENTIAL**

> Chris:
>
> See latest Ridgewood sketch for the Philmont residential units, and speak up to me if you have concerns about impact
on our club and to Brett Owings directly.
>
> Peter
> ------------------
> Peter Nanula
> Concert Golf Partners
> Tel:   949.715.0602
> Cell:  415.260.8806
> www.concertgolfpartners.com<http://www.concertgolfpartners.com/>
>
> Watch Now<https://youtu.be/f6pygnWS3sA>.
> Private club board members tell how they recapitalized their clubs with Concert Golf Partners.
>
>
> From: Jonathan Grebow <jgrebow@ridgewoodrep.com<mailto:jgrebow@ridgewoodrep.com>>
> Date: Tuesday, February 28, 2017 at 3:50 PM
> To: Peter Nanula <pnanula@concertcapital.com<mailto:pnanula@concertcapital.com>>
> Subject: Fwd: Philmont
>
> Just revived when we hung up the attached initial rough sketch plan. Needs some work but I like the 170 units and
these are pretty large units.  Gives us some nice flexibility.
>
>
> _____
> From: Brett Owings <bowings@ridgewoodrep.com<mailto:bowings@ridgewoodrep.com>>
> Sent: Tuesday, February 28, 2017 6:43 PM
> Subject: Fwd: Philmont
> To: Michael Plotnick <mplotnick@ridgewoodrep.com<mailto:mplotnick@ridgewoodrep.com>>, Jonathan Grebow
<jgrebow@ridgewoodrep.com<mailto:jgrebow@ridgewoodrep.com>>
>
>
> FYI
>
> Thanks,
>
> Brett
>
> Begin forwarded message:
>
> From: "George Hartman" <ghartman@bohlereng.com<mailto:ghartman@bohlereng.com>>
> To: "Brett Owings" <bowings@ridgewoodrep.com<mailto:bowings@ridgewoodrep.com>>
> Cc: "Nick Grandi" <ngrandi@bohlereng.com<mailto:ngrandi@bohlereng.com>>, "Chris Fischer"
<cfischer@bohlereng.com<mailto:cfischer@bohlereng.com>>, "Bill Rearden"
<wrearden@bohlereng.com<mailto:wrearden@bohlereng.com>>
> Subject: RE: Philmont
>
> Brett,
>

2

2CGP006163

CONFIDENTIAL

> Attached is the preliminary layout for your review.   We were able to get a total of 172 units.  Note that we have not done any calculations yet to determine the natural resource disturbance.
>
> Thanks,
> George
>
>
> George Hartman, P.E.
>
> [cid:image001.png@01D291E8.9991E000]
> 1600 Manor Drive, Suite 200 | Chalfont, PA 18914
> P: 215-996-9100 |  M: 267-664-2460 | ghartman@bohlereng.com<mailto:ghartman@bohlereng.com>
> www.BohlerEngineering.com<http://www.BohlerEngineering.com>
>
>
> Confidentiality Note: This e-mail, and any attachment to it, contains confidential information intended only for the use of the designated recipients, which information may also be privileged. If the reader of this e-mail is not the intended recipient, the document has been received in error and any use, review, dissemination, distribution, disclosure or copying of this message is strictly prohibited. If you have received this e-mail in error, please notify the sender via reply e-mail and immediately delete this e-mail from your system.
>
>
> From: Bill Rearden
> Sent: Tuesday, February 28, 2017 2:40 PM
> To: Brett Owings <bowings@ridgewoodrep.com<mailto:bowings@ridgewoodrep.com>>
> Cc: George Hartman <ghartman@bohlereng.com<mailto:ghartman@bohlereng.com>>; Nick Grandi <ngrandi@bohlereng.com<mailto:ngrandi@bohlereng.com>>; Chris Fischer <cfischer@bohlereng.com<mailto:cfischer@bohlereng.com>>
> Subject: RE: Philmont
>
> Good.  We just reviewed as a team and my comments are being addressed and then we'll send to you this evening. Looks like we should be able to get at least 160 units while avoiding the waters.
>
> From: Brett Owings [mailto:bowings@ridgewoodrep.com]
> Sent: Tuesday, February 28, 2017 11:56 AM
> To: Bill Rearden <wrearden@bohlereng.com<mailto:wrearden@bohlereng.com>>
> Subject: Philmont
>
> Bill,
>
> How is the layout going?
>
> Thanks,
>
> Brett
>
> _____
> Brett H. Owings, PE, PP
> Senior Vice President
>
> Ridgewood Real Estate Partners
> 25A Hanover Road

