**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **NORTH PENN TOWNS, LP, directly and as assignee of Philmont Country Club,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 19-4540-KSM** |
| **CONCERT GOLF PARTNERS, LLC, et al.,** | |
| Defendants. | |

<u>**MEMORANDUM**</u>

Marston, J.                                                                                    **July 28, 2022**

Plaintiff North Penn Towns, L.P. ("NPT"), as assignee of Philmont Country Club
("PCC"), has sued Concert Golf Partners, LLC ("CGP") and Peter Nanula (the "Concert
Defendants") and Ridgewood Real Estate Partners, LLC ("Ridgewood"), Jonathan Grebow, and
Michael Plotnick (the "Ridgewood Defendants") (collectively, "Defendants") for fraud,
fraudulent nondisclosure, and fraudulent concealment under Restatement (Second) of
Torts §§ 550 and 551, aiding and abetting fraud, and breach of contract.  (Doc. No. 59.)

Presently before the Court are Defendants' motions for summary judgment.  (Doc. Nos.
100, 101.)  For the reasons that follow, the Court grants in part and denies in part the motions.

## I.      Factual Background

### A.      *PCC Decides to Sell Part of Its Property to Raise Needed Funds*

PCC is a Pennsylvania non-profit corporation that owned and operated a private country
club by the same name, Philmont Country Club (the physical premises of which are referred to
as "Philmont Club"), located in Lower Moreland Township, Pennsylvania.  (Doc. No. 149-1 at
¶ 12.)  PCC's property included two 18-hole golf courses (the "North Course" and the "South

Course"), which spanned approximately 296 acres of land.  (*Id.*)  Philmont Club's facilities also included a tennis court, swimming pool, and clubhouse.  (*Id.*)  PCC was in a distressed financial situation and decided to sell a portion of its property (the "Property") for residential development.[1]  (*Id.* at ¶ 22.)  At first, PCC agreed to sell the Property to Toll Brothers, but Toll Brothers terminated that agreement in July 2014.  (*Id.* at ¶ 23.)

### B.    NPT Agrees to Develop the Property

In May 2015, PCC agreed to sell the Property to NVR, Inc., a homebuilder.  (*Id.* at ¶¶ 25, 27.)  Under Section 21 of their agreement of sale, NVR was given the option to assign the agreement to a third-party or terminate the agreement and simultaneously execute a substantially identical agreement of sale between PCC and a third-party.  (*Id.* at ¶ 26.)

Because NVR is a homebuilder and does not engage in real estate development, it assigned its agreement with PCC to NPT, a developer.  (*Id.* at ¶ 27.)  NPT planned to develop the Property and sell the developed lots to NVR to build homes.  (*Id.*)  On July 22, 2015, NPT and NVR entered into a Lot Purchase Agreement ("LPA"), which provided that NPT would sell the individual lots to NVR.  (*Id.* at ¶ 28.)

The following day, July 23, NPT and PCC entered into an agreement of sale ("AOS"), pursuant to which PCC agreed to sell the Property to NPT for $12 million, assuming a yield of 162 lots.  (*Id.* at ¶ 29; see also Doc. No. 100-5, Ex. 2 to Ex. A ("The purchase price for the Property shall be Twelve Million, Two Hundred Thousand and no/100 Dollars ($12,200,000) assuming a yield of one hundred sixty-two (162) single family market rate semi-attached

---

[1] The Property consisted of nine of eighteen holes of the South Course and spanned approximately 50 to 60 acres.  (*See, e.g.*, Doc. No. 100-5, Ex. 2 to Ex. A (agreement between NPT and PCC, stating that the land to be sold is comprised of approximately 61.60 gross acres); *id.*, Ex. 14 to Ex. A (CGP's proposal that it would fund approximately $5 million in phase two capital improvement projects after a real estate transaction involving the sale of approximately 50 to 60 acres on the South Course).)

residential townhome fee simple footprint lots.").)  The AOS provided NPT with a 90-day due diligence period, during which time NPT had the right to terminate the AOS for any reason. (Doc. No. 149-1 at ¶¶ 30–31.)  The due diligence period was set to run from July 23, 2015 through October 21, 2015.  (*Id.* at ¶ 30.)

Under the AOS, the purchase price for the Property was based on a per unit yield; the AOS contemplated a minimum yield of 150 units.[2]  (*Id.* at ¶ 34; *accord* Doc. No. 100-5, Ex. 2 to Ex. A ("[T]he minimum Purchase Price will be no less than the product of $73,308.64 multiplied by 150 or Eleven Million, Two Hundred Ninety-Six Thousand, Two Hundred Ninety-Six and no/100 Dollars ($11,296,296) irrespective of Unit yield[.]").)  Shortly after the AOS was executed, however, NPT learned that a 2014 zoning change meant the Property could only yield 105 units "by-right."  (Doc. No. 149-1 at ¶ 33.)  The due diligence period was extended until September 29, 2016 through a series of eight amendments to the AOS.  (*Id.* at ¶ 35.)  NPT primarily sought these extensions to sort out the unit yield issue[3] but also needed to resolve certain environmental issues prior to any development of the Property.  (*Id.*; *see also id.* at ¶ 36.)

### C.     *NPT Terminates the AOS*

On September 6, 2016, NPT sent NVR a Notice of Material Change, stating that NPT could not satisfy the conditions of the AOS, including obtaining zoning approvals to the satisfy the unit yield anticipated by the LPA.  (*Id.* at ¶ 37; *see also* Doc. No. 100-15, Ex. J.)  In the Notice, NPT explained that it "was notified that any rezoning would require that the property be age restricted and require that the community include a clubhouse and a pool" and that it had determined these "mandated changes to the scope of the project" constituted a "material change"

---

[2] "Units" and "lots" are referred to interchangeably.

[3] If zoning approvals were obtained from the Township, the Property could yield more units.

under the terms of the LPA.  (Doc. No. 100-15, Ex. J (stating that the "purpose, scope and intent of the development has substantially changed").)  NPT informed NVR that unless they were "able to come to some understanding concerning the additional costs that are involved as a result of this material change," NPT would be forced to provide notice of its intention to terminate the LPA.  (*Id.*; *see also* Doc. No. 149-1 at ¶ 37.)[4]  PCC, NVR, and NPT met the next day, September 7, to discuss these issues.  (*See* Doc. No. 149-1 at ¶ 38; *see also* Doc. No. 100-16, Ex. K.)

On September 9, two days after the meeting, counsel circulated a proposed Seventh Amendment to the AOS, which included purchase price adjustments.  (Doc. No. 116-5, Ex. 2.)  Under the proposed Seventh Amendment, the minimum purchase price would be revised to $12,049,382.40—i.e., $75,308.64 multiplied by 160.  (*Id.*)  In other words, the minimum purchase price was based on a lot yield of 160 units (rather than the 162 lot yield initially envisioned), and the overall purchase price was changed from $12.2 million to $12,049,382.40.  Second, the proposed Seventh Amendment provided that NPT would pay an additional $45,000 for each lot, if any, it was permitted to develop over 160 lots.  (*Id.*)  Last, it provided that at closing, PCC would grant NPT a credit against the purchase price in the amount of $375,000; however, if NPT's costs to construct and install the clubhouse were less than $1.6 million, the purchase price credit would be decreased by one-third.  (*Id.*)  The proposed Seventh Amendment was not executed.  (*Compare id., with* Doc. No. 100-5, Ex. 3 to Ex. A.)  Ultimately, the Seventh Amendment to the AOS that was executed did not include any purchase price adjustments and merely extended the due diligence period to September 16, 2016.  (*See* Doc. No. 100-5, Ex. 3 to Ex. A.)

---

[4] NPT cites an unsigned Third Amendment to the LPA, which was circulated on September 26, to support its assertion that NPT and NVR eventually did come to "an understanding."  (*See* Doc. No. 149-1 at ¶ 37; Doc. No. 116-4, Ex. 1.)

About a week later, on September 14, NPT provided NVR with "formal notice of [its] intention to terminate the AOS." (*See* Doc. No. 100-16, Ex. K.) NPT reiterated its position that "as a result of [the] material changes, [it] could not proceed absent an Amendment to the AOS and a corresponding Amendment to the LPA." (*Id.*) NPT wrote, "As a result of the identified changes, and in a mutual attempt to keep this deal alive, we both attended a meeting with representatives of the Seller [the September 7 meeting]. At the conclusion of the meeting the Seller agreed to a minimal reduction in the sales price and unfortunately, without an Amendment to the LPA, we are forced to provide you this notice." (*Id.*) NPT continued, "In an effort to amend the LPA, you had a telephone conversation with Marty Stallone wherein you advised Marty that the two sides were far apart and we should provide notice of our intent to terminate the AOS with the Seller." (*Id.*) Because NPT was unable to terminate the AOS with PCC without NVR's written consent, it asked NVR to determine whether it would consent or whether it would prefer for NPT to assign the AOS to NVR. (*Id.* ("As you are aware, we are unable to terminate the AOS with the Seller, without your written consent. As you also are aware, you have the option under Paragraph 3(b) of the Collateral Assignment Agreement for [NPT] to assign the AOS to NVR, Inc. Therefore, I am respectfully requesting for you to determine which course of action you like us to proceed [sic][.]").) However, NPT advised NVR that it would terminate the AOS effective Friday, September 16 (two days later) if it did not receive written notification from NVR advising which course of action it had chosen. (*Id.*)

On September 16, NVR told Glenn Meyer, then-President of PCC,[5] and PCC's counsel that NPT "indicated to NVR its desire to exit the transaction and NVR will be stepping back into

---

[5] Meyer is a financial planning and investment advisor. (Doc. No. 124-1 at ¶ 11.) Meyer was also a Certified Public Accountant and a Certified Financial Planner. (*Id.*)

the shoes of the Purchaser." (Doc. No. 100-17, Ex. L.)  Meyer testified that around the time of

the September 7 meeting and thereafter, he understood that "NPT and NVR were not getting

along very well and NPT or Metropolitan[6] was thinking about terminating their relationship with

NVR." (Doc. No. 100-8, Ex. D at 282:10–24; *see also id.* at 283:14–284:6 (explaining that at the

meeting, they discussed an amendment to the AOS and "it became clear to [him] through the

actions of Mr. Tulio that NPT and NVR were not getting along very well and there was some

indication both at that meeting and therefore that the relationship between those two entities was

going to be terminated").)  According to Meyer, given that PCC had been negotiating "for quite a

while," "the fact that the two firms [PCC] had agreed to work with were really not on the same

page and not getting along very well" "caused [him] to question whether or not this was

something that [PCC] wanted to proceed." (*Id.* at 284:7–19; *see also id.* ("So it seemed to me

that this wasn't something that we might want to continue on down the road with.").)

    However, PCC agreed to keep the AOS alive with an Eighth Amendment, which

provided for a limited 10-day extension of the due diligence period. (*See* Doc. No. 100-5, Ex. 3

to Ex. A (Eighth Amendment to the AOS, extending the due diligence period from September

16, 2016 to September 26, 2016).)

    On September 25, the day before the due diligence period was set to expire, Meyer

emailed PCC's counsel, stating, "After further thought, we have decided to let the agreement

---

[6] Metropolitan Development Group ("Metropolitan") is a land development business (*see id.* at ¶ 10), and
it had a relationship with NPT. (*See, e.g.*, Doc. No. 100-7, Ex. C at 228 (Mike Tulio's (the then-Vice
President of Land Acquisition at Metropolitan) testimony that he signed the Fifth Amendment to the AOS
on behalf of NPT); Doc. No. 100-6, Ex. B at 51:7–12 ("Q: Are there other individuals affiliated with
Metropolitan Development Group that provided an advisory role to North Penn Towns, LP?  A [Marty
Stallone, Executive Vice President of Metropolitan]: I would say on any given day any member of
Metropolitan Development Group would give their advice or opinions on any of our projects.").)
Metropolitan and NPT were at times referred to interchangeably in the record.

expire and evaluate our position rather than continue to negotiate with NVR."  (Doc. No. 100-5, Ex. 11 to Ex. A ("I thought it would be 'proper' for us to advise Tom [King with NVR] that we are going to let the agreement expire in some manner.").)

The next day, on September 26, NPT sent PCC a proposed Ninth Amendment to the AOS.[7]  (Doc. No. 100-18, Ex. M.)  The proposed Ninth Amendment had the same purchase price adjustment provisions as the proposed Seventh Amendment (which was not executed).  (*Compare* Doc. No. 100-18, Ex. M, *with* Doc. No. 100-5, Ex. 3 to Ex. A.)  The proposed Ninth Amendment also contemplated extending the due diligence period through October 3, 2016 and stated that as of October 4, the due diligence period would further be extended for six months following the date on which the Township approved an amendment to its zoning ordinance.  (Doc. No. 100-18, Ex. M; *accord id.* (providing that NPT would work "to obtain a text amendment to the current Township Zoning ordinance to (i) rezone the portion of the Property containing the Additional Land to the RSD-2 zoning district; and (ii) permit age-restricted townhouses to be permitted within the RSD-2 zoning district").)

As PCC did not execute the proposed Ninth Amendment upon receipt on September 26, the due diligence period deadline, approximately an hour and a half later, NPT formally terminated the AOS.  (Doc. No. 100-19, Ex. N.)

### D.    *CGP Expresses Interest in a Potential Transaction with PCC*

Meanwhile, on August 30, 2016, Philmont Club member David Fields had a phone call with Nanula, the sole member of CGP.[8]  (Doc. No. 149-1 at ¶¶ 161, 42.)  After the call, Nanula

---

[7] Although there had been discussion of NPT exiting the transaction and NPT had sent NVR a notice of its intent to terminate the AOS earlier in September, *see supra*, it ultimately had not terminated the AOS at that point in time.

[8] CGP is involved in the golf club industry.  (Doc. No. 149-1 at ¶ 15; Doc. No. 100-10, Ex. F at 9:4–7 (Nanula's testimony that CGP is "a private club hospitality firm"); *id.* at 62:16–64:3 (explaining that CGP

emailed Fields, attaching a signed non-disclosure agreement and requesting information about PCC, including "detailed income statements," "[a] listing of recent capital improvements made, and the current list of potential capital projects (with estimated scope and costs, if any) that are being considered," and "[a] summary of your current real estate deal and the Toll [Brothers] deal." (Doc. No. 100-5, Ex. 5 to Ex. A.)

Fields forwarded Nanula's email to PCC's then-Treasurer, Sam Silverman.[9] (*Id.*; *see also* Doc. No. 149-1 at ¶ 14.) On September 10, Silverman provided Nanula with the requested information and noted that "[t]he real estate deal [was] with NVR, Inc. not Toll Brothers." (Doc. No. 100-5, Ex. 5 to Ex. A; Doc. No. 116-9, Ex. 6.) Silverman explained that it would be easier to provide a summary of the current real estate deal with NPT "verbally as [PCC was] in the process of receiving an amendment to the [AOS] that will better clarify the details." (*Id.*) Silverman also wrote, "The current GM has a list of potential capital projects with some detail but we will need to get a copy of that list from him and forward to you." (*Id.*) Nanula forwarded the materials from Silverman to CGP's consultant, Thomas Moran, to prepare a pro forma analysis. (Doc. No. 149-1 at ¶ 47.)

On September 12, Nanula sent several follow up questions to Silverman, which Silverman answered. (Doc. No. 100-5, Ex. 5 to Ex. A.) On September 19, Nanula requested "any and all details on the pending NVR deal for the South Course acreage." (*Id.*) Nanula also stated that he would "work on a preliminary proposal to share [that] week." (*Id.*) That same day, Meyer and Nanula had a phone call regarding the terms under which the Concert

---

buys and manages country clubs but that technically each country club is owned by an individual single-purpose entity); *see also* Doc. No. 100-34, Ex. CC (describing CGP as a "boutique private club owner-operator").)

[9] Silverman is a Certified Public Accountant and a business advisor. (Doc. No. 124-1 at ¶¶ 11–12.)