3

2CGP006164

**CONFIDENTIAL**

> Suite 310
> Florham Park, New Jersey 07932
> p: 973-593-0003
> f: 973-593-0077
> c: 908-510-4670
> w: www.ridgewoodrep.com<http://www.ridgewoodrep.com/>
> e: bowings@ridgewoodrep.com<mailto:bowings@ridgewoodrep.com>
>
>
>
> <01-Concept.pdf>

2CGP006165

# EXHIBIT 35

| | |
|---|---|
| **From:** | Peter Nanula <pnanula@concertcapital.com> |
| **Sent:** | Monday, November 21, 2016 5:09 PM |
| **To:** | Brandon Collins |
| **Cc:** | John S. Kopack; Susan Dunnavant |
| **Subject:** | Philmont CC Visit on Tuesday Morning |

Brandon:

I understand you are making tracks for Philmont CC in the morning, and Jordan Kendall or Stan are arranging the visit.

First of all, thanks for doing this for us.  Second, president tells me they have no "master plan" documents for the North Course – just ideas they have been preliminarily discussing with Andrew Green, whom you probably know from his time at MacDonald & Sons.

Third, and I think you know this, we are looking primarily for agronomic input on how we can get the North Course into top shape (hire a new Super!) at a  reasonable budget.  The South Course is less desirable, and 9 of the South 18 may go away with the planned real estate development in 3-4 years, so we will probably use it like Crestview does – as a secondary course to put lesser golfers, so somewhat lower agronomy standards (and cost).

The wild ideas the Board has about a "master plan" for the North Course are probably way overblown, and we have huge capital needs in the clubhouse, HVAC, etc.  You will see.  We will want to "nod" to some master plan elements so the members are excited about their North Course being updated a bit, but we want to spend the smallest dollars possible to get the maximum member impact.  Somewhat like you did with the original master plan ideas at MacGregor Downs, but at much smaller numbers.

Peter

-------------------

Peter Nanula
Concert Golf Partners
Tel:  949.715.0602
Cell:  415.260.8806
www.concertgolfpartners.com

Watch Now.
*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

2CGP005259

# EXHIBIT 36

| | |
|---|---|
| **From:** | Peter Nanula <pnanula@concertcapital.com> |
| **Sent:** | Monday, January 16, 2017 5:58 PM |
| **To:** | Tom Moran |
| **Subject:** | Re: PSA for Philmont Country Club |

Ok, then our model is a complete swag.  Ask her when she will have something we can work with.

-------------------

Peter Nanula

Concert Golf Partners

Tel:  949.715.0602

Cell:  415.260.8806

www.concertgolfpartners.com

Watch Now.
*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

**From:** Tom Moran <tmoran49@gmail.com>
**Date:** Monday, January 16, 2017 at 2:50 PM
**To:** Peter Nanula <pnanula@concertcapital.com>
**Subject:** Re: PSA for Philmont Country Club

No, not that I have seen.

On Jan 16, 2017 3:49 PM, "Peter Nanula" <pnanula@concertcapital.com> wrote:
OK.  Thanks.

Susan has not prepared a  pro forma yet, has she?

-------------------

Peter Nanula

Concert Golf Partners

Tel:  949.715.0602

Cell:  415.260.8806

www.concertgolfpartners.com

1

2CGP014816

<u>Watch Now</u>.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

**From:** Thomas Moran <tmoran49@gmail.com>
**Date:** Monday, January 16, 2017 at 11:11 AM
**To:** Peter Nanula <pnanula@concertcapital.com>, 'John Theirl' <jtheirl@theirlwilsonlaw.com>
**Subject:** RE: PSA for Philmont Country Club

Peter,

The mini model is updated.  I've asked Seller for updated financials as the latest we have is July.