Defendants would purchase Philmont Club.[10]  (Doc. No. 149-1 at ¶ 48; *see also* Doc. No. 100-5, Ex. 5 to Ex. A.)  Nanula testified that during the "early days" he explained to Meyer that CGP would "pay off [PCC's] debt," "fund capital projects [PCC] needed," "fund working capital needs," and to the extent "the land could ever be sold on the South Course, [CGP] would reinvest proceeds from that land sale back into the club."  (Doc. No. 100-10, Ex. F at 241:24–243:10; *see also id.* at 244:8–23.)  Nanula told Meyer that he would be willing to "commit to funding and completing a series of capital projects that the board wanted to get done that was on the order of $4 million."  (Doc. No. 140-1 at ¶ 49.)

The next day, September 20, Moran provided Nanula with a preliminary analysis of Philmont Club's finances, and Nanula replied,

> Plenty for now.  This deal will be long and slow.
>
> They are under contract with our pals at NVR homes to sell off 9 of their 36 holes for $12.2m.  Not sure how they would sell the club to us, and let us have the real estate upside.  Trying for that.  Enough work on the pro forma for now.

(Doc. No. 100-5, Ex. 7 to Ex. A.)

### E.    *Ridgewood's Interest in a Potential Transaction*

In September 2016, Plotnick, then-Vice President of Ridgewood, a developer, attended an industry conference in Texas, where he met PCC's golf management consultant, John Brown of Brown Golf Management.[11]  (Doc. No. 124-1 at ¶ 9; Doc. No. 149-1 at ¶ 20.)  According to Meyer, Brown Golf Management "both own[ed] clubs and served[d] as a management company

---

[10] Nanula had previously spoken to Glenn Meyer about a potential deal in 2014.  (*See* Doc. No. 116-8, Ex. 5 (September 16, 2014 email in which Nanula wrote, "Spoke to Glenn Meyer.  Nice guy . . . He said they were working on a deal with a RE developer, and could not do anything else right now.  He told me to call him back in 6 months.").)

[11] Meyer testified that PCC "hired Brown Golf Management as a consultant to help [it] run and operate the club, hopefully more efficiently than" PCC had been running it.  (Doc. No. 100-8, Ex. D at 29:13–22.)

for clubs across the country," and PCC had "roughly a two-year relationship with them."  (Doc. No. 100-8, Ex. D at 29:13–22.)  At the conference, Plotnick expressed interest to Brown about a potential transaction between PCC and Ridgewood.  (*See* Doc. No. 124-1 at ¶ 9.)

On September 23, 2016, Plotnick emailed Meyer "to discuss a potential relationship at Philmont."[12]  (Doc. No. 100-5, Ex. 9 to Ex. A.)  Plotnick testified that he spoke with Meyer that same day and that Meyer told him PCC was under contract to sell the Property.  (Doc. No. 149-1 at ¶ 63; Doc. No. 100-26, Ex. U at 58:2–19.)  According to Plotnick, Meyer told him the due diligence period was about to expire and PCC was not willing to extend the due diligence period again.  (Doc. No. 100-26, Ex. U at 58:20–59:11.)

### F.    PCC Engages in Separate Discussions with NPT, Ridgewood, and CGP About Selling the Property and/or Philmont Club

After NPT terminated the AOS on September 26, PCC had separate discussions with NPT, Ridgewood, and CGP about potential deals.  (Doc. No. 149-1 at ¶ 50.)

*NPT*.  On September 27—the day after it terminated the AOS—NPT discussed the terms of the deposits it would render to PCC if PCC signed a new agreement of sale for the Property.  (*Id.* at ¶ 51; *see also* Doc. No. 100-5, Ex. 12 to Ex. A (September 28, 2016 email from Michael Tulio, then-Vice President of Land Acquisition at Metropolitan, stating, "I'm willing to post a deposit of 750K to show our commitment and when the zoning portion is approved and the appeal period passes I will release to the club 375K, then after the Environmental release the balance making it fully non refundable and for the club to use as they see fit.  I think that shows we are for real and committed to getting this deal done.").)

---

[12] About two years prior, in late 2014, Plotnick emailed Meyer to see whether PCC was interested in discussing a potential transaction with Ridgewood.  (Doc. No. 149-1 at ¶ 60.)  Plotnick also emailed Meyer in 2015 and 2016.  (Doc. No. 124-1 at ¶ 8.)

***Ridgewood***.  Also, on September 27, Meyer met with Plotnick and Grebow, the President

and CEO of Ridgewood, at Philmont Club to discuss Ridgewood's interest in the Property.

(Doc. No. 149-1 at ¶¶ 19, 64.)  Plotnick testified that at the time, Ridgewood was interested in

potentially purchasing either the entire Club or just a portion of it for land development.  (Doc.

No. 100-26, Ex. U at 62:16–63:19.)  Shortly after the visit, Plotnick emailed Meyer, stating,

"Thanks again for taking the time to speak with and tour Jonathan and I [sic] today.  As Jonathan

mentioned, we very much intend to put a proposal in front of you, that at the least, we hope will

open the stage for further discussion."  (Doc. No. 100-5, Ex. 13 to Ex. A.)  Plotnick also

requested that Meyer share with him information about the Property and Philmont Club's

financials.  (*Id.*)  Plotnick and Meyer spoke on the phone on October 5, October 10, and October

13.[13]  (Doc. No. 116-12, Ex. 9; Doc. No. 124-1 at ¶¶ 48–50.)

    Two days after the Club visit, on September 29, Ridgewood and PCC executed a

confidentiality agreement to facilitate the sharing of information, pursuant to which Ridgewood

agreed to "not disclose or disseminate" PCC's "proprietary, non-public information."  (Doc. No.

100-5, Ex. 37 to Ex. A; Doc. No. 124-1 at ¶ 44.)  About a week later, on October 5, Plotnick

emailed Tom Bennison from ClubCorp, attaching PCC's financials, including financial

statements, profit and loss spreadsheets, and a 2016–2017 budget.  (Doc. No. 100-5, Ex. 38 to

Ex. A.)  The following week, on October 10, Plotnick emailed the same documents to Matthew

Glavin at Morningstar Golf & Hospitality, LLC.  (Doc. No. 100-5, Ex. 39 to Ex. A; Doc. No.

124-1 at ¶ 46.)[14]  ClubCorp and Morningstar are both golf course operators.  (*See* Doc. No. 100-

---

[13] Following Plotnick and Meyer's October 10 phone call, Nanula had a 42-minute conversation with
Plotnick.  (Doc. No. 124-1 at ¶ 29.)

[14] Silverman and Meyer testified that they were not aware of any damages the Club suffered by virtue of
Ridgewood sharing the information with ClubCorp or Morningstar.  (Doc. No. 100-29, Ex. X at 80:1–

28, Ex. W at 45:13–48:17.)

Meyer testified that he did not have "extensive conversations" with Ridgewood but that he would be the most knowledgeable on the conversations that did occur. (Doc. No. 100-28, Ex. W at 111:3–9, 111:15–18.) Silverman testified that "there was such minimal communication with Ridgewood" and that he never spoke with anyone from Ridgewood. (Doc. No. 100-29, Ex. X at 67:11–13; *see also id.* at 12:4–24 (Silverman's testimony that he never spoke with anyone from Ridgewood and that there were "no in-depth discussions" with Ridgewood and "it really wasn't in the forefront" because otherwise he would have known more about it and been more involved); *id.* at 13:1–3; *id.* at 91:2–8.)

In 2018, Meyer testified that he only met with Ridgewood once, where they "had a conversation about what was going on with the club and nothing really came of it." (Doc. No. 100-8, Ex. D at 27:21–29:16.) Meyer could not recall the timing of the discussion but stated that afterwards, "they just came back to us and that it wasn't something that was attractive to them after, you know, they had kicked the tires for a very short time." (*Id.*) However, in 2021, Meyer testified that in or around September 2016, Ridgewood made an informal offer for $5 million for the nine-hole Property. (*See* Doc. No. 100-28, Ex. W at 27:1–10, 35:18–36:11, 46:4–8.)[15] Meyer stated that at the time he said "no" to that informal offer, he believed that PCC would not be hearing from Ridgewood again. (*Id.* at 36:2–11.)

---

81:6; Doc. No. 125-4, Ex. NN at 267:21–268:1.)

[15] During oral argument, NPT implied that this inconsistency in testimony rendered Meyer not credible. (*See* July 19, 2022 Hr'g Tr. at 30:16–31:10 (stating that Meyer's 2018 and 2021 deposition testimonies were contradictory and that in 2021, Meyer was "mistaken").) But, at the summary judgment stage, the Court may not make credibility determinations. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from those facts" are matters left to the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

At no point did Ridgewood formally offer to purchase the Property or any portion thereof.  (Doc. No. 124-1 at ¶ 21; *see also* Doc. No. 100-28, Ex. W at 111:19–112:7.)

*CGP*.  On October 3, 2016, Meyer informed Nanula that the AOS had been terminated and that PCC was considering its options for moving forward.  (Doc. No. 149-1 at ¶ 71.)  Meyer also stated, "Please let me know if you need any additional information from us."  (*Id.*)  On October 26, Nanula toured the Philmont Club.  (Doc. No. 100-32, Ex. AA.)  Afterwards, Nanula requested additional information from Meyer, including documents on "the real estate development, Toll / NVR deal terms, property survey, environmental reports" and "any information PCC had about the various capital projects it considered.  (*Id.*)

### G.   *CGP's Proposal to Buy Philmont Club*

On November 1, 2016, Nanula provided PCC with a formal written proposal for CGP's purchase of Philmont Club and the Property.  (Doc. No. 149-1 at ¶ 75; Doc. No. 100-5, Ex. 14 to Ex. A.)  CGP proposed to (1) pay off PCC's approximately $963,000 in debt, (2) assume or restructure capital leases and other obligations, (3) make approximately $4 million of initial capital improvements to Philmont Club within 12 to 14 months, (4) commit to fund ongoing capital reserve at three to four percent of revenues (approximately $1 million over five years), and (5) upon the sale of the Property in two to four years, make an additional approximately $5 million in capital improvements.  (Doc. No. 100-5, Ex. 14 to Ex. A.)

After Meyer reviewed CGP's proposal, he responded, "I thought upon closing the real estate transaction we would have the full proceeds of the sale available towards capital improvements but I'm only seeing $5M listed."  (Doc. No. 100-5, Ex. 16 to Ex. A.)  In response, Nanula explained that PCC had two choices:  (1) they could either get the full proceeds of the sale of the Property, if a sale ever even occurred, "and bear all the risks and costs during the process" or (2) allow CGP to "rescue and fix the club now" "without taking any risk or bearing

any cost at all." (*Id.*)  Nanula concluded, "If we can pull this off, we could get back some of our initial risk capital from future real estate proceeds – maybe zero, maybe never – and this prospect allows us to be interested in PCC." (*Id.*, Ex. 20 to Ex. A ("Sent Glenn a proposal yesterday . . . He wanted to explore how we could give the club 100% of all our real estate proceeds . . . I said no; about $5m is all we could afford to plow back.  We are taking the risk in this scenario, not the club."); *accord id.*, Ex. 16 to Ex. A ("We have to assume no real estate transaction might ever be possible, due to the environmental remediation vagaries and cost; the extensive infrastructure costs for the Philmont Ave. intersection project; and the Town approval uncertainties.").)  Meyer testified that he told Nanula he "understood" Nanula's rationale.  (Doc. No. 125-3, Ex. MM at 187:23–188:1.)  When asked whether he, on behalf of PCC, decided to move forward with the transaction anyway, Meyer testified, "[W]e were in a position of weakness, so we didn't really have a whole lot of room to negotiate." (*Id.* at 188:2–12.)

On November 9, Nanula emailed Meyer and noted that in a meeting the following week, they should focus on "[t]he capital project priorities that you really want to see happen at PCC" and "other elements of the Proposal."  (Doc. No. 100-33, Ex. BB.)  PCC did not suggest any capital improvements be made different from those described in the November 1 proposal.  (Doc. No. 149-1 at ¶ 131.)

### H.    *PCC Sells Philmont Club to the Concert Defendants*

On November 17, PCC's Board of Directors approved CGP's proposal.  (*See* Doc. No. 100-5, Ex. 21 to Ex. A; *see also* Doc. No. 100-5, Ex. 17 to Ex. A ("Given these benefits and the operational and management obstacles we continue to experience, the Board of Directors is **pursuing** a transaction with [CGP]"); *id.* ("The Board unanimously believes that this is our best option towards securing Philmont's success in the years ahead.  We are in need of more than capital funding.  We need active, independent management expertise and an immediate infusion

14

of operating and capital support.").)

That same day, Meyer sent a letter to PCC's membership, informing them of the terms of CGP's proposal.  (Doc. No. 100-5, Ex. 17 to Ex. A.)  Meyer wrote about the "potential advantages of a transaction" with CGP, including that CGP would:  (1) "pay off all of [PCC's] current debt and obligations (mortgage, line of credit, capital leases and other) which approximates $1,000,000"; (2) "commit to invest approximately $4,000,000 into the Club immediately over a 12-24 month time frame"; (3) "commit to fund ongoing capital reserves at 3-4% of annual revenues," "equat[ing] to approximately $1,000,000 over a five year period"; (4) "commit an additional $5,000,000 towards various agreed upon projects" "[u]pon closing the real estate deal"; (5) freeze dues increases for two to three years and limit annual increases thereafter; (6) eliminate assessments; and (7) "guarantee [] maintaining 27 holes of golf after the South Course land [] sold."  (*Id.*)  Meyer advised that the "transaction is subject to approval by a majority of the eligible voting members of the Club" and that there would be a membership meeting to discuss the transaction.  (*Id.*)

On November 30, Meyer emailed Nanula the contact information for NVR and NPT/Metropolitan as a potential developer Nanula could work with for developing the property. (Doc. No. 173.)  Nanula responded, "It looks like Marty was involved in a muni bond-rigging scandal in the late 1980s," and that it would be "hard for [CGP] to work with him based purely on reputation concerns."  (*Id.*)  Nanula assured Meyer that CGP would find "the right people to get this land transaction done."  (*Id.*)  Meyer replied, "Marty seems like a good guy but that's your call."  (*Id.*)

On December 12, Nanula met with PCC's membership and gave a presentation on CGP's proposal to acquire the Club.  (Doc. No. 149-1 at ¶ 83; *see also* Doc. No. 100-34, Ex. CC; Doc.

No. 149-1 at ¶¶ 136–37.)

On January 19, 2017, PCC's Executive Board voted to approve the Purchase and Sale

Agreement ("PSA").  (Doc. No. 149-1 at ¶ 86.)

Meanwhile, on January 23, CGP incorporated Concert Philmont and Concert Philmont

Properties as single purpose entities to be the purchasers.  (*Id.* at ¶¶ 1, 17, 88.)  In other words,

CGP would not be purchasing Philmont Club directly.  (*Id.*)  Ultimately, only Concert Philmont

took title to any property.  (*See id.* at ¶¶ 1, 88.)

On February 1, PCC's membership voted to approve the PSA.  (*Id.* at ¶ 87.)  The PSA

was executed on February 6 by Nanula on behalf of Concert Philmont and Concert Philmont

Properties and Meyer on behalf of PCC.  (*Id.* at ¶ 89; *see also* Doc. No. 100-35 at 56–57.)  The

transaction closed on or around March 1.  (Doc. No. 149-1 at ¶ 90.)

The PSA provided, *inter alia*, that:

- The Concert Defendants will pay "[t]he unpaid principal balance and accrued unpaid interest on [PCC's Fox Chase Bank Loan]," which had an original principal sum of $1.2 million.  (Doc. No. 100-35, § 2.1(a).)

- Concert Philmont will "cause to be completed, and pay the costs of completion of" the initial capital projects, which were enumerated in Exhibit I-1 to the PSA and estimated by the parties to cost approximately $4 million.  (*Id.* at § 5.5(h); Doc. No. 100-38, Ex. GG.)

- Concert Philmont will fund into a capital reserve account "an amount equal to between three percent (3%) and four percent (4%) of total Gross Revenues collected by the New Club, to be used for future capital improvements (not including the Initial Capital Projects of Phase II Capital Projects) at the New Club."  (Doc. No. 100-35 at § 5.5(j).)

- Following the sale of the Property, Concert Philmont will "cause to be completed, and pay the costs of completion of" the additional capital projects (Phase II Capital Projects), which were enumerated in Exhibit 1-[2] to the PSA and estimated by the parties to cost approximately $5 million.  (*Id.* at § 5.5(k); Doc. No. 100-38, Ex. GG; *see also* Doc. No. 149-1 at ¶¶ 121–22.)