The midpoint of your numbers below was $4.275M.  I took out some $ in locker rooms and golf course to get to $4M.

Tom

**From:** Peter Nanula [mailto:pnanula@concertcapital.com]
**Sent:** Monday, January 16, 2017 9:16 AM
**To:** John Theirl <jtheirl@theirlwilsonlaw.com>; Tom Moran <tmoran49@gmail.com>
**Subject:** Re: PSA for Philmont Country Club

Here is a much more likely – and more detailed - list of our initial capital projects at Philmont CC, just between us.  Not to be shared with Grant or Seller, but just so you know what we actually have planned.

2CGP014817

1. I think your current Exhibit I is fine.  It covers the Big 4 of these projects (highlighted below in Yellow), and it is nicely vague.

2. Tom, update your capex tab in the model accordingly, using the midpoint of these estimates to reach a total of $4.0m.

Budget Summary

| | |
|---|---|
| Deferred items | $350-500k |
| Sense of arrival | $150-250k |
| Utility Infrastructure | $500-700k |
| Pool/Porch/Patio | $350-550k |
| F&B Related | $250-400k |
| Locker rooms | $900-1.3m |
| Fitness/Other | $250-400k |
| Golf course | $700-1m |

Peter

-------------------

Peter Nanula

Concert Golf Partners

Tel:  949.715.0602

Cell: 415.260.8806

www.concertgolfpartners.com

2CGP014818

<u>Watch Now</u>.

*Private club board members tell how they recapitalized their clubs with Concert Golf Partners.*

---

**From:** John Theirl <<u>jtheirl@theirlwilsonlaw.com</u>>
**Date:** Monday, January 16, 2017 at 6:35 AM
**To:** Peter Nanula <<u>pnanula@concertcapital.com</u>>, Tom Moran <<u>tmoran49@gmail.com</u>>
**Subject:** Fwd: PSA for Philmont Country Club

I just got the attached from Grant Grayson. John
Sent from my iPhone

Begin forwarded message:

> **From:** "Grayson, Grant S." <<u>Grant.Grayson@leclairryan.com</u>>
> **Date:** January 16, 2017 at 8:29:56 AM CST
> **To:** 'John Theirl' <<u>jtheirl@theirlwilsonlaw.com</u>>
> **Cc:** "Selbach, John C." <<u>John.Selbach@leclairryan.com</u>>, Glenn Meyer
> <<u>glenn@gdmplan.com</u>>
> **Subject: RE: PSA for Philmont Country Club**
>
> Good morning, John.
>
> Attached are the clean and black line revisions of the PSA that you sent on
> Thursday.   It has not yet been fully reviewed by Philmont so there may be a few
> more changes, but this should be pretty close.   Most of the changes are cleanup
> and clarification, but there are a few key points:
>
> 1. Given that Philmont is transferring ownership of the assets for very little
>    consideration, the board wants t be able to count on the Club remaining in

4

2CGP014819

existence and staying private for a minimum period of time.   We would like as many as ten years, but require at least seven.    The current members should be able to enjoy the Phase I improvements, and hopefully, the Phase II improvements.    The board is reluctant to ask the members permission to convey the property with only a general assurance from Philmont.

2.  There are several additions to the agreement that when combined make it clear that to the extent Philmont does not have sufficient cash at closing to (a) dispose of any employment claims, (b) resolve any unassumed contracts or leases, (b) pay its payables, (de) set aside a small amount for D&O Insurance and maintaining its corporate existence for 5 years (which we advise is necessary and (d) pay its closing costs, that Concert will fund the shortfall.   We don't believe there will be much, if any, shortfall, but want to make sure the parties are clear on this point.

3.  We eliminated the Seller holding the Buyer harmless provision because there won't be any assets to fund any such indemnity.