The agreed-upon Initial Capital Projects[16] consisted of:  renovating the men's and women's locker rooms so that they met a modern country club standard; improving the North Course bunker, cart path, greens, and drainage and removing trees; renovating the pool and pool area; and upgrading the HVAC infrastructure.  (Doc. No. 100-38, Exhibit GG.)  The Initial Capital Projects were to be completed within two years of the closing date (i.e., before March 2019).  (*Id.*)  The agreed-upon Phase II Capital Projects included:  South Course improvements; additional North Course improvements from Andrew Green's master plan;[17] improvements to the tennis facility; clubhouse renovations; and construction of a new maintenance facility.[18]  (*Id.*)  These projects were to be completed within two years after the sale of the developed Property.  (*Id.*)

The Initial Capital Projects and Phase II Capital Projects delineated in the PSA's exhibits are identical to the capital improvement projects outlined in CGP's November 1, 2016 proposal to PCC, with one exception:  "moving and constructing a new maintenance facility" was not part of the original proposal.  (*Compare id. with* Doc. No. 100-5, Ex. 14 to Ex. A, #3 & #5.)  (*See* Doc.

---

[16] During a mid-January 2017 email exchange with counsel about a draft of the PSA, Nanula wrote that the current Exhibit I "cover[ed] the Big 4 of these projects," which included utility infrastructure; pool/porch/patio; locker rooms; and golf course.  (Doc. No. 100-5, Ex. 36 to Ex. A.)  In a later email, he also attached a "much more likely—and more detailed—list of our initial capital projects at Philmont CC," which were "[n]ot to be shared with [opposing counsel] or Seller."  (*Id.*)

[17] In an email from months before the PSA was executed, November 21, 2016, Nanula emailed Brandon Collins at CGP, writing, "The wild ideas the Board has about a 'master plan' for the North Course are probably way overblown, and we have huge capital needs in the clubhouse, HVAC, etc.  You will see. We will want to 'nod' to some master plan elements so the members are excited about their North Course being updated a bit, but we want to spend the smallest dollars possible to get the maximum member impact."  (Doc. No. 100-5, Ex. 35 to Ex. A.)

[18] The Phase II Capital Projects were subject to change arising from "consultation with the new Club Advisory Board"; "New club member surveys"; "input and recommendations by [Concert Philmont's] operating consultants and experts"; and Concert Philmont's "refinement of the scope of such items after closing," at its discretion.  (Doc. No. 149-1 at ¶ 124; Doc. No. 100-35, Ex. DD at § 5.5(k).)

No. 149-1 at ¶¶ 120, 123.)

### I. *Ridgewood and CGP's Agreement*

#### 1. CGP and Ridgewood's Initial Interactions in Fall 2016

In September 2016, Nanula met Plotnick at an industry conference.  (*Id.* at ¶ 97.)

On September 28—the day after Plotnick and Grebow toured Philmont Club—Nanula

texted Plotnick and asked if there were any club opportunities that CGP could help Ridgewood

with, and Plotnick responded that he was working on something that may fit.  (*Id.* at ¶ 98.)

Nanula testified that, at that time, he did not know that Ridgewood had discussions with PCC

about a potential deal.  (*Id.* at ¶ 99.)  On September 29, Plotnick and Nanula spoke on the phone.

(*See* Doc. No. 116-13, Ex. 10; Doc. No. 149-1 at ¶ 169.)

#### 2. Ridgewood and CGP Begin Negotiating

On October 21, Plotnick emailed Nanula "[his] initial thoughts to a structure of a deal"

between CGP and Ridgewood at PCC.  (Doc. No. 100-5, Ex. 18 to Ex. A.)  Plotnick proposed

that CGP purchase "Philmont CC from the members, including both 18 hole courses";

Ridgewood would "ha[ve] no involvement on the golf side" and instead would be "brought in as

a joint venture partner solely on the redevelopment portion of the property."  (*Id.*)  Plotnick also

proposed that in exchange for "overseeing all of the approvals for the redevelopment of the south

course" and paying half of the costs of obtaining development approvals with a budget of $1

million (i.e., Ridgewood and CGP would each pay approximately $500,000), Ridgewood would

be repaid the actual approval costs expended and fifty percent of the remaining proceeds after

CGP receives $5 million of the proceeds.  (*Id.* ("Upon the sale of the fully entitled redeveloped

portion of the property to a homebuilder, the waterfall will be as follows: -First, 50/50 to

Ridgewood to repay the actual Approval Costs expended, -Second, 100% to Concert for the next

$5MM of proceeds, -Last, 50/50 to Concert and Ridgewood for all additional proceeds.").)

Plotnick anticipated that "the fully entitled residential development for approximately 160 age restricted townhomes is worth between $12-$14 million to a builder." (*Id.*)

Plotnick also suggested that $5 million from the sale of the Property be reinvested in Philmont Club as capital expenditures.[19] (*See id.* ("I assume that the first $5MM or some negotiated portion of that money committed as additional CapX spend will probably satisfy the members.").)

After receiving Ridgewood's proposal, Nanula forwarded the email to Nick Cicero, a partner at Freestone Capital Management. (Doc. No. 100-5, Ex. 19 to Ex. A.) Nanula explained that CGP was in the early stages of trying to purchase Philmont Club and had received an initial proposal from "golf-adjacent developer" Ridgewood. (*Id.*) Nanula noted that Ridgewood had "been talking to [the] Club about buying the 9 holes for $5-6m[20] but they need a credible golf operator to sell the members on this" and that he "told them to back off completely so I can buy the whole Club and then deal them in as our real estate partner." (*Id.*) Nanula also stated that Ridgewood's proposal "juices our normal deal returns nicely." (*Id.*) However, at the end of his email, Nanula wondered, "why do we need Ridgewood at all? They are not putting up any real capital at all here," and asked Cicero for his thoughts. (*Id.*)

Cicero agreed that the return Ridgewood would receive under the proposal "seems awfully high instead of just some set fee that is relatively nominal." (*Id.*) Nanula responded, "Yes, but this firm is in advanced talks with club president about buying this 35 acre parcel from

[19] Nanula incorporated this into the November 1, 2016 proposal that CGP sent to PCC. (*See* Doc. No. 100-5, Ex. 14 to Ex. A (showing that CGP stated that, upon closing of a real estate transaction on the 60-acre Property, it would "commit to fund" $5 million in a second phase capital projects).)

[20] This is consistent with Meyer's 2021 testimony that Ridgewood informally offered $5 million for the Property. (*See* Doc. No. 100-28, Ex. W at 27:1–10, 35:18–36:11, 46:4–8.)

the club . . . So getting them to back off to a small fee will be difficult." (*Id.*)

### 3. After CGP Submits Its Proposal to PCC, CGP and Ridgewood Continue to Discuss Working Together and a Potential Deal

On November 2, Nanula emailed Plotnick to bring him up to date on PCC's reaction to CGP's proposal to purchase Philmont Club. (Doc. No. 100-5, Ex. 20 to Ex. A.) Nanula explained that Meyer "wanted to explore how we could give the club 100% of all our real estate proceeds in 2-4 years when a deal happens." (*Id.*) Nanula told Meyer "no; about $5m is all we could afford to plow back," given that CGP is "taking the risk in this scenario, not the club." (*Id.*) Nanula said that Meyer "understood" and would be going back to the Board. (*Id.*) Nanula predicted that he would "be in front of [PCC's] Board or at least Executive Committee" by mid-November and "will see if a consensus can be reached on our proposal." (*Id.*) Nanula wrote, "If so, great – we will move ahead on our club deal, and start working with you on the real estate deal." (*Id.*) Nanula told Plotnick, however, that if a consensus was not reached, Meyer "may come back to you, and ask for $7m instead of $5m." (*Id.*) Nanula made the following request: "For now, I hope you guys will stand back, profess some concerns about the real estate risks, and just wait to see if I can strike a better deal for all of us here."[21] (*Id.*)

A few hours later, Nanula sent a follow up email, stating that CGP "continue[d] to be intrigued here, with the caveat that we still have to get comfortable with the Club in the event that no real estate proceeds are ever realized (enviro, Town, intersection, buyers). (*Id.*) Nanula stated that CGP "would only pursue the real estate angle with Ridgewood" and that he was "prepared to sign an agreement to that effect." (*Id.*) Nanula also presented a "counter-proposal"

---

[21] Meyer testified that he did not believe that anyone from Ridgewood ever professed to him concerns about the condition of or risks associated with developing the Property, though he could not fully recall. (Doc. No. 125-3, Ex. MM at 149:22–150:4.) Nor was he aware of anyone from Ridgewood professing such concerns to any other PCC Board member or club member. (*Id.* at 150:5–11.)

on the real estate deal, which included first, splitting the entitlement costs 50-50, second, CGP "tak[ing] the next $7m . . . in order to deal with member capex obligations, which could go higher than the $5-6m," and last, splitting the remainder of the proceeds 60-40 (60% CGP, 40% Ridgewood).  (*Id.*)  Nanula's "math show[ed] that" with this division "Ridgewood still makes 7-14x[22] your invested capital in any reasonable scenario."  (*Id.*)  Nanula reasoned that CGP would "get a little more of the total proceeds because (1) we have to deal with member pressures and capex vagaries 3-5 years down the road, and (2) we upfronted the capital to buy all 300+ acres of land so that Ridgewood does not have to do this."  (*Id.*)  Nanula elaborated, "In a normal deal where we are both fronting the land cost, I would still presume a straight-up 50-50 deal, but here the fact pattern and risks are different."  (*Id.*)

Two days later, on November 4, Plotnick responded, "I completely understand what you are trying to do and I think your proposal is pretty close"; he believed they had "the basis for a deal," with just a few minor tweaks.  (Doc. No. 100-5, Ex. 21 to Ex. A.)  Plotnick also suggested that Nanula get feedback from Meyer and PCC's Board before putting their agreement in writing.  (*Id.*)  Plotnick added, "In the meantime, we will continue to stand on the sidelines and let you do your thing.  Keep me posted as to any progress made, and when you are closer to a deal with the club, we can paper our agreement."  (*Id.*)

Ridgewood and CGP continued to keep in touch as things moved ahead with CGP and PCC.  For example, on November 19, two days after PCC's Executive Committee voted to accept CGP's proposal, Nanula told Plotnick that the Board "want[s] to move fast and get this closed asap."  (*Id.*)  Nanula estimated that "the member vote will be 90%+ in favor."  (*Id.*)  Speaking of PCC's Board, Nanula surmised, "They need us, they want us, and they have

---

[22] Seven to fourteen times Ridgewood's initial investment of $500,000 is $3.5 million to $7 million.

capitulated in every respect.  Now it is just a matter of executing." (*Id.*)  Nanula stated, "My ops team was there on Friday, and we see a path to making this work at least marginally, even if the real estate deal falls apart after much effort." (*Id.*)  Nanula decided it was time for Ridgewood and CGP to "paper our deal on the real estate opportunity" and asked Plotnick to send him his "tweaks" to CGP's counter-proposal.  (*Id.*)

On November 21, Plotnick emailed Nanula his thoughts "on some deal points as well as a few tweaks to [the] deal structure." (Doc. No. 100-5, Ex. 20 to Ex. A.)  In light of Nanula's suggestion that they split the profits 60–40, Plotnick proposed that Ridgewood and CGP also split the due diligence and entitlement costs pro rata, or 60–40. (*Id.* ("We would like for everything to be pro rata.  Therefore, based upon your proposal of a 60/40 split of the profits, we propose splitting all due diligence and entitlement costs 60/40 (Concert/RW).  If you would like the costs split 50/50, we would request a 50/50 profit split as well[.]").)  Plotnick also proposed that "[u]pon the sale of the real estate, the net proceeds [would] flow through the following waterfall"[23]:  "[f]irst, 60/40 (Concert/Ridgewood) until all out of pocket costs have been returned to both parties"; "[s]econd, 100% to Concert for the next $7MM.  All future club required CapX will be the responsibility of Concert"; and "[t]hird, 60/40 (Concert/Ridgewood) of all additional proceeds." (*Id.*)  In addition, Plotnick requested that Ridgewood receive "a $10,000 monthly management fee (split according to the 60/40 investment)" that would be capped at 24 months; the management fee would "be a cost to both parties, and reimbursed with the costs in the first step of the waterfall."  (*Id.*)[24]

---

[23] In a February 16, 2017 email from Nanula to Moran, Nanula described the waterfall/CGP's agreement with Ridgewood as follows: (1) "Repay $1m entitle[ment] costs to each, 60-40"; (2) "Next $7m to CGP 'for land.'  We promised members $5m of Phase 2 capex, which will be more like $4.5m.  Scrape 2.5m here.";  and (3) "Split remainder 60-40." (Doc. No. 100-43, Ex. LL.)

[24] At the suggestion of PCC, the Concert Defendants also had brief communications with developer,

On January 21, 2017, Grebow emailed Nanula and Plotnick about his meeting with the Township, stating that the manager for the Township "[d]idn't flinch on the 160 units" and wanted a $1 million contribution for traffic and for the club to be age-restricted in return. (Doc. No. 116-14, Ex. 11.) Although the meeting "went well" and the Township "want[ed] to get the deal done" (*see id.*), to Plotnick's knowledge, "there were no governmental approvals issued, or even applied for, that would permit the development of the Property with 160 or more units" as of that date (*see* Doc. No. 101-2 at ¶ 14).

On March 1, 2017, Ridgewood Philmont and Concert Philmont Properties entered into a Development Services Agreement ("DSA"), pursuant to which Ridgewood would be responsible for obtaining development approvals for the Property.[25]  (Doc. No. 149-1 at ¶ 112.)  Under the DSA, Ridgewood Philmont is paid a management fee for providing development services. (*Id.* at ¶ 113.)

At no point did the Concert Defendants inform PCC that they were in talks with Ridgewood and planned to "paper the deal on the real estate opportunity." (*See* Doc. No. 149-1 at ¶ 204.)

---

NPT/Metropolitan, around this same time frame. (*See* Doc. No. 173.) On November 30, 2016, after learning that CGP had an interest in acquiring Philmont Club, Marty Stallone, an Executive Vice President at Metropolitan, sent Nanula the AOS between NPT and PCC, along with the Eighth Amendment. (Doc. No. 149-1 at ¶¶ 11, 52; Doc. No. 100-20, Ex. O.) That same day, Stallone also sent Nanula NPT's sketch plan for the Property, which had been prepared by NPT's engineer. (Doc. No. 149-1 at ¶ 53; Doc. No. 100-21, Ex. P.) The following day, on December 1, Stallone sent Nanula the draft of the text amendment he presented to Lower Moreland Township's Board of Supervisors at its September meeting related to zoning. (Doc. No. 149-1 at ¶ 54; Doc. No. 100-22, Ex. Q.) Stallone testified that during a phone call with Nanula, he and Tulio believed that Nanula was "fishing" and ended the conversation. (Doc. No. 116-10, Ex. 7 at 426:12–15.) Nanula testified that he chose to work with Ridgewood instead of NPT because he had found out that some of NPT's principals had criminal convictions and CGP "tends to avoid people with criminal records in [its] business dealings." (Doc. No. 100-23, Ex. at 198:3–199:1.)

[25] Ridgewood Philmont, LLC is a special-purpose entity created by Ridgewood for the sole purpose of entering into the DSA with Concert Philmont. (Doc. No. 124-1 at ¶ 7.)

### J.      PCC Decides Not to Pursue a Deal with NPT

In December 2016—after PCC's Board approved CGP's proposal but before it approved the PSA—NPT approached PCC again about renewing the AOS.

On December 6, Stallone, on behalf of NPT, sent Marina Katz, a PCC member, an offer to purchase the Property for $5 million.  (Doc. No. 149-1 at ¶ 56; Doc. No. 100-24, Ex. S.)  Katz responded, "The previous offer was 12,000,000."  (Doc. No. 100-24, Ex. S.)  Stallone stated, "Yes, but that was with all the environmental and zoning contingencies that you said the club was no longer interested in accepting." (*Id.*)  Stallone, who knew of CGP's proposal, responded by comparing NPT's offer of a guaranteed $5 million for the Property to CGP's proposal:  "[I]f the club accepts the offer on the table from Center [sic] Golf, it only gets $5 million for the same land and that $5 million is at risk with contingencies."  (*Id.*; *see also id.* ("[W]e are offering [PCC] $5 million 100% guarantee for the 9-holes.  It will be paid in installments as summarized below but 100% of the money is guaranteed with no contingencies on Township approvals or environmental issues.  This purchase matches the dollar amount that is subject to contingencies in the proposal on the table from Center [sic] Golf.  As a 'kicker' if we are fortunate enough to get the zoning approval we are seeking, we will add another $1 million to the purchase price for a total of $6 million."); *id.* ("Our proposal guarantees you all of the money that is currently at risk in the existing Center [sic] Golf offer.").)