As I indicated, we want to get the final to the board early for approval on Tuesday, Jan 17th, so that we can send out the notice to the members on the 18th.

If you're working today, please give me a call on my cell so that we can discuss logistics.

Thanks.   Grant

**Grant S. Grayson**
**Attorney at Law**
LeClairRyan
919 East Main Street, Twenty-Fourth Floor
Richmond, Virginia 23219
(804) 343-4381 Direct
(804) 916-7261 Fax
(804) 314-1176 Mobile
Grant.Grayson@leclairryan.com
https://www.leclairryan.com
*** *Please note our new address listed above. Our telephone and fax numbers remain the same.* ***

Please consider the environment before printing this email.

**From:** John Theirl [mailto:jtheirl@theirlwilsonlaw.com]
**Sent:** Wednesday, January 11, 2017 3:56 PM

2CGP014820

**To:** Grayson, Grant S.
**Subject:** RE: PSA for Philmont Country Club

Grant:

Here you go.  A comparison of the 12/12/16 draft to the draft I sent you earlier today.

John

John M. Theirl

**Theirl Wilson PLLC**

**Attorneys at Law**

**Two Energy Square**

4849 Greenville Ave.

Suite 1255

Dallas, Texas 75206

Tel. (214) 389-5401

Mob. (214) 912-2867

Fax. (214) 389-5404

*jtheirl@TheirlWilsonLaw.com*

**From:** Grayson, Grant S. [mailto:Grant.Grayson@leclairryan.com]
**Sent:** Wednesday, January 11, 2017 2:37 PM
**To:** John Theirl <jtheirl@theirlwilsonlaw.com>
**Subject:** RE: PSA for Philmont Country Club

2CGP014821

It's buried in a ton of emails, and I haven't been able to find it.    Why don't you just compare it to the most favorable draft you did before Peter made you change it?

Just kidding.   The draft was dated December 12, 2016.    Hopefully that will help.

**Grant S. Grayson**
**Attorney at Law**
LᴇCʟᴀɪʀRʏᴀɴ
919 East Main Street, Twenty-Fourth Floor
Richmond, Virginia 23219
(804) 343-4381 Direct
(804) 916-7261 Fax
(804) 314-1176 Mobile
Grant.Grayson@leclairryan.com
https://www.leclairryan.com
*** *Please note our new address listed above. Our telephone and fax numbers remain the same.* ***

Please consider the environment before printing this email.

**From:** John Theirl [mailto:jtheirl@theirlwilsonlaw.com]
**Sent:** Wednesday, January 11, 2017 3:25 PM
**To:** Grayson, Grant S.
**Subject:** RE: PSA for Philmont Country Club

Grant:

Can you send it to me so that I know the correct draft? I have been making some tweaks to the draft I sent you earlier today and I want to make sure I do a comparison of the correct version you previously received.

John

John M. Theirl

**Theirl Wilson PLLC**

7

2CGP014822

**Attorneys at Law**

**Two Energy Square**

4849 Greenville Ave.

Suite 1255

Dallas, Texas 75206

Tel. (214) 389-5401

Mob. (214) 912-2867

Fax. (214) 389-5404

*jtheirl@TheirlWilsonLaw.com*

........................................................................................

**From:** Grayson, Grant S. [mailto:Grant.Grayson@leclairryan.com]
**Sent:** Wednesday, January 11, 2017 2:17 PM
**To:** John Theirl <jtheirl@theirlwilsonlaw.com>
**Subject:** RE: PSA for Philmont Country Club

You did a prior draft also.

**Grant S. Grayson**
**Attorney at Law**
LECLAIRRYAN
919 East Main Street, Twenty-Fourth Floor
Richmond, Virginia 23219
(804) 343-4381 Direct
(804) 916-7261 Fax
(804) 314-1176 Mobile
Grant.Grayson@leclairryan.com
https://www.leclairryan.com
*** *Please note our new address listed above. Our telephone and fax numbers remain the same.* ***

Please consider the environment before printing this email.

........................................................................................