On December 20, NPT sent Meyer a revised proposal to buy the Property."  (Doc. No. 100-5, Ex. 22 to Ex. A; Doc. No. 149-1 at ¶ 58.)  In the revised proposal, NPT offered PCC two options:  either "[a] purchase price of $12 million subject to zoning, land development, and environmental contingencies" or "[a] purchase price of $5 million for the Property as-is, plus $1 million conditioned on rezoning approval for 160 or more restricted townhouses."  (Doc. No. 149-1 at ¶ 58; Doc. No. 100-25, Ex. T.)  NPT's revised proposal included a chart comparing

24

NPT/Metropolitan's proposals side-by-side to CGP's proposal.  (*See* Doc. No. 100-25, Ex. T at 6; *see also id.* (stating that under NPT/Metropolitan's proposal, NPT/Metropolitan would only purchase 9 holes and PCC would "retain ownership and control of EVERYTHING else," whereas CGP's proposal involved "total sale of all land and assets of the club" pursuant to which PCC would "abdicate[] club control to CGP").)  Meyer immediately forwarded to Silverman, stating, "Hot off the press.  Not interested." (Doc. No. 100-5, Ex. 22 to Ex. A

Ultimately, PCC rejected NPT's proposals.  (Doc. No. 149-1 at ¶ 59.)

### K.     PCC Members Are Dissatisfied and Unhappy in the Years Following the Sale

In the years following the sale, many Club members resigned because they were displeased with how the deal panned out and how the Club changed.  (*See, e.g.*, Doc. No. 116-19 (resignation emails); Doc. No. 100-28, Ex. W at 68:1–2 & Doc. No. 100-29, Ex. X at 10:8–13 (Meyer's and Silverman's testimony that they both resigned).)  Specifically, some members stated that they were displeased with how the Concert Defendants fulfilled (or failed to fulfill) the terms of the PSA.  (*See, e.g.*, Doc. No. 116-19, Ex. 16 (October 19, 2018 resignation email from Mitch Russell, stating, "*There is no regard for the agreement between Philmont and Concert golf* [sic] *and I will clearly go on the record of saying Concert stole Philmont and to date has yet to live up to any of the declarations in the agreement* . . . All of these 'ball drops' as Peter Nanula would refer to them, *along with the disregard to the contract* (60 Acres of Land vs 80, Modern Clubhouse Standards, Outings during off-peak times, and $5M of improvements [I'd be shocked if half of that was spent with the patchwork that has been done to date]) have brought me to my decision [to resign]." (emphasis added)); *id.* (September 17, 2018 resignation email from Scott Landsberg, stating "The primary motivation behind my resignation has been Concert Golf's refusal to respond to my repeated requests (i) to confirm in writing . . . the capital investments being implemented with regard to the two required capital phases *under our*

*Agreement of Sale* . . . (ii) to honor its commitment to retain 9 holes of the South Course (or to at

least offer an acceptable alternative in light of *its refusal to comply with the terms of our*

*Agreement of Sale regarding the South Course*), (iii) to provide evidence of the capital it has

spent to date, (iv) to provide evidence of its retention of the capital reserves generated as a

percentage of Member revenues *as required under our Agreement of Sale*, and (v) to create and

implement a business plan that honors its obligations *under our Agreement of Sale* to return

Philmont to an 'elite' country club status." (emphasis added)).)

Meyer testified that "the Philmont that was sold to Concert Golf and the Philmont that

exists today are two drastically different entities that has [sic] disrupted, you know, in my view

the lives of all of its prior members."  (Doc. No. 100-28, Ex. W at 117:17–22; *see also id.* at

117:22–23, 119:3–5 (Meyer's estimate that "90 plus percent" of prior PCC members "are no

longer members of the club" and his testimony that "[t]he membership changed drastically

because of, you know, the way Concert ran the club").)  Meyer also testified that he did not

believe the Concert Defendants "necessarily acted in accordance with what they said they were

going to do."  (*Id.* at 118:3–9.)

Meyer testified that the Concert Defendants had "discretion as to do what they wished" as

to the four general areas of capital improvements discussed and that the Concert Defendants did

"everything" that was "discussed."  (*See* Doc. No. 125-4, Ex. NN at 262:10–21.)  However,

according to Meyer, the improvements were not made in the manner PCC would have liked them

to be made; he stated that "everything they have done has been, you know, not first rate."  (*See*

Doc. No. 100-28, Ex. W at 119:20–120:6; *see also id.* at 120:10–121:2 ("I mean everything that

they undertook required it to be redone or needs to be redone again . . . Uhm, the bunkering that

they've done . . . almost needs to be all redone again.  And the golf course has not really been

improved, uhm, to the level that it needs.  Uhm, so it's – it just hasn't been, you know, first-rate execution along the way").)

### L.     *Meyer and Silverman Later Learn About CGP and Nanula's Discussions and Are Disconcerted*

Meyer did not learn that CGP and Ridgewood had been working together until after the sale.  (Doc. No. 149-1 at ¶ 158; Doc. No. 100-28, Ex. W at 113:4–9 ("Q: When did you first learn that Ridgewood had become involved with Concert Golf?  A [Meyer]: Uhm, I don't recall, but it was a significant time frame after we completed the sale.").)  When asked whether he would have voted to sell the club to the Concert Defendants had he known that "Concert Golf was telling Ridgewood to stand down and not make any offer to Philmont in exchange for . . . a deal that Concert was going to cut for Ridgewood," Meyer testified that "in [his] capacity as president, if the financial arrangement of the deal was going to be as stipulated, [he didn't] know that anything else would have changed our mind in that regard."  (Doc. No. 100-28, Ex. W at 20:9–21:23; *see also id.* at 25:24–26:22 ("Q: Would you have recommended that sale if you knew that Ridgewood had an interest in making an offer to Philmont, but refrained from doing so based on what Concert Golf – Concert saying they could get a better deal, would you still have recommended that deal?  A: . . . I would have in my personal capacity recommended *as long as, again, the financial arrangements were as stipulated in that original memo that we looked at, you know, that was what I was most concerned about and I think the members of the club were the most concerned about*." (emphasis added)).)  However, Meyer also testified had he known that Nanula "was speaking with another potential buyer to not continue to approach" PCC, that information would have been "disconcerting" to him.  (*Id.* at 36:20–37:13; *see also id.* at 117:14–16 ("Well, obviously learning of some of these negotiations behind our back is a little – you know, unsettling.").)

27

Nonetheless, according to Meyer, even if another offer were available, PCC may have still moved forward given its financial predicament and its desire to no longer operate the Club. (*See id.* at 40:16–42:21 ("Q: So given that, given your goal of maximizing return, if two potential bidders are – if they are talking with one another about their offers, would you agree that by doing that they are interfering with your goal to maximize the return for the members?  A: Potentially . . . Q: Can you explain your answer, Mr. Meyer?  A: . . . [I]f one offer were acceptable to us, uhm, irrespective of the fact that another offer may have been available, you know, the – the club still may have moved forward on that given the situation were in.  Q: If two offers were given to you, to the club, is it fair to say  based on your – your goal of maximizing return you would have picked the higher amount than the lower amount?  A: I would say not necessarily.  Q: And why is that?  A: Well, you know, because we – we wanted to be out of the club business so, you know, if we received one offer where we were going to have an operator versus another offer that was just for real estate deal there may have been some concerns about, you know, continuing to having [sic] to operate the club.").)

Silverman testified that his opinion of the agreement "would have changed" and he would have changed his vote if he had known that "Concert told Ridgewood to stay down."  (*See* Doc. No. 100-29, Ex. X at 65:20–66:21.  *But see id.* at 35:19–36:9 ("Q: [I]f you had known that Ridgewood and Concert, Concert Golf had cut a deal to work together, would it have changed your perspective on the offer that Concert Golf made?  A:  It – it *might* have.  Q: If you had known that Concert and Ridgewood were anticipating millions in extra profit from the deal, would you have thought differently about the deal that Concert was offering to Philmont Country Club?  A: *Possibly*." (emphases added)).)  Silverman also testified that Nanula "wasn't being very honest with us" and stated he does not "like doing deals with people that aren't honest."

(*Id.* at 45:23–47:2.)

### M.   The Limited Assignment Agreement Between PCC and NPT

On March 3, 2017, NPT initiated a lawsuit against CGP and PCC in the Montgomery

County Pennsylvania Court of Common Pleas (Case No. 2017-04395).  Approximately two-and-

a-half years later, on September 18, 2019, as part of the settlement, NPT and PCC entered into a

Limited Assignment of Claims Agreement.  (*See* Doc. No. 100-5, Ex. 1 to Ex. A.)  Under the

agreement, PCC (the Assignor) agreed to assign NPT (the Assignee)

> any and all claims, demands, and cause or causes of action of any
> kind whatsoever which Assignor has, may have, may have [sic], or
> may have had on or before March 1, 2017 against Concert Golf
> Partners LLC, Concert Philmont Properties, LLC, Concert
> Philmont, LLC, Peter Nanula, Ridgewood Real Estate Partners,
> Michael Plotnick, and Jonathan Grebow . . .

(*Id.*)  In addition, the assignment agreement contained a categorical exclusion for all

claims arising under the PSA:

> Assignee expressly acknowledges and agrees that Assignor is not
> assigning, and is specifically reserving to itself, any and all claims
> that it has against any/or all the Concert and Ridgewood Real Estate
> Partners, Michael Plotnick, and Jonathan Grebow under that certain
> Purchase and Sale Agreement dated February 6, 2017 by and among
> Philmont Country Club, Concert Philmont, LLC, and Concert
> Philmont Properties, LLC.

(*Id.*)  NPT brings all of its claims in the Amended Complaint as assignee.  (*See generally* Doc.

No. 59.)

## II.   Procedural History

NPT initiated this action against Defendants[26] on October 1, 2019.  (Doc. No. 1.)  NPT,

---

[26] NPT also named Concert Philmont, LLC, Concert Philmont Properties, LLC, and Ridgewood Philmont, LLC as Defendants in its original Complaint.  (*See* Doc. No. 1.)  However, the Court dismissed the only cause of action asserted against those entities—civil conspiracy, so they are no longer Defendants in this action.

individually and as PCC's assignee, asserted claims for fraud, breach of contract, conspiracy, and violations of federal antitrust law. (*Id.*) Defendants moved to dismiss the Complaint (*see* Doc. No. 13), and the Court granted the motion in part and denied the motion in part (Doc. Nos. 53–54.) The Court found that the fraud, antitrust, and civil conspiracy claims NPT asserted as assignee did not arise out of the PSA and, therefore, were not barred by the Limited Assignment of Claims between NPT and PCC. (*See* Doc. No. 53 at 26–30; *see also id.* at 27 ("At this stage in the litigation, the Court is not persuaded by Defendants' contention that the fraud claims arise under the PSA. Notably, Defendants fail to cite any applicable case law to support their position.").). Next, we dismissed the antitrust claims because NPT failed to establish an unreasonable restraint of trade. (*Id.* at 35–47.)

As to fraud, the Court found that the fully integrated PSA did not prevent NPT, as assignee, from asserting fraud claims against CGP and Nanula, as CGP and Nanula were not parties to the PSA; the Court was unpersuaded by Defendants' argument that general agency principles dictated otherwise. (*Id.* at 50–53.) The Court dismissed the fraud in the omission and fraudulent concealment claims, determining that Defendants did not owe PCC, which was a sophisticated entity engaged in an arms-length business transaction, a duty to speak. (*Id.* at 53–57.) The Court dismissed the fraud claim asserted against Ridgewood, Plotnick, and Grebow and the fraud claim asserted against CGP and Nanula to the extent it was based on representations about the riskiness of developing the Property or retaining 27 holes of golf, finding that NPT failed to allege justifiable reliance. (*Id.* at 60–64.) However, the Court permitted the fraud claim against CGP and Nanula to proceed to the extent it was based on the representation that they would spend $5 million in capital improvements. (*Id.*) The Court dismissed the aiding and abetting fraud claims. (*Id.* at 65–67.) The Court also dismissed the

30

civil conspiracy claim because NPT failed to plead actual malice.  (*Id.* at 67–69.)  Last, the Court denied the motion to dismiss NPT's breach of contract claim against Ridgewood, which was based on Ridgewood's alleged violation of a confidentiality agreement.  (*Id.* at 70–71.)

On August 26, 2021, NPT filed an Amended Complaint.  (Doc. No. 59.)  In the Amended Complaint, NPT, as assignee, brings a fraud claim against CGP and Nanula (Count I); a fraudulent concealment claim against all Defendants, brought pursuant to Restatement (Second) of Torts § 550 (Count II); a fraudulent nondisclosure claim against all Defendants, brought pursuant to Restatement (Second) of Torts § 551 (Count III); aiding and abetting fraud claims against Concert Defendants (Count IV) and Ridgewood Defendants (Count V); and a breach of contract claim against Ridgewood (Count VI).  (*Id.*)

Presently before the Court are the Ridgewood Defendants' and the Concert Defendants' motions for summary judgment.  (Doc. Nos. 100, 101.)  NPT opposes the motions.  (Doc. Nos. 116, 117.)  The Court held oral argument on the motions on July 19, 2022.

### III.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.

Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In examining the motion, we must draw all reasonable inferences in the nonmovant's favor.  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d

144, 159–60 (3d Cir. 2003).

Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from those facts" are matters left to the jury. *Anderson*, 477 U.S. at 255.

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, the nonmoving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The non-moving party must show more than the "mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## IV.   Discussion

In their motions for summary judgment, Defendants argue that:

- Summary judgment is warranted on the fraud claim NPT asserts as assignee against the Concert Defendants (Count I) because:

  - There is no evidence that CGP's representations were false when made or that CGP never intended to make the Initial Capital Improvements;

  - Plaintiff cannot show that PCC justifiably relied on the Concert Defendants' representations;

  - The PSA precludes the fraud claim because the claim arises under the PSA and because parol evidence cannot be introduced since the PSA was fully integrated;

  - NPT lacks standing to assert fraud claims against the Concert Defendants;

- The claim is barred by the gist of the action and economic loss doctrines; and

- The claim is barred by the statute of limitations.

• NPT cannot receive punitive damages for the fraud claim brought against the Concert Defendants (Count I).

• Summary judgment is appropriate on the fraudulent concealment and fraudulent nondisclosure claims brought against all Defendants under the Restatement §§ 550 & 551 (Counts II and III) because:

- NPT was not a party to the transaction and the Restatement only imposes liability on parties to a business transaction;

- There is no evidence that the Concert Defendants and/or Ridgewood Defendants intentionally concealed a material fact from PCC;

- CGP and Ridgewood did not have a duty to speak; and

- There is no evidence that the sale would not have occurred had Philmont known of Ridgewood and CGP's relationship.

• Summary judgment is warranted on the aiding and abetting fraud claims (Counts IV and V) because:

- There are no underlying fraud claims; and

- NPT has not produced evidence that the Concert Defendants and/or the Ridgewood Defendants "encouraged" and "assisted" in allege fraudulent acts.

• Summary judgment is appropriate on the breach of contract claim against Ridgewood (Count VI) because PCC did not suffer any damages.

(Doc. Nos. 100-2, 101)  The Court addresses NPT's fraud, fraudulent concealment, fraudulent nondisclosure, aiding and abetting fraud, and breach of contract claims below.

### A.    Fraud

As assignee, NPT asserts a fraud claim against the Concert Defendants, which arises out of affirmative misrepresentations CGP allegedly made to PCC concerning capital expenditures. (Doc. No. 59 at 26–27 (Count I).)  Specifically, NPT alleges that CGP falsely represented that it would make $4 million in initial capital improvements upon acquiring PCC and another $5 million in capital improvements upon the sale of the Property when, in fact, it never intended to

"expend[] the full amount" or "engage in those projects as represented." (*Id.* at ¶¶ 177–79.)