**From:** John Theirl [mailto:jtheirl@theirlwilsonlaw.com]
**Sent:** Wednesday, January 11, 2017 3:10 PM
**To:** Grayson, Grant S.
**Subject:** RE: PSA for Philmont Country Club

2CGP014823

Grant:

Do you mean blackline against the final form of the White Manor PSA?  The draft I sent you is our original PSA draft for Philmont.

John

John M. Theirl

**Theirl Wilson PLLC**

**Attorneys at Law**

**Two Energy Square**

4849 Greenville Ave.

Suite 1255

Dallas, Texas 75206

Tel. (214) 389-5401

Mob. (214) 912-2867

Fax. (214) 389-5404

*jtheirl@TheirlWilsonLaw.com*

---

**From:** Grayson, Grant S. [mailto:Grant.Grayson@leclairryan.com]
**Sent:** Wednesday, January 11, 2017 1:43 PM
**To:** John Theirl <jtheirl@theirlwilsonlaw.com>
**Subject:** RE: PSA for Philmont Country Club

John— Hope you had a great sailing trip.    Welcome back to the salt mine.

2CGP014824

Thanks for the draft.  Can you send a blackline against the original draft you did?  That would speed our review considerably.

Grant

**Grant S. Grayson**
**Attorney at Law**
LECLAIRRYAN
919 East Main Street, Twenty-Fourth Floor
Richmond, Virginia 23219
(804) 343-4381 Direct
(804) 916-7261 Fax
(804) 314-1176 Mobile
Grant.Grayson@leclairryan.com
https://www.leclairryan.com
*** *Please note our new address listed above. Our telephone and fax numbers remain the same.* ***

Please consider the environment before printing this email.

**From:** John Theirl [mailto:jtheirl@theirlwilsonlaw.com]
**Sent:** Wednesday, January 11, 2017 11:41 AM
**To:** Grayson, Grant S.
**Cc:** Peter Nanula (pnanula@concertcapital.com); Thomas Moran; Jack Wilson; Quinn Martindale
**Subject:** PSA for Philmont Country Club

Grant:

Attached for your review is a first draft of the PSA.  I will forward you drafts of the exhibits to the PSA later this week which will be similar to the exhibits we had for White Manor Country Club sale. We look forward to working with you and your team again on this matter.

John

10

2CGP014825

John M. Theirl

**Theirl Wilson PLLC**

**Attorneys at Law**

**Two Energy Square**

4849 Greenville Ave.

Suite 1255

Dallas, Texas 75206

Tel. (214) 389-5401

Mob. (214) 912-2867

Fax. (214) 389-5404

*jtheirl@TheirlWilsonLaw.com*

\* This e-mail may contain confidential or privileged information. If you are not the intended recipient, please notify the sender immediately by return e-mail with a copy to emailadministrator@leclairryan.com and delete this e-mail and all copies and attachments.

\* This e-mail may contain confidential or privileged information. If you are not the intended recipient, please notify the sender immediately by return e-mail with a copy to emailadministrator@leclairryan.com and delete this e-mail and all copies and attachments.

\* This e-mail may contain confidential or privileged information. If you are not the intended recipient, please notify the sender immediately by return e-mail with a copy to emailadministrator@leclairryan.com and delete this e-mail and all copies and attachments.

\* This e-mail may contain confidential or privileged information. If you are not the intended recipient, please notify the sender immediately by return e-mail with a copy to emailadministrator@leclairryan.com and delete this e-mail and all copies and attachments.

2CGP014826

# EXHIBIT 37

# CONFIDENTIALITY AGREEMENT

THIS CONFIDENTIALITY AGREEMENT ("**Agreement**") is made and entered into as of September 29, 2016 by and among Ridgewood Real Estate Partners, **LLC** having an address at 25A Hanover Road, Suite 310, Florham Park, NJ   07932 ("Ridgewood"), on the one hand, and _PHILMONT COUNTRY CLUB_ having an address at _301 Tomlinson Rd Huntingdon Valley PA_ ("**Owner**"), on the other hand, with reference to the following facts:

A.       Owner is providing confidential information to Ridgewood about **Philmont Country Club "Philmont" located at 301 Tomlinson Rd, Huntingdon Valley, PA 19006**.