The Concert Defendants argue that the fraud claim should be dismissed because it is barred by the statute of limitations, the gist of the action doctrine, and the economic loss doctrine, among other reasons. (Doc. No. 100-2 at 8–22.) Because the gist of the action doctrine analysis is dispositive and bars NPT from bringing its fraud claim against the Concert Defendants, the Court does not address the Concert Defendants' other arguments as to why summary judgment is warranted on the fraud claim.

\* \* \*

"The 'gist of the action' doctrine is 'designed to maintain the conceptual distinction between breach of contract claims and tort claims [by] precluding plaintiffs from recasting ordinary breach of contract claims into tort claims.'" *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 229 (3d Cir. 2008) (quoting *eToll v. Elias/Savion Advert. Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002)). In analyzing the applicability of the gist of the action doctrine and determining whether a cause of action sounds in contract or tort, courts should consider whether the claim arises from "breaches of duties imposed by law as a matter of social policy" or from breaches of duties imposed by contracts between particular individuals. *See Toledo Mack Sales & Serv., Inc.*, 530 F.3d at 229; *eToll, Inc.*, 811 A.2d at 14 (cleaned up); *see also Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014) (explaining that the "nature of the duty alleged to have been breached . . . is the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract"); *id.* ("If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract . . . then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals,

which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.").

Where, as here, the precontractual statements that form the basis for the fraudulent inducement claim concern specific duties that are later outlined in the contract, courts in this Circuit routinely dismiss the claims as sounding in contract and thus barred by the gist of the action doctrine. *See, e.g.*, *Plexicoat Am., LLC v. PPG Architectural Finishes, Inc.*, 9 F. Supp. 3d 484, 487–88 (E.D. Pa. 2014 (collecting cases); *CRS Auto Parts, Inc. v. Nat'l Grange Mut. Ins. Co.*, 645 F. Supp. 2d 354, 377–78 (E.D. Pa. 2009) (collecting cases); *see also First United Bank & Tr. v. PNC Fin. Servs. Grp., Inc.*, 667 F. Supp. 2d 443, 450 (M.D. Pa. 2009) ("[S]everal district courts evaluating the gist of the action doctrine have held that fraudulent inducement claims are still barred when the fraudulent statements made during negotiations becomes the basis for a subsequently executed contractual duty."). In this same vein, a fraudulent inducement claim premised on an the allegation that a party to the contract never intended to abide by a provision in the contract is barred by the gist of the action doctrine. *See Malone v. Weiss*, Civil Action No. 17-1694, 2018 WL 827433, at *5 (E.D. Pa. Feb. 12, 2018) ("Permitting a fraudulent inducement claim in this case would essentially negate the entire [] gist of the action doctrine because a Plaintiff would have only to allege that Defendants never intended to abide by a provision in their contract in order to escape dismissal. Such is the case here. The only duty that defendants allegedly breached involved a breach of a duty enshrined in the Purchase Agreement—namely, the non-compete clause."); *see also Shoemaker v. HedgeCoVest LLC*, Civ. No. 20-6127, 2021 WL 6106423, at *1, *5 (E.D. Pa. Apr. 30, 2021) (finding that the gist of the action barred fraudulent inducement claim where the plaintiffs alleged that the defendant never intended to pay the plaintiffs the compensation they were promised under their contracts).

*Wen v. Willis* is illustrative.  117 F. Supp. 3d 673 (E.D. Pa. 2015).  The plaintiff alleged that defendant Willis fraudulently induced him to enter into a contract (the Foxcode Far East LLC Agreement (the "FFE Agreement")) and provide defendants Willis and Foxcode with $4 million by falsely representing that if he placed a $4 million investment with them, they would manage the money for his benefit, deliver a return on the investment, and guarantee that the $4 million principal would ultimately be returned in full once the investment was completed.  *Id.* at 682.  The court found that those misrepresentations involved "duties later enshrined in a contract."  *Id.*  Namely, the FFE Agreement provided that the defendants would "provide cash and all finance advisory services necessary to generate earnings," the plaintiff would receive 99.9% of the net profits, and when the FFE was dissolved, the plaintiff would receive distributions equal to $4 million.  *Id.* at 682–83.  Because "each of the Defendants' misrepresentations [the plaintiff] claim[ed] induced him to enter into the FFE Agreement [were] incorporated into the FFE agreement," the court held that the gist of the action doctrine barred the fraudulent inducement claims.  *Id.* at 683; *see also Plexicoat Am., LLC*, 9 F. Supp. 3d at 488–89 (holding that the gist of the action doctrine barred two of the plaintiff's fraud in the inducement claims where the plaintiff alleged that the defendant "represented it was ready, willing and able to comply with the terms and conditions set forth in the Agreement" and that it "would utilize its national sales and marketing team and programs to promote, market and advertise the sale of Plaintiff's products as" because those statements were "clearly enshrined in the Agreement," which provided that the defendants would "'use commercially reasonable effort' to promote and sell the Products and generate a minimum amount of sales"); *First United Bank & Tr.*, 667 F. Supp. 2d at 451 (concluding that the gist of the action doctrine barred the fraudulent inducement claims where "[i]t [was] clear that the[] representations and duties

detailed in the Master Agreement concern[ed] the same facts and circumstances that [the plaintiff] now alleges were misrepresented in order to induce it to enter the Master Agreement" and emphasizing that "the subject representations made during negotiations foreshadowed contractual duties and subsequently ripened into contractual provisions such that the duties allegedly breached were grounded in the contract itself"); *CRS Auto Parts, Inc.*, 645 F. Supp. 2d at 380 (finding that the gist of the action doctrine barred the plaintiff's fraud claim in part because "[a]ny contractual statements by Turley concerned coverage duties that were later outlined in the written insurance policy").

Here, NPT alleges that the Concert Defendants fraudulently induced PCC to enter into the PSA by falsely representing to PCC during negotiations that it would engage in certain capital improvement projects and that it would make $4 million in initial capital improvements upon acquiring PCC and another $5 million in capital improvements upon the sale of the Property. (Doc. No. 1 at ¶¶ 177–85.) Critically, these allegations involve duties that were outlined in the PSA. Sections 5.5(h) and 5.5(k) of the PSA provide (1) Concert Philmont LLC will "cause to be completed, and pay the costs of completion of, the [Initial Capital Projects] currently estimated by the Parties to cost approximately FOUR MILLION AND NO/100 DOLLARS" and (2) Concert Philmont LLC will "cause to be completed, and pay the costs of completion of," the Phase II Capital Projects "currently estimated by the parties to cost approximately FIVE MILLION AND NO/00 DOLLARS." (Doc. No. 100-35 at 25–27.) Attached to the PSA are exhibits that delineate the capital improvement projects to be undertaken. (*See id.*; *see also id.* at 59, Appendix A to the PSA.)

In its response, NPT asserts that the Concert Defendants' argument that the gist of the action doctrine bars the fraud claim necessarily fails because the Court "already found the gist of

the action doctrine inapplicable." (*See* Doc. No. 116 at 17–18.)  In so arguing, NPT misconstrues the Court's prior ruling at the motion to dismiss stage.  First, in the Court's August 18, 2021 Memorandum, the Court *sua sponte* considered the gist of the action doctrine in determining whether fraud claims arose under the PSA.  (*See* Doc. No. 53 at 27–29 ("*At this stage in the litigation*, the Court is not persuaded by Defendants' contention that the fraud claims arise under the PSA.  Notably, Defendants fail to cite to any applicable case law to support their position." (emphasis added)).)  Second—and most importantly—the Court only determined that the fraud claim as alleged in the *initial* Complaint sounded in tort.  But the allegations in the initial Complaint are fundamentally different from those alleged in the Amended Complaint, which was filed *after* the Court ruled on Defendants' motion to dismiss and is the current operative complaint.  To that end, the crux of the original fraud claim pertained to Ridgewood and CGP's alleged misrepresentations as to the riskiness of developing the Property, not capital expenditures.  (*See* Doc. No. 1 at ¶¶ 226–41.)

NPT also misstates the Court's prior Memorandum when it posits, "The Court has similarly observed that the gist of the action doctrine does not bar fraud claims where the defendant never intended to keep its promise to do something in the future." (Doc. No. 116 at 18 (citing Doc. No. 53 at 58).)  That is not what this Court held.  NPT conflates the Court's rulings on whether the fraud claim arose under the PSA (the context in which the Court discussed the gist of the action doctrine) and whether NPT can state a fraud claim when alleging fraud in connection with future promises.  (*Compare* Doc. No. 53 at 26–29 (discussing gist of the action doctrine) *with id.* at 57–59 (analyzing Defendants' argument that the fraud claim must be dismissed because it was based on "promises to do something in the future").)

In sum, because the representations concerning capital improvements that Plaintiff

alleges fraudulently induced PCC to enter into the PSA were ultimately incorporated into the PSA, NPT's fraud claim sounds in contract, not tort, and is barred by the gist of the action doctrine.[27] *See Wen*, 117 F. Supp. 3d at 683.  Accordingly, the Court grants summary judgment to the Concert Defendants on Count I.

### B.   *Fraudulent Concealment and Fraudulent Nondisclosure Claims*

In Counts II and III, NPT, as PCC's assignee, asserts fraudulent concealment and fraudulent nondisclosure claims against all Defendants under Restatement (Second) of Torts §§ 550 and 551, alleging that the Concert and Ridgewood Defendants failed to disclose that they were working together and actively concealed their relationship.  (Doc. No. 59 at 27–32.)

Section 550 applies to fraudulent concealment claims (i.e., active concealment), while Section 551 applies to fraudulent nondisclosure claims (i.e., mere silence).  Section 550 imposes liability when "one party to a transaction . . . by concealment or other action intentionally prevents the other from acquiring material information."  Restatement (Second) of Torts § 550. Section 551 imposes liability when "one . . . fails to disclose . . . a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction . . . if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question." Restatement (Second) of Torts § 551; *see also Gnagey Gas & Oil Co., Inc. v. Pa. Underground Storage Tank Indemnification Fund*, 82 A.3d 485, 501 (Pa. Cmw. Ct. 2013) ("[S]ection 551

---

[27] The fact that Nanula and CGP were not parties to PSA is of no moment, as they were agents of Concert Philmont and Concert Philmont Properties.  *See Williams v. Hilton Grp. PLC*, 93 F. App'x 384, 387 (3d Cir. 2004) ("[W]e hold that the District Court did not err in concluding that the doctrine barred Williams's claims against Ross, as well as his claims against Ladbrokes.  Although Williams did not have a contractual relationship with Ross, Williams cannot detach Ross from his status as an agent for Ladbrokes.  Ross served as the principal negotiator for Ladbrokes. . . . All of Ross's alleged misrepresentations concerned matters governed by the Letter of Intent between Ladbrokes and Williams.").

imposes liability for nondisclosure of information when the defendant has a specific duty to disclose, which arises only in certain, enumerated circumstances."). The key difference between the two is that a defendant can only be held liable for fraudulent nondisclosure under § 551 if a duty to disclose exists, while a defendant can be held liable for active concealment under § 500 even if a duty to disclose does not exist. *See* Restatement (Second) of Torts §§ 550–51; *see also Gnagey*, 82 A.3d at 501 ("[T]he *Colton* court explained how and why the doctrine of 'active concealment' constitutes fraud even if there is no independent legal duty to disclose information, while the concept of 'mere silence' requires the disclosure of information only if there is a positive statutory, regulatory, or legal duty mandating disclosure." (citing *United States v. Colton*, 231 F.3d 890 (4th Cir. 2000))); *Boardakan Rest. LLC v. Gordon Grp. Holdings, LLC*, Civil Action No. 11-5676, 2015 WL 4597970, at *11 (E.D. Pa. July 31, 2015) ("[W]here a party is accused of purposefully concealing information material to a transaction, no confidential or fiduciary relationship between the parties need exist for liability to be imposed. Pennsylvania has adopted the Restatement (Second) of Torts § 550, which imposes liability for intentional concealment of material information regardless of a duty to disclose."). In Pennsylvania, "the elements of fraud must be proven by clear and convincing evidence." *See Gnagey Gas & Oil Co.*, Inc., 82 A.3d at 493, 500 n.4 (noting that the presiding officer found that the "Fund presented clear and convincing evidence that Gnagey perpetrated a fraud in concealing the existence of the abandoned tanks and/or misrepresenting the number of tanks at the site" and ultimately affirming the presiding officer's holding that the hiding of the tanks constituted fraud); *see also SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 205, 212 (3d Cir. 2022) (holding that "the evidence produced by [the plaintiff] would allow a reasonable jury the option of concluding by clear and convincing evidence that Drexel misrepresented or concealed its own

projections for student enrollment").

In their motions for summary judgment, Defendants argue that the §§ 550 and 551 claims should be dismissed because the Concert and Ridgewood Defendants were not parties to a transaction with PCC; Defendants did not owe PCC a duty to speak and therefore a fraudulent nondisclosure claim cannot lie under § 551; and NPT has failed to produce evidence showing active concealment under § 550.

### 1. Whether the Concert Defendants and/or Ridgewood Defendants Were Parties to a Transaction with PCC

The Concert and Ridgewood Defendants argue that summary judgment is mandated on the fraudulent concealment and fraudulent nondisclosure claims because §§ 550 and 551 of the Restatement impose liability only on one who is a party to the transaction and CGP, Nanula, Ridgewood, Plotnick, and Grebow were not parties to the PSA.  (*See* Doc. No. 100-2 at 23–24; Doc. No. 101-1 at 11.)  In its response, NPT entirely fails to address the Concert Defendants' argument that CGP and Nanula were not parties to a transaction.  (*See* Doc. No. 116 at 25 (addressing only whether there was a business relationship between PCC and CGP/Nanula, as they were "discussing a business transaction," not whether CGP and Nanula were *parties* to the business transaction).)  As to the Ridgewood Defendants, NPT summarily asserts that they were parties to a transaction because they "participated in the transaction by colluding with the Concert Defendants."  (Doc. No. 117 at 16–17.)

Defendants are correct that §§ 550 and 551 impose liability only on one who is a party to a transaction.  Restatement (Second) of Torts §§ 550 (stating that "*one party to a transaction*" is subject to liability if he conceals or intentionally prevents the other party from acquiring material information); Restatement (Second) of Torts § 551 (explaining that "*one party to a business transaction* is under a duty to exercise reasonable care to disclose to the other before the

41

transaction is consummated" in certain circumstances); *accord LEM 2Q, LLC v. Guaranty Nat'l Title Co.*, 144 A.3d 174, 182 (Pa. Super. Ct. 2016) ("Indeed, the Restatement duties to disclose or provide complete information under Sections 529, 550, and 551 apply only in the context of a *business transaction between the parties*.")