B.       Subject to the terms of this Agreement, Owner is willing to furnish Ridgewood with certain information concerning **Philmont**.  Ridgewood is willing to evaluate same in contemplation of a potential relationship with Owner.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants, agreements, representations and warranties herein contained, Ridgewood and Owner hereby agree as follows:

1.       Ridgewood, for itself and on behalf of its employees, agents, attorneys, accountants, advisors, investors, partners and affiliates, agrees to maintain in confidence and not disclose or disseminate, either orally or in writing, directly or indirectly, to any third party (other than Ridgewood's employees, agents, attorneys, accountants, advisors, officers, directors, investors, lenders, and affiliates who have a bona fide reason to know such information.) any proprietary, non-public information, including Ridgewood's evaluation or analysis of the opportunity, that is provided to Ridgewood by Owner or any of Ridgewood's employees, agents, attorneys, accountants, officers, directors, representatives or affiliates (collectively "**Information**").

2.       Ridgewood agrees that it will not, without the prior written consent of Owner, use the Information for any purpose other than in connection with evaluating a potential relationship with Owner (the "**Permitted Use**").  Without limiting the generality of the foregoing, Ridgewood agrees that it will not make copies, photocopies, disk copies, facsimiles or other reproductions of the Information, other than in connection with the Permitted Use.

3.       The Information, and all reproductions thereof, shall be and remain the property of Owner, shall not be used by Ridgewood for any purpose except as permitted hereby, and such Information, including _all_ reproductions thereof, shall either be destroyed by Ridgewood or be returned by Ridgewood to Owner, at Owner's option, upon the written demand thereof by Owner.

PCC-08604

4.      The information shall not be disseminated by Ridgewood until such time as Owner has approved such dissemination and the person or entity to whom such information is being sent.

5.      Ridgewood agrees that an action at law may not provide an adequate remedy for a breach or default by, or threatened breach or default by, it of the provisions of this Agreement.  As such, Ridgewood agrees that in the event of any such breach or default or threatened breach or default, in addition to all other remedies provided elsewhere in this Agreement or by applicable law, Owner shall be entitled to relief in equity (including a temporary restraining order, temporary or preliminary injunction, and mandatory or prohibitory injunction) to restrain the continuation of such breach or default, the occurrence of such threatened breach or default, or to compel compliance with such provisions of this Agreement, without the necessity of any posting of a bond or other undertaking in connection therewith.  Any such requirement of a bond or undertaking is hereby waived by Ridgewood and Ridgewood acknowledges that in the absence of such a waiver such a bond or undertaking might be required.

5.      If Owner initiates any action or proceeding before any court of competent jurisdiction to enforce any of its rights under this Agreement or to obtain any determination of its rights or obligations hereunder, and if such court determines in a final, non-appealable order that this Agreement has been breached by Ridgewood, then Owner shall be entitled to be paid for its reasonable costs and expenses, including reasonable attorneys' fees, incurred in connection with such action, any appeal and execution of any judgment.  If Ridgewood should be the prevailing party in any such action or proceeding, then Ridgewood shall be entitled to be paid for its reasonable costs and expenses, including reasonable attorneys' fees, incurred in connection with such action, any appeal and execution of any judgment.

6.      Ridgewood understands and acknowledges that Owner is making no representation nor warranty in this Agreement, express or implied, as to the accuracy or completeness of the Information.

7.      The validity of this Agreement and the construction of its terms shall be governed by the laws of the State of New Jersey (without reference to its principles of conflict of laws).  In the event that any provision of this Agreement shall be held to be illegal or invalid, the same shall not affect in any respect the validity of the remainder of this Agreement.

8.      This Agreement may be executed in one or more counterparts, each of which shall constitute and original Agreement, but all of which together shall constitute one and the same instrument.