There is scant case law on what constitutes a "party to a transaction" under § 550 and "a business transaction between parties" under § 551.  And the only two cases cited by Plaintiff and Defendants are not particularly analogous.  *See LEM 2Q, LLC*, 144 A.3d at 182 ("Here, Guaranty was a party only to the escrow and thus had no duties toward LEM in the mezzanine loan transaction.  In the separate escrow agreement contract, to which Guaranty was a party, the agreement itself conclusively sets forth Guaranty's duties and must be strictly construed."); *Gaines v. Krawczyk*, 354 F. Supp. 2d 573 (W.D. Pa. 2004) (finding no duty to speak to the public at large).[28]

*In re Rumsey Land Company, LLC* is instructive as to whether the Ridgewood Defendants were parties to a business transaction under § 551.  944 F.3d 1259 (10th Cir. 2019). In *In re Rumsey Land Company, LLC*, the Tenth Circuit considered whether a § 551 fraudulent nondisclosure claim could be brought against a third party in the context of a land sale.  *See generally id.*  Rumsey Land Company ("Rumsey") owned a property, and when Rumsey filed for

---

[28] Throughout its response, Plaintiff emphasizes the distinction between fraudulent concealment under § 550 and fraudulent nondisclosure under § 551 and the fact that a duty to disclose is only required under § 551—not § 550.  (*See* Doc. No. 117 at 13–16.)  And Plaintiff relies on *Gaines* to support its position that Ridgewood is a party to a transaction for purposes of § 550.  (*Id.* at 17.)  But, ironically, the *Gaines* court conflated § 550 and § 551 by holding that the plaintiffs could not bring a claim of fraudulent concealment under § 550 because there was no duty to speak to the general public or the residents of Homestead, Pennsylvania.  *See Gaines*, 354 F. Supp. 2d at 587–88 (citing Restatement (Second) of Torts § 550 and failing to mention § 551 but holding that "Plaintiffs have failed to advance any authority supporting the extension of the duty to speak in the manner necessary to sustain a fraudulent concealment claim based on the asserted non-disclosure of Krawczyk's past misdeeds to the general public or residents of Homestead, Pennsylvania").  In addition, the *Gaines* court did not hold that the plaintiffs in that case were parties to a transaction or involved in a business transactional relationship.

bankruptcy, Resource Land Holdings, LLC ("RLH") offered to purchase the property.  *Id.* at 1265.  When the bankruptcy court did not approve the sale, Pueblo Bank & Trust Company, LLC ("PBT") purchased the property at a bankruptcy auction and then transferred the land to RLH.  *Id.*  The Tenth Circuit affirmed summary judgment for RLH on the § 551 claim, holding that RLH was not a party to a business transaction under § 551.  *Id.*  The Court reasoned:  "Here, RLH was not a party to a business transaction with Rumsey.  Although RLH made an initial offer to purchase Rumsey's land and later placed an unsuccessful stalking horse bid on the property, RLH did not contract to buy anything from Rumsey.  It also never contracted to perform services for Rumsey, and it was not part of an employment relationship with Rumsey.  Rumsey identifies no other interaction with RLH that would constitute a business transaction."  *Id.* at 1274–75.

The Tenth Circuit's logic in *In re Rumsey Land Company, LLC* applies with equal force as to Ridgewood.  Like RLH, NPT contends Ridgewood initially showed interest in potentially purchasing a portion of the Property or the entire club from PCC in 2014, 2015, and then again in September 2016.[29]  (*See* Doc. No. 149-1 at ¶¶ 19, 60, 64; Doc. No. 124-1 at ¶ 8; Doc. No. 100-5, Ex. 9 to Ex. A (September 23, 2016 email from Plotnick to Meyer about wanting to "discuss a potential relationship at Philmont"); Doc. No. 100-5, Ex. 13 (September 27, 2016 email from Plotnick to Meyer, stating, "Thanks again for taking the time to speak with and tour Jonathan and I today.  As Jonathan mentioned, we very much intend to put a proposal in front of you, that at the least, we hope will open the stage for further discussion"); Doc. No. 100-5, Ex. 37 to Ex. A

---

[29] NPT insists that Ridgewood did not make an informal offer for $5 million, despite Meyer's testimony in 2021 that such an offer was made.  (July 19, 2022 Hr'g Tr. at 29:15–31:10.)  Viewing the facts in the light most favorable to NPT, the Court will not consider whether there was a $5 million informal offer for the nine-hole Property, as NPT contends the Court must infer that Meyer did not make an offer since he failed to mention it in 2018.  (*See id.*)

(executed copy of a September 29, 2016 confidentiality agreement between Ridgewood and PCC).)  And, like RLH, Ridgewood ultimately did not contract to buy anything from PCC. Viewing the facts in the light most favorable to NPT and drawing all inferences in NPT's favor, the Court infers from the fact that Plotnick and Meyer had several phone calls in October 2016 that there were ongoing discussions about Ridgewood's interest in purchasing a portion of the Property or the entire club.  But no reasonable juror could find from these facts that Ridgewood was a party to a business transaction.   At bottom, aside from Ridgewood's initial interest in making an offer to purchase a portion of the Property or the entire club, NPT has not identified— let alone pointed to any evidence of—any interaction that PCC had with Ridgewood that would constitute a business transaction.  NPT must set forth more than a mere scintilla of evidence to survive summary judgment, and it has not.  For these reasons, the Court finds that Ridgewood is not a party to a business transaction for purposes of § 551 and grants summary judgment to Ridgewood on NPT's fraudulent nondisclosure claim against it.

In addition, although the Court recognizes the distinction between §§ 550 and 551 (i.e., the language of "a party to a transaction" versus "party to a *business* transaction"), the Court finds that the same reasoning applies here with respect to whether the Ridgewood Defendants were a party to a transaction for purposes of § 550—NPT has not identified any transaction to which PCC and the Ridgewood Defendants were both parties.  The mere fact that Ridgewood showed interest in making an offer to PCC and followed up with telephone calls does not mean that they were parties to a transaction, whether business-related or not.  Thus, the Court grants the Ridgewood Defendants' motion for summary judgment as to the § 550 claim.

Whether the Concert Defendants were parties to a transaction with PCC for purposes of §§ 550 and 551 is a closer call.  Although this Court has held that CGP and Nanula were not

parties to the PSA (*see* Doc. No. 53 at 53 ("Because CGP and Nanula were not parties to the PSA, the integration clause does not apply to them and NPT's fraud claims against them survive the motion to dismiss.")), courts have stated that an individual can be a party to a *transaction* for purposes of §§ 550 and 551 liability even if they were not a party to the *contract* itself.  *See In re Rumsey Land Co., LLC*, 944 F.3d at 1273 n.9 ("Although contractual partners qualify as parties to a business transaction, a contractual relationship is not required under § 551(2)(b)."); *Church Mut. Ins. Co. v. Coutu*, Case No. 17-cv-00209-RM-NYW, 2015 WL 1517022, at *4 (D. Colo. Mar. 28, 2018) ("A 'party' is defined as 'someone who takes part in a transaction.' Although the dictionary gives as an example 'a party to the contract,' the Court does not consider that to be the universe of parties who can take part in a transaction." (quoting Black's Law Dictionary 1297 (10th ed. 2014)); *see also id.* at *3–4 (finding that the defendant–insurance adjuster was a party to the transaction for purposes of § 551 despite the fact that the adjuster was not named in the insurance policy or any other contract).  Because a "party to a transaction" is broader than a "party to a contract," the fact that CGP and Nanula were not parties to the PSA is not dispositive.

Undoubtedly, the record shows that Nanula and CGP were heavily involved in the negotiations for the transaction.  (*See, e.g.*, Doc. No. 125-1 at ¶ 76 ("Nanula gave Meyer his preliminary thoughts on a proposed transaction"); *id.* at ¶ 77 (describing "[t]he financial components of CGP's proposal"); *id.* at ¶¶ 79–80; *id.* at ¶ 83 ("On December 12, 2016, Nanula met with members of Philmont at the Club and made a power point presentation relating to CGP's proposal to acquire the Club.").)  It is undisputed that CGP incorporated Concert Philmont to purchase the Club (*id.* at ¶ 88) and that Concert Philmont was not incorporated until January 23, 2017 (*id.* at ¶ 17)—i.e., after CGP and Nanula's initial November 1, 2016 proposal

to acquire the Club and after Philmont's Executive Board voted to approve the PSA (*id.* at ¶ 86). Viewing the facts in the light most favorable to NPT, the Court cannot find that there is no material dispute of fact as to whether Nanula and CGP are parties to the transaction for the purposes of §§ 550 and 551. Therefore, the Concert Defendants' motion for summary judgment is denied as to this argument. *See Church Mut. Ins. Co.*, 2018 WL 1517022, at *4 n.2 ("Put another away, Coutu cannot reasonably expect to lob facts into a business transaction, such as Bensusan being able to act as an appraiser under an insurance policy requiring an impartial appraiser, and then walk away unscathed when those facts cause mayhem to the business transaction. In allegedly creating the mayhem, Coutu became part of the transaction.").

* * *

In sum, the Court finds that the Ridgewood Defendants were not parties to a business transaction under § 551 or parties to a transaction under § 550, and, therefore, we grant summary judgment in their favor on Counts II and III. Because we find that there is a genuine issue of material fact as to whether the Concert Defendants are parties to a business transaction under § 551 or parties to a transaction under § 550, the Court denies summary judgment on Counts II and II as to this argument.

Accordingly, the Court now turns to the Concert Defendants' remaining arguments on these Counts: first, we consider whether there was a duty to disclose, giving rise to a fraudulent nondisclosure claim under § 551, and second, we consider whether there are sufficient facts to show that the Concert Defendants actively concealed their relationship with Ridgewood from Defendants and that their relationship was material to the transaction, giving rise to a fraudulent concealment claim under § 550.

### 2. Restatement (Second) of Torts § 551

Next, the Concert Defendants argue that summary judgment is appropriate on NPT's

§ 551 fraudulent nondisclosure claim because they did not owe PCC a duty to speak.  As noted

above, a defendant can be held liable under § 551 only if there is a duty to disclose.  Restatement

(Second) Torts § 551(1) ("One who fails to disclose to another a fact that he knows may

justifiably induce the other to act or refrain from acting in a business transaction is subject to the

same liability to the other as though he had represented the nonexistence of the matter that he has

failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to

disclose the matter in question.").  Section 551(2) outlines the five circumstances that give rise to

a duty to disclose.  Specifically:

> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
>
> > (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and
> >
> > (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
> >
> > (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and
> >
> > (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
> >
> > (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Restatement (Second) of Torts § 551(2); *see also Schutter v. Herskowitz*, Civil Action No. 07-

3823, 2008 WL 2502132, at *5–6 (E.D. Pa. June 23, 2008); *Youndt v. First Nat'l Bank of Port*

*Allegany*, 868 A.2d 539, 550 (Pa. Super. Ct. 2005).

The Court finds that there is no genuine issue of material fact that the Concert Defendants did not have a duty to disclose its relationship with Ridgewood to PCC.  First, NPT has not pointed to any evidence showing that CGP and Ridgewood's partnership was a fact *basic* to the transaction.[30]  A comment to § 551(e) provides:

> A basic fact is a fact that is assumed by the parties as a basis for the transaction itself.  It is a fact that goes to the basis, or essence, of the transaction, and is an important part of the substance of what is bargained for or dealt with.  *Other facts may serve as important and persuasive inducements to enter into the transaction, but [do] not go to its essence.  These facts may be material, but they are not basic.*  If the parties expressly or impliedly place the risk as to the existence of a fact on one party or if the law places it there by custom or otherwise the other party has no duty of disclosure.

Restatement (Second) of Torts § 551, cmt. j (emphases added); *see also Schutter*, 2008 WL 2502132, at \*6; *Youndt*, 868 A.2d at 551.  The illustrations to the comment make clear that a fact can be important and still not go to the essence of the transaction—and therefore would not constitute a basic fact giving rise to a duty to disclose.  *Compare* Restatement (Second) of Torts § 551, cmt. j, illustration 3 ("A sells to B a dwelling house, without disclosing to B the fact that the house is riddled with termites.  This is a fact basic to the transaction.") *with id.*, illustration 4 ("A sells to B a dwelling house, knowing that B is acting in the mistaken belief that a highway is planned that will pass near the land and enhance its value.  A does not disclose to B the fact that no highway is actually planned.  This is not a fact basic to the transaction.").  In arguing that

---

[30] In the Court's prior Memorandum, the Court ruled on whether Defendants owed PCC a duty to disclose and, in particular, whether Ridgewood and CGP's relationship was basic to the transaction.  (*See* Doc. No. 53 at 53–57; *see id.* at 54 ("Here, NPT argues that Defendants had a duty to speak because the omissions were 'basic to the transaction' (i.e., PCC would not have entered into the PSA had it known that the development approvals were forthcoming *and/or that Ridgewood and CGP were working together*) and that subsequently acquired knowledge rendered previous representations Defendants made to PCC false . . . We disagree." (emphasis added).)

CGP and Ridgewood's relationship was a fact basic to the transaction, NPT cites only to Meyer

and Silverman's testimony.  (*See* Doc. No. 116 at 29 (citing Ex. X, 45:23–47:2,[31] 65:20–66:21;

Ex. W, 36:20–37:9, 54:10–54:22[32]).)  Silverman testified that, had "Ridgewood reached out to

Philmont independently of Concert . . . and then Concert told Ridgewood to stay down,

---

[31] This portion of Silverman's testimony largely goes to his dissatisfaction with the Concert Defendants not doing what they promised to do under the terms of the PSA (i.e., that they did not intend to follow through with the PSA, even before the PSA was executed) and Nanula's lack of honesty:

> Q: Would it have changed your outlook on the deal, 'deal' meaning selling the club to Concert Golf, if you knew that Mr. Nanula had different plans than he was telling Philmont Country Club?
>
> A: Yes.
>
> Q: Would it have changed your outlook on the deal if you knew that Mr. Nanula *was already planning to spend less than what he was telling Philmont Country Club*?
>
> A: Yes.
>
> Q: Would you have voted to sell the club had you known that Mr. Nanula and Concert Golf *were planning to spend less money than what they were promising on capital expenditures*?
>
> A: No.
>
> Q: Knowing what you know now, would you have approved the sale of the club to Concert Golf?
>
> A: No.
>
> A: Why not?
>
> A: Uhm, Peter wasn't being very honest with us.  I don't like doing deals with people that aren't honest.

(Doc. No. 100-29, Ex. X at 45:23–47:2 (emphases added).)

[32] This portion of Meyer's testimony relates to the capital expenditures CGP promised to make (i.e., its contractual obligations).  (*See* Doc. No. 100-28, Ex. W 54:10–54:22 ("Q: [I]f you knew that Mr. Nanula was promising to spend $5 million . . . but in reality he was planning to actually spend less than $5 million, would you have still voted to sell the club to Concert Golf?  A: [I]f I knew that that was his intention . . . that wouldn't have sat well with me, nor the members of the club.").)  Contrary to NPT's assertion, this does not show that "Ridgewood's and CGP's secret agreement . . . was basic to the transaction."  (*See* Doc. No. 116 at 29.)

therefore, not to have potentially two people interested in Philmont, that would have changed [his] opinion" of the transaction. (Doc. No. 100-29, Ex. X at 65:20–66:15.) Meyer testified that it would have been "disconcerting" to hear that Nanula had been speaking with another potential buyer about not approaching Philmont. (Doc. No. 100-28, Ex. W at 36:20–37:13.)

Silverman's testimony that he would not have voted to approve the PSA had he known of Ridgewood and CGP's relationship may show that that fact is *important* and Silverman wished he had known it, but it does *not* show that the fact is *basic* to the transaction. *See Schutter*, 2008 WL 2502132, at *2, *6–7 (granting summary judgment on fraudulent omission claim under § 551 and holding that a hostel's bed capacity was not basic to the transaction, even though the plaintiff only purchased the hostel based on his understanding that the hostel had a 70-bed capacity and sought to cancel the agreement of sale after learning that the hostel's bed capacity was in fact only 54 beds).[33] Silverman was but one vote. And, the Court is even less persuaded by NPT's contention that Meyer's testimony that the Defendants' relationship was "disconcerting" shows that relationship went to the essence of the transaction.

The record reflects that what was basic to the transaction was the fact that the Concert entities would pay off PCC's debt, ensure capital funding, make approximately $4 million in initial capital expenditures, an additional approximately $5 million in capital expenditures upon the sale of the Property, and take over all operations of the Club. (*See* Doc. No. 100-35, Ex. DD at 8 (indicating that the purchase price included the unpaid principal balance and accrued and unpaid interest on PCC's Fox Chase Bank loan, which bore an original principal sum of $1.2 million); *id.* at 25–27 (providing that Concert Philmont LLC would pay approximately $4

---

[33] NPT failed to cite a single case supporting its position that CGP and Ridgewood's relationship was basic to the transaction. (*See* Doc. No. 116 at 28–29.)

million for the initial capital projects and approximately $5 million for the second phase of capital improvement projects); *id.* at 2 (stating that Concert Philmont LLC would "establish and operate" the Club); *see also* Doc. No. 100-5, Ex. 14 to Ex. A (November 1, 2016 Proposal from CGP to PCC stating the key financial components of the transaction).)