9.      The term of this Agreement and the obligations hereunder shall continue until the earlier of (i) two (2) years from the date hereof or (ii) the date of execution of a definitive  agreement  between  Owner  and  Ridgewood  (or  its  designated  affiliate)

PCC-08605

regarding the proposed relationship, but such event shall affect the termination of this Agreement only to the extent that such agreement specifically supersedes the provisions hereof.

10.    In the event that Ridgewood or anyone to whom Ridgewood transmits the Information pursuant to this Agreement is requested or becomes legally compelled (by oral questions, interrogatories, request for information or documents, subpoena, civil investigative demand or similar process) to disclose any of the Information, we will, prior to such Information being disclosed, provide Owner with prompt written notice so that Owner may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written.

By:    _____

Name:  SAMUEL SILVERMAN
Title: TREASURER


**Ridgewood Real Estate Partners, LLC**

By:    _____

Name: Jonathan Grebow
Title: President

PCC-08606

# EXHIBIT 38

## Ethan OShea

| | |
|---|---|
| **From:** | Michael Plotnick <mplotnick@ridgewoodrep.com> |
| **Sent:** | Wednesday, October 05, 2016 5:12 PM |
| **To:** | Tom Bennison (tom.bennison@clubcorp.com) |
| **Cc:** | Jonathan Grebow |
| **Subject:** | Philmont CC |
| **Attachments:** | Philmont financial statement- August 2016.pdf; Philmont P&L - trailing 12 mo.xls; Philmont P&L 043016.xls; Philmont P&L 043017.xls; 2016 Resign Up  Downgrades New Members (Recovered).xls; PCC - Aug16 DRAFT Financial Reporting Package.xlsx; Philmont Budget 2016-17 - final .pdf; Philmont Budget 2016-2017 -offical.xls; Philmont capital improvements summary May 2012 - July 2016.pdf; Philmont capital summary 092916.xls; April 30 2014 Philmont Country Club Fin Statement.pdf; April Financial Statement.pdf; Philmont FS 043015.pdf |

Tom - Attached, per your conversation with Jonathan, please find the financials for Philmont Country Club.  Once you have had a chance to review, lets set up a time to talk at your earliest convenience.  I have spoken with the President again, and believe there is a real opportunity for us to make a deal with the Club.

In the meantime, if there is any additional information I can provide, please let me know.

Thanks,

Mike

**Michael Plotnick**
Vice President
Ridgewood Real Estate Partners, LLC
25A Hanover Road
Suite 310
Florham Park, NJ 07932

(p) 973.593.0003 x213
(c) 617.835.2431
(f) 973.593.0077
mplotnick@ridgewoodrep.com

# EXHIBIT 39

## Ethan OShea

| | |
|---|---|
| **From:** | Michael Plotnick <mplotnick@ridgewoodrep.com> |
| **Sent:** | Tuesday, October 11, 2016 10:00 AM |
| **To:** | Matthew Galvin (Matt@mstargolf.com) |
| **Subject:** | Philmont CC |
| **Attachments:** | Philmont financial statement- August 2016.pdf; Philmont P&L - trailing 12 mo.xls; Philmont P&L 043016.xls; Philmont P&L 043017.xls; 2016 Resign Up  Downgrades New Members (Recovered).xls; PCC - Aug16 DRAFT Financial Reporting Package.xlsx; Philmont Budget 2016-17 - final .pdf; Philmont Budget 2016-2017 -offical.xls; Philmont capital improvements summary May 2012 - July 2016.pdf; Philmont capital summary 092916.xls; April 30 2014 Philmont Country Club Fin Statement.pdf; April Financial Statement.pdf; Philmont FS 043015.pdf |

Matt - Attached, please find the financials for Philmont Country Club.  Once you have had a chance to review, lets set up a time to talk at your convenience.  As I mentioned, please keep these confidential.

In the meantime, if there is any additional information I can provide, please let me know.

Thanks,

Mike

**Michael Plotnick**
Vice President
Ridgewood Real Estate Partners, LLC
25A Hanover Road
Suite 310
Florham Park, NJ 07932

(p) 973.593.0003 x213
(c) 617.835.2431
(f) 973.593.0077
mplotnick@ridgewoodrep.com