Meyer's testimony underscores that CGP taking over as golf operator and CGP's monetary promises (i.e., paying off PCC's debt and spending $4 million in capital expenditures initially, followed by another $5 million upon the sale of the Property) were the bases of the transaction:

> Q: So given that, given your goal of maximizing return, if two potential bidders are – if they are talking with one another about their offers, would you agree that by doing that they are interfering with your goal to maximize the return for the members?
>
> A: Potentially. . . .
>
> Q: Can you explain your answer, Mr. Meyer?
>
> A: . . . [I]f one offer [was] acceptable to us, uhm, *irrespective of the fact that another may have been available, you know, the – the club still may have moved forwarded on that given the situation we were in.*
>
> Q: If two offers were given to you, to the club, is it fair to say based on your – your goal of maximizing return you would have picked the higher amount than the lower amount?
>
> A: *I would say not necessarily.*
>
> Q: And why is that?
>
> A: Well, you know, because we – we wanted to be out of the club business so, you know, if we received one offer where we were going to have an operator versus another offer that was just for real estate deal there may have been some concerns about, you know, continuing to having [sic] to operate the club.

(*See* Doc. No. 100-8, Ex. W at 40:16-42:21 (emphases added); *see also id.* at 20:9–21:3 ("Q: Mr. Meyer, had you known that before Philmont sold the club to Concert Golf that Concert Golf and Ridgewood, they were talking where Concert Golf was telling Ridgewood to stand down and not

make any offer to Philmont in exchange for . . . a deal that Concert was going to cut for Ridgewood, had you known that would you have voted to sell the club to Concert Golf? . . . A: Well, I think in my capacity as president, *if the financial arrangement of the deal was going to be as stipulated, I don't know that anything else would have changed our mind in that regard*." (emphasis added)); *see also id.* at 20:23–21:3 ("Q: Would you have recommended that sale if you knew that Ridgewood had an interest in making an offer to Philmont, but refrained from doing so based on what Concert Golf – Concert saying they could get a better deal, would you still have recommended that deal?  A: Well, Ridgewood had not made a formal proposal to me earlier, but had shared a number with me, uhm, that, you know, I chose to ignore because it was insufficient in my mind.  So again, you know, I – I would have in my personal capacity recommended as long as, again, *the financial arrangements were as stipulated in that original memo that we looked at, you know, that was what I was most concerned about and I think the members of the club were most concerned about*." (emphasis added).)

It is also noteworthy that, before the PSA was executed, Meyer provided Nanula with the contact information for NVR and NPT/Metropolitan.  (*See* Doc. Nos. 125-14, 173.)  This underscores the fact that Meyer and PCC understood CGP, a golf hospitality firm, would be working with a developer.  After receiving the contact information, Nanula stated that "it would be hard for [CGP] to work with [Stallone of NPT/Metropolitan]" in light of Stallone's criminal history, but added that "[r]egardless, [CGP would] find the right people to get this land transaction done."  (Doc. No. 173.)  Meyer responded, "Marty [Stallone] seems like a good guy *but that's your call*."  (*Id.* (emphasis added).)  That Meyer and PCC never inquired further as to whether or not CGP had found the "right developer" after learning that CGP would likely not be moving forward with NPT/Metropolitan, coupled with the fact that Meyer recognized that it was

CGP's "call" as to which developer to use, illustrate that CGP and Ridgewood's relationship was not a fact basic to the transaction.[34]

Citing to comment l to § 551, NPT argues that the Concert Defendants' behavior amounted to swindling.  (Doc. No. 116 at 29.)  *See* Restatement (Second) of Torts § 551, comment l ("In general, the cases in which the rule stated in Clause (e) has been applied have been those *in which the advantage taken of the plaintiff's ignorance is so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling, in which the plaintiff is led by appearances into a bargain that is a trap, of whose essence and substance he is unaware* . . . Thus a seller who knows that his cattle are infected with tick fever or contagious abortion is not free to unload them on the buyer and take his money, when he knows that the buyer is unaware of the fact, could not easily discover it, would not dream of entering into the bargain if he knew and is relying upon the seller's good faith and common honesty to disclose any such fact if it is true." (emphasis added)).

That Ridgewood could net a significant return from partnering with CGP does not mean that PCC was swindled.  The Court is not persuaded that the Concert Defendants' behavior shocks the conscience or that the Concert Defendants trapped PCC into a deal, the substance of

---

[34] Moreover, the fact that Ridgewood and CGP stood to make a significant profit working together is also not basic to the transaction.  Ultimately, NPT is upset that CGP may have gotten the better end of this business deal, which was based on real estate.  Each side had the same ability to obtain an appraisal and understand the potential worth of the Property and Club.  If PCC wanted to drive a harder bargain, it could have gotten an appraisal and tried to negotiate further and/or tried to attract other buyers.  But it did not.  Instead, driven by its distressed financial position, it chose to take the only deal on the table other than NPT's.  The fact of the matter is that PCC was distressed and in need of capital; that CGP and Ridgewood took advantage of PCC's financial woes does not make the Defendants' actions unlawful.  In fact, during oral argument, NPT could not identify a case providing that two companies cannot make plans to acquire a company together, unbeknownst to the seller.  (July 19, 2022 Hr'g Tr. at 62:1–10 ("[The Court]: Do you have a case that shows Concert and Ridgewood couldn't do what they did; in other words, two companies can't make plans to acquire a company together unbeknownst to the seller? . . . [A]: I'm not sure whether there is a case that talks about two companies cannot do that.").)

which it was unaware.  To the contrary, the record shows that PCC *was aware* that CGP, a golf operator, would want to partner with a developer to develop the Property, that PCC's then-President had passed along the information for a potential developer, and that under the terms of the PSA, the second phase of capital improvement projects would occur only after the sale of the *developed* Property.  It is undisputed that PCC was in a distressed financial situation.  And the record reflects that because of PCC's distressed financial circumstances, it did not push back during negotiations with the Concert Defendants or halt the transaction even when it believed it could have or should have received more monetary consideration in exchange for selling the Club and Property.  (*See, e.g.*, 123-5, Ex. MM at 186:17–188:12 (Meyer testifying that on November 2, 2016, he told Nanula he believed that PCC would receive the full proceeds of the sale of the Property to go towards capital improvements (i.e., phase two of the capital improvements projects) instead of just $5 million, that he ultimately understood Nanula's rationale to limit PCC's recovery to $5 million of the proceeds of the sale of the Property given the risks and costs of the development process, and that he decided to move forward with the transaction anyway because PCC was in a position of financial weakness and "didn't really have a whole lot of room to negotiate"); Doc. No. 125-5, Ex. 16 to Ex. A (said email exchange).) Likewise, PCC outright rejected NPT's two offers—which it received prior to executing the PSA with CGP—rather than try to start a bidding war between CGP and NPT.  (*See* Doc. No. 100-5, Ex. 22 to Ex. A (December 20, 2016 email from Meyer to Silverman, forwarding NPT's revised proposal and stating, "Hot off the press.  Not interested").)[35]

---

[35] There is no evidence that PCC seriously considered NPT's revised proposal, which outlined two different options.  Even viewing the evidence in the light most favorable to Plaintiff, the Court cannot find evidence from which a reasonable juror could infer that knowledge of CGP and Ridgewood's relationship would have changed PCC's course of action or the result (i.e., no reasonable juror could find that disclosure of their relationship would have led to a bidding war and, therefore, increased profits on

In sum, even when viewing the evidence in the light most favorable to Plaintiff, the Court cannot conclude that CGP and Ridgewood's relationship—and the fact that the pair would profit from that relationship—was a fact basic to the transaction.  *See Leprino Foods Co. v. DCI, Inc.*, 727 F. App'x 464, 476 (10th Cir. 2018) (rejecting the plaintiff's argument that the need for chloride-free insulation to reduce the risk of corrosion was basic to the plaintiff's agreement to purchase crystallizer tanks from the defendant and finding that although the facts "were important," they were "not necessarily basic").  *Contra Youndt*, 868 A.2d at 551 ("Appellants have alleged that Appellees knew of a defect in the sewage system that will cost approximately $28,000 to repair.  Considering that this cost is a significant percentage of the overall purchase price of $170,000, and that it was necessary to perform the work to use the property, and resolving any doubt in favor of Appellants, we conclude that the existence of the sewer defect was a fact basic to the transaction.").  In so holding, the Court emphasizes that NPT asserts this claim—and all other claims—as *assignee*.  It is clear that NPT believes it has been wronged. NPT is upset that Ridgewood and CGP partnered together to create a better business deal on their ends and received significant profits as a result of their partnership, while NPT was left out and received nothing.  But the only relevant question here is what facts *PCC—not* NPT—would have considered basic to the transaction.  And there is insufficient evidence in the record from which a reasonable juror could find that Ridgewood and CGP's relationship—and their subsequent profits—were basic to the transaction.

NPT also argues the Concert Defendants had a duty to disclose under § 551(2)(b).  (*See* Doc. No. 116 at 28–19 ("Ridgewood and CGP also had a duty to disclose their relationship because disclosure was necessary to prevent Ridgewood's backing out of its promise to make an

PCC's behalf).

offer to [PCC] from being misleading.").)  The Court is not persuaded.  As noted above, the § 551 claim against the Ridgewood Defendants cannot stand because they were not parties to a business transaction.  And, even to the extent that a statement about the mere intent to make an offer (i.e., a promise to make a promise) is a partial or ambiguous statement, as NPT posits, the *Ridgewood Defendants* are the ones who purportedly made this statement to PCC—*not* the *Concert Defendants*.  NPT has not cited a single case suggesting that an individual or entity can be held to have a duty to disclose and be responsible for clarifying a partial or ambiguous statement that *it did not make*.  As such, the Court finds that § 551(2)(b) did not impose a duty to disclose on the Concert Defendants.

In addition, NPT argues that there is a duty to disclose because Defendants were the only source of the information.  (*See* Doc. No. 116 at 28 ("Rather, the Defendants were the only source of the information that they were working together behind [PCC's] back to acquire Philmont Club at a cut rate price.  That this deception was undiscoverable, regardless of [PCC's] efforts, yields a duty to disclose.").)[36]  But this is *not* an enumerated circumstance that gives rise

---

[36] In so arguing, NPT cites to this Court's August 12, 2021 Memorandum, in which the Court cited to *Bucci v. Wachovia Bank, N.A.*, 591 F. Supp. 2d 773 (E.D. Pa. 2008), to show when there is a duty to speak under Pennsylvania law.  (*See* Doc. No. 53 at 53 ("Under Pennsylvania law, a duty to speak 'exists only in limited circumstances,' such as (1) 'when there is a fiduciary, or confidential, relationship between the parties'; (2) *where one party is the only source of information to the other party or the problems are not discoverable by other reasonable means*; (3) 'when disclosure is necessary to prevent an ambiguous or partial statement from being misleading'; (4) 'where subsequently acquired knowledge makes a previous representation false'; or (5) 'where the undisclosed fact is basic to the transaction.'" (citing *Bucci*, 591 F. Supp. 2d at 783) (emphasis added).)  However, in *Bucci*, the court *never* analyzed the Restatement (Second) of Torts § 551; rather, it mentions the Restatement only once, in passing, as part of a "see also" cite for when a duty to speak arises.  *See Bucci*, 591 F. Supp. 2d at 783.  As noted above, the Restatement does *not* provide that a duty to disclose arises "where one party is the only source of information to the other party."  *Bucci* also cites to *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604 (3d Cir. 1995) to support its duty to speak test.  *Id.*  In *Duquesne Light Co.*, the Third Circuit specifically enumerated the five circumstances in which a duty to speak arises under § 551 (which again does not include the "only source of information to the other party" prong).  *See* 66 F.3d at 611.  The Third Circuit noted that "while Pennsylvania courts have adopted the duty to speak requirement, the cases leave us uncertain of the extent to which Pennsylvania law includes the Restatement's discrete criteria for when a duty to speak arises" and then interpreted two Pennsylvania cases, one in which latent problems

to a duty to disclose under the *Restatement*.  *See* Restatement (Second) of Torts § 551(2)(a)–(e).

And NPT has made quite clear that it is pursuing a fraudulent nondisclosure claim based on the

*Restatement (Second) of Torts § 551*.[37]

Because the Concert Defendants did not owe PCC a duty of disclosure under any of the

circumstances enumerated in the Restatement (Second) of Torts § 551(2)(a)–(e), the Court grants

the Concert Defendants' summary judgment motion as to NPT's § 551 fraudulent nondisclosure

claim.

### 3.   Restatement (Second) of Torts § 550

Last, the Concert Defendants argue that summary judgment should be entered on NPT's

§ 550 fraudulent concealment claim because "NPT has no evidence that CGP or Nanula

intentionally concealed a material fact from [PCC]."  (Doc. No. 100-2 at 25.)

Fraudulent concealment is "characterized by deceptive acts or contrivances intended to

hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter."

*Gnagey Gas & Oil Co.*, 82 A.3d at 501 (quoting *Colton*, 231 F.3d at 898–99); *see also id.*

(explaining that concealment involves "the hiding of a material fact with the attained object of

creating or continuing a false impression as to that fact").  This includes "affirmative"

"suppression of the truth with the intent to deceive."  *Id.* at 501–02 (quoting *Colton*, 231 F.3d at

---

were "not discoverable by other reasonable means" and one in which one party "was the only reasonable source of the information."  *Id.* at 612.  It appears that this was the basis for the *Bucci* court's test—not the Restatement directly.

[37] Although the Court does not rely on this in so holding, the Court notes that as of January 20, 2017— *before* the PSA was executed—the Township was aware that Ridgewood and CGP were working together.  (*See* Doc. No. 116-14, Ex. 11 (January 20, 2017 email from Grebow to Nanula, stating "Meeting with the manager went well . . . He already knew about *you* and had been on *your website*.  Was thrilled that there were going to be one owner who wanted to integrated homes into club.  Really like that *we* are planning on utilizing 1 clubhouse and not 2." (emphasis added)).)  Thus, PCC could have learned this information (Ridgewood and CGP's relationship) from the Township, and not just the Concert and Ridgewood Defendants.

898–99).  *Gnagey Gas & Oil Co., Inc. v. Pennsylvania Underground Storage Tank Indemnification Fund* illustrates the type of conduct that constitutes active concealment.  There, the court held that the defendant, Gnagey, actively concealed eight abandoned tanks from the plaintiff, the Fund, which provided coverage to storage tank owners.  *Id.* at 496–97, 503–04.  The evidence showed that Gnagey had "discarded the abandoned tanks and the soil, and backfilled the excavated area without informing the Fund that it discovered the abandoned tanks"; "changed its invoicing procedure to the Fund" after discovering the abandoned tanks; and "issued three invoices to the Fund accompanied by photographs, narratives, and a chronology of daily work activities, all of which failed to document or disclose the abandoned tanks."  *Id.* at 503.  In addition, when Gnagey provided a site characterization report and remedial action plan to the Fund, it failed to describe or depict the eight abandoned tanks, rendering the report inaccurate under the Pennsylvania Department of Environmental Protection's regulations.  *Id.* And when asked specific questions related to the tanks, Gnagey failed to provide pertinent information.  *See id.*

As noted above, there is a difference between "passive concealment," which involves "mere nondisclosure or silence," and "active concealment."  *Id.*  (quoting *Colton*, 231 F.3d at 898–99); *accord U.S. ex rel. Rostholder v. Omnicare, Inc.*, 2012 WL 3399789, at *14 n.18 (D. Md. Aug. 14, 2012) ("'[C]ommon-law fraud includes acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to prevent the other party from acquiring material information.  Relator does not, however, allege any active concealment or suppression on the part of Omnicare.  He alleges only the failure to disclose." (quoting *Colton*, 231 F.3d at 898)).

Imposition of liability for fraudulent concealment "is commonly applied in two types of

situations, although it is not limited to them."  Restatement (Second) of Torts § 550, cmt. a.
"The first occurs when the defendant actively conceals a defect or other disadvantage in
something that he is offering for sale to another."  *Id.* (explaining, by way of example, that a
defendant "is subject to liability if he reads a contract to the plaintiff and omits a portion of it" or
if he arranges "stacks of aluminum sheets that he is selling [so] as to conceal defective sheets in
the middle of the pile").  "The second situation occurs when the defendant successfully prevents
the plaintiff from making an investigation that he would otherwise have made, and which, if
made, would have disclosed the facts; or when the defendant frustrates the investigation."  *Id.*,
cmt. b.  Neither of these situations is present here.  Mindful that is not dispositive, *see id.*, cmt. a,
the Court considers whether there is a genuine issue of material fact as to whether the Concert
Defendants intentionally prevented PCC from acquiring material information.  The Court
concludes there is not.

        In its response brief, NPT summarily asserts, without citation, "The evidence clearly
shows that the Defendants concealed their relationship and that concealment was material to the
transaction at hand."[38]  (*See* Doc. No. 116 at 26.)  Viewing all the facts in the light most
favorable to Plaintiff and drawing all inferences in its favor, the Court finds that a reasonable
juror could conclude that the Concert Defendants' actively concealed their relationship with

---

[38] NPT follows this by saying, "There is no dispute that the Defendants did not disclose their relationship
or [sic] working together to Philmont NPC."  (Doc. No. 116 at 26.)  NPT is correct—it is undisputed that
Defendants did not disclose that they were working together.  But neither this assertion—nor the single
citation to the record that follows—evidence active concealment of material information.  (*See id.* (only
citing SOF, ¶ 202, which in turn cites to an internal Concert email (Doc. No. 116-16) pertaining to capital
improvements and appears entirely unrelated to trying to hide or deceive PCC as to CGP and
Ridgewood's relationship); Doc. No. 116-2 at ¶ 202 ("In discussing the component of the Defendants'
agreement that yields a $7 million allocation for the Property, Mr. Nanula wrote to his associates:  'Next
$7m to CGP for land.  We promised members $5m of Phase 2 capex, which will be more like $4.5m.
Scrape $2.5m here.'").)  *See Gnagey Gas & Oil Co.*, 82 A.3d at 501–02 (explaining difference between
passive concealment and mere silence versus active concealment and suppression of the truth).

Ridgewood from PCC.  On November 2, 2016, Nanula emailed Plotnick, "I hope you guys will stand back, profess some concerns about the real estate risks, and just wait to see if I can strike a better deal for all of us here.  (*See* Doc. No. 100-5, Ex. 20 to Ex. A at 190.)  And on November 30, in response to receiving Meyer's email with the contact information of two firms (NPT and NVR), Nanula told Meyer that he would "find the right people to get this land transaction done" (Doc. No. 173)—notwithstanding the fact that he had told Ridgewood that he was ready to "paper [their] deal" the week prior (Doc. No. 100-5, Ex. 21 to Ex. A).

Nonetheless, even finding that Concert Defendants actively concealed their relationship, there is no evidence that this relationship was *material* information that deceived PCC into entering into the PSA.

As NPT notes, Pennsylvania's model jury instructions provide that a fact is material if it

> would be of importance to a reasonable person in determining a choice of action.  A material fact need not be the sole or even a substantial factor in inducing or influencing a reasonable person's decision.  A fact is also material if the maker of the misrepresentation knows that the person to whom it is made is likely to regard it as important even though a reasonable person would not regard it as important.

(Doc. No. 116 at 25–26 (quoting 17.240 (Civ) Fraud, Pa. SSJI (Civ), § 17.240 (2020)).)[39]  Here, the Concert Defendants did not create any false impression as to whether they would be working with a developer.  CGP's proposal provided that PCC would receive approximately $5 million of

---

[39] NPT cites two cases for the proposition that "the question of materiality cannot can be decided at the summary judgment stage unless the issues are 'so obviously important that reasonable minds cannot differ on the question of materiality.'"  (Doc. No. 116 at 26 (quoting *Parasco v. Pac. Indem. Co.*, 920 F. Supp. 647, 654 (E.D. Pa. 1996) and *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 (3d Cir. 1996)).)  Those cases arose in different contexts.  *See In re Westinghouse Sec. Litig.*, 90 F.3d at 714 (in the context of securities litigation, discussing whether "the alleged misrepresentations or omissions are so obviously unimportant to an investor"); *Parasco*, 920 F. Supp. at 654 (discussing materiality in the context of a breach of contract claim in an insurance case and "an insurer's post-loss investigation").  However, even applying that rule in this context, the Court finds that here, the omitted information is so obviously unimportant that reasonable minds could not differ on its materiality.

capital improvements only *upon the sale* of the *developed* Property.  It was no secret that CGP would be working with a developer, and PCC provided CGP contact information for a possible developer, namely NPT/Metropolitan.  After looking into NPT/Metropolitan, Nanula reported back to Meyer, stating, "It looks like Marty [Stallone] was involved in a muni bond-rigging scandal in the late 1980s," and that it would be "hard for [CGP] to work with him based purely on reputation concerns."  (Doc. No. 173.)  Nanula assured Meyer that CGP would find a developer.  (*See id.* ("[W]e will find the right people to get this land transaction done.").)  And Meyer's only response to CGP's search for the right developer was "that's your call."  (*See id.*) Without any evidence that PCC asked for any further information as to who CGP's developer would be and knowing that PCC believed it was CGP's call as to who they ultimately decided to use as a developer, Meyer's response illustrates that the Concert Defendants had no reason to believe that PCC considered its relationship with Ridgewood, as its developer, important to whether or not PCC agreed to CGP's proposal.  Even viewing the evidence and all inferences in the light most favorable to the Plaintiff, no reasonable juror could find the relationship between CGP and Ridgewood material to the transaction between CGP and PCC.

Further, there is no evidence from which a reasonable juror could find that the profits Ridgewood and/or CGP stood to gain were material to PCC.  To the contrary, the evidence shows that PCC did not even attempt to create a bidding war to drive up the sale price to increase its own profit when it received NPT's revised proposal in December 2016.  (*See, e.g.*, Doc. No. 100-5, Ex. 22 to Ex. A (Meyer's December 20, 2016 email to Silverman forwarding NPT's revised proposal, stating, "Hot off the press.  Not interested.").)  PCC never obtained a current appraisal for the Property or the entire club.  And PCC did not push back or drive a harder bargain to get CGP to expend more money on capital improvements following the sale of the

developed Property—things that could have increased its own profit as well. Even drawing all inferences in Plaintiff's favor, PCC's conduct illustrates what was material to the transaction— PCC's need to obtain an operator for the club and capital funding given its distressed financial situation, not whether CGP would maximize its profit from the deal. The Court concludes that no reasonable juror would find Ridgewood and CGP's relationship—and the profits they would garner from their separate and independent transaction—was material.

NPT relies on the evidence of disgruntled members to support its contention that Ridgewood and CGP's relationship was material. (*See* Doc. No. 116 at 26–27.) The Court disagrees. First, the resignation emails do not show that PCC members would have voted against the sale of the Club to CGP had they known of Ridgewood and CGP's relationship and the profits the Defendants stood to gain as a result of the deal. To the contrary, Russell complained that CGP *did not abide by the terms of the PSA*. (*See* Doc. No. 116-19, Ex. 16 at 4–5 ("*There is no regard for the agreement between Philmont and Concert golf* [sic] and I will clearly go on the record of saying Concert stole Philmont and *to date has yet to live up to any of the declarations in the* agreement . . . All of these 'ball drops' as Peter Nanula would refer to them, *along with the disregard to the contract* (60 Acres of Land vs 80, Modern Clubhouse Standards, Outings during off-peak times, and $5M of improvements [I'd be shocked if half of that was spent with the patchwork that has been done to date]) have brought me to my design [to resign.]" (emphasis added)).) Landsberg lodged a similar complaint. (*See id.* at 2–3 ("The primary motivation behind my resignation has been Concert Golf's refusal to respond to my repeated requests (i) to confirm in writing . . . the capital investments being implemented with regard to the two required capital phases under our Agreement of Sale . . . (ii) to honor its commitment to retain 9 holes of the South Course (or to at least offer an acceptable alternative in light of its refusal to comply

with the terms of our Agreement of Sale regarding the South Course), (iii) to provide evidence of the capital it has spent to date, (iv) to provide evidence of its retention of the capital reserves generated as a percentage of Member revenues as required under our Agreement of Sale, and (v) to create and implement a business plan that honors its obligations under our Agreement of Sale to return Philmont to an 'elite' country club status.").)  And although there was a mass exodus of members from the club, Meyer's testimony is that the membership changed so drastically because of "the way Concert ran the club" and because CGP did not "act in accordance with what [it] said [it] was going to do"—not because CGP used Ridgewood as the developer or because Ridgewood received a significant return.  (Doc. No. 100-28, Ex. W at 117:17–118:9.)

Second, although Meyer testified that it would have been "disconcerting" to him if Nanula told Ridgewood to stand down, he did not testify that that information alone would have changed his mind regarding approving the deal. (*See id.* at 36:20–39.  *Accord id.* at 28:8–21 ("Q: If you found out, if you learned before the sale of the club to Concert Golf, if you found out Ridgewood was going to make an offer with an increased amount but did not do so because Concert instructed Ridgewood not to make an offer, had you out about that, would you still have recommended the sale of the club to Concert Golf?  A: Again, I – I don't – that I can't answer.  I don't know the answer to that question.").)[40]  To the contrary, Meyer testified that so long as "one offer [was] acceptable to PCC, uhm, irrespective of the fact that another may have been available . . . the club still may have moved forward given the situation it was in."  (*Id.* at 42:2–

---

[40] NPT also cites Meyer's testimony that certain information would not have "sat well with [him], nor the members of the club."  (Doc. No. 116 at 27 (citing Ex. W, 54:10–22).)  But that information related to the amount of money CGP intended to spend on capital expenditures, *not* Ridgewood and CGP's relationship.  (*See* Doc. No. 100-28, Ex. W at 54:10–22 ("Q: . . . [I]f you knew that Mr. Nanula was promising to spend $5 million to you, but in reality he was planning to actually spend less than $5 million, would you have still voted to sell the club to Concert Golf?  A: . . . [I]f I knew that was his intention I would say I wouldn't – that wouldn't have sat well with me, nor the members of the club.").)

7.)  Third, even though Silverman testified that his opinion "would have changed" had he known that "Concert told Ridgewood to stay down," Silverman is but one vote.[41]  (*See* Doc. No. 100-29, Ex. X at 65:20–66:21.  *But see id.* at 35:19–36:9 ("Q: [I]f you had known that Ridgewood and Concert, Concert Golf had cut a deal to work together, would it have changed your perspective on the offer that Concert Golf made?  A:  It – it *might* have.  Q: If you had known that Concert and Ridgewood were anticipating millions in extra profit from the deal, would you have thought differently about the deal that Concert was offering to Philmont Country Club?  A: *Possibly*." (emphases added)).)  Ultimately, more than a mere scintilla of evidence is needed to survive summary judgment, and based on the present record, no reasonable juror could find by clear and convincing evidence that the Concert Defendants' relationship with Ridgewood constituted material information.

For these reasons, the Court grants summary judgment in favor of the Concert Defendants on NPT's § 550 fraudulent concealment claim.

### C.      *Aiding and Abetting Fraud*

In Counts IV and V, NPT, as assignee, brings twin aiding and abetting fraud claims

---

[41] To support its position, NPT also cites Silverman's statement that he would not have approved the sale knowing what he knows now:

> Q: Knowing what you know now, would you have approved the sale of the club to Concert Golf?
>
> A: No.
>
> A: Why not?
>
> A: Uhm, Peter wasn't being very honest with us.  I don't like doing deals with people that aren't honest.

(Doc. No. 116 at 26 (citing Ex. X, 45:23–47:2).)  But even drawing all inferences from that testimony in Plaintiff's favor, it does not show that Ridgewood and CGP's relationship—or the profits they would receive as a result of their deal—was important to Silverman.

against the Concert Defendants (Count IV) and the Ridgewood Defendants (Count V).

Because we dismissed the fraud claims brought against all Defendants, *supra* Sections IV.A and IV.B, there is no fraud for which either the Concert Defendants or the Ridgewood Defendants can have aided and abetted.  *See The Roskamp Inst., Inc. v. Alzheimer's Inst. of Am., Inc.*, Civil Action No. 15-3641, 2015 WL 6438093, at *10 (E.D. Pa. Oct. 23, 2015) ("Plaintiffs in this case fail to allege an actionable underlying fraud that the Foundation could have aided and abetted . . . Absent a viable claim of fraud, the Foundation could not have aided and abetted any tort.").  Accordingly, we grant summary judgment to all Defendants on Counts IV and V.

### D.     Breach of Contract Claim

In Count VI, NPT, as assignee, asserts a breach of contract claim against Ridgewood, alleging that Ridgewood breached a confidentiality agreement with PCC by disseminating PCC's confidential information to two separate entities, ClubCorp and Morningstar Golf & Hospitality, LLC.  (Doc. No. 59 at 36.)  Ridgewood moves for summary judgment on this claim, arguing that because Silverman testified that PCC suffered no damages from Ridgewood's breach, NPT cannot prove an essential element of a breach of contract claim.  (Doc. No. 101-1 at 6 n.2, 17.) We disagree.

Under either New Jersey or Pennsylvania law,[42] actual damages need not be established to survive summary judgment on a contract claim.  *See Wolfe v. Allstate Prop. & Cas. Ins. Co.*, 709 F.3d 487, 497–98 (3d Cir. 2015) ("Under Pennsylvania law, if a party is able to prove breach of contract but can show no damages flowing from the breach, the party is entitled to recover nominal damages.  A grant of summary judgment on the sole basis of absence of provable

---

[42] Ridgewood appears to argue that Pennsylvania law applies.  (*See* Doc. No. 101-1 at 17 (citing case applying Pennsylvania law).)  NPT counters that New Jersey law applies, citing to a choice of law provision in the Confidentiality Agreement.  (*See* Doc. No. 117 at 24 n.4.)

damages, therefore, is generally improper.  Federal courts applying Pennsylvania law have agreed with the impropriety of summary judgment in such a situation.  Therefore, even without compensatory damages, an insurer can be liable for nominal damages for violating its contractual duty of good faith by failing to settle.  Accordingly, we affirm the District Court's denial of the motion for summary judgment as to the breach of contract claim." (cleaned up)); *Stevenson v. Env't Servs., Inc. v. Diversified Royalty Corp.*, Civil No. 08-1386, 2018 WL 5033749, at *6 (D.N.J. Oct. 16, 2018) ("[T]he Court holds that Diversified's 'no damages' argument does not support granting summary judgment to Diversified as to Stevenson's breach of contract claim."); *Fagal v. Marywood Univ.*, Civil Action No. 3:14-cv-02404, 2017 WL 4540613, at *8 (M.D. Pa. Oct. 11, 2017) ("[I]t is generally inappropriate for a court to grant summary judgment based solely on a failure to prove damages flowing from a demonstrated breach of contract."); *see also Interlink Grp. Corp. USA, Inc. v. Am. Trade & Fin. Corp.*, Civil Action No. 12-6179 (JBC), 2014 WL 3578748, at *7 (D.N.J. July 18, 2014) ("The New Jersey Supreme Court has held that proof of actual damages is not necessary to survive summary judgment on a breach of contract claim: 'the general rule is that whenever there is a breach of contract . . . the law ordinarily infers that damage ensued, and, in the absence of actual damages, the law vindicates that right by awarding nominal damages.' . . . Applying New Jersey law, courts in this district have allowed breach of contract claims to proceed despite proof of actual damages." (quoting *Nappe v. Anschelewitz, Barr, Ansell & Bonnello*, 477 A.2d 1224 (N.J. 1984)); *Norfolk S. Ry. Co. v. Pittsburgh & W.Va. R.R. & Power Reit*, No. 2:11-cv-1588-TFM, 2014 WL 2808097, at *19–20 (W.D. Pa. June 19, 2014) (rejecting the defendant's argument that the plaintiffs had not been damaged and that summary judgment was warranted as to their breach of contract claim because at a minimum, nominal damages were proper to the extent the plaintiffs prevailed on liability);

*Haywood v. University of Pittsburgh*, 976 F. Supp. 2d 606, 645 (W.D. Pa. 2013) ("Haywood's motion for summary judgment must, therefore, be denied because the University, if it proves the other elements of a claim for breach of contract, may be entitled to nominal damages."). Accordingly, the Court denies Ridgewood's motion for summary judgment as to the breach of contract claim.

### V.  Conclusion

For the foregoing reasons, the Court grants summary judgment to the Concert Defendants on Counts I (fraud), II (§ 550), III (§ 551), and IV (aiding and abetting) and grants summary judgment to the Ridgewood Defendants on Counts II (§ 550), III (§ 551), V (aiding and abetting). The Court denies summary judgment to Ridgewood on Count VI (breach of contract).

An appropriate Order follows.